**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 (Subchapter V) |
| MVMT Labs, Inc., | Case No. 26-11113 (TMH) |
| Debtor.[1] | |

**DECLARATION OF MICHAEL ROBINSON IN SUPPORT OF MVMT
LABS, INC.'S CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

I, Michael Robinson, hereby declare under penalty of perjury:

1. I am the Chief Restructuring Officer ("CRO") for the above-captioned debtor and debtor-in-possession ("Labs" or the "Debtor"). I am also a Partner at Province, LLC ("Province"), the proposed financial advisor to the Debtor. The Debtor engaged Province in April 2026.

2. Province is a nationally-recognized financial advisory firm focusing on growth opportunities, restructurings, and fiduciary-related services. I am a seasoned corporate restructuring professional in high-profile board, buyside, and advisory roles. My background includes large and complex financial restructurings, operational transformations, mergers and acquisitions, interim management, distressed financings, and litigation-orientated investments.

3. I have over fifteen (15) years of experience in the financial services sector, initially through my work in investment banking advisory where I advised on a number of significant transactions across diverse industry verticals, and then through my work in restructuring advisory in which I have directly managed many in-court and out-of-court restructurings. Additionally, I

---

[1] The last four digits of the Debtor's federal tax identification number are 5217. The Debtor's service address is c/o Legalinc Corporate Services Inc., 131 Continental Drive, Suite 305, Newark, New Castle County, DE 19713.

am a Certified Insolvency and Restructuring Advisor, awarded from the Association of Insolvency and Restructuring Advisors, of which I am a member.

4.      On July 15, 2026 (the "Petition Date"), Labs filed a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case").  Labs is eligible, and has elected, to proceed under Subchapter V of title 11 of the United States Code (the "Bankruptcy Code").  Labs continues to manage and operate its business as debtor-in-possession pursuant to section 1184 of the Bankruptcy Code.  To minimize any disruption or other adverse effect resulting from the filing of the Chapter 11 Case, Labs is filing contemporaneously herewith several motions seeking certain "first day" relief (collectively, the "First Day Motions").[2]  I submit this declaration (this "Declaration") in support of the Debtor's voluntary petition and the relief requested in the First Day Motions and to assist the Court and parties-in-interest in understanding Labs, its business, and the circumstances leading to this Chapter 11 Case.

5.      Except as otherwise indicated herein, the statements in this Declaration are based on (i) my personal knowledge of, and familiarity with, Labs's operations, finances, restructuring efforts, and evaluation of strategic alternatives; (ii) my review of relevant documents and information provided to me by employees of or advisors to Labs or their professionals; (iii) my opinion based on my experience and knowledge of Labs's operations and financial and business affairs, including my general knowledge of the industry in which Labs operates; and (iv) Labs's records maintained in the ordinary course of business.  I have obtained this information during my tenure working with Labs and its professionals, including Labs's corporate and restructuring counsel.  In making this Declaration, I have also relied on information and materials that Labs's

---

[2]    In connection with the filing of its chapter 11 petition, Labs filed the First Day Motions requesting relief that the Debtor believes is necessary to enable it to administer its estate with minimal disruption and loss of value during this Chapter 11 Case.

personnel and advisors have gathered, prepared, verified and provided to me, in each case under my ultimate supervision, at my direction or for my benefit in preparing this Declaration.

6.      I am not being compensated specifically for this testimony other than through payments received by Province as its financial advisor.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.  I am over the age of 18 years and authorized to submit this Declaration on behalf of Labs.

7.      To better familiarize the Court with Labs and its business, this Declaration is organized into the following sections:

- **Part I** provides background information regarding the Debtor, its business, and capital structure;

- **Part II** describes the circumstances leading to this Chapter 11 Case; and

- **Part III** discusses the First Day Motions.

## I.   BACKGROUND

### A.      The Debtor's Business and History

8.      Labs, a Delaware corporation, was founded in 2023 by its then-sole directors Cooper Scanlon ("Scanlon") and Rushikesh Manche ("Manche").  Labs's registered office is c/o Legalinc Corporate Services Inc., 131 Continental Drive, Suite 305, Newark, New Castle County, DE 19713.

9.      Labs was formed as a development company in the crypto industry that developed and licensed intellectual property, including specialized software, applications, smart contracts, and blockchain protocols, associated with the blockchain-based network known as the "Movement Network", in connection with the governance, deployment and minting of cryptocurrency, called $MOVE tokens.

