**Exhibit A**.

**Execution Version**

**DATED: DECEMBER 2, 2025**

**MVMT LABS INC.**

**(LABS)**

**MOVEMENT NETWORK FOUNDATION**

**(FOUNDATION)**

**and**

**MOVEMENT LIMITED**

**(TOKEN ISSUER)**

**TERMINATION AND SETTLEMENT AGREEMENT**

**THIS AGREEMENT** (this "**Agreement**") is made on 2 December 2025.

**BETWEEN**:

(1) **MVMT Labs Inc.,** a United States corporation with registered address at 166 Geary St, STE 1500 #1853, San Francisco, CA 94108 ("**Labs**");

(2) **Movement Network Foundation**, an exempted foundation company incorporated under the laws of the Cayman Islands whose registered office is at 71 Fort Street, PO Box 10035, George Town, Grand Cayman KY1-1001, Cayman Islands ("**Foundation**"); and

(3) **Movement Limited**, a company incorporated in the British Virgin Islands whose registered office is at Trinity Chambers, PO Box 4301, Road Town, Tortola, British Virgin Islands ("**Token Issuer**", and, together with Labs and Foundation, the "**Parties**" and each a "**Party**".)

**RECITALS**

(A) On 9 September 2024, Labs, Foundation and Token Issuer entered into a Tripartite IP Licensing and Services Agreement (the "**Tripartite Agreement**").

(B) The Parties acknowledge that the Foundation and Token Issuer (together, the "**Foundation Parties**") consider there to be valid bases to terminate the Tripartite Agreement for cause pursuant to section 7.2(B), although no formal notice of termination has been delivered pursuant to section 7.2(B). Nevertheless, the Parties wish to terminate the Tripartite Agreement with immediate effect pursuant to section 7.2(A) thereof.

(C) Subject to the other terms of this Agreement, in full satisfaction of all obligations between the Foundation Parties and Labs under the Tripartite Agreement and otherwise, the Parties are prepared to agree that: (i) the Foundation Parties would deliver $MOVE tokens ("**Tokens**") to certain counterparties to Token delivery agreements with Labs, subject to know-your-customer and know-your-business checks satisfactory to the Foundation Parties and such parties entering into appropriate documentation with the Foundation Parties and Labs; (ii) intellectual property and agreements owned by Labs relating to the Move platform and technologies that allow users to transact Tokens (the "**Move Ecosystem**") will be assigned to Foundation; (iii) mutual releases will be granted; and (iv) a cash payment will be made by Foundation to Labs, all subject to the terms of this Agreement.

(D) It is contemplated that Labs and Move Ind. Inc ("**Move Indus**") will enter into a separate transaction (the "**Move Indus Transaction**") whereby certain employees, consultants and contractors of the Labs team will become employed by or consultants or contractors of Move Indus in order to allow Move Indus to provide services with respect to the Move Ecosystem in place of the services that Labs was expected to perform under the Tripartite Agreement.

## 1. DEFINITIONS AND INTERPRETATION

1.1 In this Agreement, unless the context otherwise requires:

**"Confidential Information"** means and includes any and all information and data not in the public domain, including know-how and trade secrets, relating to, or contained or embodied in this Agreement, and/or the business or affairs of a Party. Confidential Information may be communicated electronically, orally, visually, in writing, or in any other recorded or tangible form. Without limiting the generality of the foregoing, "Confidential Information" includes any business, marketing, advertising, product development or design, financial, planning, operational, or technical information provided by a Party hereunder that is marked or otherwise identified as confidential or proprietary, or that Party knows or should know is confidential or proprietary. The term "Confidential Information" also includes the terms of this Agreement, any payments, costs, and reimbursements embodied or described within this Agreement or any of its Schedules or Exhibits.

All data and information shall be considered to be Confidential Information hereunder:

(a) if marked as such;

(b) if a Party, electronically, orally, or in writing, has advised the other Party of its or their confidential nature; or

(c) if, due to its or their character or nature, a reasonable person in a like position and under like circumstances would treat it or them as confidential.

**"Covered Token Agreements"** means (a) Token Warrant Agreements and Other Token Agreements set forth on the Covered Token Agreement Schedules that are not Rejected Token Agreements, (b) any portion of a Disputed Token Agreement that becomes, at Foundation's election pursuant to Clause 3.5, a Covered Token Agreement, (c) any portion of an Incomplete Token Agreement that becomes, at Foundation's election pursuant to Clause 3.4, a Covered Token Agreement,

(d) any portion of a Disputed Token Agreement that becomes, at Foundation's election pursuant to Clause 3.5, a Covered Token Agreement, or (e) any portion of a Rejected Token Agreement that becomes, at Foundation's election pursuant to Clause 3.6, a Covered Token Agreement.

**"Covered Token Agreement Schedules"** means, collectively, Schedules 3.1.1(a) and 3.1.1(b) of this Agreement.

**"Disputed Token Agreements"** means the agreements entered into by Labs for the delivery of Tokens, as to which: (a) an Excluded Party is party; or (b) as set forth on Schedule 3.5, any of the following apply (1) the delivery conditions have not been satisfied, (2) any Party believes as of the date hereof that it is not appropriate to deliver Tokens, or (3) the obligation to deliver the Tokens is disputed for any other reason.

**"Excluded Matter"** has the meaning given in Clause 6.3.

**"Excluded Party"** means:

(a) each of [redacted], in each case together with their Related Parties (it being understood that Labs and its Related Parties (other than Rushikesh Manche) are not covered by this clause (a)), in whatsoever capacity as they may have acted up until now; and

(b) any other agent, employee, advisor or other person of Labs or otherwise who has engaged in any fraud or willful misconduct (each as defined under the laws of the State of Delaware) in connection with Labs, Move Indus, the Foundation Parties or the Move Ecosystem.

**"Forfeited Tokens"** means any Tokens that a Team Member ceases to be entitled to (including as a result of a separation from service or other event that results in a failure of vesting

| | |
|---|---|
| | conditions) under their respective Team Token Grant Agreement. |
| **"Foundation Loans"** | means (i) that certain loan in the amount of US$1 million made by Foundation to Labs the week of November 17, 2025, and (ii) any other loans made by Foundation to Labs prior to the effective date of this Agreement. |
| **"Foundation Parties"** | has the meaning given in the Recitals. |
| **"Incomplete Token Warrant Minimum"** | means the number of Tokens that Labs, after due investigation, believes are due under each Incomplete Token Agreement. |
| **"Incomplete Token Agreements"** | means the agreements for the delivery of Tokens entered into by Labs, as set forth on Schedule 3.4: (a) that are incomplete or not fully reduced to writing; or (b) where a modification has been made to the number of Tokens deliverable under such agreement based on events surrounding or subsequent to the issuance of such agreement. |
| **"KYC/KYB"** | means know-your-customer and know-your-business checks satisfactory to the Foundation Parties in their absolute discretion. |
| **"Labs IP"** | has the meaning given in clause 4.1.2(a). |
| **"Move Agreements"** | means operating agreements that are used in the operation of the Move Ecosystem. |
| **"Move Ecosystem"** | has the meaning given in the Recitals. |
| **"Move IP"** | means all intellectual property rights, on a worldwide basis, in the intellectual property used by Labs in the operation of the Move Ecosystem. |
| **"Move Indus"** | has the meaning given in the Recitals. |
| **"Move Indus Transaction"** | has the meaning given in the Recitals. |
| **"Mutual Release"** | has the meaning given in Clause 6.1. |

| | |
|---|---|
| **"OTA TUA"** | means a Token Undertaking Agreement and Release for use with counterparties to Other Token Agreements, in the form attached hereto as Exhibit B. |
| **"Other Token Agreements"** | means the agreements entered into by Labs with advisors and relevant parties for the delivery of Tokens that are not (a) Token Warrant Agreements, (b) Team Token Grant Agreements, (c) Disputed Token Agreements or (d) Incomplete Token Agreements. |
| **"Proceeding"** | means any actual, pending or threatened action, suit, claim, arbitration, inquiry, investigation or proceeding by or before any court, tribunal, arbitrator or public authority. |
| **"Related Parties"** | means, with respect to each Party, each of its past, present and future affiliates, and with respect to each of the foregoing, their respective past, present and future directors, officers, employees, agents, contractors, advisors, insurers, counsel and representatives. |
| **"Releasing Party"** | has the meaning given to it in Clause 6.1. |
| **"Released Party"** | means the Foundation Parties and their Related Parties, and Labs and any of its Related Parties that are not Excluded Parties. |
| **"Rejected Token Agreement"** | means (a) any Incomplete Token Agreement that does not become a Covered Token Agreement at Foundation's election pursuant to clause 3.4, (b) any Disputed Token Agreement that does not become a Covered Token Agreement at Foundation's election pursuant to clause 3.5, and (c) any Token Warrant Agreement, Other Token Agreement or Team Token Agreement with any counterparty that the Foundation Parties, in their absolute discretion, determine to not be entitled to receive Tokens pursuant to their Token Agreement. |
| **"Rejected Token Party"** | means a counterparty to a Rejected Token Agreement. |
| **"Subject Parties"** | means Move Indus and its Related Parties, and those Related Parties of Labs that are proposed to receive releases from counterparties to Covered Token |

| | |
|---|---|
| | Agreements pursuant to the form of Warrant TUA and OTA TUA. |
| "**Team Member**" | means any current or former employee, consultant or contractor of Labs that is not an Excluded Party. |
| "**Team Token Grant Agreement"** | means any token grant agreement of Labs with a Team Member, as set forth on Schedule 3.3. |
| **"Tokens"** | has the meaning given in the Recitals. |
| **"Token Agreements"** | means individually and collectively, Token Warrant Agreements, Team Token Grant Agreements, Other Token Agreements, Disputed Token Agreements, Incomplete Token Agreements and Rejected Token Agreements. |
| **"Token Delivery Documentation"** | means, collectively, the Warrant TUAs and OTA TUAs. |
| **"Token Warrant Agreements"** | means all existing warrant agreements for the delivery of Tokens entered into by Labs that are not Disputed Token Agreements or Incomplete Token Agreements. |
| **"Tripartite Agreement"** | has the meaning given in the Recitals. |
| **"Warrant TUA**" | means a Token Undertaking Agreement and Release for use with holders of Token Warrant Agreements, in the form attached hereto as Exhibit A. |

1.2 In this Agreement, unless the context otherwise requires:

1.2.1 the singular shall include the plural and the masculine shall include the feminine and neuter genders and *vice versa*;

1.2.2 references to a "person" includes any individual, firm, company, corporation, government, state, or agency of a state or association, trust, joint venture, consortium or partnership (whether or not having separate legal personality);

1.2.3 references to an "affiliate" shall be construed to include, in relation to a body corporate, any subsidiary, subsidiary undertaking or holding company of such body corporate, and any subsidiary or subsidiary undertaking of any such holding company for the time being;

1.2.4 the Recitals, Schedules and Exhibits form part of this Agreement and shall have the same effect as if they were expressly set out in the body of this Agreement;

1.2.5 sections 8 and 19(3) of the Electronic Transactions Act (as revised) of the Cayman Islands are hereby excluded; and

1.2.6 references to any statutory provision are to such statutory provision as modified or re-enacted for the time being and include any analogous provision or rule under any applicable law.

1.2.7 Any of the following words, **including, include, in particular, for example** or any similar expression shall be construed as illustrative and shall not limit the sense of the words, description, definition, phrase or terms preceding those words.

1.3 Clause headings are used for convenience only and shall not affect the interpretation of this Agreement.

1.4 Except to the extent that the context otherwise requires, any reference in this Agreement to "this Agreement" or any other document, agreement or instrument is a reference to this Agreement or, as the case may be, the relevant document, agreement or instrument as may be amended, restated, supplemented, replaced or otherwise modified from time to time and includes any document which amends, restates, supplements, replaces, or otherwise modifies or is entered into, made or given pursuant to or in accordance with any of the terms of this Agreement or, as the case may be, the relevant document, agreement or instrument.

2. **TERMINATION OF TRIPARTITE AGREEMENT**

2.1 **Termination**. With effect from the date of this Agreement, each Party hereby irrevocably agrees that the Tripartite Agreement shall (pursuant to section 7.2(A) of the Tripartite Agreement) be terminated in full and be of no further force or effect, save as otherwise specified in Clause 2.2. Notwithstanding the foregoing, to the extent necessary and applicable, each Party hereby unconditionally releases and discharges in full the other Parties in respect of any and all obligations under the Tripartite Agreement and agrees that each Party shall have no further liability of any kind to any other Party in respect of such obligations, save as otherwise specified in this Agreement.

2.2 **Consequences**.

2.2.1 The termination of the Tripartite Agreement shall not terminate, limit, modify or otherwise affect the ownership by the Foundation of the Supplier IPR and the Deliverables (each as defined in the Tripartite Agreement), all right, title and interest in and to each of which were previously conveyed to the Foundation under and in accordance with the terms of the Tripartite Agreement, and all of which remain owned by the Foundation without modification as a result of the entry into or consummation of this Agreement.

2.2.2 Without limiting anything in Clause 2.2.1, upon such termination of the Tripartite Agreement, no ongoing obligations shall subsist between the Parties under the Tripartite Agreement, save for any provisions expressed in the Tripartite Agreement

to survive termination, except: (a) as limited by Clause 4.1.2(b); and (b) claims against Labs under the Tripartite Agreement for fraud or wilful misconduct .

3. **TOKEN MATTERS**

3.1 **Covered Token Agreements**.

3.1.1 **Token Warrant Agreements and Other Token Agreements.**

(a) Schedule 3.1.1(a) to this Agreement is the schedule of existing Token Warrant Agreements, and the number of Tokens covered by each such Token Warrant Agreement.

(b) Schedule 3.1.1(b) to this Agreement is the schedule of Other Token Agreements and the number of Tokens covered by each such Other Token Agreement.

3.1.2 **Offer to counterparties to Covered Token Agreements**. Foundation Parties shall offer each counterparty to a Covered Token Agreement the opportunity to receive Tokens, in accordance with, and subject to, the terms of this Agreement.

(a) [redacted]

(b) Notwithstanding anything to the contrary herein, in each case, the commitment of the Foundation Parties to enter into Token Delivery Documentation and deliver Tokens to any counterparty to a Covered Token Agreement shall be subject in all respects to: (i) the determination of the Foundation Parties, in their sole and absolute discretion, that such counterparty is entitled to Tokens pursuant to its Covered Token Agreement; (ii) the completion of KYC/KYB by such counterparty, to the satisfaction of the Foundation Parties; and (iii) the execution and delivery by such counterparty of the applicable Token Delivery Documentation. Notwithstanding anything to the contrary, the Foundation Parties retain the

sole and exclusive right to designate any agreement that otherwise would be a Covered Token Agreement as a Rejected Token Agreement.

3.2 **Token Delivery Documentation; delivery obligations for Covered Token Agreements**.

3.2.1 The Foundation Parties agree, with respect to each Covered Token Agreement as to which Token Delivery Documentation is executed by the Foundation Parties and Labs in accordance with Clause 3.1 (following completion by the relevant counterparty of all KYC/KYB requirements to the full and complete satisfaction of the Foundation Parties), to deliver all Tokens to such counterparty in accordance with the applicable Token Delivery Documentation, in full and final satisfaction of each such counterparty's Covered Token Agreement, except to the extent that the Foundation Parties, in their sole and complete discretion, agree with a counterparty to a Covered Token Agreement that any provisions of a Covered Token Agreement would survive the entry into applicable Token Delivery Documentation.

3.2.2 [redacted]

3.3 **Team Token Grant Agreements.**

3.3.1 Schedule 3.3 to this Agreement is the schedule of Team Token Grant Agreements and the number of Tokens covered by each such Team Token Grant Agreement.

3.3.2 Subject to clause 3.3.3, upon the applicable Team Member completing KYC/KYB, the Foundation Parties have funded or shall fund the Tokens awarded under their respective Team Token Grant Agreements, as set forth on Schedule 3.3. For the avoidance of any doubt, the Foundation Parties shall have no obligation to deliver Tokens to any Team Member that does not complete KYC/KYB.

3.3.3 [redacted]

3.3.4 If a Team Member ceases to be entitled to any portion of the Tokens under their respective Team Token Grant Agreement, the Foundation Parties, and not Labs or Move Indus, shall be entitled to receive back any Forfeited Tokens.

3.4 **Incomplete Token Agreements.** Schedule 3.4 to this Agreement is the schedule of Incomplete Token Agreements and, for each Incomplete Token Agreement thereon: [redacted] Each Incomplete Token Agreement shall be a Rejected Token Agreement unless, at the sole and complete discretion of the Foundation Parties, it becomes a Covered Token Agreement pursuant to clause 3.6 of this Agreement.

3.5 **Disputed Token Schedule**. Schedule 3.5 to this Agreement is the schedule of Disputed Token Agreements that are not with Excluded Parties. Each Disputed Token Agreement shall be a Rejected Token Agreement, unless, at the sole and complete discretion of the Foundation Parties, it becomes a Covered Token Agreement pursuant to clause 3.6 of this Agreement.

3.6 **Rejected Token Agreements**. Notwithstanding anything to the contrary herein, the Foundation Parties shall not be required to deliver Tokens to, or execute Token Delivery Documentation with, any Rejected Token Party; provided, however, that the Foundation Parties may elect, in their sole and complete discretion, to treat any Rejected Token Agreement, in whole or in part, as a Covered Token Agreement.

3.7 **Residual obligations**.

