**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re:<br><br>MVMT LABS, INC.,<br><br>Debtor. | :<br>:<br>:<br>:<br>:<br>: | Chapter 11<br>(Subchapter V)<br><br>Case No. 26-11113 (TMH) |

**MOTION OF THE UNITED STATES TRUSTEE (I) OBJECTING TO THE DEBTOR'S DESIGNATION AS A SMALL BUSINESS DEBTOR AND (II) FOR ENTRY OF AN ORDER DEEMING THAT THE COUNTERPARTIES TO THE DEBTOR'S SIMPLE AGREEMENTS FOR FUTURE EQUITY HAVE ALLOWED NONCONTINGENT AND LIQUIDATED CLAIMS**

In support of his motion (i) objecting to the Debtor's designation as a small business debtor and (ii) for entry of an order deeming that the counterparties to the Debtor's simple agreements for future equity have allowed noncontingent and liquidated claims (the "Motion"), Andrew R. Vara, the United States Trustee for Regions 3 and 9 (the "U.S. Trustee"), by and through his counsel, avers:

**JURISDICTION, VENUE AND STANDING**

1. Pursuant to 28 U.S.C. § 1334, applicable order(s) of the United States District Court for the District of Delaware issued pursuant to 28 U.S.C. § 157(a), and 28 U.S.C. § 157(b)(2)(A), this Court has jurisdiction to hear and resolve this Motion.

2. Pursuant to 28 U.S.C. § 1408, venue of the above-captioned case in this District is proper because the Debtor is a Delaware corporation; the Debtor is domiciled in Delaware.

3. Pursuant to 28 U.S.C. § 586, the U.S. Trustee is charged with monitoring the federal bankruptcy system. *See In re Columbia Gas Sys., Inc.*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that 11 U.S.C. § 307 gives the U.S. Trustee "public interest standing"); *In re Revco D.S., Inc.*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").

4. The U.S. Trustee has standing to be heard on the Motion pursuant to 11 U.S.C. § 307.

## BACKGROUND

5. On July 15, 2026 (the "Petition Date"), the Debtor filed the petition which initiated the above-captioned case.

6. Labs was formed in 2023 "as a development company in the crypto industry that developed and licensed intellectual property, including specialized software, applications, smart contracts, and blockchain protocols, associated with the blockchain-based network known as the 'Movement Network', in connection with the governance, deployment and minting of cryptocurrency, called $MOVE tokens." *Declaration of Michael Robinson in Support of MVMT Labs, Inc.'s Chapter 11 Petition and First Day Motions* (the "'First Day Declaration'") [D.I. 21] ¶¶ 8, 9.

7. On its voluntary petition, the Debtor indicated that it is a small business debtor as defined in 11 U.S.C. § 101(51D) and elected to proceed under Subchapter V of the Bankruptcy Code.

8. The term "small business debtor" is defined in section 101(51D) of the Bankruptcy Code:

> (51D) The term "small business debtor"— (A) subject to subparagraph (B), means a person engaged in commercial or business activities (including any affiliate of such person that is also a debtor under this title and excluding a person whose primary activity is the business of owning single asset real estate) **that has aggregate noncontingent liquidated secured and unsecured debts as of the date of the filing of the petition or the date of the order for relief in an amount not more than $3,424,000 (excluding debts owed to 1 or more affiliates or insiders)** not less than 50 percent of which arose from the commercial or business activities of the debtor; and (B) does not include— (i) any member of a group of affiliated debtors under this title that has aggregate noncontingent liquidated secured and unsecured debts in an amount greater than $3,424,000 (excluding debt owed to 1 or more affiliates or insiders); (ii) any debtor that is a corporation subject to the

> reporting requirements under section 13 or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m , 78o(d)); or (iii) any debtor that is an affiliate of a corporation described in clause (ii). (Emphasis added).

9. In short, the definition of "small business debtor" in 11 U.S.C. § 101(51D) establishes a ceiling for qualifying debt – the Debtor can't have noncontingent, liquidated, secured and unsecured debts which exceed $3,424,000.