3

10.    On September 9, 2024, Labs entered into a Tripartite IP Licensing and Services Agreement (the "Tripartite Agreement") with Movement Network Foundation, a Cayman Islands exempted foundation company ("Foundation") and its subsidiary, Movement Limited, a British Virgin Islands company ("ML").   Under the Tripartite Agreement, among other things, Labs licensed its software and intellectual property rights ("IP") to ML, transferred certain IP rights to Foundation and provided engineering and technical services required for the purposes of launching and supporting the $MOVE token.  In exchange for Labs's services and IP rights under the Tripartite Agreement, Labs received an allocation of $MOVE tokens payable by ML.

11.    Foundation serves in a variety of capacities with respect to maintaining the stability and continuity of the Movement Network.  ML is the minter and issuer of $MOVE tokens. Foundation and ML are not affiliates of — and do not share any common control or ownership with — Labs.  ML is an affiliate of Foundation.

12.    On December 9, 2024, the $MOVE token was launched, following which it briefly traded at prices in excess of $1.00 per $MOVE token.  The price has since declined by nearly 99% and $MOVE tokens were trading around $0.01 per $MOVE token around the time of the Petition Date.

13.    As described in more detail below, following the launch of the $MOVE token, Labs became aware of market-making irregularities, calling into question the conduct of Manche and certain third parties at and around the time of the launch, and which threatened the entirety of the $MOVE token ecosystem.  These irregularities and the publicity[3] that followed thereafter made Labs's continued role in the $MOVE token ecosystem untenable.  In addition, as a result of the

---

[3]    *See e.g.*, https://www.coindesk.com/tech/2025/04/30/inside-movement-s-token-dump-scandal-secret-contracts-shadow-advisors-and-hidden-middlemen.

irregularities, disputes arose between Foundation and Labs with respect to the Tripartite Agreement.

14.     Labs sought to maximize the value of its assets and ensure that as many of its obligations as possible were satisfied.  Consistent with its fiduciary duties, Labs also sought to protect the value of the $MOVE token ecosystem for the benefit of those who had invested in Labs through SAFEs and Warrants (both as defined below), its creditors, equity holders, and other stakeholders. Labs determined that the best course of action was to (1) monetize the value of the team it had built through a transaction with Move Industries (defined below) whereby Move Industries agreed to employ certain Labs team members and pay Labs $1.2 million in exchange for the right to do so, (2) settle certain disputes with Foundation and ML under the Tripartite Agreement by agreeing to assign its remaining intellectual property and key contracts to Foundation and forgo its token-distribution rights in exchange for a cash payment and Foundation's commitment to deliver tokens on account of certain of Labs's legitimate token-denominated obligations, subject to certain terms and conditions, and (3) wind-down its business affairs.  The results of those efforts are described in greater detail below.

15.     Currently, Labs's sole commercial activity consists of (i) providing certain transition services to Foundation and Move Industries to help effectuate the Fenix Agreement and the Transfer Agreement (each as defined below) and (ii) coordinating with Foundation pursuant to the Fenix Agreement with respect to certain alleged contractual obligations of Labs for the delivery of $MOVE tokens under Warrants (defined below) issued by Labs to third parties.

B.     **Corporate Structure**

16.     The majority of Labs's common stock is held directly by its two co-founders: Scanlon holds approximately 65.75% of the total equity, Manche holds approximately 34.25%.

Additionally, Lucas Vinzon holds less than 0.10% of the outstanding shares. Labs does not have any subsidiaries or parent entities.

17. Currently, Labs's board consists of Matt Kahn as the sole independent director. There are no other directors or officers except for me in my capacity as CRO. Prior to the Petition Date, Scanlon had served as the sole director of Labs and its Chief Executive Officer. In the interests of ensuring both governance and officer independence for this Chapter 11 Case, Scanlon resigned from both his director and officer positions. He has agreed to remain available and assist with this Chapter 11 Case as a consultant and independent contractor to assist Mr. Kahn and myself.

### C. Pre-Petition Capital Structure

#### i. Funded Indebtedness & Intercompany Loans

18. Labs has no secured or unsecured funded indebtedness.

19. In connection with its founding and the planned launch of the $MOVE token, Labs raised capital through two primary means. The first means was through the sale of Simple Agreements for Future Equity ("SAFEs"), which are a common form of fundraising for startup companies. As the term implies, participants in a SAFE transaction pay consideration up front in exchange for a commitment to be issued equity at some point in the future after the occurrence of a defined triggering event. SAFEs are not considered to be debt because there is not a maturity date or an interest component. Labs had numerous rounds of SAFE offerings and raised over $40 million thereunder.