3.7.1 Any obligations owed to a Rejected Token Party or any other liability of Labs that Foundation has not agreed to assume in accordance with this Agreement shall remain the sole obligation of Labs.

3.7.2 For the avoidance of doubt, Labs cannot compel Foundation or Token Issuer to issue Tokens to any particular party to a Token Agreement without the Foundation Parties' express written consent.

3.7.3 Notwithstanding the foregoing, the Foundation Parties may in the future voluntarily, in their absolute discretion, elect (on terms satisfactory to Foundation in its sole discretion) to deliver Tokens to any Rejected Token Party.

3.8 **Covenants and information undertakings by Labs**. Labs covenants and agrees that it shall:

3.8.1 cooperate in good faith with the Foundation Parties to deliver the Token Delivery Documentation to the relevant counterparties;

3.8.2 provide prompt written notice to Foundation, not later than five business days after it gains knowledge, of (i) any claims, demands or litigation initiated from or by counterparties to any Token Agreement, or evidence that such claims, demands or litigation may be initiated, or (ii) evidence that any counterparty to any Token Agreement has taken, or participated in, any action with respect to the Move Ecosystem that constituted fraud or wilful misconduct; and

3.8.3 cooperate fully with any internal or regulatory investigation and any defence or prosecution of any pending or threatened litigation or disputes in any way related to Tokens; provided, however, that in providing such cooperation, Labs shall not be required to take any action in connection with such full cooperation or support that would result in a waiver of any attorney-client privilege, attorney work product protection, or any other applicable privilege or protection held by Labs, its Related Parties, or their respective counsel, except to the extent that a reasonable basis for a common legal interest or joint defence privilege exists with respect to a matter that could give rise to an attorney-client privilege.

3.8.4 Nothing in this Agreement shall restrict or limit Labs' or its Related Parties' ability to provide truthful and accurate information, documents, interviews, or testimony in connection with any internal or regulatory investigation and any defence or prosecution of any pending or threatened litigation or disputes involving Labs or its Related Parties.

4. **MOVE IP AND MOVE AGREEMENTS**

4.1 **Move IP**.

4.1.1 Schedule 4.1.1 is a schedule of all Move IP, which identifies any consents that are required to effectuate a transfer of the Move IP to the Foundation.

4.1.2 At date of this Agreement**:**

(a) Labs hereby irrevocably assigns, transfers and conveys to the Foundation all right, title and interest of Labs, on a worldwide basis, in and to all and any Labs IP (the "**Labs IP**"), whether or not it is listed on Schedule 4.1.1, which shall include Move IP developed by Labs using third party or open-source software. For clarity, all Supplier IPR and the Deliverables (each as defined in the Tripartite Agreement), ownership of which has previously been transferred to the Foundation Parties pursuant to the Tripartite Agreement, remains owned by the Foundation Parties, and this clause is solely a confirmation and quitclaim that Labs has no right, title or interest in and to any such Supplier IPR and the Deliverables. In addition, to the extent that any Move IP has previously been open-sourced, this clause constitutes an assignment of any remaining rights, if any, that Labs has to such open-sourced Move IP, and no action is taken that is inconsistent with the relevant open-source license, as listed on Schedule 4.1.1.

(b) The Foundation Parties revoke any license under which Labs has been using the Move IP and Labs acknowledges that it retains no right to use the Move IP and agrees not to challenge the validity of the Foundation's ownership of

the Move IP, whether or not listed on Schedule 4.1.1. For clarity, the Foundation Parties do not intend to limit the effect of the provisions of Labs' separate agreement with Move Indus.

4.2 **Move Agreements**.

4.2.1 Schedule 4.2.1 to this Agreement is a schedule of all Move Agreements, which identifies any consents that are required to effectuate a transfer of the Move Agreements to Foundation.

4.2.2 Labs hereby irrevocably assigns, transfers and conveys to the Foundation all of its rights, and Foundation assumes and agrees to pay, perform, and discharge when due any liabilities and obligations of Labs, under any Move Agreements, arising or relating to the period from and after the date of this Agreement.

4.2.3 Notwithstanding anything to the contrary in this Agreement, and subject to the provisions of this Clause 4.2, to the extent that the assignment, transfer, conveyance or delivery, or attempted assignment, transfer, conveyance or delivery, to Foundation of any Move Agreement would require the consent, authorization, approval or waiver of a person who is not a Party to this Agreement or a Related Party, and such consent, authorization, approval or waiver shall not have been obtained prior to the execution of this Agreement, this Agreement shall not constitute an assignment, transfer, conveyance or delivery, or an attempted assignment, transfer, conveyance or delivery, thereof, unless and until the consent of such person is obtained.

4.2.4 Following the execution of this Agreement, the Parties shall use commercially reasonable efforts, and shall cooperate with each other, to obtain any such required consent, authorization, approval or waiver, or any release, substitution or amendment required to assign, transfer and convey such Move Agreement, to Foundation, with effect from the date of this Agreement. Until such consent is obtained, the Parties shall cooperate in any lawful and reasonable arrangement reasonably proposed by Foundation under which Foundation shall obtain the economic claims, rights and benefits under the Move Agreement with respect to which the consent has not yet been obtained in accordance with this Agreement.

4.2.5 Upon obtaining any necessary consent, authorization, approval, waiver, release, substitution or amendment, Labs shall assign, transfer, convey and deliver to Foundation the relevant Move Agreement to which such consent, authorization, approval, waiver, release, substitution or amendment relates for no additional consideration.

4.3 **Further assurance.** Upon each request by the Foundation, without additional consideration, and without limiting any requirement for Labs to take any action or cooperate with any of the Foundation Parties pursuant to the terms of this Agreement, Labs agrees to promptly execute documents, testify and take other acts at the Foundation's expense as the Foundation may deem necessary or desirable to procure, maintain, perfect, and enforce the full benefits, enjoyment, rights, title and interest, on a worldwide basis, of the Move IP and Labs IP assigned hereunder.

4.4 **Transitional arrangements; further assurances**. The Parties shall implement appropriate transitional arrangements for the transfer and delivery of Move IP and Move Agreements and shall execute such documents and do such acts as may reasonably be required by the Foundation to give full effect to the intent of this clause 4.4, including obtaining any relevant counterparty consent where required.

4.5 **No going concern; as-is, where-is**. The Parties agree that the Move IP and the Move Agreements do not include goodwill and that no going-concern transfer of Labs' business occurs under this Agreement. The transfer and assumption of the Labs IP, the Move IP and Move Agreements is on an "as-is, where-is" basis with no representation or warranty, whether express or implied, except as expressly set out in this Agreement.

5. **PAYMENT**

5.1 **Payment**. In consideration of and subject to Labs entering into and performing this Agreement, and in full satisfaction of any amounts due or that might be claimed by Labs in cash or Tokens under the Tripartite Agreement (including any purported reimbursement of expenses), Foundation shall pay to Labs at the date of this Agreement an amount of US$6.9 million (the "**Payment**"), less the outstanding amount of any and all Foundation Loans. Other than such reduction on account of the Foundation Loans, the Payment shall be without deduction, counterclaim, withholding or other reduction. The Payment shall be in the lawful currency of the United States of America, unless otherwise mutually agreed between the Parties.

5.2 **Retained matters**. Except as expressly provided in this Agreement (including but not limited to Clauses 3.1 and 3.2 in respect of Covered Token Agreements and Clause 4 in respect of Labs IP, Move Agreements and Move IP), Labs retains all of its other assets, liabilities and obligations, and shall have the ability to dispose of any of its other assets or settle any of its other obligations, except as specified by the terms of this Agreement.

5.3 **Satisfaction of Foundation Loans**. The application of the outstanding Foundation Loans to the Payment in accordance with Clause 5.1 shall be in full and final satisfaction of the Foundation Loans.

6. **MUTUAL RELEASE AND SETTLEMENT**

6.1 **Mutual Release.** With effect from the date of this Agreement and in consideration of the rights and obligations set out in this Agreement, each Party, for itself and its Related Parties (each a "**Releasing Party**") irrevocably and unconditionally releases and forever discharges each other Released Party from any and all claims, demands, causes of action, liabilities, obligations, promises, debts, penalties, suits, rights, damages, losses, costs and expenses (including attorneys' fees and costs actually incurred) and punitive damages, of any kind or nature (whether pursuant to common law, equity or statute, arising under the laws of the Cayman Islands, the State of Delaware or any other jurisdiction) and whether known or unknown, suspected or unsuspected, that such Releasing Party has or may have arising out of or in connection with (1) the Tripartite Agreement, (2) any other agreement or understanding between the Parties prior to the date of this Agreement, including the Foundation Loans, and (3) any other claim(s) or matter(s) from the beginning of the world up to and including the date of this Agreement, in each case other than the Excluded Matters (the "**Mutual Release"**). For clarity, the Mutual Release includes, without limitation, any of the foregoing arising out of or related to (a) the business, activities, omissions or conduct of any or all of the Released Parties up to and including the date of this Agreement, (b) any other course of conduct, dealing, relationship, action, occurrence or omission relating to or in any way involving any or all of the Released Parties, (c) executed or potential fundraising activities at or involving the Released Parties, (d) the development or marketing of the Move Ecosystem, including tweets and other communications involving or relating to the Released Parties, Tokens or the Move Ecosystem, (e) the creation of Tokens or airdrops, sales, transfers or issuances of Tokens, (f) market making matters relating to Tokens, and (g) the listing of Tokens on various digital asset exchanges.

6.2 With respect to the Mutual Release, the Parties stipulate and agree that they expressly waive the provisions, rights, and benefits of California Civil Code §1542, which provides:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY;**

and all provisions, rights, and benefits conferred by any law of any state or territory of the United States, or principle of common law, which is similar, comparable, or equivalent to Cal. Civ. Code § 1542.

6.3 **Exclusions**. The Mutual Release and the covenants in this Clause 6 do not extend to any obligation expressly preserved, created or assumed by any Party under this Agreement, any Warrant TUA or OTA TUA; fraud or wilful misconduct; or enforcement of this Agreement or any claim expressly preserved by this Agreement (collectively, the "**Excluded Matters**").

6.4 **Covenant Not to Sue; Indemnity Bar**. Each Releasing Party covenants, for itself and on behalf of its Related Parties, that it will not, at any time hereafter, commence, continue, assist or maintain any Proceeding against any Released Party in respect of any matter which is released by Clause 6, except with respect to Excluded Matters or as required under applicable law. To the fullest extent permitted by applicable law, the Parties intend that the releases provided under this Clause 6 shall also bar any claim for contribution or indemnity (whether contractual, equitable or otherwise) among the Releasing and Released Parties.

6.5 **Authority; Capacity**. Each Party enters into this Clause 6 in its own capacity and, to the extent applicable, as agent for and on behalf of its Related Parties, who are intended third-party beneficiaries of this Clause 6 and may enforce it directly.

6.6 **Enforcement and Preservation.** Nothing in this Clause 6 prevents any Party from enforcing this Agreement, or from making a claim for breach of this Agreement, or limits their ability to enforce any Warrant TUA, Team Token Grant Agreement or OTA TUA. For the avoidance of doubt, the releases and covenants not to sue set forth herein do not extend to any claim to enforce the terms of this Agreement, any Warrant TUA, Team Token Grant Agreement or OTA TUA or to any claim arising under the terms of this Agreement.

7. **NO ADMISSION; COOPERATION**

7.1 The Parties acknowledge that this Agreement is in full and final settlement of disputed matters, and that nothing contained in this Agreement, nor any action taken pursuant to it, shall constitute or be construed as an admission of liability, wrongdoing or responsibility by any Party or any other person. Each Party specifically denies any liability or wrongdoing with the matters addressed in this Agreement.

7.2 Each Party shall, and shall use all reasonable endeavours to procure that any necessary third party shall, execute and deliver such documents, and perform such acts, as the other Party may reasonably require after the date of this Agreement for the purpose of giving full effect to this Agreement, including to effectuate the transfer of intellectual property.

7.3 The Parties shall cooperate in good faith with each other and take such further steps as may be reasonably necessary to carry out the purpose and intent of this Agreement. Without limiting the generality of the foregoing, each Party agrees to execute and deliver any additional documents and to take any further actions as may be reasonably required to give effect to the terms and intent of this Agreement, including in connection with any internal or regulatory investigation and any defence or prosecution of any litigation or dispute in any way related to Tokens. Notwithstanding the foregoing, nothing herein shall require any Party to agree to any action or execute any agreement or document that would result in the waiver of attorney-client privilege (absent a reasonable basis for a common legal interest or joint

defence privilege with respect to a matter that could give rise to an attorney-client privilege) without the prior consent of such Party.

8. **REPRESENTATIONS AND WARRANTIES**

8.1 **Mutual Representations and Warranties.** As at the date of this Agreement, each Party represents and warrants to the other Parties that: (a) it has the legal capacity to enter into and deliver this Agreement and perform its covenants and obligations hereunder; and (b) this Agreement has been duly executed and delivered by such Party and constitutes the valid and binding obligations of such Party, enforceable against the undersigned in accordance with its terms.

8.2 **Additional Labs Representations and Warranties**. Labs represents to Foundation that:

8.2.1 to the best of its knowledge as at date of this Agreement after all due and careful enquiry (but recognizing that counterparties to Token Agreements have in the past and may in the future claim that they are owed different amounts of Tokens), the information on each of the Schedules to this Agreement is full, complete and accurate;

8.2.2 to the best of its knowledge after all due and careful enquiry, no counterparty to an agreement set forth on the Covered Token Agreement Schedules has taken, or participated in, any action with respect to the Move Ecosystem that constituted fraud or wilful misconduct; and

8.2.3 it has provided to Foundation copies of all written agreements comprising the Token Agreements of which Labs is currently aware.

9. **CONFIDENTIALITY**

9.1 The Parties agree that all communications, documents, and information exchanged in connection with the negotiation and implementation of this Agreement (including drafts of this Agreement, and communications regarding the disputes and settlement) shall be deemed Confidential Information.

9.2 Labs shall maintain the existence and terms of this Agreement as confidential and shall not make any public announcement or press release regarding this Agreement or its subject matter without the prior written agreement of the Foundation Parties.

9.3 **Permitted Disclosures**.

9.3.1 Notwithstanding Clause 9.1, a Party may disclose information that would otherwise be Confidential Information:

(a) to the extent necessary to comply with any law, order, decision, ruling, or requirement made or issued by a governmental, regulatory, or administrative authority with jurisdiction over a Party or Related Party;

(b) as may be deemed necessary in response to any document request, interrogatory, subpoena, civil investigative demand, or other legal process;

(c) to cooperate, provide information, or give assistance to governmental, regulatory, or administrative authority concerning the investigation, prosecution, or any inquiry about the matters released herein;

(d) as part of normal reporting or review procedures, or examinations by, a governmental, regulatory, administrative, or self-regulating authority;

(e) to enforce a Party's rights created under this Agreement, in connection with the exercise of any remedy or enforcement of any rights hereunder, or to establish a Party's rights in a subsequent Proceeding (including the fact of settlement, to the extent necessary, in litigation or threatened litigation involving third parties);

(f) to disclose, on a strictly confidential basis, to the Party's directors, officers, shareholders, personnel, and professional advisors (including but not limited to legal counsel, auditors, or tax advisors) who need to know the information for the purpose of advising on this Agreement or the matters relating thereto;

(g) in connection with the disclosing Party obtaining shareholder approvals for this Agreement and the transactions contemplated by this Agreement; and

(h) if the information is already in the public domain, other than as a result of a breach of this Agreement by the disclosing Party or other confidentiality obligation by that Party.

9.4 **Prior Notice of Certain Disclosures**. To the extent permitted by law, the Party disclosing subject to Clauses 9.3.1(a) through (d) shall give the other Party reasonable prior notice of the disclosure so that the other Party may seek a protective order or other reliable assurance that confidential treatment will be afforded to the disclosure.

9.5 Notwithstanding clauses 9.1 to 9.3, it is understood and agreed that one or more of the Parties will be having discussions with counterparties to Token Agreements and to counterparties to Move Agreements, including in order to effectuate the delivery of Tokens and the matters covered by the Warrant TUA and OTA TUA, and none of the foregoing shall violate this clause 9, and that no Party shall have any liability under this clause 9 if such counterparties or Excluded Parties publicly disclose matters within the scope of this clause 9. In addition, the

Foundation Parties acknowledge that Labs will be disclosing various matters to Move Indus, and cooperating with Move Indus, under its agreements with Move Indus, and that no such disclosures or cooperation will breach this clause 9 or require the consent of the Foundation Parties.

9.6 Nothing in this Agreement, or clause 9 specifically, shall restrict or limit any Party's or its Related Parties' ability to provide truthful and accurate information, documents, interviews, or testimony, including based on information that would otherwise be confidential, in connection with any internal or governmental, regulatory, or administrative investigation, or to defend or prosecute any future claims, pending or threatened litigation, or disputes involving any Party or its Related Parties.

10. **COSTS**

Each Party shall bear its own costs and expenses in relation to the negotiation, preparation and execution of this Agreement and the transactions contemplated by it, except as expressly provided in this Agreement.

11. **TAXES**

Each Party shall be responsible for any taxes properly payable by it in connection with this Agreement and the transactions contemplated by it.

12. **NOTICES**

12.1 **Form and delivery**. Any notice given under this Agreement shall be in writing and in English and shall be delivered by hand, courier or email to the address or email address of the relevant Party set out below (or such other address or email address as notified from time to time).

12.2 **Details**.