10. On its list of 20 largest unsecured claims held by non-insiders appended to its bankruptcy petition (the "Top Creditor List"), Michael Robinson, the Debtor's Chief Restructuring Officer, declared under penalty of perjury that (i) the Debtor had a total of nine (9) claims and (ii) five (5) of those claims were both noncontingent and liquidated.[1] The five (5) noncontingent, liquidated claims total $436,600 – meaning, if the Debtor has more than $2,987,400 in other noncontingent, liquidated claims as of the Petition Date, it would not be a "small business debtor" and, by extension, ineligible to proceed under Subchapter V.

Ottersec -- $174,600
Move Industries -- $125,000
Anchorage Digital -- $105,000
Ironclad -- $17,000
Notifi -- $15,000

11. As of the Petition Date, the Debtor was party to a number of "simple agreements for future equity" ("SAFEs;" each such agreement, a "SAFE"). In paragraph 19 of the First Day Declaration, Mr. Robinson stated:

> In connection with its founding and the planned launch of the $MOVE token, Labs

[1] The Debtor listed the claim of Rushikesh Manche, an "insider" as of the Petition Date, on the "20 largest" list; Mr. Manche was an "affiliate" of the Debtor as of the Petition Date (and, upon information and belief, remains an affiliate of the Debtor). The term "insider" includes an "affiliate" (11 U.S.C. § 101(31)(E)), and an "affiliate" is a "corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote … by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor." 11 U.S.C. § 101(2)(B). In its combined corporate ownership statement and equity security holder list appended to its petition, the Debtor stated that Manche holds 34.25% of the Debtor's equity.

> raised capital through two primary means. The first means was through the sale of Simple Agreements for Future Equity ("SAFEs"), which are a common form of fundraising for startup companies. As the term implies, participants in a SAFE transaction pay consideration up front in exchange for a commitment to be issued equity at some point in the future after the occurrence of a defined triggering event. SAFEs are not considered to be debt because there is not a maturity date or an interest component. **Labs had numerous rounds of SAFE offerings and raised over $40 million thereunder.** (Emphasis added).

12. In connection with the U.S. Trustee's evaluation of whether the Debtor is a "small business debtor," the Debtor forwarded copies of a number of the Debtor's SAFEs. The Debtor listed 204 SAFEs on Schedule G (Executory Contracts) of its schedules. Based upon the Office of the U.S. Trustee's review of approximately sixty (60) SAFEs produced by the Debtor, the Debtor's SAFEs were executed using a form agreement. A form copy of one of the Debtor's SAFEs is attached as **Exhibit A**.[2]

13. Section 1 of the SAFEs (titled "Events") provides:

> (a) **Equity Financing**. If there is an Equity Financing before the termination of this Safe, on the initial closing of such Equity Financing, this Safe will automatically convert into the greater of: (1) the number of shares of Standard Preferred Stock equal to the Purchase Amount divided by the lowest price per share of the Standard Preferred Stock; or (2) the number of shares of Safe Preferred Stock equal to the Purchase Amount divided by the Safe Price.
>
> In connection with the automatic conversion of this Safe into shares of Standard Preferred Stock or Safe Preferred Stock, the Investor will execute and deliver to the Company all of the transaction documents related to the Equity Financing; *provided,* that such documents (i) are the same documents to be entered into with the purchasers of Standard Preferred Stock, with appropriate variations for the Safe Preferred Stock if applicable, and (ii) have customary exceptions to any drag-along applicable to the Investor, including (without limitation) limited representations, warranties, liability and indemnification obligations for the Investor. (Emphasis in original).

---

[2] While there is a Token Warrant attached to the form SAFE, the Token Warrant is not relevant to the relief requested.

14. The term "Equity Financing" in the Debtor's SAFEs means:

> a bona fide transaction or series of transactions with the principal purpose of raising capital, pursuant to which the Company issues and sells Preferred Stock at a fixed valuation, including but not limited to, a pre-money or post-money valuation.