20. On March 31, 2025, Labs closed a Series B preferred stock financing (the "Series B Placement"), in which the SAFEs were intended to convert into Series B preferred stock and the Series B investors were to receive a combination of equity and $MOVE tokens (or rights thereto).

6

As a result of the discovery of the irregularities in April and May 2025, Labs rescinded the Series B Placement by mutual agreement with the lead investors.  Approximately $12.7 million of cash was returned to investors, the corresponding Series B shares were cancelled, and tokens delivered in connection with the round were returned.  As a result of the recission, the SAFE conversions did not occur.

21.     Also as part of the SAFE fundraising, and in certain other cases, Labs entered into warrant agreements ("Warrants") whereby Labs agreed to deliver $MOVE tokens to the Warrant holders.  In some cases, the consideration for the Warrant was entry into SAFEs by third-party investors.  In other cases, the consideration for the Warrant was the provision by a third party of in-kind services related to the operations of Labs.

### ii.     Assets

22.     Labs holds no material operating assets.  Its remaining assets consist principally of: (a) approximately $60,000 in cash on hand; (b) residual contractual rights; and (c) litigation claims and causes of action related to the irregularities surrounding the launch of the $MOVE token.

### iii.     Equity and Other Interests

23.     Labs is a privately held corporation and the full breakdown of its ownership structure for its common stock is discussed in Sections I. B.  and I.C. *supra*.

## II.  EVENTS LEADING UP TO THE CHAPTER 11 CASE

**A.     Investigations, Series B Recission, and Subsequent Governance Reset**

24.     The key events precipitating this Chapter 11 filing relate to the $MOVE launch and subsequent dilution of the token price, alleged wrongful activity in connection therewith, and related counterparty actions.

25.     In early 2025, following the launch of the $MOVE token and subsequent decline in token price, Binance Holdings Limited ("Binance"), the operator of a major cryptocurrency exchange on which $MOVE tokens were traded, commenced an investigation after discovering that an unnamed market-maker sold approximately 66 million $MOVE tokens for a profit of approximately $38 million, without executing corresponding buy orders.  To protect its users, Binance notified Labs and Foundation about the violations, froze the market-maker's proceeds, and banned the market-maker from continuing to engage in market-making activities on its platform.

26.     Upon learning of these allegations, Labs initiated an internal investigation in late April and early May 2025 into the alleged $MOVE token market-making irregularities.  In connection therewith, Labs implemented certain governance actions to separate co-founder Manche as an employee and officer and to remove him as a director of the company.  Manche had primary responsibility at Labs for matters relating to the launch and market-making of the $MOVE token.  Manche disputed these actions by Labs before ultimately dismissing his claims with prejudice.  Subsequently, Manche filed the Advancement Action (as defined and discussed further below).

27.     Following the commencement of the internal investigation, Foundation, ML and Labs agreed to terminate the Tripartite Agreement.  Foundation informed Labs that it believed that Labs was in breach of the agreement, and that Foundation and ML wished to sever their association with Labs in light of the serious allegations involving the irregularities surrounding the launch of the $MOVE token and the resulting harm to the Movement Network.  Contemporaneously therewith, Labs was running out of operating capital.  Ultimately, Labs's remaining board, including a disinterested then-board member designated by Labs's lead investor,

determined that it was in the best interests of Labs and those to whom Labs's board owed fiduciary duties, including Labs's investors—many of whom were $MOVE token holders—to maximize the value of Labs's assets, minimize cash burn, and help preserve the $MOVE token ecosystem by removing Labs from any active involvement in the Movement Network, thereby creating a clean go-forward structure for the Movement Network to continue.

28.     To continue building, operating, and growing the $MOVE token ecosystem after the contemplated termination of the Tripartite Agreement, however, Labs needed to be replaced by another cryptocurrency development company.  Foundation, whose corporate remit is to foster and support the research, development, extension and use of the Movement Network, $MOVE tokens and related technology, selected Move Ind. Inc. ("Move Industries") to fill that role.  Labs considered various options to monetize the value of the team it had built, but which imposed substantial operating expenses on it, and concluded that releasing the bulk of the Labs team from employment agreements in order to allow them to transfer to Move Industries in exchange for cash consideration was the only realistic value-maximizing transaction, absent which Labs would have had to terminate the majority, if not all, of its employees and contractor relationships for no value, and incur liabilities relating to those terminations.   To that end, on October 14, 2025, Labs and Move Industries entered into the Project Fenix (Labs – Industries) Term Sheet that outlined a transaction under which Labs would release certain employees and contractors from non-competes, allowing Move Industries to employ or engage, as applicable, such Labs employees and contractors, in exchange for $1.2 million.  On November 26, 2025, Labs and Move Industries entered into the Team and Asset Transfer Agreement (the "Transfer Agreement") that formally memorialized the transaction.