Labs:

MVMT Labs Inc.
166 Geary St
STE 1500 #1853
San Francisco, CA 94108
Attention: General Counsel
Email: Joseph.Golding@movementlabs.xyz

Foundation:

Movement Network Foundation
71 Fort Street
PO Box 10035
George Town
Grand Cayman KY1-1001
Cayman Islands
Email: Cobus@Caliber.ky
piano@horizonsglobal.io

Token Issuer:

Movement Limited
Trinity Chambers
PO Box 4301
Road Town, Tortola
British Virgin Islands
Email: Cobus@Caliber.ky
piano@horizonsglobal.io

12.3 **Deemed receipt**. A notice is deemed received: (a) if delivered by hand or courier, at the time of delivery; and (b) if sent by email, when transmitted, provided no non-delivery notice is received. If deemed receipt occurs outside business hours at the place of receipt, the notice is deemed received at 9.00 a.m. on the next business day.

13. **GENERAL**

13.1 **Entire agreement**. This Agreement, together with the Exhibits and Schedules attached hereto, constitutes the entire agreement between the Parties, and supersedes all prior agreements, understandings, and communications between the Parties with respect to the subject matter hereof. No waiver, modification or amendment to this Agreement shall be effective unless in writing and executed by the duly authorized representative of each of the Parties.

13.2 **Variation**. No variation of this Agreement is effective unless in writing and signed by or on behalf of each Party.

13.3 **Assignment**. No Party may assign, transfer, novate or otherwise dispose of any of its rights or obligations under this Agreement without the prior written consent of the other Parties.

13.4 **Severability.** In the event that any provision hereof is found invalid or unenforceable pursuant to a final judicial decree or decision, the remainder of this Agreement will remain valid and enforceable according to its terms. In the event of such partial invalidity or partial unenforceability, the Parties shall seek in good faith to agree to replace any such legally invalid

or unenforceable provision or provisions with another provision or other provisions, which, in effect, will most nearly and fairly approach the effect of the invalid or unenforceable provision or provisions.

13.5 **Further assurances**. Each Party shall, at its own cost, promptly execute and deliver all such documents and do all such acts as the other Parties may reasonably require to give full effect to this Agreement.

13.6 **Third party rights**. It is acknowledged that the Released Parties described in Clause 6 who are not signatories to this Agreement shall be entitled to the benefit of the releases and covenants not to sue provided in Clause 6 above. To that extent, each such Released Party is deemed an intended third-party beneficiary of such clause. In all other respects, a person who is not a Party has no right under the Contracts (Rights of Third Parties) Act (as revised) of the Cayman Islands to enforce or enjoy the benefit of any term of this Agreement.

13.7 **No Waiver.** The failure of any Party to assert any of its rights under this Agreement shall not be deemed to constitute a waiver of that Party's right thereafter to enforce each and every provision of this Agreement in accordance with its terms.

13.8 **Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together constitute one and the same instrument.

13.9 **Governing law and jurisdiction**. This Agreement (including any non-contractual obligations or liabilities arising out of it or in connection with it) will be governed and construed in accordance with the laws of the Cayman Islands. Each Party irrevocably agrees that the Cayman Islands courts have non-exclusive jurisdiction to hear and determine, and settle any Proceedings concerning a dispute relating to this Agreement and each party irrevocably submits to the jurisdiction of the Cayman Islands courts. Each Party hereby irrevocably waives (and irrevocably agrees not to raise) any objection which it might at any time have on the grounds of *forum non conveniens* or on any other ground to proceedings concerning a dispute relating to this Agreement being taken in the courts of the Cayman Islands, and agrees that any judgment in such proceedings taken in any such court shall be conclusive and binding on it and may be enforced in any other jurisdiction.

**Execution Version**

**IN WITNESS** whereof the Parties have executed this Agreement on the day and year first above written:

For and on behalf of

**MVMT Labs Inc.**

DocuSigned by:
Cooper Scanlon
4B4701AED8C941B...

Name: Cooper Scanlon

Title: founder

For and on behalf of

**Movement Network Foundation**

Signed by:
Marc Piano
43A1DDF150E2431...

Name: Marc Piano

Title: Director

For and on behalf of

**Movement Limited**

Signed by:
Marc Piano
43A1DDF150E2431...

Name: Marc Piano

Title: Director

**SCHEDULE 3.1.1(a) (TOKEN WARRANT AGREEMENTS)**

| Counterparty | [redacted] | Agreement | Date |
|---|---|---|---|
| VARYS CAPITAL VENTURES SP1 | | Token Warrant | 3/13/2023 |
| Avalanche Fund LP | | Token Warrant | 3/15/2023 |
| Vllaki LP | | Token Warrant | 3/23/2023 |
| Jonathan West | | Token Warrant | 3/24/2023 |
| COLONY LAB LTD | | Token Warrant | 4/4/2023 |
| COLONY LAB LTD | | Token Warrant | 4/4/2023 |
| Jan Stastny | | Token Warrant | 4/8/2023 |
| Dovey Wan | | Token Warrant | 4/12/2023 |
| Jonathan West | | Token Warrant | 4/18/2023 |
| Brian Johnson | | Token Warrant | 4/19/2023 |
| Dan Mgbor | | Token Warrant | 4/24/2023 |
| Jung-Yung Jonathan Lim Chang | | Token Warrant | 4/28/2023 |
| GuanxiDAO Pte. Ltd. | | Token Warrant | 5/11/2023 |
| Merkle Tech Capital | | Token Warrant | 5/13/2023 |
| Sonny Azeez | | Token Warrant | 5/15/2023 |
| Bilge Tanyeri | | Token Warrant | 5/16/2023 |
| Bilge Tanyeri | | Token Warrant | 5/16/2023 |
| Borderless Cross-chain Ecosystem Fund LP | | Token Warrant | 5/17/2023 |
| Borderless Liquid Multi Strategy Fund LP | | Token Warrant | 5/17/2023 |
| Sera Partners Limited | | Token Warrant | 5/17/2023 |
| Adam Smith | | Token Warrant | 5/19/2023 |
| Silvermine Capital Advisors, LLC | | Token Warrant | 5/20/2023 |
| Silvermine Capital Advisors, LLC | | Token Warrant | 5/20/2023 |
| Emilio Maglione-Fulco | | Token Warrant | 5/21/2023 |
| Michael Shafer | | Token Warrant | 5/24/2023 |
| Fjodor Agranat | | Token Warrant | 5/29/2023 |
| Alexander Phua | | Token Warrant | 5/29/2023 |
| Oai Lam | | Token Warrant | 5/30/2023 |
| Oai Lam | | Token Warrant | 5/31/2023 |
| GC | | Token Warrant | 6/1/2023 |
| Christian sullivan | | Token Warrant | 6/5/2023 |
| Radostin Minchev | | Token Warrant | 6/8/2023 |
| Yorkville Commodities LLC | | Token Warrant | 6/8/2023 |
| Token Metrics Ventures Fund Ltd | | Token Warrant | 6/13/2023 |
| Moyukh Sen | | Token Warrant | 6/13/2023 |
| Shak Capital Inc. | | Token Warrant | 6/14/2023 |
| Nilseh Global Ltd, | | Token Warrant | 6/21/2023 |
| Josh Hesketh | | Token Warrant | 6/25/2023 |
| Flowdesk | | Token Warrant | 6/27/2023 |
| EV3 Ventures LLC | | Token Warrant | 7/5/2023 |
| Aves Lair S23 Fund LLC | | Token Warrant | 7/6/2023 |
| George Lambeth | | Token Warrant | 7/8/2023 |
| Hansen Niu | | Token Warrant | 7/12/2023 |
| Calvin Liu | | Token Warrant | 7/13/2023 |
| CVP | | Token Warrant | 7/22/2023 |
| Gann Liquid Investments LLC | | Token Warrant | 7/24/2023 |
| Dao5 (assigned to bastion) | | Token Warrant | 8/1/2023 |
| Ankr PBC | | Token Warrant | 8/2/2023 |
| Interop Ventures Fund 1 LP | | Token Warrant | 8/7/2023 |
| CABRIT CAPITAL LTD | | Token Warrant | 8/16/2023 |
| Altasia Investments Limited | | Token Warrant | 8/23/2023 |
| Alexander Opeagbe | | Token Warrant | 9/4/2023 |
| Enigmafund LLC | | Token Warrant | 10/1/2023 |
| Saxon Ventures | | Token Warrant | 11/15/2023 |
| Kirby Fine | | Token Warrant | 11/18/2023 |
| SRS Investment Holdings Limited | | Token Warrant | 11/21/2023 |
| Jason Yanowitz | | Token Warrant | 11/22/2023 |
| Ajit Kumar Tripathi | | Token Warrant | 11/24/2023 |
| Vyas Venkatakrishnan | | Token Warrant | 11/27/2023 |
| Mark Santin | | Token Warrant | 11/27/2023 |

| | | | |
|---|---|---|---|
| Bekhzod Khatamov | [redacted] | Token Warrant | 11/29/2023 |
| CAP MAVEN MARKETING MANAGEMENT | [redacted] | Token Warrant | 11/30/2023 |
| Delta747 Limited | [redacted] | Token Warrant | 12/1/2023 |
| TSS Digital FZCO | [redacted] | Token Warrant | 12/5/2023 |
| TRGC SPC Limited | [redacted] | Token Warrant | 12/7/2023 |
| Anthony Lesoismier | [redacted] | Token Warrant | 12/9/2023 |
| Michael Wurzinger | [redacted] | Token Warrant | 12/22/2023 |
| RPMA \| LLC | [redacted] | Token Warrant | 1/3/2024 |
| ZK Enpachi Foundation | [redacted] | Token Warrant | 1/4/2024 |
| MH Technologies Ltd | [redacted] | Token Warrant | 1/4/2024 |
| Digital Consensus Fund SA | [redacted] | Token Warrant | 1/4/2024 |
| Jonathan Brosseau | [redacted] | Token Warrant | 1/4/2024 |
| Eser Uyanik | [redacted] | Token Warrant | 1/4/2024 |
| Ben Rahnema | [redacted] | Token Warrant | 1/4/2024 |
| Paul Kim | [redacted] | Token Warrant | 1/4/2024 |
| Hypersphere Parallel Network Master Fund | [redacted] | Token Warrant | 1/5/2024 |
| Artichoke Capital Fund LLP | [redacted] | Token Warrant | 1/5/2024 |
| Danny Christ | [redacted] | Token Warrant | 1/5/2024 |
| Timothy Wang | [redacted] | Token Warrant | 1/5/2024 |
| Jerry Liu | [redacted] | Token Warrant | 1/8/2024 |
| Token Metrics Ventures Ltd | [redacted] | Token Warrant | 1/11/2024 |
| Oliver Bickell | [redacted] | Token Warrant | 1/12/2024 |
| Pavanveer Singh Heer | [redacted] | Token Warrant | 1/15/2024 |
| Alwan Zaidan | [redacted] | Token Warrant | 1/16/2024 |
| Alwan Zaidan | [redacted] | Token Warrant | 1/16/2024 |
| Eterna Blockchain Fund II | [redacted] | Token Warrant | 1/16/2024 |
| Pavanveer Singh Heer | [redacted] | Token Warrant | 1/17/2024 |
| Absoluta | [redacted] | Token Warrant | 1/17/2024 |
| Abhimanyu Bansal | [redacted] | Token Warrant | 1/18/2024 |
| Anuke Ganegoda | [redacted] | Token Warrant | 1/18/2024 |
| Clayton Menzel | [redacted] | Token Warrant | 1/20/2024 |
| Eugene Attalah | [redacted] | Token Warrant | 1/21/2024 |
| Software Dev Integration Ltd. | [redacted] | Token Warrant | No Date |
| Skyfrog capital (named changed; formerly AUGR | [redacted] | Token Warrant | 1/22/2024 |
| Pedro Gomes | [redacted] | Token Warrant | 1/23/2024 |
| Blocmates | [redacted] | Token Warrant | 1/24/2024 |
| Taisu Ventures Web3 Fund Limited Partnership | [redacted] | Token Warrant | 1/26/2024 |
| Sintra FZCO | [redacted] | Token Warrant | 1/28/2024 |
| George Burke | [redacted] | Token Warrant | 1/29/2024 |
| Chen Qijan | [redacted] | Token Warrant | 2/2/2024 |
| Any Labs | [redacted] | Token Warrant | 2/2/2024 |
| Ansem Holdings LLC | [redacted] | Token Warrant | 2/6/2024 |
| Sagaar Mandavia | [redacted] | Token Warrant | 2/11/2024 |
| Continue Asset Management Ltd | [redacted] | Token Warrant | 2/12/2024 |
| Archetype Crypto II LP | [redacted] | Token Warrant | 2/22/2024 |
| Peter Wang | [redacted] | Token Warrant | 2/25/2024 |
| Placeholder Fund III, LP | [redacted] | Token Warrant | 2/26/2024 |
| MAVEN 11 BLOCKCHAIN VENTURE FUND 2 LP (acting through its GP: MAVEN 11 GP BVF 2) | [redacted] | Token Warrant | 2/27/2024 |
| Batuhan Dasgin | [redacted] | Token Warrant | 2/28/2024 |
| Polkassembly LLC | [redacted] | Token Warrant | 2/28/2024 |
| Ko Beng Hin | [redacted] | Token Warrant | 2/29/2024 |
| Jia Yaoqi | [redacted] | Token Warrant | 3/1/2024 |
| Figment Master Fund II LP | [redacted] | Token Warrant | 3/5/2024 |
| OKG Ventures Limited, | [redacted] | Token Warrant | 3/6/2024 |
| Dao5 (assigned to bastion) | [redacted] | Token Warrant | 3/6/2024 |
| Hack VF 2022 LP | [redacted] | Token Warrant | 3/7/2024 |
| J17 Pioneer Fund L.P. | [redacted] | Token Warrant | 3/7/2024 |
| Ambush Capital Liquid Cayman | [redacted] | Token Warrant | 3/9/2024 |
| Skip Technology | [redacted] | Token Warrant | 3/10/2024 |

| | | | |
|---|---|---|---|
| Mitchell Chase | [redacted] | Token Warrant | 3/10/2024 |
| Luna Ventures FZCO | | Token Warrant | 3/10/2024 |
| Protagonist LP | | Token Warrant | 3/11/2024 |
| exTerra Ventures | | Token Warrant | 3/12/2024 |
| Shiny Pony LLC | | Token Warrant | 3/13/2024 |
| Georgios Vlachos | | Token Warrant | 3/13/2024 |
| Mo Shaik | | Token Warrant | 3/13/2024 |
| Public Works LP | | Token Warrant | 3/14/2024 |
| ABCD SPV I, LLC | | Token Warrant | 3/15/2024 |
| 4RC Ventures II LP | | Token Warrant | 3/19/2024 |
| Two Square Capital | | Token Warrant | 3/20/2024 |
| BVC Digital Opportunities Master Fund I, LTD | | Token Warrant | 3/24/2024 |
| Polychain Master Fund I LP | | Token Warrant | 3/27/2024 |
| Polychain Parallel Fund I LP | | Token Warrant | 3/27/2024 |
| Samantha Bohbot | | Token Warrant | 3/31/2024 |
| Everest TM Limited | | Token Warrant | 4/3/2024 |
| Recursive Group LLC | | Token Warrant | 4/3/2024 |
| Gate Ventures Capital Corp. | | Token Warrant | 4/9/2024 |
| Mentat Group LTD | | Token Warrant | 4/9/2024 |
| Machine Identity LLC | | Token Warrant | 4/23/2024 |
| Daniel Nunes | | Token Warrant | 5/1/2024 |
| Mawson Consultants Limited | | Token Warrant | 5/18/2024 |
| Daniel Abelon | | Token Warrant | 5/28/2024 |
| NacionCrypto | | Token Warrant | 6/5/2024 |
| Oleg Pavletsov | | Token Warrant | 6/9/2024 |
| Up Top Search | | Token Warrant | 6/10/2024 |
| SeedHorizon Group | | Token Warrant | 6/22/2024 |
| WAGMI 55- WAGMI Master LLC | | Token Warrant | 12/8/2024 |
| CZ Labs Management Ltd. | | Token Warrant | No Date |
| Mile High Blockchain | | Token Warrant | No Date |
| Ricadano Capital LLC | | Token Warrant | No Date |
| 1470621 B.C. Ltd | | Token Warrant | No Date |
| La Gold Cartel LLC | | Token Warrant | No Date |
| Sparta Digital Pte Ltd (assigned to Sparta Holdings LLC | | Token Warrant | No Date |
| Jayendra Jog | | Token Warrant | No Date |
| Ruxin LLC | | Token Warrant | No Date |
| Ko Beng Hin | | Token Warrant | No Date |
| Rahed Rayeh | | Token Warrant | No Date |
| Crypto.com Capital | | Token Warrant | No Date |
| Web3Port LP | | Token Warrant | 6/30/2024 |
| Joint Knowledge Labs | | Token Warrant | |
| Joshua Shih | | Token Warrant | |
| Rokubunnoni Inc. | | | |