15. The term "Purchase Amount" is defined in the SAFEs as the amount paid by the "Investor."

16. In this case, the Equity Financing contingency referenced in the Debtor's SAFEs did not occur prepetition; the Debtor did not issue Preferred Equity prepetition.

17. Section 1 of the SAFEs (titled "Events") also provides:

> (b) **Liquidity Event**. If there is a Liquidity Event before the termination of this Safe, the Investor will automatically be entitled (subject to the liquidation priority set forth in Section 1(d) below) to receive a portion of Proceeds, due and payable to the Investor immediately prior to, or concurrent with, the consummation of such Liquidity Event, equal to the greater of (i) the Purchase Amount (the "**Cash-Out Amount**") or (ii) the amount payable on the number of shares of Common Stock equal to the Purchase Amount divided by the Liquidity Price (the "**Conversion Amount**"). (Emphasis in original).

18. A "Liquidity Event" is defined in the SAFEs as meaning "a Change of Control, a Direct Listing or an Initial Public Offering."

19. A "Change of Control" is defined in the SAFEs as meaning

> (i) a transaction or series of related transactions in which any "person" or "group" (within the meaning of Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), becomes the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended), directly or indirectly, of more than 50% of the outstanding voting securities of the Company having the right to vote for the election of members of the Company's board of directors, (ii) any reorganization, merger or consolidation of the Company, other than a transaction or series of related transactions in which the holders of the voting securities of the Company outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity or (iii) **a sale, lease or other disposition of all or substantially all of the assets of the Company**. (Emphasis added).

20. The term "Proceeds" is defined in the SAFEs as "cash and other assets (including without limitation stock consideration) that are proceeds from the Liquidity Event or the Dissolution Event, as applicable, and legally available for distribution."

21. Section 1 of the SAFEs further provides:

> (c) **Dissolution Event**. If there is a Dissolution Event before the termination of this Safe, the Investor will automatically be entitled (subject to the liquidation priority set forth in Section 1(d) below) to receive a portion of Proceeds equal to the Cash-Out Amount, due and payable to the Investor immediately prior to the consummation of the Dissolution Event. (Emphasis in original).

22. "Dissolution Event" is defined in the SAFEs as meaning "(i) a voluntary termination of operations, (ii) a general assignment for the benefit of the Company's creditors or (iii) any other liquidation, dissolution or winding up of the Company (excluding a Liquidity Event), whether voluntary or involuntary."

23. Section 1(d) of the SAFEs ("Liquidation Priority") provides:

> (d) **Liquidation Priority**. In a Liquidity Event or Dissolution Event, this Safe is intended to operate like standard non-participating Preferred Stock. The Investor's right to receive its Cash-Out Amount is:
>
> (i) Junior to payment of outstanding indebtedness and creditor claims, including contractual claims for payment and convertible promissory notes (to the extent such convertible promissory notes are not actually or notionally converted into Capital Stock);
>
> (ii) On par with payments for other Safes and/or Preferred Stock, and if the applicable Proceeds are insufficient to permit full payments to the Investor and such other Safes and/or Preferred Stock, the applicable Proceeds will be distributed pro rata to the Investor and such other Safes and/or Preferred Stock in proportion to the full payments that would otherwise be due; and
>
> (iii) Senior to payments for Common Stock.
>
> The Investor's right to receive its Conversion Amount is (A) on par with payments for Common Stock and other Safes and/or Preferred Stock who are also receiving Conversion Amounts or Proceeds on a similar as-converted to Common Stock basis, and (B) junior to payments described in clauses (i) and (ii) above (in the latter

> case, to the extent such payments are Cash-Out Amounts or similar liquidation preferences). (Emphasis in original).