29.    To address issues under the Tripartite Agreement and as a way to resolve Labs's $MOVE token delivery obligations to the greatest extent possible, on December 2, 2025, Labs, Foundation, and ML entered into the Termination and Settlement Agreement (the "Fenix Agreement"), pursuant to which (i) the Tripartite Agreement was terminated; (ii) Foundation agreed, subject to know-your-customer ("KYC") and know-your-business ("KYB") checks satisfactory to Foundation, to settle, pursuant to a form of token undertaking agreement between Foundation, ML, Labs and the token recipient, Labs's obligation to deliver $MOVE tokens to counterparties pursuant to valid (and not fraudulent) and undisputed token delivery agreements with Labs; (iii) Foundation agreed to pay Labs $6.9 million (less amounts outstanding on certain loans provided by Foundation); (iv) Labs assigned to Foundation remaining IP rights and key operating agreements relating to the Movement Network and technologies that allow users to transact in $MOVE tokens; (v) Labs agreed to provide certain transition services to assist with the transfer and delivery of IP rights and the KYC and KYB process; and (vi) the parties granted mutual releases, subject to certain exclusions (including for fraud and willful misconduct).  Labs determined that the Fenix Agreement was the transaction most likely to maximize the value of its assets, because it would result in a much-needed cash infusion for Labs, Foundation's settlement of Labs's obligation to deliver $MOVE tokens to counterparties pursuant to valid (and not fraudulent) and undisputed token delivery agreements with Labs, and the avoidance of potential litigation with Foundation and ML that Labs would not have been able to afford, and which almost certainly could not have resulted in an outcome more favorable to Labs or its creditors.

30.    At the time of the Fenix Agreement, Labs was aware of an investigation by the Department of Justice (the "DOJ Investigation") related to the activities surrounding the launch and market-making of the $MOVE token.  Labs lacks D&O insurance that would cover the defense

or indemnification of Manche and the other officers and directors serving at the time of the $MOVE launch and market-making activities that arose prior to the commencement of the Chapter 11 Case, including with respect to the DOJ Investigation.

31.    The Fenix Agreement resulted in the transfer of substantially all of Labs's operating assets in exchange for cash, which Labs intended on using to manage litigation and to wind down Labs's business.  Given the complexity of issues and the potential for litigation on multiple fronts to exhaust those limited funds, and the need for Scanlon, General Counsel Joseph Golding-Ochsner ("Golding"), and others to remain on to facilitate the orderly implementation of the Fenix Agreement, Foundation (i) entered into indemnification and release agreements with Labs's now-former officers, Scanlon and Golding, and (ii) agreed to provide sufficient cash consideration under the Fenix Agreement to allow Labs to retain Scanlon's and Golding's services and settle certain litigation claims.  The indemnification and release agreements were disclosed to Labs's board, and the disinterested director approved the retention and settlement arrangements.

B.    **The Debtor's Current Status**

32.    Following the termination of the Tripartite Agreement, Labs retains no material operating assets and conducts no operating business.  As of the Petition Date, Labs does not have any full-time employees.  Instead, Labs has independent contractor agreements in place with Scanlon and Golding, as well as my engagement as CRO, which will allow Labs to continue its ongoing business functions, including supporting Labs with wind-down, regulatory cooperation, litigation oversight, and work with Foundation to perform the remaining transition services and assist with token delivery obligations under the Fenix Agreement.

33.    Although Labs does not hold any material operating assets, it does retain the following assets:  (i) limited cash on hand; (ii) residual contractual and indemnification rights; and

11

(iii) potential litigation assets, including but not limited to the following potential claims, causes of action, and litigation recoveries: (a) counterclaims and affirmative claims in the Arbitration and the Lei Action (each defined below); (b) potential affirmative claims arising out of the alleged wrongdoing in connection with the market-making conduct, the December 2024 token launch, and related activities and market irregularities; and (c) other claims and causes of action against former officers, directors, advisors, consultants, and counterparties. The Debtor intends to investigate these claims and causes of action and the alleged wrongful activity that contributed to the significant drop in the $MOVE token price and deterioration of the Debtor's financial condition. Faced with increasing liquidity issues and pending litigation, the Debtor filed this Chapter 11 Case with the goal of confirming a plan under subchapter V of the Bankruptcy Code that will create a litigation trust to preserve and pursue claims and causes of action for the benefit of Labs's estate and creditors.