Execution Version

**SCHEDULE 3.1.1(b) (OTHER TOKEN AGREEMENTS)**

| Counterparty | [redacted] | Agreement |
|---|---|---|
| PV Technology LLC (Dovey) | [redacted] | Advisory Agreement |
| VARYS CAPITAL VENTURES SP1 | [redacted] | Advisory Agreement |
| Michael Curcio | [redacted] | Executed Settlement Approved by MNF |
| Lavra Holdings Limited (Pyth) | [redacted] | Service Agreement |
| Ben Rahnema | [redacted] | |
| Ader Group Limited | [redacted] | |
| Harald Foslien Løvstad | [redacted] | |
| viperr | [redacted] | |
| Inderpreet Singh | [redacted] | |
| wiz | [redacted] | |
| 0xSun | [redacted] | |
| Vanessa sierra | [redacted] | |
| eli5defi | [redacted] | |
| Robin Dirickx | [redacted] | |
| Igor Lymar | [redacted] | |
| Richard May | [redacted] | |
| Kirby Ong | [redacted] | |
| Zachary Manafort | [redacted] | |
| Liew Ashton | [redacted] | |
| ho ka hon | [redacted] | |
| Wye Meng Cheong | [redacted] | |
| Jordi Alexander | [redacted] | |
| smol | [redacted] | |
| Eric Gansman | [redacted] | |
| Daan aan de Stegge | [redacted] | |
| artemis research | [redacted] | |
| Djamaladine Souleyman | [redacted] | |
| i | [redacted] | |
| Limbo | [redacted] | |
| Ding Xiao | [redacted] | |
| Dusty Brockland | [redacted] | |
| Aylo | [redacted] | |
| Ben Wee | [redacted] | |
| Mark Cullen | [redacted] | |
| Sjuul Follings | [redacted] | |
| Simon Jenvey | [redacted] | |
| Cal | [redacted] | |
| Lucas Dantur | [redacted] | |
| Levi Magill | [redacted] | |
| Ashish Kumar | [redacted] | |
| jaypeg | [redacted] | |
| Bui Duc Huy | [redacted] | |
| Dipanshu | [redacted] | |
| CHEN WEINIAN | [redacted] | |
| SEUNGYUN LEE | [redacted] | |
| chen jian | [redacted] | |
| Zolo Xiong | [redacted] | |
| kirara | [redacted] | |
| Jang Won Sok | [redacted] | |
| Yomiko Chen | [redacted] | |
| 倪琪 | [redacted] | |
| KimDongGeon | [redacted] | |
| Jian Li | [redacted] | |
| Feng Liu | [redacted] | |
| Fiyes Yu | [redacted] | |
| HU XIUHONG | [redacted] | |
| Chan Ho Fung | [redacted] | |
| Redefinition Ltd. \| Jung-Yung Jonathan Lim Cl | [redacted] | |
| Choi won jun | [redacted] | |
| Yun Ju Park | [redacted] | |
| YunJe Jeong | [redacted] | |
| Wuhongliang | [redacted] | |
| Inwon jung | [redacted] | |
| 腦哥 Raizel (Wen Yi Huang) | [redacted] | |
| Nhan Ngo | [redacted] | |
| EunseongBoo | [redacted] | |
| Root Liu | [redacted] | |
| hellosuoha | [redacted] | |
| Ai 姨 | [redacted] | |
| 默默 | [redacted] | |
| Gibbeum Lee | [redacted] | |
| cryptosmart | [redacted] | |
| BinmengLuo | [redacted] | |
| Youngwoo Jung | [redacted] | |
| YOHAN LIM | [redacted] | |
| JUYEONG KIM | [redacted] | |
| bo lin | [redacted] | |
| jack | [redacted] | |

Docusign Envelope ID: 1F9BB922-E490-4A4B-BD26-5BC71E3950E5


| | | |
|---|---|---|
| Leon Liu | [redacted] | |
| SUBIN HONG | | |
| Sungyun Jeong | | |
| BITWU | | |
| Yuyue | | |
| Mehdi Devillers | | |
| HE JIE | | |
| 小人物 | | |
| Lanhu | | |
| Sally wang/wang jia | | |
| Ni Sen | | |
| Kaiyuan Feng | | |
| Zhao Shuai | | |
| memory | | |
| QFi 元宇宙阿Q | | |
| SU ZHENZHU | | |
| K2 kai | | |
| Yaoyuan Lu | | |
| Wang lei | | |
| Vincent Yu | | |
| bushizhe | | |
| Elizabeth | | |
| ohsangheon | | |
| LINSHENGPENG | | |
| Mulan | | |
| Jung Joon Park | | |
| 链上达人 | | |
| shifeng | | |
| Xiyan Sun | | |
| Kim Minsoo | | |
| Cimpean Rares Eugen | | |
| lubiyangjia | | |
| Calvin Chu | | |
| Zhixiong Pan | | |
| Lai Hong Phong | | |
| Canghai Ji | | |
| Kang Zeng | | |
| tai lai | | |
| Eisuke Watanabe | | |
| Xinhai Shu | | |
| Donghyeon Jo | | |
| BILI | | |
| Shiyi Yu | | |
| 王思莹 | | |
| Golden Financial Innovation Ltd | | |
| Hae Min Park | | |
| sanghyuk cho | | |
| 0x易经 | | |
| JUNKI KATO | | |
| temari | | |
| Gareth Christopher Lai | | |
| kazuhiro ooishi | | |
| Takahito Matsuzawa | | |
| Zhao yuqing | | |
| Yusuke Tsuji | | |
| Surekha Tuntiserirat | | |
| koichi kitamura | | |
| Takao Kido | | |
| Takahiro Ohtake | | |
| Shuichi Yoshida | | |
| Brandon Suzuki | | |
| Wu guanggeng | | |
| jinki kim | | |
| MAI OKUBO | | |
| Newtribe Capital Pte Ltd | | |
| Gordon Lau | | |
| Artur Felk | | |
| bankeradao | | |
| Hamzah Khan | | |
| web3honey | | |
| TAKAYUKI NEMOTO | | |
| Fernando Trespalacios | | |
| JE YOUNG SEO | | |
| Inanc | | |
| Taikan Okumura | | |
| Lewis Phey | | |
| Chang Chi Chang | | |
| LIU AIJIA | | |
| Ethan Choi | | |

Docusign Envelope ID: 1F9BB922-E490-4A4B-BD26-5BC71E3950E5



| | | |
|---|---|---|
| Davinci Jeremie | [redacted] | |
| KIE KATO (FIG) | [redacted] | |
| SALMON PINK | [redacted] | |
| Zhang Qianyi（Ryan） | [redacted] | |
| LI MINGCHAN | [redacted] | |
| Yoshiki Kawai | [redacted] | |
| Leung Ka Ho Carl | [redacted] | |
| CHEN PENGZHOU | [redacted] | |
| PANONY LIMITED | [redacted] | |
| Bill Stoke | [redacted] | |
| DONGYEON LEE | [redacted] | |
| Jiwon | [redacted] | |
| Qinghua LI | [redacted] | |
| Justin Wu | [redacted] | |
| Shitij Gupta | [redacted] | |
| snowball | [redacted] | |
| Wooyoung Chung | [redacted] | |
| Albert Kim Than | [redacted] | |
| Leesoon Kim | [redacted] | |
| BQ | [redacted] | |
| kwak jisung | [redacted] | |
| K300 Ventures | [redacted] | |
| Yerui Zhang | [redacted] | |
| Hugo Cesmat | [redacted] | |
| hebi | [redacted] | |
| Jongmin Kim | [redacted] | |
| Huage | [redacted] | |
| MOONLIGHT | [redacted] | |
| Mugiwara Capital Ltd. Alex Malosse | [redacted] | |
| Léonard Dupuis - IGMI Capital Ltd | [redacted] | |
| Paul Kim | [redacted] | |
| Nox | [redacted] | |
| YONGGYU KIM | [redacted] | |
| Kim YoungTaek | [redacted] | |
| Jin Shang | [redacted] | |
| junhyuk rhee | [redacted] | |
| Alex Chan | [redacted] | |
| Hae Min Park | [redacted] | |
| Gabriel Tramble | [redacted] | |
| Inderpreet Singh | [redacted] | |
| Andrew Cavanaugh | [redacted] | |
| Diederick Jacobs | [redacted] | Kol and Research |
| Kittipoom aksornsua | [redacted] | |
| Gun | [redacted] | |
| David Hulshof | [redacted] | |
| Skyfrog Capital | [redacted] | |
| Constellation VP Pte Ltd | [redacted] | |
| HE YANGJIAN | [redacted] | |
| Unicorn Verse Pte Ltd | [redacted] | |
| Jacob_Huzi | [redacted] | |
| YZi | [redacted] | Advisory option |
| Simmerman | [redacted] | |

**SCHEDULE 3.3 (TEAM TOKEN GRANT AGREEMENTS)**

| Counterparty | [redacted] | [redacted] | Agreement |
|---|---|---|---|
| Liam Monninger | [redacted] | [redacted] | |
| William Gaines | [redacted] | [redacted] | |
| Merq | [redacted] | [redacted] | |
| Torab Arya | [redacted] | [redacted] | |
| Lucas Vinzon | [redacted] | [redacted] | |
| Richard Melkonian | [redacted] | [redacted] | |
| Andy Golay | [redacted] | [redacted] | |
| Nicolas Lopez | [redacted] | [redacted] | |
| Radu Popa | [redacted] | [redacted] | |
| Frasher Ulaj | [redacted] | [redacted] | |
| Ali Sheikh | [redacted] | [redacted] | |
| Chris Malloy | [redacted] | [redacted] | |
| Zhen Lu | [redacted] | [redacted] | |
| Shereen Alibhai | [redacted] | [redacted] | |
| Paco Bolanos | [redacted] | [redacted] | |
| Luca Loscalzo | [redacted] | [redacted] | |
| Philippe Delrieu | [redacted] | [redacted] | |
| Carmen Pearson | [redacted] | [redacted] | |
| Franck Cassez | [redacted] | [redacted] | |
| Rahat Chowdhury | [redacted] | [redacted] | |
| Joe Chen | [redacted] | [redacted] | |
| Andreas Penzkofer | [redacted] | [redacted] | |
| Vinay Pallegar | [redacted] | [redacted] | |
| Jonathan Wizman | [redacted] | [redacted] | |
| Grant Gerber | [redacted] | [redacted] | |
| Joseph Golding | [redacted] | [redacted] | |
| Shayan Sanjideh | [redacted] | [redacted] | |
| Connie Wong | [redacted] | [redacted] | |
| Young Liaw | [redacted] | [redacted] | |
| Imran Mohammad | [redacted] | [redacted] | |
| Nick McMillen | [redacted] | [redacted] | |
| Brian Hennessey | [redacted] | [redacted] | |
| Andy Bell | [redacted] | [redacted] | |
| Cooper Scanlon | [redacted] | [redacted] | |
| Ben Wee | [redacted] | [redacted] | |

**SCHEDULE 3.4 (INCOMPLETE TOKEN AGREEMENTS)**

[redacted]

**SCHEDULE 3.5 (DISPUTED TOKEN AGREEMENTS)**

[redacted]

Docusign Envelope ID: 1F9BB922-E490-4A4B-BD26-5BC71E3950E5


| |
|---|
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| |

**SCHEDULE 4.1.1 (MOVE IP)**

| Move IP |
| --- |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |

| |
|---|
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |
| [redacted] |

| |
|---|
| [redacted] |
| [redacted] |

**SCHEDULE 4.2.1 (MOVE AGREEMENTS)**

| Counterparty | Agreement | Consent |
|---|---|---|
| Vercel | Service Agreement | Consent assumed to be required |
| Datadog | Service Agreement | Consent assumed to be required |
| Contentful | Service Agreement | Consent assumed to be required |
| hCaptcha | Service Agreement | Consent assumed to be required |
| Bigquery | Service Agreement | Consent assumed to be required |
| Looker Studio | Service Agreement | Consent assumed to be required |
| Ottersec | Service Agreement | Consent required - Section 18 of MSA |
| Kite Labs | Service Agreement | Partnership Agreement silent |
| AWS | Infra | Consent assumed to be required |
| HackenProof | Service Agreement | Agreement silent |
| Immunefi | Service Agreement | Consent required - Section 13 of MSA |

**EXHIBIT A (FORM OF WARRANT TUA)**

**MOVEMENT LIMITED**
(***Token Issuer***)

**MOVEMENT NETWORK FOUNDATION**
(***Foundation***)

**MVMT LABS, INC.**
(***Labs***)

and

**[HOLDER]**
(***Holder***)

---

**TOKEN UNDERTAKING AGREEMENT AND RELEASE**
in relation to
**$MOVE**

---

**THIS TOKEN UNDERTAKING AGREEMENT AND RELEASE** (this ***Agreement***) is dated [_______________] and entered into

**AMONG**

1 **MOVEMENT LIMITED**, a company registered in the British Virgin Islands (the ***Token Issuer***);

2 **MOVEMENT NETWORK FOUNDATION**, an exemption foundation company registered in the Cayman Islands (***Foundation***);

3 **MVMT LABS, INC.**, a Delaware corporation (***Labs***); and

4 **[______________],** of [________________________] (***Holder***).

**RECITALS**

A Holder desires that "MOVE" digital asset tokens (***$MOVE*** or the ***Tokens***) be delivered to its Holder Delivery Wallet in satisfaction of the Warrant issued to Holder by Labs, in exchange for which the Holder is granting the Release (as such term is defined herein) hereunder.

B Token Issuer, which is a wholly owned subsidiary of Foundation, has minted and issued Tokens for delivery in accordance with the terms of this Agreement.

C The Parties recognize that the delivery of Tokens contemplated by this Agreement will occur as Foundation is considering with Labs a Potential Ecosystem Restructuring (as defined below).

**IT IS AGREED** as follows:

**1 DEFINITIONS AND INTERPRETATION**

1.1 In this Agreement, the following words and expressions shall have the following meanings:

***Affiliate*** means, with respect to any specified Person, any other Person who, directly or indirectly, controls, is controlled by, or is under common control with such Person, including, without limitation, any general partner, managing member, officer, founder, director or trustee of such Person, or any venture capital or similar investment fund or registered investment company now or hereafter existing that is controlled by one (1) or more general partners, managing members, investment managers, or investment advisers of, or shares the same management company, investment manager, or investment adviser with, such Person. The word "control" (including its correlative meanings, "controlled by", "controls" and "under common control with") shall mean directly or indirectly possessing the power to direct or cause the direction of the management and policies of the Affiliate, whether through ownership of voting securities, by contract or otherwise.

***Approved Custodian*** means Anchorage, Coinbase or another custodian acceptable to Token Issuer to which Warrant Tokens are delivered in accordance with this Agreement.

***Claims and Losses*** means any and all claims, actions, causes of action, suits, losses, debts, dues, sums of money, accounts, liabilities, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, rights, liens, damages, obligations, fees, attorney's fees, costs, judgments, awards, executions, claims, warranties, warranty claims, damages, and demands whatsoever claimed or held by, or owed to, Holder or its Related Parties by any other Party or any other Party's Related Parties of any kind or nature whatsoever, whether directly, indirectly, derivatively or otherwise, in each case, whether now or hereafter existing, absolute or contingent, liquidated or unliquidated, known or unknown, suspected or unsuspected, anticipates or unanticipated, matured or unmatured or determined or determinable, and whether arising under any applicable law, duty or contract (including without limitation pursuant to any SAFE or Warrant) or

otherwise at law or in equity, and without regard to whether the same sound under tort, contract or otherwise.

***Effective Time*** means the time when the Warrant Tokens are actually deposited in the Holder Delivery Wallet or into the Smart Contract Wallet in accordance with this Agreement, which will be on or prior to December 8, 2025 (subject to this Agreement being executed by all Parties, and Holder completing the Foundation's KYC/KYB process, on or before November 20, 2025).

***Excluded Matter*** means any fraud or willful misconduct (each as defined under the laws of the State of Delaware), as determined by any federal or state court in the United States in a final non-appealable judgment or order.

***Excluded Party*** means: (a) Rushikesh Manche, and (b) any other Related Party of Labs solely with respect to any Excluded Matter.

***Holder Delivery Wallet*** means a locked smart wallet with an Approved Custodian to which Warrant Tokens are delivered and from which Warrant Tokens will automatically unlock in accordance with the unlock schedule specified in Clause 3.1.

***Locked Tokens*** means Warrant Tokens that have not yet been unlocked and released from the Transfer Restrictions listed in Clause 3.1.

***Parties*** means Holder, Foundation, the Token Issuer and Labs, and ***Party*** shall mean any one of them.

***Person*** means any individual, corporation, partnership, trust, limited liability company, association or other entity, including any foundation, decentralized autonomous organization or other similar decentralized or distributed entity.

***Potential Ecosystem Restructuring*** means a potential restructuring, the specific terms of which remain subject to change in whole or in part, of the management of the Move ecosystem, under which Labs would transfer any intellectual property it may own to Foundation and the majority of its personnel to a new entity.

***Protocol*** means any blockchain-based network protocol, platform or application (including any blockchain-based network of nodes running a common smart contract or suite of related smart contracts) created, developed, operated or managed by, or based upon, or incorporating material portions of any intellectual property developed, owned, or licensed by the Token Issuer or Foundation, including the blockchain-based network protocol currently known as Movement (website: https://www.movementnetwork.xyz/).

***Regulation S*** means Regulation S and the related rules promulgated by the SEC under the Securities Act as an exemption from registration.

***Related Parties*** means, with respect to any Party, such Party's Affiliates and its and their current and former employees, counsel, officers, directors, stockholders, agents, representatives, successors-in-interest and assigns, other than any Excluded Party. For the avoidance of doubt, neither Labs nor any Labs Related Party is an Affiliate or Related Party of Foundation or Move Industries, Inc., under this Agreement.