24. In late November and early December, 2025, the Debtor entered into the "Transfer Agreement" and the "Fenix Agreement." Both terms are defined in paragraphs 28 and 29 of the First Day Declaration, below). The two transactions were described by the Debtor as follows:

> To continue building, operating, and growing the $MOVE token ecosystem after the contemplated termination of the Tripartite Agreement, however, Labs needed to be replaced by another cryptocurrency development company. Foundation, whose corporate remit is to foster and support the research, development, extension and use of the Movement Network, $MOVE tokens and related technology, selected Move Ind. Inc. ("Move Industries") to fill that role. Labs considered various options to monetize the value of the team it had built, but which imposed substantial operating expenses on it, and concluded that releasing the bulk of the Labs team from employment agreements in order to allow them to transfer to Move Industries in exchange for cash consideration was the only realistic value-maximizing transaction, absent which Labs would have had to terminate the majority, if not all, of its employees and contractor relationships for no value, and incur liabilities relating to those terminations. To that end, on October 14, 2025, Labs and Move Industries entered into the Project Fenix (Labs – Industries) Term Sheet that outlined a transaction under which Labs would release certain employees and contractors from noncompetes, allowing Move Industries to employ or engage, as applicable, such Labs employees and contractors, in exchange for $1.2 million. On November 26, 2025, Labs and Move Industries entered into the Team and Asset Transfer Agreement (the "Transfer Agreement") that formally memorialized the transaction.
>
> To address issues under the Tripartite Agreement and as a way to resolve Labs's $MOVE token delivery obligations to the greatest extent possible, on December 2, 2025, Labs, Foundation, and ML entered into the Termination and Settlement Agreement (the "Fenix Agreement"), pursuant to which (i) the Tripartite Agreement was terminated; (ii) Foundation agreed, subject to know-your-customer ("KYC") and know-your-business ("KYB") checks satisfactory to Foundation, to settle, pursuant to a form of token undertaking agreement between Foundation, ML, Labs and the token recipient, Labs's obligation to deliver $MOVE tokens to counterparties pursuant to valid (and not fraudulent) and undisputed token delivery agreements with Labs; (iii) Foundation agreed to pay Labs $6.9 million (less amounts outstanding on certain loans provided by Foundation); (iv) Labs assigned to Foundation remaining IP rights and key operating agreements relating to the Movement Network and technologies that allow users to transact in $MOVE tokens; (v) Labs agreed to provide certain transition services to assist with the transfer and delivery of IP rights and the KYC and KYB process; and (vi) the parties granted mutual releases, subject to certain exclusions (including for fraud and

> willful misconduct). Labs determined that the Fenix Agreement was the transaction most likely to maximize the value of its assets, because it would result in a much-needed cash infusion for Labs, Foundation's settlement of Labs's obligation to deliver $MOVE tokens to counterparties pursuant to valid (and not fraudulent) and undisputed token delivery agreements with Labs, and the avoidance of potential litigation with Foundation and ML that Labs would not have been able to afford, and which almost certainly could not have resulted in an outcome more favorable to Labs or its creditors.

25. Move Industries, Inc. and Movement Network Foundation, a Cayman Islands exempted foundation company ("Foundation") are not "insiders" of the Debtor; the two entities are not affiliated with the Debtor. First Day Decl. ¶ 11 (stating that Foundation is not an affiliate of (and does not share any common control or ownership with) Labs).

26. Based upon information and belief, the Transfer Agreement and the Fenix Agreement became effective and, if applicable, closed prior to the Petition Date in accordance with their terms.

27. The Debtor did not distribute any proceeds it received under the Transfer Agreement and Fenix Agreement to the SAFE counterparties on account of the SAFEs.

28. In the First Day Declaration, the Debtor stated that

> Labs holds no material operating assets. Its remaining assets consist principally of: (a) approximately $60,000 in cash on hand; (b) residual contractual rights; and (c) litigation claims and causes of action related to the irregularities surrounding the launch of the $MOVE token.

29. The U.S. Trustee convened the initial meeting of creditors on August 20, 2026 and continued the meeting to a date to be determined pending the filing of the Debtor's schedules.