C.      **Pending and Threatened Litigation Against the Debtor**

34.     Labs is subject to significant ongoing and potential future litigation claims, including with respect to the launch of the $MOVE tokens and related market-making activity brought by various governmental agencies, delivery or payment on account of the tokens, and employee advancement and indemnification obligations brought by Labs's former officers.

*Government Investigation*

35.     Labs is subject to an ongoing investigation by the United States Attorney's Office for Northern District of California and related federal authorities concerning the December 2024 launch of $MOVE tokens and related market-making activity. No charges have been filed against Labs. Labs has cooperated with the investigation through counsel.

12

*Active Civil Litigation*

36.     Currently, Labs is party to two actions:

i.   On January 16, 2025, Metaverse Technology Company FZE ("Metaverse") commenced an arbitration claim in a JAMS arbitration seated in New York, JAMS Ref. No. 5425003221 (the "Arbitration"), asserting claims arising out of Labs's failure to deliver crypto assets owed under an advisory agreement. The claim is pending in arbitration before JAMS. On December 5, 2025, Lihuimei Lei ("Lei"), the founder and CEO of Metaverse, filed a separate action in the United States District Court for the Southern District of New York, *Lihuimei Lei v. MVMT Labs, Inc.*, Case No. 25-cv-10123 (the "Lei Action"), seeking to stay arbitration and obtain declaratory relief. Lei asserted that she was being improperly compelled to participate in an arbitration between Snow and Labs in New York to which she did not agree. Specifically, Lei sought a declaration that no agreement to arbitrate exists between her and Labs, as well as an injunction prohibiting Labs from pursuing claims against her in the arbitration. On May 18, 2026, Lei voluntarily dismissed the case without prejudice, and the dispute has since been consolidated with the arbitration.

ii.  On December 3, 2025, Manche filed an action in the Court of Chancery of the State of Delaware, *Rushikesh Manche v. MVMT Labs, Inc.*, Case No. 2025-1407-CDW (the "Advancement Action"), seeking advancement from the corporation for fees and expenses incurred in connection with a federal investigation of Labs. On March 6, 2026, Magistrate Wright issued a report granting Manche's claim for advancement and holding that Manche is entitled to fees-on-fees. On March 11, 2026, Labs filed a notice of exceptions to the Magistrate's report. On June 12, 2026, Vice Chancellor Laster issued an order overruling the exceptions and adopting the report as final (the "Advancement Order"). Upon information and belief, Manche has expended over $1.6 million in legal fees which would be entitled to be paid under the Advancement Order.

The defense of these claims significantly drained Labs's operating resources, including the cash it received upon the closing of both the Fenix Agreement and the Transfer Agreement.

*Threatened Civil Litigation*

37.     Several of Labs's former advisors and counterparties have asserted, but not yet filed, claims against Labs related to Warrants or other agreements relating to the delivery of

$MOVE tokens.  Those claims principally seek delivery of additional $MOVE tokens, cash payments, or both, for services purportedly rendered in connection with the launch of the $MOVE token, the operation of Labs, or the development of the Movement Network.  It is the position of Labs that these claims are not valid contractual claims due to, *inter alia*, breach of contract and/or the non-binding source of such claims, or because they relate to bad acts in connection with the launch, trading and market-making of the $MOVE token, and such claims are vigorously disputed by Labs.

**D.      Liquidity Issues**

38.      Currently, Labs does not have sufficient cash to, among other things, fulfill its obligations under the Fenix Agreement and the Transfer Agreement or to wind down its affairs, especially amidst pending litigation.  Further, Labs has no assets, other than illiquid litigation assets, which could be monetized to fund its obligations.

**E.      Retention of Debtor's Advisors and Determination to File the Chapter 11 Case**

39.      Against this backdrop, the Debtor evaluated all available alternatives to a Chapter 11 filing.  However, the Debtor was left with critical liquidity needs that could not be funded outside of a formal restructuring process.  In light of the pending and threatened litigation and growing liquidity constraints, the Debtor considered the appointment of restructuring advisors to assess and explore the Debtor's strategic alternatives.