***Release*** means the release and consent set forth in Clause 10.1 hereof.

***Released Matters*** means Claims and Losses from the beginning of the world up to and including the Effective Time, including without limitation any of the foregoing arising out of or related to (a) the business, activities, omissions or conduct of any or all of the Released Parties up to and including the Effective Time, (b) any other course of conduct, dealing, relationship, action, occurrence or omission relating to or in any way involving any or all of the Released Parties, (c) sales or issuances of SAFEs and other executed or potential fundraising activities at or involving the Released Parties, (d) the

development or marketing of the MOVE ecosystem, including tweets and other communications involving or relating to the Released Parties, Tokens or the MOVE ecosystem, (e) the creation of Tokens or airdrops, sales, transfers or issuances of Tokens, (f) market making matters relating to Tokens, (g) the listing of Tokens on various digital asset exchanges, and (h) otherwise relating to Tokens, in each case other Holder's or its Affiliates' right to receive payment under any SAFE(s) held by Holder or its Affiliates, as, to the extent, and at the time, specified in such SAFE(s).

***Released Parties*** means, individually and collectively, (a) each Related Party of Labs that is not an Excluded Party and (b) Foundation, Token Issuer, Move Industries, Inc., Move Ind., Inc. and their respective Related Parties.

***Releasing Parties*** means, collectively, Holder and its Related Parties.

***SAFE*** means a Simple Agreement for Future Equity between Labs and Holder.

***Safe Class*** means SAFEs issued by Labs prior to the date hereof and which have the same Post-Money Valuation Cap (as defined in the SAFE) and/or Discount Rate (as defined in the SAFE).

***SEC*** means the United States Securities and Exchange Commission.

***Securities Act*** means the United States Securities Act of 1933.

***Smart Contract Wallet*** means a smart wallet acceptable to Token Issuer into which Warrant Tokens are delivered and from which Warrant Tokens will automatically unlock in accordance with the unlock schedule specified in Clause 3.1.

***Tokens*** means $MOVE tokens.

***Transfer*** means, directly or indirectly, (a) transfer, sell, convey, encumber or otherwise dispose of, Locked Tokens, the Holder Delivery Wallet or the Smart Contract Wallet, (b) offer, contract to, charge, pledge, or grant any option to, transfer, sell, convey, encumber or otherwise dispose of Locked Tokens, the Holder Delivery Wallet or the Smart Contract Wallet, (c) enter into any swap or other agreement that transfers, in whole or in part, any of the economic consequences of ownership of, Locked Tokens, the Holder Delivery Wallet or the Smart Contract Wallet, whether cash-settled, settled by delivery of $MOVE or otherwise, (d) create or maintain any other derivative position equivalent to any of the actions described in clauses (a) through (c) that would be prohibited by Regulation S, (e) sell short any Locked Tokens, or (f) transfer or otherwise remove Locked Tokens from the Holder Delivery Wallet or the Smart Contract Wallet, in each case whether or not for value, excluding (1) a Transfer to an Affiliate of Holder that is subject to the restrictions set forth in clauses (a) through (f) and (2) any other action that the Token Issuer has consented to in writing in advance.

***UnLocked Tokens*** means Warrant Tokens that have been fully unlocked and released from the Transfer Restrictions listed in Clause 3.1.

***U.S. Person*** means a Person that is a "U.S. Person" as defined in Rule 902(k) of Regulation S.

***Warrant*** means the warrant to purchase $MOVE that Labs previously entered into with Holder and is listed on the signature page hereto. If Holder holds more than one Warrant, references herein to "the Warrant" shall be deemed to mean "each Warrant" held by Holder. Holder should attach a copy of the Warrant to its signature page, unless otherwise agreed with the Token Issuer.

***Warrant Class*** means warrants to purchase $MOVE that have substantially the same terms.

***Warrant Tokens*** means those $MOVE as set out in Schedule 1.

**2 CALCULATION OF $MOVE AND DELIVERY**

2.1 The number of Warrant Tokens has been calculated on a "net exercise" basis, i.e., netting from the gross number of $MOVE deliverable under the Warrant a net exercise based on a per $MOVE price of $0.10.

2.2 Subject to the Holder's completion of KYC/KYB to the satisfaction of Labs and Foundation, Warrant Tokens will be delivered to Holder by depositing them into its Holder Delivery Wallet or Smart Contract Wallet on or prior to December 8, 2025. The delivery of Warrant Tokens into the Holder Delivery Wallet or Smart Contract Wallet will be irrevocable, except as otherwise consented to by all Parties.

2.3 Holder may transfer Warrant Tokens from the Holder Delivery Wallet or the Smart Contract Wallet to its personal wallet once they become UnLocked Tokens. Warrant Tokens are not subject to vesting, only unlock in accordance with the Unlock Schedule (as defined below).

2.4 Warrant Tokens will be delivered to Holder free from all claims, liens, encumbrances, and restrictions (other than those arising under this Agreement). The Token Issuer represents and warrants that it is the lawful owner of the Warrant Tokens with good, legal and marketable title thereto, and the Token Issuer has the absolute right to sell, assign, convey, transfer, and deliver the Warrant Tokens as per the terms of this Agreement.

**3 UNLOCK AND TRANSFER RESTRICTIONS**

3.1 Warrant Tokens are issued to Holder on a locked basis and unlock on the following schedule (the ***Unlock Schedule***):

(a) 1/36th of the Warrant Tokens will unlock on December 9, 2025, and

(b) Thereafter, the remaining 35/36ths of Warrant Tokens will unlock in 35 equal monthly instalments thereafter such that all Warrant Tokens will be unlocked and released from the lock-up described in this Clause 3.1 on November 9, 2028.

3.2 Holder agrees that neither it nor its Affiliates shall Transfer Warrant Tokens except (i) when such Warrant Tokens are UnLocked Tokens and (ii) in compliance with applicable law, including U.S. federal and state securities laws (collectively, the ***Transfer Restrictions***).

(a) **U.S. Holder Resale Restrictions**. If Holder is a U.S. Person, Holder acknowledges and agrees that the Warrant Tokens may be "restricted securities" within the meaning of Rule 144 under the Securities Act. Holder understands that the Rule 144 holding period applicable to the Warrant Tokens begins on the Effective Time (and not from the date of the related SAFE or Warrant). Holder agrees not to resell or otherwise transfer any Warrant Tokens except pursuant to an effective registration statement or a valid exemption from registration under the Securities Act, including compliance with Rule 144 after the applicable holding period (one year).

(b) **Non-U.S. Holder Resale Restrictions**. If Holder is not a U.S. Person, Holder acknowledges and agrees that the Warrant Tokens are being offered and issued in an offshore transaction pursuant to Regulation S under the Securities Act. Holder agrees not to resell or otherwise transfer any Warrant Tokens to a U.S. Person or into the United States during the applicable distribution compliance period under Regulation S (currently one year from the date of issuance), and further agrees to comply with all other applicable transfer restrictions under U.S. securities laws.

3.3 Notwithstanding anything herein to the contrary, Holder may do any of the following:

(a) transfer Tokens (whether or not Locked Tokens) to any Affiliate or custodian of Holder (including to another network or wallet address of Holder or an Affiliate of Holder), subject to such Affiliate or other wallet being subject to the same Transfer Restrictions and the Token Issuer having determined the enforceability of such Transfer Restrictions to its reasonable satisfaction (which may be by a programmatic lock-up or smart contract);

(b) stake Unlocked Tokens in accordance with the Protocol consensus mechanism (including, but not limited to, any proof-of-work or proof-of-stake mechanisms), if any, to secure the Protocol (for clarity, reward tokens received via staking will not be locked and Clause 3.2(a) will not apply); and

(c) participate in voting and other governance abilities associated with control of the Tokens in accordance with the governance and other rules of the Protocol.

3.4 For clarity, nothing herein shall create restrictions on any Tokens acquired by Holder or its Affiliates on the open market; *provided* that all Tokens obtained via staking or a programmatic reward process with respect to Tokens will be subject to such restrictions herein retroactively applied to the date of such Tokens being obtained.

**4 REPRESENTATIONS AND WARRANTIES**

4.1 Each Party to this Agreement represents and warrants to the other Parties that:

(a) it has full legal power, capacity, and authorisation to enter into and to exercise its rights and perform its obligations under, and has taken all necessary action to authorise the entry into, performance and delivery of this Agreement;

(b) the obligations expressed to be assumed by it under this Agreement are its legal, valid, and binding obligations enforceable in accordance with their terms;

(c) in any proceedings taken in a relevant jurisdiction of such Party, the choice of the laws of the Cayman Islands as governing law of this Agreement and any judgment obtained in the Cayman Islands will be recognised and enforced; *provided*, *however*, that Clause 10.1 (and any other relevant clause in connection with a dispute or contractual interpretation question relating to Clause 10.1) shall be governed by the laws of Delaware;

(d) this Agreement is not subject to any registration or filing requirements, or any stamp duty or similar documentary tax in any relevant jurisdiction;

(e) it has not taken any corporate action and no other steps have been taken or legal proceedings been started or (to the best of such Party's knowledge and belief) threatened against it for its winding-up, bankruptcy, dissolution, or re-organisation or for the appointment of a receiver, administrator, administrative receiver, trustee, or similar officer of it or any or all of its assets; and

(f) it is entering into this Agreement as principal and solely for its own account, and not as the agent, trustee, or partner of any other person.

4.2 Each Party acknowledges and agrees that each other Party has entered into this Agreement based on the representations and warranties made in this Clause 4.

**5 HOLDER WARRANTIES**

Holder represents and warrants to the other Parties that:

5.1 Holder is the registered and beneficial owner of the Warrant, free and clear of all liens, restrictions, charges and encumbrances and not subject to any adverse claim of any nature whatsoever, and has

not assigned or transferred, directly or indirectly, any interest therein. Holder and, to the best of its knowledge, the other Releasing Parties, have not assigned or transferred, any Claim and Loss to any other person or entity, such that the assigned or transferred Claim and Loss would not be released by the Release.

5.2 Holder has sufficient knowledge and experience to evaluate the risks of receiving Warrant Tokens and can bear the risk of a complete loss of value. Holder is fully aware of: (a) the highly speculative nature of Warrant Tokens; (b) the financial hazards involved; and (c) the tax consequences of acquiring and holding the Warrant Tokens. Holder is acquiring the Warrant Tokens for its own account and not with a view to resale or distribution in violation of applicable securities laws.

5.3 Holder understands that the Warrant Tokens may be deemed “securities” under U.S. or other laws, have not been registered with the SEC or any other regulator, and cannot be resold in the United States or to U.S. Persons absent registration or an applicable exemption.

5.4 Holder has made, or has had the opportunity to make, an independent examination of the transactions contemplated hereby, including the consequences of providing the Release on behalf of itself and the other Releasing Parties. Holder has had an opportunity to consult with and has relied solely upon the advice, if any, of its legal counsel, financial or tax advisors, or accountants with respect to the transactions contemplated hereby to the extent Holder has deemed necessary, and has not been advised or directed by any other Party in respect of any such matters and has not relied on any such Parties in connection with this Agreement or the transactions contemplated hereby. The terms of this Agreement (including without limitation the Release) are contractual and not mere recitals. Holder has read this Agreement carefully and knows and understands the contents and meaning hereof and signs the same freely and without duress. Without limiting the scope of the foregoing, Holder understands, acknowledges and agrees that it or he is releasing and relinquishing both it or his own potential or actual claims and potential or actual claims of the other Releasing Parties.

5.5 Holder has sufficient understanding of the functionality, usage, storage, transmission mechanisms, and other material characteristics of cryptographic tokens, token wallets, and other token storage mechanisms, public and private key management, blockchain technology, and blockchain-based software systems to understand the terms of this Agreement. Holder understands, acknowledges, and agrees that such knowledge allows Holder to appreciate the implications and risks of acquiring the Warrant Tokens herein. Holder will at all times maintain control of Holder’s (current or future) wallet private key where any Warrant Tokens are stored.

5.6 Holder agrees to cooperate fully with Token Issuer's future requests for information and to complete any required Know Your Customer procedures as may be reasonably requested by the Token Issuer from time to time to comply with applicable laws, regulations, or to fulfil other regulatory or compliance requirements.

5.7 Holder, for itself and on behalf of the Releasing Parties, hereby acknowledges and agrees that, except as expressly set forth in this Agreement and the SAFE, the Token Issuer, Labs and Foundation have no other liabilities or obligations, of any kind or nature, owed to Holder or the Releasing Parties, in connection with or relating to the Released Matters or otherwise.

5.8 Holder understands that (a) Warrant Tokens may decrease in value or may not have any value; (b) no assurance is provided of the success of $MOVE; (c) unless and until Holder’s Warrant Tokens cease to be subject to the restrictions listed herein, Holder will not be able to transfer or otherwise dispose of Warrant Tokens; and (d) except as otherwise expressly agreed in writing by another Party after the Effective Time, the Warrant Tokens are the only Tokens that Holder or its Affiliates will or be entitled to receive from any other Party.

5.9 Neither Holder nor its Related Parties are:

(a) a citizen or resident, or otherwise subject to the laws, of any jurisdiction in which the offer, sale, receipt, or transfer of Warrant Tokens is not permitted by applicable laws in all respects, or prohibited;

(b) the subject of sanctions or restrictions under applicable laws and regulations administered by the U.S. Government, including the U.S. Department of Treasury's Office of Foreign Assets Control (***OFAC***), the European Union and/or enforced by its member states, the United Kingdom (as extended to the Cayman Islands and the British Virgin Islands by statutory instrument), the Cayman Islands and the British Virgin Islands, or any other government entity with regulatory authority over Holder. This includes persons that are physically located in, organized or incorporated under the laws of, or ordinarily resident in, Cuba, Iran, North Korea, Syria, the Crimea, the so-called Donetsk People's Republic and Luhansk People's Republic regions of Ukraine, the Kherson and Zaporizhzhia regions of Ukraine, and Venezuela (each a ***Sanctioned Jurisdiction***), or on behalf of the government of such a jurisdiction;

(c) identified on the U.S. Department of Commerce's Denied Persons, Unverified, or Entity List, or the U.S. Department of State's Debarred Parties List nor is Holder or its Related Parties a party which any other Party is prohibited to deal with under the laws of the United Kingdom (as extended to the Cayman Islands and the British Virgin Islands by statutory instrument), the Cayman Islands and the British Virgin Islands; and

(d) a citizen or resident of, organized or incorporated under the laws of, or physically located in, a Sanctioned Jurisdiction.

Holder acknowledges and agrees that each other Party has entered into this Agreement based on the representations and warranties made in this Clause 5.

**6 ADDITIONAL COVENANTS AND WARRANTIES**

6.1 The Parties (severally and not jointly) agree to use reasonable efforts to prohibit themselves, their respective employees, contractors, Affiliates and the employees and contractors of Holder's Affiliates from creating multiple accounts primarily for the purpose of participating in any airdrop of $MOVE.

6.2 In the event of an increase in Network Supply, Holder shall be entitled to receive a portion of such increase in Network Supply equal to the product of (a) the number of $MOVE issued in such increase in Network Supply multiplied by (b) a fraction, the numerator of which is the number of the Warrant Tokens held by Holder and the denominator of which is the total Network Supply, in each case immediately prior to such increase in Network Supply. "***Network Supply***" means the total number of $MOVE that may be issued in accordance with the terms of the Protocol, excluding any such increase resulting from $MOVE issued pursuant to staking, rewards, inflationary or dilutive controls on the Protocol or an on-chain Protocol governance vote that dilutes all Token holders on an equal basis. As of the date hereof, the Network Supply is 10,000,000,000 $MOVE. This clause shall apply iteratively in the event of multiple increases in Network Supply during the period Locked Tokens are held by Holder or its Affiliates.

6.3 Holder is liable for any and all of its own taxes on its receipt of Warrant Tokens. Holder will provide the other Parties with all information that any of them shall request in connection with the transactions contemplated by this Agreement and delivery of Warrant Tokens to Holder, in order to satisfy tax, accounting and securities laws reporting and other regulatory requirements. Holder will indemnify each other Party against any taxes suffered or incurred by such other Party in connection with the delivery of Warrant Tokens to Holder, including withholding taxes and failure to withhold on delivery of Warrant Tokens to Holder, other than taxes (if any) imposed on the net income of any other Party.

6.4 Holder agrees to take all reasonable steps and execute all further documents and instruments, as requested by any other Party, in order to give effect to the transactions and agreements contemplated by this Agreement.

**7 RIGHTS AS THE OWNER OF $MOVE**

7.1 Holder is not entitled to stake Warrant Tokens unless and until unlocked and permitted in accordance with the rules of the Protocol, vote or receive dividends or be deemed the purchaser of shares of the Token Issuer or any of its affiliated entities for any purpose, nor will anything contained herein be construed to confer on any Party, as such, any of the rights of a shareholder of any entity or any right to vote for the election of board members or upon any matter submitted to shareholders at any meeting thereof, or to give or withhold consent to the Token Issuer or corporate action or to receive notice of meetings, or to receive subscription rights or otherwise.

**8 COMPLIANCE WITH LAWS AND REGULATIONS**

8.1 The issuance of the Warrant Tokens will be subject to and conditioned upon compliance by Holder with all applicable laws and regulations. There is no guarantee that there will be any exchange or market available for Tokens.

8.2 The Warrant Tokens are not intended to be delivered in any jurisdiction or to any person where delivery of such Warrant Tokens would be unlawful under applicable law or would require registration of the $MOVE or licensing of Labs, Foundation or the Token Issuer. Delivery will only be made where lawful, and nothing in this Agreement constitutes an offer or sale of the Warrant Tokens in any jurisdiction where such offer or sale would be unlawful. Each Holder represents and agrees it is not subject to any such restrictions and is responsible for ensuring its own compliance with applicable laws in connection with its receipt and holding of Warrant Tokens.