30. The Debtor filed its schedules and Statement of Financial Affairs on August 27, 2026.

31. On Schedule E/F, the Debtor did not list any SAFE claims as general unsecured claims.

**GROUNDS/BASIS FOR RELIEF**

32. Federal Rule of Bankruptcy Procedure 1020 provides:

(a) In General. In a voluntary Chapter 11 case, the debtor must state in the petition whether the debtor is a small business debtor and, if so, whether the debtor elects to have Subchapter V of Chapter 11 apply. In an involuntary Chapter 11 case, the debtor must provide the same information in a statement filed within 14 days after the order for relief. The case must proceed in accordance with the debtor's statement, unless and until the court issues an order finding that the statement is incorrect.

(b) Objecting to the Designation. The United States trustee or a party in interest may object to the debtor's designation. The objection must be filed within 30 days after the conclusion of the meeting of creditors held under §341(a) or within 30 days after an amendment to the designation is filed, whichever is later.

(c) Procedure; Service. An objection or request under this rule is governed by Rule 9014 and must be served on:

• the debtor;
• the debtor's attorney;
• the United States trustee;
• the trustee;
• the creditors included on the list filed under Rule 1007(d)-or if a committee has been appointed under §1102(a)(3), the committee or its authorized agent; and
• any other entity as the court orders.

33. If an objection under Federal Rule of Bankruptcy Procedure 1020 is asserted, the Debtor bears the burden of proving its eligibility for relief under Subchapter V by a preponderance of the evidence. *See In re PortArthur Steam Energy, L.P.*, 629 B.R. 233, 235 (Bankr. S.D. Tex. 2021); *In re Offer Space*, 629 B.R. 299, 304 (Bankr. D. Utah 2021). "The rationale [supporting assigning the burden of proving Subchapter V eligibility to the debtor] is that Subchapter V gives significant advantages to debtors compared to traditional chapter 11 reorganizations. Further, it 'makes sense to place the burden on the debtor because debtors are in the best position to prove that they are qualified to be in subchapter V.'" *In re Carter*, No. 23-54816-JWC, 2023 WL

9103614 at *2 (internal citations omitted; quoting *In re RS Air, LLC*, 638 B.R. 403, 414 (B.A.P. 9th Cir. 2022)).

34. The Transfer Agreement and the Fenix Agreement together constituted a "Change in Control" under the SAFEs; they constituted "a sale, lease or other disposition of all or substantially all of the Debtor's assets. Thus, the Transfer Agreement and the Fenix Agreement together constituted a "Liquidity Event" under the SAFEs.

35. Alternatively, the Transfer Agreement and the Fenix Agreement together constituted a Dissolution Event under the SAFEs, given that the two agreements effectuated "a voluntary termination of operations."

36. 11 U.S.C. § 101(5) defines a "claim" as a

> **(A)** right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or
>
> **(B)** right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

37. Under the terms of the SAFEs, upon a Liquidity Event or a Dissolution Event, SAFE counterparties are automatically entitled to receive a portion of the Proceeds in the amount of, at a minimum, the Cash-Out Amount (that is, the Purchase Price), subject to the Liquidation Priority.

38. In *In Re Rhodium Encore LLC*, 675 B.R. 502 (Bankr. S.D. Tex. 2025), the United States Bankruptcy Court for the Southern District of Texas considered whether counterparties to SAFEs held claims. The SAFEs at issue in *Rhodium Encore* were substantially similar to the SAFEs to which the Debtor is party; the SAFEs at issue in *Rhodium Encore* contained "Liquidity

Event" and "Dissolution Event" contingencies. *See id.* at 518 (citing to SAFE agreement). Applying Delaware law, the *Rhodium Encore* court concluded that "the SAFE Agreement provides a contingent claim to the investors and the parties who invested in REI are in fact creditors with contingent claims." *Id.*