40.      In April 2026, the Debtors retained Potter Anderson & Corroon LLP ("Potter") as restructuring counsel and Province as its financial advisor to evaluate a variety of strategic restructuring alternatives.

41.      On July 12, 2026, Matt Kahn was appointed to Labs's board as the sole independent director (the "Independent Director").  The Independent Director is disinterested and independent

14

with respect to all claims that may be asserted against former directors and officers and has been empowered by the board with full authority to review, consider and approve strategic alternatives for the Debtor, or to maximize value for its creditors through liquidation or commencement of a bankruptcy proceeding.  After careful consideration of all available alternatives and deliberation with the Debtor's advisors, the Independent Director determined that filing this Chapter 11 Case under subchapter V of the Bankruptcy Code is in the best interests of the Debtor's creditors and other stakeholders and is the most appropriate mechanism for liquidating the Debtor's assets and maximizing potential recovery to creditors.  In particular, the Debtor believes it has colorable claims and causes of action that retain real value and the Chapter 11 Case is intended to provide a stable platform from which the Debtor can preserve, pursue, and maximize that value for the benefit of all parties in interest.

42.     The Debtor's goals in this Chapter 11 Case are to:

i.   Continue to work cooperatively with Foundation to identify valid (and not fraudulent) and undisputed Warrants and to request that Foundation resolve Labs's token issuance obligations for such Warrants pursuant to the Fenix Agreement; and

ii.  Establish a litigation trust to pursue Labs's claims and causes of action, including those related to the irregular market-making surrounding the issuance of the $MOVE tokens.

43.     To get to confirmation of a plan and establish the litigation trust, the Debtor requires immediate access to additional liquidity; without it, the Debtor will (i) be unable to continue operating and satisfying its contractual obligations to Foundation and (ii) lack the funding to pursue and liquidate litigation claims and causes of action of significant value.  Accordingly, the Debtor will be seeking approval of a DIP financing package (the "DIP Facility") to fund operations through confirmation of a plan and an exit facility to fund a litigation trust.

44.     To that end, prior to the Petition Date, the Debtor negotiated the DIP Facility with MNF DIP SPV Ltd. (the "DIP Lender"), a Cayman Island exempted company and a subsidiary of Foundation.    Province contacted 15 potential alternative sources of post-petition financing on behalf of the Debtor to gauge their interest in providing debtor-in-possession financing to the Debtor.  Although 10 of those parties initially responded, 6 subsequently declined, 1 held an initial call with Province, and only 3 entered into a non-disclosure agreement with the Debtor. Unfortunately, none of the parties were willing to provide financing on a fully unsecured basis or on better terms than the proposed DIP Facility.  Following a series of arm's-length negotiations with the DIP Lender, the Debtor ultimately agreed to the terms of the proposed DIP Facility, which provides the Debtor with sufficient runway to administer the Chapter 11 Case, confirm a plan under subchapter V of the Bankruptcy Code, and fund a litigation trust on reasonable terms given the Debtor's situation and the unique circumstances of the case.  For all of these reasons, the Debtor has an urgent and immediate need for entry of the interim order requested in the DIP Motion (as defined below).

### III.  FIRST DAY MOTIONS

45.     Contemporaneously herewith, the Debtor has filed several First Day Motions seeking orders that grant various forms of relief intended to stabilize the Debtor's business operations, facilitate the efficient administration of the Chapter 11 Case, and expedite a swift and smooth sale process.  On or around the Petition Date, the Debtor filed the following First Day Motions:

- **DIP Motion**. *Debtor's Motion for Entry of Interim and Final Orders (A) Authorizing Debtor to Obtain Post-Petition Financing and to Grant Security Interests and Super-Priority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 362, and 364; (B) Authorizing the Debtor to Use Cash Collateral; (C) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (D) Scheduling a Final Hearing; (E) Approving the*

*Settlement Between the Debtor and Movement Network Foundation; and (F) Granting Related Relief* (the "<u>DIP Motion</u>");

- **Cash Management Motion**. *Debtor's Motion for Entry of Interim and Final Orders (A) Authorizing the Maintenance of Bank Accounts and Continued Use of Existing Business Forms and Checks; (B) Authorizing the Continued Use of Existing Cash Management System; (C) Granting Limited Relief from the Requirements of Bankruptcy Code Section 345(b) and the U.S. Trustee's Operating Guidelines; and (D) Granting Related Relief;*

- **Reliable Retention Application**. *Debtor's Application for Authorization to Employ and Retain Reliable Companies d/b/a Reliable as Claims and Noticing Agent Effective as of the Petition Date*; and