**9 DISCLAIMERS AND LIMITATION OF LIABILITY**

9.1 A Party shall not be liable or responsible to any other Party, nor shall a Party be deemed to have defaulted under or breached this Agreement, for any failure or delay in fulfilling or performing any term of this Agreement (including without limitation sending Warrant Tokens to the Holder Delivery Wallet or Smart Contract Wallet) to the extent such failure or delay is caused by or results from (a) acts of God; (b) flood, fire, earthquake, pandemics, or explosion; (c) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, or other civil unrest; (d) changes to applicable law or regulations; (e) unavailability or inoperability of the underlying blockchain on which records relating to activity involving Tokens are kept; and (f) action by any governmental authority.

9.2 Except as expressly set forth herein, no Party makes any warranty whatsoever with respect to Warrant Tokens, including any (a) warranty of merchantability; (b) warranty of fitness for a particular purpose; or (c) warranty against infringement of intellectual property rights of a third party; whether arising by law, course of dealing, course of performance, usage of trade, or otherwise.

9.3 To the fullest extent permitted by applicable laws, in no event will any Party be liable to Holder or its Related Parties for any indirect, special, incidental, consequential, or exemplary loss of any kind (including, but not limited to, where related to loss of revenue, income or profits, loss of use or data, or damages for business interruption) arising out of or in any way related to the sale, purchase, or use of Tokens or otherwise related to this Agreement, regardless of the cause of action, whether based in contract, tort (including, but not limited to, simple negligence, whether active, passive, or imputed), or any other legal or equitable basis (even if any Party has been advised of the possibility of such losses and regardless of whether such losses were foreseeable). For the avoidance of doubt, no Party shall be entitled to recover damages in respect of any claim (as the case may be) if, and to the extent that, such Party has already recovered damages in respect of the same fact or subject matter.

**10 RELEASE AND CONSENT**

10.1 Upon the occurrence of the Effective Time, without need for further documentation, action, consent, notice to, or agreement by any Party:

(a) (i) The Warrant shall be deemed to have been fully and finally performed and satisfied, (ii) no Party or any other Person shall have any further rights or obligations in respect of the Warrant, and (iii) Holder's rights and obligations shall thereafter be solely as set forth herein. Holder acknowledges and agrees that the issuance of Warrant Tokens to Holder is in consideration of its execution and delivery of this Agreement (including Holder's provision of the Release to the other Parties), and constitutes good and valid consideration therefor.

(b) Holder, on behalf of itself and its Related Parties (collectively, the ***Releasing Parties***), hereby, knowingly and willingly, fully and irrevocably expressly waives, acquits, remises, discharges and forever releases each of the Released Parties from and against any and all Claims and Losses arising out of or related to the Released Matters. Holder, on behalf of itself and the other Releasing Parties, hereby agrees that it and they will not or participate in, join or cause or permit to be filed on their behalf, any claim or proceeding for any Claim or Loss against any of the Released Parties with respect to any Released Matter.

(c) Without limiting the Release, Holder hereby amends, agrees to, consents to, and waives, as applicable:

(i) any provision, condition or requirement in any SAFE and/or Token Warrant that was or could have been breached (with the giving of notice, passage of time or otherwise) by any matter that is or arises out of a Released Matter; and

(ii) the Potential Ecosystem Restructuring, and any claim that the Potential Ecosystem Restructuring (A) constitutes or could have constituted a "Change of Control," a "Liquidation Event," or "Dissolution Event" (or any similar event or legal consequence) for purposes of any SAFE or Token Warrant or (B) breaches any SAFE or Token Warrant

(collectively, the "Consent and Waiver").

The Consent and Waiver is being given pursuant to Section 5(a) of Holder's SAFE and Section 8.6 of the Warrant. Upon the execution and delivery of this Agreement and other similar agreements (containing similar consents and waivers) sufficient to constitute a majority in interest of any SAFE Class and Warrant Class, all holders in such SAFE Class and Warrant Class will be bound by such consent and waiver, whether or not they shall have executed (yet or ever) an agreement containing a consent and waiver. For clarity, this Consent and Waiver (and any similar consent and waiver) is subject to the limitations set forth in Section 5(a) of the SAFEs and Section 8.6 of the Token Warrants (or counterparts thereto).

(d) Holder, on behalf of itself and the other Releasing Parties, hereby expressly and knowingly waives and relinquishes any and all rights that it or they have or might have relating to the Released Matters and Consent and Waiver under any applicable law, statute, regulation or common law principle, including without limitation California Civil Code § 1542 which reads as follows:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

Holder further waives any equivalent protections under the laws of any other jurisdiction that might otherwise apply.

(e) Holder, on behalf of itself and the other Releasing Parties, hereby acknowledges and agrees that (i) it or they may hereafter discover facts different from, or in addition to, those which it or they now believe to be true with respect to the Released Matters; (ii) the Release and Consent and Waiver shall be and remain effective in all respects notwithstanding such

different or additional facts or discovery thereof, and that this Release contemplates the extinguishment of all such Released Matters; (iii) it or they are represented by counsel and/or otherwise have had an opportunity to seek advice regarding this Release and Consent and Waiver from counsel; (iv) it and they have read and fully understand the provisions of California Civil Code § 1542 or other applicable law, statute or common principle of similar effect; (v) nevertheless, it is the intention of the Releasing Parties to fully, finally and forever settle and release the Released Matters, including claims that exist, or might have existed, in connection with the Released Matters, and that this Release forever extinguishes all such Claims and Losses; and (vi) this Release may be pleaded as a full and complete defense to any and all Released Matters and Claims and Losses being released pursuant to this Release, and that this Release may be used as the basis for an injunction to halt any action, suit or other proceeding based upon the Released Matters.

(f) Each Party hereby agrees that following the Effective Time, no amendment, modification or termination of this Agreement shall affect, modify or terminate the Release or this Clause 10.1, in each case except as expressly consented to in writing by each Party.

(g) For the avoidance of doubt, the provisions of this clause 10 shall be effective if and only if the Effective Time occurs – i.e., the Warrant Tokens are actually deposited in the Holder Delivery Wallet or into the Smart Contract Wallet in accordance with this Agreement.

**11 MISCELLANEOUS**

11.1 This Agreement contains the whole agreement between the Parties relating to the transactions contemplated by this Agreement and supersedes all previous understandings and agreements between any of the Parties relating to these transactions or the subject matter hereof (including the Warrant). Each Party acknowledges that, in agreeing to enter into this Agreement, it has not relied on any representation, warranty, collateral contract, or other assurance (except those set out in this Agreement and the Release) made by or on behalf of any other Party or any other person whatsoever before the execution of this Agreement. Without limiting the foregoing, Holder, for itself and on behalf of the Releasing Parties, acknowledges that, except for the representations and warranties contained herein, neither Holder nor any of the Releasing Parties is relying on, any other express or implied representation or warranty with respect to the value or future prospects of Warrant Tokens; the Company or any other matter related to this Agreement. Each Party waives all rights and remedies which, but for this Clause, might otherwise be available to it in respect of any such representation, warranty, collateral contract, or other assurance, provided that nothing in this Clause shall limit or exclude any liability for willful misconduct or fraud.

11.2 If a provision of this Agreement is or becomes illegal, invalid, or unenforceable in any jurisdiction, that shall not affect (a) the validity or enforceability in that jurisdiction of any other provision of this Agreement or (b) the validity or enforceability in other jurisdictions of that or any other provision of this Agreement.

11.3 No Party may assign, transfer, or dispose of its rights and/or obligations arising under, out of or in connection with this Agreement to any other person without the prior written consent of the other Party; provided, that from and after the Effective Time, no consent of Labs shall be necessary for any such assignment, transfer or disposal other than in respect of Clause 10.1 hereof or that would otherwise adversely affect the rights hereunder of Labs or its Related Parties. No delay or omission on the part of any Party in exercising any right, power, or remedy provided by the law of any jurisdictions or under this Agreement shall (a) impair such right, power, or remedy or (b) operate as a waiver thereof.

11.4 Each Released Party is an intended third-party beneficiary of the Release and is entitled to enforce the same as if directly a party hereto. Except as otherwise expressly provided herein, the provisions hereof shall inure to the benefit of, and be binding upon each Party and their respective successors, assigns, heirs, executors and administrators.

11.5 No waiver of any right or rights arising under this Agreement shall be effective unless such waiver is in writing and signed by the Party or Parties whose rights are being waived; provided, that from and after the Effective Time, no consent of Labs shall be necessary for any waiver other than in respect of Clause 10.1 hereof or that would otherwise adversely affect the rights hereunder of Labs or its Related Parties. This Agreement may be executed in any number of counterparts and all of such counterparts taken together shall be deemed to constitute one and the same instrument.

11.6 This Agreement may only be amended by an instrument in writing signed by each Party; provided, that from and after the Effective Time, no consent of Labs shall be necessary for any amendment other than in respect of Clause 10.1 hereof or that would otherwise adversely affect the rights hereunder of Labs or any Related Party of Labs that is a Released Party. Time shall be of the essence in this Agreement. This Agreement shall not be deemed to create any partnership, joint venture, agency, fiduciary, or employment relationship between the Parties. No Party holds itself out as the agent or partner of any other Party.

11.7 Except as otherwise expressly provided for in this Agreement, this Agreement does not give rise to any rights under the Contracts (Rights of Third Parties) Act (as revised) to enforce any term of this Agreement.

11.8 Sections 8 and 19(3) of the Electronic Transactions Act (as revised) of the Cayman Islands are hereby excluded.

11.9 In this Agreement, unless the contrary intention appears, a reference to:

(a) this ***Agreement*** includes the Schedules to this Agreement;

(b) an ***authorisation*** includes an authorisation, consent, approval, resolution, licence, exemption, filing, registration, or notarisation;

(c) a ***person*** includes any individual, company, unincorporated association, or body of persons (including a partnership, joint venture, or consortium), government, state, agency, international organisation, or other entity;

(d) a ***regulation*** includes any regulation, rule, official directive, or guideline (whether or not having the force of law, but if not having the force of law, if compliance is customary) of any governmental, inter-governmental, or supranational body, agency, department, or regulatory or self-regulatory authority or organisation;

(e) a ***relevant jurisdiction*** in relation to any person means a jurisdiction in which that person is resident, domiciled, incorporated (in the case of corporate entities) or has citizenship (in the case of natural persons), or has a branch or place of business, or is in some other way connected;

(f) ***tax*** shall be construed so as to include any tax, fund, levy, impost, duty or other charge of a similar nature (including, without limitation, any penalty or interest payable in connection with any failure to pay or any delay in paying of the same);

(g) a provision of law or regulation is a reference to that provision as amended or re-enacted;

(h) a ***Clause*** or ***Schedule*** is a reference to a clause in or schedule to this Agreement respectively;

(i) a person includes its successors, permitted transferees and assigns;

(j) the singular shall include the plural and vice versa; and

(k) a document is a reference to that document as amended.

(l) The word ***including*** is to be construed as being by way of illustration or emphasis only and is not to be construed as, nor shall it take effect as, limiting the generality of any foregoing words.

(m) Headings do not affect the interpretation of this Agreement.

**12 NOTICES**

12.1 All notices or other communications under or in connection with this Agreement shall be given in writing and may be made by electronic mail. Any such notice will be deemed to be given as follows (a) if by hand or by international courier, upon delivery and (b) if by electronic mail, when sent.

12.2 All communications and notices provided or given in connection with this Agreement shall be (a) in English or (b) if not in English, accompanied by a certified English translation and, in this case, the English translation shall prevail unless the document is a statutory or other official document.

12.3 Any notice may be served on the relevant Party at its registered office or such other physical or electronic address as the relevant Party shall give written notice of to each other Party.

**13 CONFIDENTIALITY**

13.1 This Agreement and its existence are confidential. No Party may disclose this Agreement, the existence of this Agreement or its contents to any other person except (a) as may be required by law (including disclosures required under the Securities Act of 1934); (b) in connection with any proceedings for the resolution of any dispute arising between the Parties under this Agreement; or (c) with the prior written consent of the other Party.

13.2 If any Party is required to disclose any information regarding this Agreement or its existence by law they shall notify each other Party in writing as soon as is reasonably possible after such disclosure has been made.

**14 COSTS AND EXPENSES**

14.1 Each Party shall be responsible for the payment of its own costs and expenses in connection with the preparation, execution, and carrying into effect of this Agreement.

**15 DISPUTE RESOLUTION**

15.1 Any dispute, controversy, difference or claim arising out of or relating to this Agreement, including the existence, validity, interpretation, performance, breach or termination thereof or any dispute regarding non-contractual obligations arising out of or relating to it shall be referred to and finally resolved in accordance with the Arbitration Rules of the Cayman International Mediation and Arbitration Centre Ltd (***Rules***) in force as at the date hereof, which Rules are deemed to be incorporated by reference into this clause. The arbitration shall be conducted in the English language. The number of arbitrators shall be one. The place of arbitration will be George Town, Cayman Islands. The decision of the sole arbitrator to any such dispute, controversy, difference or claim shall be final and binding upon each Party. Each Party waives any right it may have to assert the doctrine of *forum non conveniens*, to assert that it is not subject to the jurisdiction of such arbitration or courts or to object to venue to the extent any proceeding is brought in accordance herewith.

**16 GOVERNING LAW**

16.1 This Agreement and the relationship between the Parties in relation to the subject matter of this Agreement shall be governed exclusively by Cayman Islands law; *provided*, *however*, that Clause 10.1 (and any other relevant clause in connection with a dispute or contractual interpretation question relating to Clause 10.1) the Release shall be governed by, and construed in accordance with, the

substantive law of the State of Delaware, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof.

[*Remainder of page intentionally blank*]

Docusign Envelope ID: 1F9BB922-E490-4A4B-BD26-5BC71E3950E5

**SCHEDULE 1**

Tokens

| Holder | Holder Delivery Wallet or Smart Contract Wallet | Warrant Tokens |
|---|---|---|
| [Name and Address] | [Wallet Address] | [____________] |

**EXECUTION PAGE**

This Agreement has been entered into on the date first above written.

**Token Issuer**

| | | |
|---|---|---|
| Executed for and on behalf of | ) | |
| **MOVEMENT LIMITED** | ) | ............................................ |
| | ) | (Director) |

**Foundation**

| | | |
|---|---|---|
| Executed for and on behalf of | ) | |
| **MOVEMENT NETWORK FOUNDATION** | ) | ............................................ |
| | ) | (Director) |

**Labs**

| | | |
|---|---|---|
| Executed for and on behalf of | ) | |
| **MVMT LABS, INC.** | ) | ............................................ |
| | ) | (Director) |

**Holder**

| | | |
|---|---|---|
| Executed for and on behalf of | ) | |
| **[______________________]** | ) | ............................................ |
| by its duly authorised representative | ) | |

**EXHIBIT B (FORM OF OTA TUA)**

**MOVEMENT LIMITED**
(***Token Issuer***)

**MOVEMENT NETWORK FOUNDATION**
(***Foundation***)

**MVMT LABS, INC.**
(***Labs***)

and

**[HOLDER]**
(***Holder***)

---

**TOKEN UNDERTAKING AGREEMENT AND RELEASE**
in relation to
**$MOVE**

---

**THIS TOKEN UNDERTAKING AGREEMENT AND RELEASE** (this ***Agreement***) is dated [_______________] and entered into

**AMONG**

1 **MOVEMENT LIMITED**, a company registered in the British Virgin Islands (the ***Token Issuer***);

2 **MOVEMENT NETWORK FOUNDATION**, an exemption foundation company registered in the Cayman Islands (***Foundation***);

3 **MVMT LABS, INC.**, a Delaware corporation (***Labs***); and

4 **[_______________],** of [_________________________] (***Holder***).

**RECITALS**

A Holder desires that "MOVE" digital asset tokens (***$MOVE*** or the ***Tokens***) be delivered to its Holder Delivery Wallet in satisfaction of the obligations to deliver $MOVE under the Token Agreement by and between Holder and Labs, in exchange for which the Holder is granting the Release (as such term is defined herein) hereunder.

B Token Issuer, which is a wholly owned subsidiary of Foundation, has minted and issued Tokens for delivery in accordance with the terms of this Agreement.

C The Parties recognize that the delivery of Tokens contemplated by this Agreement will occur as Foundation is considering with Labs a Potential Ecosystem Restructuring (as defined below).

**IT IS AGREED** as follows:

**1 DEFINITIONS AND INTERPRETATION**

1.1 In this Agreement, the following words and expressions shall have the following meanings:

***Affiliate*** means, with respect to any specified Person, any other Person who, directly or indirectly, controls, is controlled by, or is under common control with such Person, including, without limitation, any general partner, managing member, officer, founder, director or trustee of such Person, or any venture capital or similar investment fund or registered investment company now or hereafter existing that is controlled by one (1) or more general partners, managing members, investment managers, or investment advisers of, or shares the same management company, investment manager, or investment adviser with, such Person. The word "control" (including its correlative meanings, "controlled by", "controls" and "under common control with") shall mean directly or indirectly possessing the power to direct or cause the direction of the management and policies of the Affiliate, whether through ownership of voting securities, by contract or otherwise.

***Approved Custodian*** means Anchorage, Coinbase or another custodian acceptable to Token Issuer to which Holder Tokens are delivered in accordance with this Agreement.