39. Analyzing whether SAFE holders held debt or equity, the *Rhodium Encore* court stated:

> The SAFE Agreement here is not your typical instrument. It would be very difficult to compare the investors to a stockholder because while yes, if REI did well, the investors could receive enhanced value, they are different from stockholders in that they are to some extent protected in a Liquidity or Dissolution Event. When a stockholder invests in a company and the company starts a downward trajectory, the stockholder will only receive whatever the company is worth at the point that the stockholder decides to sell or at the point the company fails. Here, while a SAFE Agreement investor can see the potential fruits of the success of REI, at the same time the SAFE Agreement provides that in the situation of a Liquidity or Dissolution event, at a minimum, the investor will receive the Purchase Amount back (or its pro-rata share of any consideration after payment of all the creditors). That is wholly different from your typical stockholder. The right to receive their Purchase Amount further supports that the SAFE Agreement provides for a contingent claim given the inclusion of the paragraphs with regard to a Liquidity or Dissolution Event. While yes, a Liquidity Event or Dissolution Event may never happen when a SAFE Agreement such as this is entered, there is still the possibility, and that is the essence of the description of a contingent claim.
>
> As counsel for the SAFE claimants said at the hearing regarding the SAFE Agreement, "[I]t is a contract. It is not a share of stock. It is not a stock certificate. It is not a share preferred stock. It's an agreement. SAFE contracts require different performances by the company, depending on contingent future events that are defined in the contracts." (ECF No. 1434 at 63:3-8). And "SAFE parties were never guaranteed that they would ever own stock, or otherwise participate in the upside of the company. (*Id.* at 64:4-6). However, "[T]he SAFEs also provide downside protection. Where a company dissolves, liquidates, or otherwise fails, as has happened here, the SAFE contract obligates the debtors to return to the SAFE counter

> party, the amount it invested in the form of a cash-out amount. That's the bargain." (*Id.* at 64:12-17).

*Rhodium Encore*, 675 B.R. at 520-21.[3]

40. Unlike this case, the question in *Rhodium Encore* was whether post-petition events (e.g., a transaction under section 363, or a liquidating plan) would satisfy the "Liquidity Event" or "Dissolution Event" contingencies, thereby giving rise to noncontingent, liquidated claims for the Cash-Out Amount (which is – at a minimum – the Purchase Amount). The *Rhodium Encore* court did not reach this question, but noted that confirmation of the Debtor's liquidating plan would "certainly" constitute a Liquidity Event or Dissolution Event. *See Rhodium Encore*, 675 B.R. at 524-25. In this case, the SAFE contingency (the "Liquidity Event" or "Dissolution Event") was satisfied *pre-petition* by way of the Transfer Agreement and the Fenix Agreement, thereby giving rise to noncontingent, liquidated claims for the holders of the Debtor's SAFEs.

41. The Debtor's SAFE investors hold noncontingent, liquidated claims. By extension, the Debtor is not a "small business debtor" eligible to proceed under Subchapter V.

[3] While the *Rhodium Encore* court acknowledged that the "Liquidation Priority" paragraph in the SAFE may be enforceable under section 510(a) of the Bankruptcy Code, that did not alter or affect the court's conclusion that the SAFE holders held claims as opposed to equity. *Rhodium Encore*, 675 B.R. at 524-25.

## CONCLUSION

WHEREFORE the U.S. Trustee requests that this Court enter an order (i) determining that the Debtor is not a "small business debtor" under 11 U.S.C. § 101(51D) and (ii) deeming that the counterparties to the Debtor's simple agreements for future equity have allowed noncontingent and liquidated claims.

Dated: September 14, 2026
Wilmington, Delaware

Respectfully submitted,

**ANDREW R. VARA**
**UNITED STATES TRUSTEE,**
**REGIONS 3 and 9**

By: *Joseph J. McMahon, Jr.*
Joseph J. McMahon, Jr. (# 4819)
Assistant United States Trustee
United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207, Lockbox 35
Wilmington, DE 19801
(302) 573-6491 (Phone)
joseph.mcmahon@usdoj.gov