- **PII Redaction Motion**. *Debtor's Motion for Entry of an Order (A) Authorizing the Debtor to Redact Certain Personally Identifiable Information; (B) Authorizing the Debtor to Serve Certain Parties by Electronic Mail; (C) Approving Certain Notice Procedures; and (D) Granting Related Relief.*

46.     **The PII Redaction Motion**.  Through the PII Redaction Motion, the Debtor seeks, among other things, (a) authority to redact certain personally identifiable information, (b) authority to serve certain parties by electronic mail; and (c) approval of certain notice procedures.  In my opinion it is appropriate to authorize the Debtor to redact from any paper filed or to be filed with the Court in this Chapter 11 Case the telephone numbers and home and email addresses of individual creditors as such information can be used to perpetrate identity theft and phishing scams or to locate survivors of domestic violence, harassment, or stalking.  Moreover, absent such relief, the Debtor could potentially be exposed to civil liability and significant financial penalties. Further, I believe email service is appropriate in this Chapter 11 Case under certain circumstances because, prior to the termination of the Tripartite Agreement, the Debtor conducted its business through an online cryptocurrency platform and communicated with its customers and other parties in interest primarily through electronic means and other web-based applications.  Indeed, the Debtor has in excess of 300 parties that are counterparties to SAFEs, counterparties to Warrants, or were customers of the Debtor who will require service of certain notices and other documents

17

filed in the Chapter 11 Case. The Debtor's books and records contain reliable email addresses for substantially all customers and creditors, and email is the method of communication through which such parties historically received important communications from the Debtor in the ordinary course of business.

47. **The DIP Motion**. Through the DIP Motion, the Debtor seeks, among other things: (a) authority to enter into a secured superpriority, multi-draw term loan debtor-in-possession financing in an amount of up to $5.7 million, of which (i) $750,000 will be available within 7 days after the later to occur of (x) entry by the Bankruptcy Court of an interim order (the "Interim DIP Order") approving the DIP Facility on an interim basis, and (y) the entry into a credit agreement and other definitive documents with respect to the DIP Loans as agreed to between the DIP Lender and the Debtor; (ii) $2.55 million shall be available in two additional tranches following entry of a final order (the "Final DIP Order" and, together with the Interim DIP Order, the "DIP Order") approving the DIP Facility; and (iii) an additional $2.4 million shall be available upon entry of an order confirming a plan under subchapter V of the Bankruptcy Code; (b) authority to use DIP cash collateral; (c) authority to assume the Fenix Agreement; and (d) subject to entry of the Final DIP Order, approval of the global resolution with the Foundation Parties (as defined in the DIP Motion).

48. The Debtor has limited liquidity to continue business in the ordinary course and satisfy accruing administrative expenses. For that reason, the Debtor requires debtor-in-possession financing to fund its Chapter 11 Case and ensure the administrative solvency of the Debtor's estate through confirmation of a plan. Absent the funding available under the DIP Facility, the Debtor would be unable to sustain operations and meet contractual obligations, pay its independent contractors, or achieve a successful outcome through the Chapter 11 process. Accordingly, the

18

Debtor has an urgent and immediate need for entry of the Interim DIP Order as requested in the DIP Motion.

49.    As described above, the Debtor was unable to obtain post-petition financing on a fully unsecured basis or on better terms than the proposed DIP Facility.  Ultimately, following a series of arm's-length negotiations with Foundation, the Debtor agreed to the terms of the proposed DIP Facility, which provides the Debtor with sufficient runway to confirm a plan under subchapter V of the Bankruptcy Code on reasonable terms.  Accordingly, the DIP Facility offered by the DIP Lender represents the best and only financing option available to the Debtor under the unique circumstances of the case.

50.    The DIP Lender made clear in its negotiations with the Debtor that it would not agree to lend unless the Debtor agreed to:  (i) pay the fees and expenses set forth in the DIP Term Sheet; (ii) assume the Fenix Agreement as part of the transaction; and (iii) grant releases to the DIP Lender and the other Foundation Parties from any claims that may arise out of any prior conduct of the Foundation Parties, or any interaction or relationship (alleged or otherwise) with the Foundation Parties, *provided*, *however*, that the releases shall not include any rights of the Debtor with respect to any breach by a Foundation Party of its obligations under the Fenix Agreement.

51.    Given the thorough negotiations with the DIP Lender and the Debtor's assessment that it was unlikely to find better currently available alternatives given the lack of working capital, operational assets, and unique circumstances of the case, agreeing to these terms was a reasonable exercise of the Debtor's business judgment.