***Claims and Losses*** means any and all claims, actions, causes of action, suits, losses, debts, dues, sums of money, accounts, liabilities, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, rights, liens, damages, obligations, fees, attorney's fees, costs, judgments, awards, executions, claims, warranties, warranty claims, damages, and demands whatsoever claimed or held by, or owed to, Holder or its Related Parties by any other Party or any other Party's Related Parties of any kind or nature whatsoever, whether directly, indirectly, derivatively or otherwise, in each case, whether now or hereafter existing, absolute or contingent, liquidated or unliquidated, known or unknown, suspected or unsuspected, anticipates or unanticipated, matured or unmatured or determined or determinable, and whether arising under any applicable law, duty or contract (including without limitation pursuant to any Token Agreement) or

otherwise at law or in equity, and without regard to whether the same sound under tort, contract or otherwise.

***Effective Time*** means the time when the Holder Tokens are actually deposited in the Holder Delivery Wallet or into the Smart Contract Wallet in accordance with this Agreement, which will be on or prior to December 8, 2025 (subject to this Agreement being executed by all Parties, and Holder completing the Foundation's KYC/KYB process, on or before November 20, 2025).

***Excluded Matter*** means any fraud or willful misconduct (each as defined under the laws of the State of Delaware), as determined by any federal or state court in the United States in a final non-appealable judgment or order.

***Excluded Party*** means: (a) Rushikesh Manche, and (b) any other Related Party of Labs solely with respect to any Excluded Matter.

***Holder Delivery Wallet*** means a locked smart wallet with an Approved Custodian to which Holder Tokens are delivered and from which Holder Tokens will automatically unlock in accordance with the unlock schedule specified in Clause 3.1.

***Holder Tokens*** means those $MOVE as set out in Schedule 1.

***Locked Tokens*** means Holder Tokens that have not yet been unlocked and released from the Transfer Restrictions listed in Clause 3.1.

***Parties*** means Holder, Foundation, the Token Issuer and Labs, and ***Party*** shall mean any one of them.

***Person*** means any individual, corporation, partnership, trust, limited liability company, association or other entity, including any foundation, decentralized autonomous organization or other similar decentralized or distributed entity.

***Potential Ecosystem Restructuring*** means a potential restructuring, the specific terms of which remain subject to change in whole or in part, of the management of the Move ecosystem, under which Labs would transfer any intellectual property it may own to Foundation and the majority of its personnel to a new entity.

***Protocol*** means any blockchain-based network protocol, platform or application (including any blockchain-based network of nodes running a common smart contract or suite of related smart contracts) created, developed, operated or managed by, or based upon, or incorporating material portions of any intellectual property developed, owned, or licensed by the Token Issuer or Foundation, including the blockchain-based network protocol currently known as Movement (website: https://www.movementnetwork.xyz/).

***Regulation S*** means Regulation S and the related rules promulgated by the SEC under the Securities Act as an exemption from registration.

***Related Parties*** means, with respect to any Party, such Party's Affiliates and its and their current and former employees, counsel, officers, directors, stockholders, agents, representatives, successors-in-interest and assigns, other than any Excluded Party. For the avoidance of doubt, neither Labs nor any Labs Related Party is an Affiliate or Related Party of Foundation or Move Industries, Inc., under this Agreement.

***Release*** means the release and consent set forth in Clause 10.1 hereof.

***Released Matters*** means Claims and Losses from the beginning of the world up to and including the Effective Time, including without limitation any of the foregoing arising out of or related to (a) the business, activities, omissions or conduct of any or all of the Released Parties up to and including the Effective Time, (b) any other course of conduct, dealing, relationship, action, occurrence or omission

relating to or in any way involving any or all of the Released Parties, (c) sales or issuances of SAFEs and other executed or potential fundraising activities at or involving the Released Parties, (d) the development or marketing of the MOVE ecosystem, including tweets and other communications involving or relating to the Released Parties, Tokens or the MOVE ecosystem, (e) the creation of Tokens or airdrops, sales, transfers or issuances of Tokens, (f) market making matters relating to Tokens, (g) the listing of Tokens on various digital asset exchanges, and (h) otherwise relating to Tokens, in each case other than Holder's or its Affiliates' right to receive payment under any agreement between the Released Parties and Holder or its Affiliates, as, to the extent, and at the time, specified in such agreements.

***Released Parties*** means, individually and collectively, (a) each Related Party of Labs that is not an Excluded Party and (b) Foundation, Token Issuer, Move Industries, Inc., Move Ind., Inc. and their respective Related Parties.

***Releasing Parties*** means, collectively, Holder and its Related Parties.

***SEC*** means the United States Securities and Exchange Commission.

***Securities Act*** means the United States Securities Act of 1933.

***Smart Contract Wallet*** means a smart wallet acceptable to Token Issuer into which Holder Tokens are delivered and from which Holder Tokens will automatically unlock in accordance with the unlock schedule specified in Clause 3.1.

***Token Agreement*** means the Token Agreement that Labs previously entered into with Holder and is listed on the signature page hereto. If Holder is a party to more than one Token Agreement, references herein to "the Token Agreement" shall be deemed to mean "each Token Agreement" held by Holder. Holder should attach a copy of the Token Agreement to its signature page, unless otherwise agreed with the Token Issuer.

***Token Agreement Class*** means agreements with the Company entitling a person to receive $MOVE under such agreement that have substantially the same terms.

***Tokens*** means $MOVE tokens.

***Transfer*** means, directly or indirectly, (a) transfer, sell, convey, encumber or otherwise dispose of, Locked Tokens, the Holder Delivery Wallet or the Smart Contract Wallet, (b) offer, contract to, charge, pledge, or grant any option to, transfer, sell, convey, encumber or otherwise dispose of Locked Tokens, the Holder Delivery Wallet or the Smart Contract Wallet, (c) enter into any swap or other agreement that transfers, in whole or in part, any of the economic consequences of ownership of, Locked Tokens, the Holder Delivery Wallet or the Smart Contract Wallet, whether cash-settled, settled by delivery of $MOVE or otherwise, (d) create or maintain any other derivative position equivalent to any of the actions described in clauses (a) through (c) that would be prohibited by Regulation S, (e) sell short any Locked Tokens, or (f) transfer or otherwise remove Locked Tokens from the Holder Delivery Wallet or the Smart Contract Wallet, in each case whether or not for value, excluding (1) a Transfer to an Affiliate of Holder that is subject to the restrictions set forth in clauses (a) through (f) and (2) any other action that the Token Issuer has consented to in writing in advance.

***UnLocked Tokens*** means Holder Tokens that have been fully unlocked and released from the Transfer Restrictions listed in Clause 3.1.

***U.S. Person*** means a Person that is a "U.S. Person" as defined in Rule 902(k) of Regulation S.

**2 CALCULATION OF $MOVE AND DELIVERY**

2.1 The number of Holder Tokens has been calculated on a "net exercise" basis, i.e., netting from the gross number of $MOVE deliverable under the Token Agreement a net exercise based on a per $MOVE price of $0.10.

2.2 Subject to the Holder's completion of KYC/KYB to the satisfaction of Labs and Foundation, Holder Tokens will be delivered to Holder by depositing them into its Holder Delivery Wallet or Smart Contract Wallet on or prior to December 8, 2025. The delivery of Holder Tokens into the Holder Delivery Wallet or Smart Contract Wallet will be irrevocable, except as otherwise consented to by all Parties.

2.3 Holder may transfer Holder Tokens from the Holder Delivery Wallet or the Smart Contract Wallet to its personal wallet once they become UnLocked Tokens. Holder Tokens are not subject to vesting, only unlock in accordance with the Unlock Schedule (as defined below).

2.4 Holder Tokens will be delivered to Holder free from all claims, liens, encumbrances, and restrictions (other than those arising under this Agreement). The Token Issuer represents and warrants that it is the lawful owner of the Holder Tokens with good, legal and marketable title thereto, and the Token Issuer has the absolute right to sell, assign, convey, transfer, and deliver the Holder Tokens as per the terms of this Agreement.

**3 UNLOCK AND TRANSFER RESTRICTIONS**

3.1 Holder Tokens are issued to Holder on a locked basis and unlock on the following schedule (the ***Unlock Schedule***):

(a) 1/36th of the Holder Tokens will unlock on December 9, 2025, and

(b) Thereafter, the remaining 35/36ths of Holder Tokens will unlock in 35 equal monthly instalments thereafter such that all Holder Tokens will be unlocked and released from the lock-up described in this Clause 3.1 on November 9, 2028.

3.2 Holder agrees that neither it nor its Affiliates shall Transfer Holder Tokens except (i) when such Holder Tokens are UnLocked Tokens and (ii) in compliance with applicable law, including U.S. federal and state securities laws (collectively, the ***Transfer Restrictions***).

(a) **U.S. Holder Resale Restrictions**. If Holder is a U.S. Person, Holder acknowledges and agrees that the Holder Tokens may be "restricted securities" within the meaning of Rule 144 under the Securities Act. Holder understands that the Rule 144 holding period applicable to the Holder Tokens begins on the Effective Time (and not from the date of the related Token Agreement). Holder agrees not to resell or otherwise transfer any Holder Tokens except pursuant to an effective registration statement or a valid exemption from registration under the Securities Act, including compliance with Rule 144 after the applicable holding period (one year).

(b) **Non-U.S. Holder Resale Restrictions**. If Holder is not a U.S. Person, Holder acknowledges and agrees that the Holder Tokens are being offered and issued in an offshore transaction pursuant to Regulation S under the Securities Act. Holder agrees not to resell or otherwise transfer any Holder Tokens to a U.S. Person or into the United States during the applicable distribution compliance period under Regulation S (currently one year from the date of issuance), and further agrees to comply with all other applicable transfer restrictions under U.S. securities laws.

3.3 Notwithstanding anything herein to the contrary, Holder may do any of the following:

(a) transfer Tokens (whether or not Locked Tokens) to any Affiliate or custodian of Holder (including to another network or wallet address of Holder or an Affiliate of Holder), subject to such Affiliate or other wallet being subject to the same Transfer Restrictions and the Token Issuer having determined the enforceability of such Transfer Restrictions to its reasonable satisfaction (which may be by a programmatic lock-up or smart contract);

(b) stake Unlocked Tokens in accordance with the Protocol consensus mechanism (including, but not limited to, any proof-of-work or proof-of-stake mechanisms), if any, to secure the Protocol (for clarity, reward tokens received via staking will not be locked and Clause 3.2(a) will not apply); and

(c) participate in voting and other governance abilities associated with control of the Tokens in accordance with the governance and other rules of the Protocol.

3.4 For clarity, nothing herein shall create restrictions on any Tokens acquired by Holder or its Affiliates on the open market; *provided* that all Tokens obtained via staking or a programmatic reward process with respect to Tokens will be subject to such restrictions herein retroactively applied to the date of such Tokens being obtained.

**4 REPRESENTATIONS AND WARRANTIES**

4.1 Each Party to this Agreement represents and warrants to the other Parties that:

(a) it has full legal power, capacity, and authorisation to enter into and to exercise its rights and perform its obligations under, and has taken all necessary action to authorise the entry into, performance and delivery of this Agreement;

(b) the obligations expressed to be assumed by it under this Agreement are its legal, valid, and binding obligations enforceable in accordance with their terms;

(c) in any proceedings taken in a relevant jurisdiction of such Party, the choice of the laws of the Cayman Islands as governing law of this Agreement and any judgment obtained in the Cayman Islands will be recognised and enforced; *provided*, *however*, that Clause 10.1 (and any other relevant clause in connection with a dispute or contractual interpretation question relating to Clause 10.1) shall be governed by the laws of Delaware;

(d) this Agreement is not subject to any registration or filing requirements, or any stamp duty or similar documentary tax in any relevant jurisdiction;

(e) it has not taken any corporate action and no other steps have been taken or legal proceedings been started or (to the best of such Party's knowledge and belief) threatened against it for its winding-up, bankruptcy, dissolution, or re-organisation or for the appointment of a receiver, administrator, administrative receiver, trustee, or similar officer of it or any or all of its assets; and

(f) it is entering into this Agreement as principal and solely for its own account, and not as the agent, trustee, or partner of any other person.

4.2 Each Party acknowledges and agrees that each other Party has entered into this Agreement based on the representations and warranties made in this Clause 4.

**5 HOLDER WARRANTIES**

Holder represents and warrants to the other Parties that:

5.1 Holder is the registered and beneficial owner of the right to receive Holder Tokens owed under the Token Agreement, free and clear of all liens, restrictions, charges and encumbrances and not subject

to any adverse claim of any nature whatsoever, and has not assigned or transferred, directly or indirectly, any interest therein. Holder and, to the best of its knowledge, the other Releasing Parties, have not assigned or transferred, any Claim and Loss to any other person or entity, such that the assigned or transferred Claim and Loss would not be released by the Release.

5.2 Holder has sufficient knowledge and experience to evaluate the risks of receiving Holder Tokens and can bear the risk of a complete loss of value. Holder is fully aware of: (a) the highly speculative nature of Holder Tokens; (b) the financial hazards involved; and (c) the tax consequences of acquiring and holding the Holder Tokens. Holder is acquiring the Holder Tokens for its own account and not with a view to resale or distribution in violation of applicable securities laws.

5.3 Holder understands that the Holder Tokens may be deemed "securities" under U.S. or other laws, have not been registered with the SEC or any other regulator, and cannot be resold in the United States or to U.S. Persons absent registration or an applicable exemption.

5.4 Holder has made, or has had the opportunity to make, an independent examination of the transactions contemplated hereby, including the consequences of providing the Release on behalf of itself and the other Releasing Parties. Holder has had an opportunity to consult with and has relied solely upon the advice, if any, of its legal counsel, financial or tax advisors, or accountants with respect to the transactions contemplated hereby to the extent Holder has deemed necessary, and has not been advised or directed by any other Party in respect of any such matters and has not relied on any such Parties in connection with this Agreement or the transactions contemplated hereby. The terms of this Agreement (including without limitation the Release) are contractual and not mere recitals. Holder has read this Agreement carefully and knows and understands the contents and meaning hereof and signs the same freely and without duress. Without limiting the scope of the foregoing, Holder understands, acknowledges and agrees that it or he is releasing and relinquishing both it or his own potential or actual claims and potential or actual claims of the other Releasing Parties.

5.5 Holder has sufficient understanding of the functionality, usage, storage, transmission mechanisms, and other material characteristics of cryptographic tokens, token wallets, and other token storage mechanisms, public and private key management, blockchain technology, and blockchain-based software systems to understand the terms of this Agreement. Holder understands, acknowledges, and agrees that such knowledge allows Holder to appreciate the implications and risks of acquiring the Holder Tokens herein. Holder will at all times maintain control of Holder's (current or future) wallet private key where any Holder Tokens are stored.

5.6 Holder agrees to cooperate fully with Token Issuer's future requests for information and to complete any required Know Your Customer procedures as may be reasonably requested by the Token Issuer from time to time to comply with applicable laws, regulations, or to fulfil other regulatory or compliance requirements.

5.7 Holder, for itself and on behalf of the Releasing Parties, hereby acknowledges and agrees that, except as expressly set forth in this Agreement and the Token Agreement, the Token Issuer, Labs and Foundation have no other liabilities or obligations, of any kind or nature, owed to Holder or the Releasing Parties, in connection with or relating to the Released Matters or otherwise.

5.8 Holder understands that (a) Holder Tokens may decrease in value or may not have any value; (b) no assurance is provided of the success of $MOVE; (c) unless and until Holder's Holder Tokens cease to be subject to the restrictions listed herein, Holder will not be able to transfer or otherwise dispose of Holder Tokens; and (d) except as otherwise expressly agreed in writing by another Party after the Effective Time, the Holder Tokens are the only Tokens that Holder or its Affiliates will or be entitled to receive from any other Party.

5.9 Neither Holder nor its Related Parties are:

(a) a citizen or resident, or otherwise subject to the laws, of any jurisdiction in which the offer, sale, receipt, or transfer of Holder Tokens is not permitted by applicable laws in all respects, or prohibited;

(b) the subject of sanctions or restrictions under applicable laws and regulations administered by the U.S. Government, including the U.S. Department of Treasury's Office of Foreign Assets Control (***OFAC***), the European Union and/or enforced by its member states, the United Kingdom (as extended to the Cayman Islands and the British Virgin Islands by statutory instrument), the Cayman Islands and the British Virgin Islands, or any other government entity with regulatory authority over Holder. This includes persons that are physically located in, organized or incorporated under the laws of, or ordinarily resident in, Cuba, Iran, North Korea, Syria, the Crimea, the so-called Donetsk People's Republic and Luhansk People's Republic regions of Ukraine, the Kherson and Zaporizhzhia regions of Ukraine, and Venezuela (each a ***Sanctioned Jurisdiction***), or on behalf of the government of such a jurisdiction;

(c) identified on the U.S. Department of Commerce's Denied Persons, Unverified, or Entity List, or the U.S. Department of State's Debarred Parties List nor is Holder or its Related Parties a party which any other Party is prohibited to deal with under the laws of the United Kingdom (as extended to the Cayman Islands and the British Virgin Islands by statutory instrument), the Cayman Islands and the British Virgin Islands; and

(d) a citizen or resident of, organized or incorporated under the laws of, or physically located in, a Sanctioned Jurisdiction.

Holder acknowledges and agrees that each other Party has entered into this Agreement based on the representations and warranties made in this Clause 5.

**6 ADDITIONAL COVENANTS AND WARRANTIES**

6.1 The Parties (severally and not jointly) agree to use reasonable efforts to prohibit themselves, their respective employees, contractors, Affiliates and the employees and contractors of Holder's Affiliates from creating multiple accounts primarily for the purpose of participating in any airdrop of $MOVE.