52.    With limited cash on hand, and mounting litigation threats, the Debtor requires the proceeds from the DIP Facility to fund operations during the Chapter 11 Case.  Absent immediate

access to the DIP Facility and use of cash collateral, the Debtor will have insufficient liquidity to satisfy, among other things, (a) its working capital and business operating needs while it continues to satisfy its contractual obligations and wind down its affairs; (b) the administrative costs of this Chapter 11 Case; and (c) the funding requirements necessary to confirm a plan and pursue estate claims and causes of action for the benefit of all stakeholders. Any delay or inability to draw under the DIP Facility will require the Debtor to cease operations and cause immediate and irreparable harm to the value of the Debtor's estate to the detriment of all stakeholders. For all of these reasons, the Debtor has an urgent and immediate need for entry of the interim order requested in the DIP Motion.

53. It is also my belief that the proposed global resolution with Foundation (and the DIP Facility that coincides with it) is fair, reasonable, and in the interest of the estate. First, the proposed releases under the global resolution are not prejudicial to the rights of creditors in the Chapter 11 Case, because the Fenix Agreement already contains substantially similar mutual releases for the same conduct. Second, the DIP Facility that travels as part of the settlement will allow a litigation trustee to pursue claims and causes of action, which would otherwise be lost without funding, against the rightful targets, for the benefit of the Debtor's estate. Moreover, the settlement is the product of good-faith negotiations between the Debtor and the DIP Lender, and the agreement falls well within the range of reasonable litigation outcomes as to each of the issues encompassed by the settlement. More specifically, the proposed resolution will allow the Debtor, its creditors and its estate to avoid the costs, risks, and delay attendant to litigating certain matters before the Court, particularly related to the structure of the Tripartite Agreement, the launch of the $MOVE token and the circumstances surrounding the same, the prepetition relationship between the Debtor and Foundation, and certain advancement rights between the parties, while affording

20

the Debtor the ability to preserve valuable estate claims and causes of action to be pursued by a litigation trust. Finally, the proposed settlement (and DIP Facility that coincides with it) will preserve the go-forward relationship between the Debtor and Foundation under the terms of the Fenix Agreement, which will allow Foundation to continue to issue $MOVE tokens to counterparties under valid arrangements, thus avoiding further harm to those who have that have already been injured by the alleged improprieties.

54. For these reasons, I believe the proposed global resolution that is intertwined with the DIP Facility is fair, reasonable, and in the interest of the estate.

55. In my capacity as CRO to the Debtor, I believe the relief requested in the First Day Motions is necessary and essential to ensuring the Debtor's immediate needs are met, and that the Debtor (and other constituencies) will not suffer any immediate and irreparable harm as a result of the commencement of this Chapter 11 Case. My opinion as to the necessity of the First Day Motions is based upon my firsthand experience as CRO to the Debtor, and my firsthand experience as a Partner at Province, in its capacity as financial advisor to the Debtor, and my review of various materials and information provided to me by the Debtor and the Debtor's other advisors, as well as discussions had in connection therewith. In considering the necessary first-day relief, the Independent Director, the Debtor's advisors, and I were cognizant of the level of cash on hand and, in light of these limitations, narrowed the relief requested at the outset of the Chapter 11 Case to only those matters that require urgent relief to preserve value during the pendency of this case.

56. I have reviewed each of the First Day Motions (including the exhibits and schedules thereto) and am familiar with the content and substance contained therein. The facts set forth in each First Day Motion are true and correct to the best of my knowledge and belief with appropriate reliance on other officers and advisors and I can attest to such facts.

57.     For a more detailed description of the First Day Motions, I respectfully refer the Court to the respective First Day Motion.  The facts set forth in each of the First Day Motions, listed below, are incorporated herein in their entirety.  To the extent that this Declaration and the provisions of any of the First Day Motions are inconsistent, the terms of the First Day Motions shall control.

58.     The Debtor has tailored its requests for immediate relief to those circumstances when the failure to receive such relief would cause immediate and irreparable harm to the Debtor and its estate.  I believe an orderly transition into chapter 11 is critical to the viability of the Debtor's operations and that any delay in granting the relief described below could hinder the Debtor's operations and cause irreparable harm.  Other requests for relief will be deferred for consideration at a later hearing.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct.

Dated: July 17, 2026

By:     */s/ Michael Robinson*
Name: Michael Robinson
Title:   Chief Restructuring Officer

22