6.2 In the event of an increase in Network Supply, Holder shall be entitled to receive a portion of such increase in Network Supply equal to the product of (a) the number of $MOVE issued in such increase in Network Supply multiplied by (b) a fraction, the numerator of which is the number of the Holder Tokens held by Holder and the denominator of which is the total Network Supply, in each case immediately prior to such increase in Network Supply. "***Network Supply***" means the total number of $MOVE that may be issued in accordance with the terms of the Protocol, excluding any such increase resulting from $MOVE issued pursuant to staking, rewards, inflationary or dilutive controls on the Protocol or an on-chain Protocol governance vote that dilutes all Token holders on an equal basis. As of the date hereof, the Network Supply is 10,000,000,000 $MOVE. This clause shall apply iteratively in the event of multiple increases in Network Supply during the period Locked Tokens are held by Holder or its Affiliates.

6.3 Holder is liable for any and all of its own taxes on its receipt of Holder Tokens. Holder will provide the other Parties with all information that any of them shall request in connection with the transactions contemplated by this Agreement and delivery of Holder Tokens to Holder, in order to satisfy tax, accounting and securities laws reporting and other regulatory requirements. Holder will indemnify each other Party against any taxes suffered or incurred by such other Party in connection with the delivery of Holder Tokens to Holder, including withholding taxes and failure to withhold on delivery of Holder Tokens to Holder, other than taxes (if any) imposed on the net income of any other Party.

6.4 Holder agrees to take all reasonable steps and execute all further documents and instruments, as requested by any other Party, in order to give effect to the transactions and agreements contemplated by this Agreement.

**7 RIGHTS AS THE OWNER OF $MOVE**

7.1 Holder is not entitled to stake Holder Tokens unless and until unlocked and permitted in accordance with the rules of the Protocol, vote or receive dividends or be deemed the purchaser of shares of the Token Issuer or any of its affiliated entities for any purpose, nor will anything contained herein be construed to confer on any Party, as such, any of the rights of a shareholder of any entity or any right to vote for the election of board members or upon any matter submitted to shareholders at any meeting thereof, or to give or withhold consent to the Token Issuer or corporate action or to receive notice of meetings, or to receive subscription rights or otherwise.

**8 COMPLIANCE WITH LAWS AND REGULATIONS**

8.1 The issuance of the Holder Tokens will be subject to and conditioned upon compliance by Holder with all applicable laws and regulations. There is no guarantee that there will be any exchange or market available for Tokens.

8.2 The Holder Tokens are not intended to be delivered in any jurisdiction or to any person where delivery of such Holder Tokens would be unlawful under applicable law or would require registration of the $MOVE or licensing of Labs, Foundation or the Token Issuer. Delivery will only be made where lawful, and nothing in this Agreement constitutes an offer or sale of the Holder Tokens in any jurisdiction where such offer or sale would be unlawful. Each Holder represents and agrees it is not subject to any such restrictions and is responsible for ensuring its own compliance with applicable laws in connection with its receipt and holding of Holder Tokens.

**9 DISCLAIMERS AND LIMITATION OF LIABILITY**

9.1 A Party shall not be liable or responsible to any other Party, nor shall a Party be deemed to have defaulted under or breached this Agreement, for any failure or delay in fulfilling or performing any term of this Agreement (including without limitation sending Holder Tokens to the Holder Delivery Wallet or Smart Contract Wallet) to the extent such failure or delay is caused by or results from (a) acts of God; (b) flood, fire, earthquake, pandemics, or explosion; (c) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, or other civil unrest; (d) changes to applicable law or regulations; (e) unavailability or inoperability of the underlying blockchain on which records relating to activity involving Tokens are kept; and (f) action by any governmental authority.

9.2 Except as expressly set forth herein, no Party makes any warranty whatsoever with respect to Holder Tokens, including any (a) warranty of merchantability; (b) warranty of fitness for a particular purpose; or (c) warranty against infringement of intellectual property rights of a third party; whether arising by law, course of dealing, course of performance, usage of trade, or otherwise.

9.3 To the fullest extent permitted by applicable laws, in no event will any Party be liable to Holder or its Related Parties for any indirect, special, incidental, consequential, or exemplary loss of any kind (including, but not limited to, where related to loss of revenue, income or profits, loss of use or data, or damages for business interruption) arising out of or in any way related to the sale, purchase, or use of Tokens or otherwise related to this Agreement, regardless of the cause of action, whether based in contract, tort (including, but not limited to, simple negligence, whether active, passive, or imputed), or any other legal or equitable basis (even if any Party has been advised of the possibility of such losses and regardless of whether such losses were foreseeable). For the avoidance of doubt, no Party shall be entitled to recover damages in respect of any claim (as the case may be) if, and to the extent that, such Party has already recovered damages in respect of the same fact or subject matter.

**10 RELEASE AND CONSENT**

10.1 Upon the occurrence of the Effective Time, without need for further documentation, action, consent, notice to, or agreement by any Party:

(a) (i) The obligations to deliver $MOVE under the Token Agreement shall be deemed to have been fully and finally performed and satisfied, (ii) no Party or any other Person shall have any further rights or obligations related to the transfer or receipt of $MOVE under the Token Agreement, and (iii) Holder's rights and obligations related to the receipt of $MOVE shall thereafter be solely as set forth herein. Holder acknowledges and agrees that the issuance of Holder Tokens to Holder is in consideration of its execution and delivery of this Agreement (including Holder's provision of the Release to the other Parties), and constitutes good and valid consideration therefor.

(b) Holder, on behalf of itself and its Related Parties (collectively, the ***Releasing Parties***), hereby, knowingly and willingly, fully and irrevocably expressly waives, acquits, remises, discharges and forever releases each of the Released Parties from and against any and all Claims and Losses arising out of or related to the Released Matters. Holder, on behalf of itself and the other Releasing Parties, hereby agrees that it and they will not or participate in, join or cause or permit to be filed on their behalf, any claim or proceeding for any Claim or Loss against any of the Released Parties with respect to any Released Matter.

(c) Without limiting the Release, Holder hereby amends, agrees to, consents to, and waives, as applicable:

(i) any provision, condition or requirement in any Token Agreement that was or could have been breached (with the giving of notice, passage of time or otherwise) by any matter that is or arises out of a Released Matter; and

(ii) the Potential Ecosystem Restructuring, and any claim that the Potential Ecosystem Restructuring (A) constitutes or could have constituted a "Change of Control," a "Liquidation Event," or "Dissolution Event" (or any similar event or legal consequence) for purposes of any Token Agreement or (B) breaches any Token Agreement

(collectively, the "Consent and Waiver").

The Consent and Waiver is being given pursuant to the Token Agreement. Upon the execution and delivery of this Agreement and other similar agreements (containing similar consents and waivers) sufficient to constitute a majority in interest of any Token Agreement Class, all holders in such Token Agreement Class will be bound, to the extent possible under the terms of the Token Agreements of such Token Agreement Class, by such consent and waiver, whether or not they shall have executed (yet or ever) an agreement containing a consent and waiver. For clarity, this Consent and Waiver (and any similar consent and waiver) is subject to the limitations set forth in such Token Agreements.

(d) Holder, on behalf of itself and the other Releasing Parties, hereby expressly and knowingly waives and relinquishes any and all rights that it or they have or might have relating to the Released Matters and Consent and Waiver under any applicable law, statute, regulation or common law principle, including without limitation California Civil Code § 1542 which reads as follows:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

Holder further waives any equivalent protections under the laws of any other jurisdiction that might otherwise apply.

(e) Holder, on behalf of itself and the other Releasing Parties, hereby acknowledges and agrees that (i) it or they may hereafter discover facts different from, or in addition to, those which it

or they now believe to be true with respect to the Released Matters; (ii) the Release and Consent and Waiver shall be and remain effective in all respects notwithstanding such different or additional facts or discovery thereof, and that this Release contemplates the extinguishment of all such Released Matters; (iii) it or they are represented by counsel and/or otherwise have had an opportunity to seek advice regarding this Release and Consent and Waiver from counsel; (iv) it and they have read and fully understand the provisions of California Civil Code § 1542 or other applicable law, statute or common principle of similar effect; (v) nevertheless, it is the intention of the Releasing Parties to fully, finally and forever settle and release the Released Matters, including claims that exist, or might have existed, in connection with the Released Matters, and that this Release forever extinguishes all such Claims and Losses; and (vi) this Release may be pleaded as a full and complete defense to any and all Released Matters and Claims and Losses being released pursuant to this Release, and that this Release may be used as the basis for an injunction to halt any action, suit or other proceeding based upon the Released Matters.

(f) Each Party hereby agrees that following the Effective Time, no amendment, modification or termination of this Agreement shall affect, modify or terminate the Release or this Clause 10.1, in each case except as expressly consented to in writing by each Party.

(g) For the avoidance of doubt, the provisions of this clause 10 shall be effective if and only if the Effective Time occurs – i.e., the Holder Tokens are actually deposited in the Holder Delivery Wallet or into the Smart Contract Wallet in accordance with this Agreement.

**11 MISCELLANEOUS**

11.1 This Agreement contains the whole agreement between the Parties relating to the transactions contemplated by this Agreement and supersedes all previous understandings and agreements between any of the Parties relating to these transactions or the subject matter hereof (including the Token Agreement). Each Party acknowledges that, in agreeing to enter into this Agreement, it has not relied on any representation, warranty, collateral contract, or other assurance (except those set out in this Agreement and the Release) made by or on behalf of any other Party or any other person whatsoever before the execution of this Agreement. Without limiting the foregoing, Holder, for itself and on behalf of the Releasing Parties, acknowledges that, except for the representations and warranties contained herein, neither Holder nor any of the Releasing Parties is relying on, any other express or implied representation or warranty with respect to the value or future prospects of Holder Tokens; the Company or any other matter related to this Agreement. Each Party waives all rights and remedies which, but for this Clause, might otherwise be available to it in respect of any such representation, warranty, collateral contract, or other assurance, provided that nothing in this Clause shall limit or exclude any liability for willful misconduct or fraud.

11.2 If a provision of this Agreement is or becomes illegal, invalid, or unenforceable in any jurisdiction, that shall not affect (a) the validity or enforceability in that jurisdiction of any other provision of this Agreement or (b) the validity or enforceability in other jurisdictions of that or any other provision of this Agreement.

11.3 No Party may assign, transfer, or dispose of its rights and/or obligations arising under, out of or in connection with this Agreement to any other person without the prior written consent of the other Party; provided, that from and after the Effective Time, no consent of Labs shall be necessary for any such assignment, transfer or disposal other than in respect of Clause 10.1 hereof or that would otherwise adversely affect the rights hereunder of Labs or its Related Parties. No delay or omission on the part of any Party in exercising any right, power, or remedy provided by the law of any jurisdictions or under this Agreement shall (a) impair such right, power, or remedy or (b) operate as a waiver thereof.

11.4 Each Released Party is an intended third-party beneficiary of the Release and is entitled to enforce the same as if directly a party hereto. Except as otherwise expressly provided herein, the provisions

hereof shall inure to the benefit of, and be binding upon each Party and their respective successors, assigns, heirs, executors and administrators.

11.5 No waiver of any right or rights arising under this Agreement shall be effective unless such waiver is in writing and signed by the Party or Parties whose rights are being waived; provided, that from and after the Effective Time, no consent of Labs shall be necessary for any waiver other than in respect of Clause 10.1 hereof or that would otherwise adversely affect the rights hereunder of Labs or its Related Parties. This Agreement may be executed in any number of counterparts and all of such counterparts taken together shall be deemed to constitute one and the same instrument.

11.6 This Agreement may only be amended by an instrument in writing signed by each Party; provided, that from and after the Effective Time, no consent of Labs shall be necessary for any amendment other than in respect of Clause 10.1 hereof or that would otherwise adversely affect the rights hereunder of Labs or any Related Party of Labs that is a Released Party. Time shall be of the essence in this Agreement. This Agreement shall not be deemed to create any partnership, joint venture, agency, fiduciary, or employment relationship between the Parties. No Party holds itself out as the agent or partner of any other Party.

11.7 Except as otherwise expressly provided for in this Agreement, this Agreement does not give rise to any rights under the Contracts (Rights of Third Parties) Act (as revised) to enforce any term of this Agreement.

11.8 Sections 8 and 19(3) of the Electronic Transactions Act (as revised) of the Cayman Islands are hereby excluded.

11.9 In this Agreement, unless the contrary intention appears, a reference to:

(a) this ***Agreement*** includes the Schedules to this Agreement;

(b) an ***authorisation*** includes an authorisation, consent, approval, resolution, licence, exemption, filing, registration, or notarisation;

(c) a ***person*** includes any individual, company, unincorporated association, or body of persons (including a partnership, joint venture, or consortium), government, state, agency, international organisation, or other entity;

(d) a ***regulation*** includes any regulation, rule, official directive, or guideline (whether or not having the force of law, but if not having the force of law, if compliance is customary) of any governmental, inter-governmental, or supranational body, agency, department, or regulatory or self-regulatory authority or organisation;

(e) a ***relevant jurisdiction*** in relation to any person means a jurisdiction in which that person is resident, domiciled, incorporated (in the case of corporate entities) or has citizenship (in the case of natural persons), or has a branch or place of business, or is in some other way connected;

(f) ***tax*** shall be construed so as to include any tax, fund, levy, impost, duty or other charge of a similar nature (including, without limitation, any penalty or interest payable in connection with any failure to pay or any delay in paying of the same);

(g) a provision of law or regulation is a reference to that provision as amended or re-enacted;

(h) a ***Clause*** or ***Schedule*** is a reference to a clause in or schedule to this Agreement respectively;

(i) a person includes its successors, permitted transferees and assigns;

(j) the singular shall include the plural and vice versa; and

(k) a document is a reference to that document as amended.

(l) The word ***including*** is to be construed as being by way of illustration or emphasis only and is not to be construed as, nor shall it take effect as, limiting the generality of any foregoing words.

(m) Headings do not affect the interpretation of this Agreement.

**12 NOTICES**

12.1 All notices or other communications under or in connection with this Agreement shall be given in writing and may be made by electronic mail. Any such notice will be deemed to be given as follows (a) if by hand or by international courier, upon delivery and (b) if by electronic mail, when sent.

12.2 All communications and notices provided or given in connection with this Agreement shall be (a) in English or (b) if not in English, accompanied by a certified English translation and, in this case, the English translation shall prevail unless the document is a statutory or other official document.

12.3 Any notice may be served on the relevant Party at its registered office or such other physical or electronic address as the relevant Party shall give written notice of to each other Party.

**13 CONFIDENTIALITY**

13.1 This Agreement and its existence are confidential. No Party may disclose this Agreement, the existence of this Agreement or its contents to any other person except (a) as may be required by law (including disclosures required under the Securities Act of 1934); (b) in connection with any proceedings for the resolution of any dispute arising between the Parties under this Agreement; or (c) with the prior written consent of the other Party.

13.2 If any Party is required to disclose any information regarding this Agreement or its existence by law they shall notify each other Party in writing as soon as is reasonably possible after such disclosure has been made.

**14 COSTS AND EXPENSES**

14.1 Each Party shall be responsible for the payment of its own costs and expenses in connection with the preparation, execution, and carrying into effect of this Agreement.

**15 DISPUTE RESOLUTION**

15.1 Any dispute, controversy, difference or claim arising out of or relating to this Agreement, including the existence, validity, interpretation, performance, breach or termination thereof or any dispute regarding non-contractual obligations arising out of or relating to it shall be referred to and finally resolved in accordance with the Arbitration Rules of the Cayman International Mediation and Arbitration Centre Ltd (***Rules***) in force as at the date hereof, which Rules are deemed to be incorporated by reference into this clause. The arbitration shall be conducted in the English language. The number of arbitrators shall be one. The place of arbitration will be George Town, Cayman Islands. The decision of the sole arbitrator to any such dispute, controversy, difference or claim shall be final and binding upon each Party. Each Party waives any right it may have to assert the doctrine of *forum non conveniens*, to assert that it is not subject to the jurisdiction of such arbitration or courts or to object to venue to the extent any proceeding is brought in accordance herewith.

**16 GOVERNING LAW**

16.1 This Agreement and the relationship between the Parties in relation to the subject matter of this Agreement shall be governed exclusively by Cayman Islands law; *provided*, *however*, that Clause 10.1 (and any other relevant clause in connection with a dispute or contractual interpretation question

relating to Clause 10.1) the Release shall be governed by, and construed in accordance with, the substantive law of the State of Delaware, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof.

[*Remainder of page intentionally blank*]

Docusign Envelope ID: 1F9BB922-E490-4A4B-BD26-5BC71E3950E5

**SCHEDULE 1**

Tokens

| Holder | Holder Delivery Wallet or Smart Contract Wallet | Holder Tokens |
|---|---|---|
| [Name and Address] | [Wallet Address] | [____________] |

**EXECUTION PAGE**

This Agreement has been entered into on the date first above written.

**Token Issuer**

Executed for and on behalf of )
**MOVEMENT LIMITED** ) ..............................................
) (Director)

**Foundation**

Executed for and on behalf of )
**MOVEMENT NETWORK FOUNDATION** ) ..............................................
) (Director)

**Labs**

Executed for and on behalf of )
**MVMT LABS, INC.** ) ..............................................
) (Director)

**Holder**

Executed for and on behalf of )
**[______________________]** ) ..............................................
by its duly authorised representative )