# EXHIBIT A

**(Revised Proposed Final Order)**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>MVMT Labs, Inc.,<br><br>Debtor.[1] | Chapter 11 (Subchapter V)<br><br>Case No. 26-11113 (TMH)<br><br>**Re: Docket No. 19** |

**FINAL ORDER (I) AUTHORIZING THE DEBTOR TO (A) OBTAIN POSTPETITION FINANCING AND (B) GRANT LIENS, INCLUDING SENIOR SECURED LIENS, AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (II) MODIFYING THE AUTOMATIC STAY; (III) APPROVING THE SETTLEMENT BETWEEN THE DEBTOR AND THE FOUNDATION PARTIES PURSUANT TO BANKRUPTCY RULE 9019; (IV) AUTHORIZING THE ASSUMPTION OF THE FENIX AGREEMENT PURSUANT TO SECTIONS 365 AND 363 OF THE BANKRUPTCY CODE; AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "Motion") of MVMT Labs, Inc.,[2] as debtor and debtor in possession (the "Debtor") in the above-captioned case (the "Chapter 11 Case") under subchapter V of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), seeking entry of an interim order, which was entered on July 20, 2026 [Docket No. 33] (the "First Interim DIP Order"), and a final order (this "Final DIP Order"), pursuant to sections 105, 362, 363, 364, 365, 503, 506 and 507 of the Bankruptcy Code, Rules 2002, 4001, 6004, 9014 and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 4001-1, 4001-2 and 9013-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), which was supplemented in accordance with the record of the hearings held by this Court on August 27, 2026, September 3, 2026, and September 11, 2026, including a request for the entry of a second interim order, which was entered on September 18,

[1] The last four digits of the Debtor's federal tax identification number are 5217. The Debtor's service address is c/o Legalinc Corporate Service Inc., 131 Continental Drive, Suite 305, Newark, New Castle County, DE 19713.

[2] Capitalized terms used but not otherwise defined herein have the meanings set forth in the Motion or the DIP Loan Documents, as applicable.

2026 [Docket No. 171] (the "Second Interim DIP Order" and, together with the First Interim DIP Order, the "Interim DIP Orders"), that, among other things:

(i) authorize the Debtor to obtain postpetition financing on a superpriority senior secured basis, consisting of a new-money multi-draw term loan facility in an aggregate amount of up to $5,700,000 (the "DIP Facility") on the terms and conditions set forth in the Second Amended and Restated Senior Secured, Superpriority Debtor-in-Possession Loan and Security Agreement, a copy of which is annexed hereto as Exhibit 1 (as further amended or otherwise modified from time to time in accordance with its terms, the "DIP Credit Agreement" and, together with any related documents, the "DIP Loan Documents"),[3] between the Debtor, as borrower, and MNF DIP SPV Ltd, as lender (the "DIP Lender"), comprising: (a) a new-money term loan in the principal amount of $750,000 (the "First Interim DIP Loan"), funded as a single disbursement after the entry of the First Interim DIP Order, subject to the satisfaction of all conditions set forth in Section 3.1 of the DIP Credit Agreement; (b) a new-money term loan in the principal amount of $3,450,000 (the "Second Interim DIP Loan" and, together with the First Interim DIP Loan, the "Interim DIP Loans"), funded as a single disbursement after the entry of the Second Interim DIP Order, subject to the satisfaction of all conditions set forth in Section 3.1 of the DIP Credit Agreement; and (c) subject to entry by this Court of an order, in form and substance acceptable to the DIP Lender in its sole discretion, confirming a plan under subchapter V of chapter 11 of the Bankruptcy Code, a new-money, delayed-draw term loan in the principal amount of $1,500,000, which loan will be funded in a single disbursement on the date upon which all conditions set forth in Sections 3.1 and 3.2 of the DIP Credit Agreement have been satisfied (the "Final DIP Loan" and, together with the Interim DIP Loans, the "DIP Loans");

(ii) authorize the Debtor to enter into the DIP Credit Agreement, which amends and supersedes in its entirety the credit agreements approved in the First Interim DIP Order and in the Second Interim DIP Order (the "First Amended DIP Credit Agreement");

(iii) approve the terms of the DIP Credit Agreement and authorize the Debtor to execute, deliver and perform under the DIP Loan Documents;

(iv) authorize the Debtor to incur the obligations due or payable to or for the benefit of the DIP Lender under the DIP Loan Documents (collectively, the "DIP Obligations") and pay such DIP Obligations when due and payable under the DIP Loan Documents and this Final DIP Order, including without limitation the DIP Fees (as defined below), each of which will be paid-in-kind rather than in cash, and to perform such other acts as may be required or appropriate in connection therewith;

[3] A redline showing revisions contained in the DIP Credit Agreement relative to the First Amended DIP Credit Agreement is annexed hereto as Exhibit 2.

(v) authorize and direct the Debtor to use the proceeds of the DIP Loans (the "DIP Proceeds") and the DIP Cash Collateral (as defined below) in accordance with the DIP Loan Documents to (a) fund the postpetition working capital needs of the Debtor; (b) pay fees, costs and expenses of the DIP Facility on the terms and conditions described in this Final DIP Order and the DIP Loan Documents; and (c) pay the allowed administrative costs and expenses of the Chapter 11 Case, in each case, solely in accordance with the DIP Loan Documents, the Approved Budget (as defined below), and this Final DIP Order;

(vi) provide that, subject to the terms and conditions of the DIP Loan Documents and the Subchapter V Plan (as defined below), the DIP Loans will convert (the "Exit Conversion") to an exit facility on the terms set forth in the DIP Credit Agreement and the other DIP Loan Documents (the "Exit Facility") upon substantial consummation of a confirmed plan of reorganization, in form and substance acceptable to the DIP Lender, in its sole discretion (the "Subchapter V Plan");

(vii) authorize the Debtor to grant to the DIP Lender, subject only to the Carve-Out and the Permitted Prior Liens (each as defined below): (a) allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code; and (b) valid, binding, continuing, enforceable, non-avoidable, and automatically and fully perfected security interests and liens (the "DIP Liens") on the DIP Collateral (as defined below) and all proceeds thereof, including without limitation all DIP Proceeds and any property that would comprise "cash collateral" of the DIP Lender in accordance with section 363(a) of the Bankruptcy Code (the "DIP Cash Collateral"), pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, to secure all DIP Obligations;

(viii) authorize the DIP Lender and the Debtor to take all commercially reasonable actions to implement and effectuate the terms of this Final DIP Order and the DIP Loan Documents;

(ix) modify the automatic stay imposed by section 362(a) of the Bankruptcy Code to the extent set forth herein and as necessary to permit the Debtor and the DIP Lender to implement and effectuate the terms and provisions of the DIP Loan Documents and this Final DIP Order, and authorize the DIP Lender, upon the occurrence and continuation of an Event of Default (as defined in the DIP Credit Agreement), and subject to the Remedies Notice Period (as defined below), to exercise rights and remedies, as contemplated hereby and by the DIP Loan Documents, without further order of the Court;

(x) waive any applicable stay (including under Bankruptcy Rule 6004) and provide for immediate effectiveness of this Final DIP Order;

(xi) grant waivers, retroactive to the Petition Date (as defined below), of (a) the Debtor's and its estate's right to surcharge against the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code and (b) the equitable doctrine of marshaling with respect to the DIP Collateral;

(xii) approve the global resolution between the Debtor and the Foundation Parties (as defined below), as set forth in the Motion and the DIP Loan Documents (the "Global Resolution"), as fair, reasonable and in the best interest of the Debtor's estate; and

(xiii) authorize the assumption of the Termination and Settlement Agreement, dated December 2, 2025 (the "Fenix Agreement"), by and among the Debtor, Foundation and Movement Limited, pursuant to section 365 of the Bankruptcy Code.

This Court having considered the Motion, the DIP Credit Agreement, the *Declaration of Michael Robinson in Support of MVMT Labs, Inc.'s Chapter 11 Petition and First Day Motions* [Docket No. 21], the papers filed with this Court, the evidence submitted and arguments made at the hearing held before this Court on July 20, 2026 (the "First Interim Hearing"), at the hearings held before this Court on August 27, 2026, September 3, 2026 and September 11, 2026 (collectively, the "Second Interim Hearing" and, together with the First Interim Hearing, the "Interim Hearings") and at the hearing held before this Court on October 19, 2026 (the "Final Hearing" and, together with the Interim Hearings, the "Hearings") and upon the record of the Chapter 11 Case; and adequate notice having been given in accordance with Bankruptcy Rules 2002, 4001, and 9014 and all applicable Local Rules, and no other or further notice being required; and all objections with respect to the entry of this Final DIP Order (including with respect to the Global Resolution and the assumption of the Fenix Agreement), if any, having been withdrawn, resolved or overruled by this Court; and this Court having found that granting the relief requested in the Motion is fair and reasonable and in the best interests of the Debtor, its estate, creditors and other parties in interest, and is essential for the continued operation of the Debtor and the preservation of the value of the Debtor's assets, and represents a sound exercise of the Debtor's business judgment; and after due deliberation and consideration, having found good and sufficient cause therefor,

**THIS COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW BASED UPON THE MOTION, THE REPRESENTATIONS OF COUNSEL AND THE EVIDENCE SUBMITTED DURING THE HEARINGS**.[4]

A. **Petition Date**. On July 15, 2026 (the "Petition Date"), the Debtor filed a voluntary petition for relief under subchapter V of chapter 11 of the Bankruptcy Code in this Court, commencing this Chapter 11 Case.

B. **Debtor in Possession**. The Debtor is operating its business and managing its property as a debtor in possession pursuant to sections 1182 and 1184 of the Bankruptcy Code.

C. **Jurisdiction and Venue**. This Court has jurisdiction over the Chapter 11 Case and the Motion pursuant to 28 U.S.C. § 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of this Chapter 11 Case and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The Court has authority to enter this Final DIP Order consistent with Article III of the United States Constitution.

D. **Appointment of Subchapter V Trustee / Committee Formation**. On July 16, 2026, Jeffrey Schwendeman was appointed as subchapter V trustee in the Chapter 11 Case (the "Subchapter V Trustee"). The Court has not ordered the appointment of any official committee in this Chapter 11 Case pursuant to section 1102(a)(3) of the Bankruptcy Code.

E. **Notice**. Sufficient and adequate notice has been given of the Motion and entry of this Final DIP Order pursuant to Bankruptcy Rule 9013 and Local Rule 9013-1(m) to all entities entitled thereto, and no other or further notice of the Motion or of the entry of this Final DIP Order need be provided to any entity.

[4] The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014, and shall take effect and be fully enforceable immediately upon entry hereof. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

F. **No Credit Available on More Favorable Terms**. Given its current financial condition and the circumstances of the Chapter 11 Case, the Debtor is unable to obtain financing from sources other than the DIP Lender on terms more favorable than the DIP Facility. The Debtor is unable to procure sufficient financing in the form of unsecured credit allowable as an administrative expense. The Debtor is also unable to obtain sufficient secured credit without granting to the DIP Lender the DIP Liens and the DIP Superpriority Claims (as defined below), subject and subordinate to the Carve-Out and the Permitted Prior Liens, as set forth herein and in the DIP Loan Documents.

G. **Good Cause**. Good cause has been shown for the entry of this Final DIP Order, and the relief requested in the Motion and the entry of this Final DIP Order are in the best interests of the Debtor, its estate, its creditors and other parties in interest.

H. **Need for Postpetition Financing**. The Debtor does not have sufficient and reliable sources of working capital to continue to operate its business in the ordinary course without the financing requested in the Motion. The financing provided pursuant to this Final DIP Order and the DIP Loan Documents will permit the Debtor, among other things, to: (i) pay the fees, costs, and expenses incurred in connection with the Chapter 11 Case; (ii) fund any obligations benefiting from the Carve-Out; (iii) continue the orderly operation of its business; (iv) make payroll; and (v) satisfy other working capital and operational needs. In addition, subject to the terms set forth in the DIP Credit Agreement, the DIP Lender has agreed to the Exit Conversion, which affords the Debtor the assurance of having funding of the Subchapter V Plan.

I. **Willingness to Provide Financing**. The DIP Lender has committed to provide financing to the Debtor subject to: (i) entry of this Final DIP Order; (ii) approval of the terms and conditions of the DIP Facility and the DIP Loan Documents; (iii) satisfaction of the closing

conditions set forth in the DIP Loan Documents; and (iv) findings by this Court that the DIP Lender is extending credit to the Debtor pursuant to this Final DIP Order and the DIP Loan Documents in good faith, and that the DIP Lender's claims, superpriority claims, security interests, liens, and other protections granted pursuant to this Final DIP Order and the DIP Loan Documents will have the protections provided by section 364(e) of the Bankruptcy Code. The DIP Lender is an affiliate of Movement Network Foundation ("Foundation"), which is the entity responsible for overseeing the $MOVE ecosystem that the Debtor helped to develop. Neither Foundation nor its affiliates are affiliates of the Debtor but have been contract counterparties with the Debtor. The DIP Lender's willingness to provide DIP Loans, other than the Interim DIP Loans, is conditioned on the approval of the DIP Releases (as defined below) set forth herein.

J. **DIP Budget and Reporting**. The Debtor prepared and delivered to the DIP Lender and its advisors an initial budget, which was updated pursuant to the DIP Loan Documents and is annexed hereto as Exhibit 3 (including as such may be updated from time to time pursuant to the DIP Credit Agreement with the approval of the DIP Lender, the "Approved Budget"). The Approved Budget reflects the Debtor's projected expenses for the eighteen-week period beginning on the Petition Date and shall be updated every four weeks on a rolling basis, with reconciliation on a line-item basis of actual results to projections, and with narrative explanations prepared by the Debtor of any material variances exceeding the permitted variance (other than variances in the line item for the fees and expenses of the DIP Lender's professional advisors) of 25% (the "Permitted Variance"), to be certified by an authorized person of the Debtor and approved in form and substance by the DIP Lender. The DIP Lender relied, in part, upon the Debtor's agreement to comply with the Approved Budget, subject to the Permitted Variance, in making its determination to enter into the DIP Facility and consent to the use of the DIP Cash Collateral as provided in this

Final DIP Order. The Approved Budget as prepared by the Debtor, its management and its advisors, is found by this Court to be reasonable under the circumstances. Each subsequent Approved Budget shall be filed with this Court and provided to counsel to the United States Trustee and the Subchapter V Trustee.

K. **Use of DIP Proceeds and DIP Cash Collateral**. As a condition to the Debtor's entry into the DIP Loan Documents and the extension of credit under the DIP Facility, the Debtor has agreed that the DIP Proceeds and the DIP Cash Collateral shall be used solely in accordance with the terms and conditions of this Final DIP Order, the DIP Loan Documents, and the Approved Budget (subject to the Permitted Variance).

L. **Good Faith**. Based upon the papers filed and the proceedings of record in this Chapter 11 Case: (i) the extension of credit and financial accommodations under the DIP Facility, as provided by the DIP Loan Documents, is fair, reasonable, in good faith, negotiated at arm's length, reflects the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and is supported by reasonably equivalent value and fair consideration; (ii) the DIP Facility and the DIP Loans thereunder are being provided by the DIP Lender in "good faith" within the meaning of section 364(e) of the Bankruptcy Code in express reliance on the protections offered thereby; and (iii) the liens, claims and other covenants and payments as set forth in the DIP Loan Documents and this Final DIP Order, as well as the protections afforded parties acting in "good faith" under section 364(e) of the Bankruptcy Code, are integral, critical and essential components of the DIP Facility provided by the DIP Lender to the Debtor. Accordingly, the DIP Facility, the DIP Liens and the DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Final DIP Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

M. **Section 506(c) and Marshaling**. As material inducement to the DIP Lender's agreement that its liens and superpriority claims shall be subject to payment of the Carve-Out and the Permitted Prior Liens, effective as of the Petition Date, the DIP Lender is entitled to (i) a waiver of the Debtor's and its estate's right to surcharge against the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code and (ii) a waiver of the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, DIP Liens and the DIP Obligations in favor of the DIP Lender.

N. **Requisite Authority**. Subject to the entry of this Final DIP Order, the Debtor has all requisite corporate or entity power and authority to execute and deliver the DIP Loan Documents to which it is a party and to perform its obligations thereunder.

O. **Global Resolution**. Pursuant to Bankruptcy Rule 9019, the Court has considered the factors enumerated in *Myers v. Martin* (*In re Martin*), 91 F.3d 389 (3d Cir. 1996), including (i) the probability of success in any litigation, (ii) the likely difficulties in collection, (iii) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it, and (iv) the paramount interest of creditors, and determined that the Global Resolution between the Debtor and the Foundation Parties is warranted, reasonable and in the best interests of the Debtor, its estate, its creditors and other parties in interest. The Global Resolution was the product of arm's-length negotiations and provides substantial benefits to the estate, including the avoidance of unnecessary litigation expenses, unlocking new-money financing and, subject to the conditions set forth in the DIP Loan Documents, the Exit Conversion, and the contribution of claims by Foundation to a litigation trust, which facilitate a path to a confirmable Subchapter V Plan. In addition, the DIP Lender's agreement to eliminate the mandatory prepayment in the DIP Credit Agreement with respect to proceeds of the Manche Settlement (as defined in the DIP Credit

Agreement), significantly increases estate assets, reduces the risk that the Debtor will need to seek additional debtor-in-possession financing and reduces the amount of exit financing that will be needed. In agreeing to the Global Resolution, the Debtor exercised sound business judgment.

P. **Fenix Agreement Assumption**. The assumption of the Fenix Agreement pursuant to section 365 of the Bankruptcy Code is a sound exercise of the Debtor's business judgment. There are no material defaults under the Fenix Agreement requiring cure. The assumption of the Fenix Agreement will allow the Debtor to continue to be able to deliver tokens on account of delivery obligations to counterparties under valid (and not fraudulent) and undisputed SAFEs and Warrants, in a manner that would avoid claims being asserted directly against the Debtor's estate by such counterparties. The Debtor has demonstrated adequate assurance of future performance under the Fenix Agreement. The assumption of the Fenix Agreement is in the best interests of the Debtor, its estate, its creditors and other parties in interest.

NOW, THEREFORE, based upon the foregoing findings and conclusions, the Motion and the record before this Court, and after due consideration, this Court having found good and sufficient cause therefor,

**IT HEREBY IS ORDERED THAT:**

1. **Motion Granted**. The relief requested by the Motion is granted as set forth herein. Entry into the DIP Credit Agreement and the use of the DIP Proceeds and the DIP Cash Collateral on a final basis are authorized, in each case, subject to the terms and conditions set forth in this Final DIP Order and in the DIP Loan Documents, including the Approved Budget (subject to the Permitted Variance). Upon entry into the DIP Credit Agreement, as authorized hereby, the First Amended DIP Credit Agreement shall cease to be binding on the parties thereto. The Global

Resolution (including the DIP Releases as set forth herein) and the assumption of the Fenix Agreement by the Debtor hereby are authorized and approved.

2. **Authorization of the DIP Facility**. The Debtor expressly and immediately is authorized and empowered to execute and deliver the DIP Loan Documents, and to incur and perform the DIP Obligations in accordance with, and subject to, the terms of this Final DIP Order and the DIP Loan Documents, and to execute, deliver and perform under all instruments, certificates, agreements and documents that may be required or necessary for its performance under the DIP Loan Documents and the creation and perfection of the DIP Liens described in and provided for by this Final DIP Order and the DIP Loan Documents. The Debtor hereby is authorized to pay any principal, interest, fees, expenses and other amounts subject to and in accordance with the DIP Loan Documents and this Final DIP Order, as such amounts become due and owing, without further Court approval (except as otherwise provided herein or in the DIP Loan Documents), including without limitation the DIP Fees and any reasonable and invoiced fees and expenses of counsel to the DIP Lender, as set forth herein and in the DIP Loan Documents, subject to paragraph 25 of this Final DIP Order, and to take any other actions that may be necessary or appropriate, all to the extent provided in this Final DIP Order and the DIP Loan Documents. Upon execution and delivery, the DIP Loan Documents shall represent legal, valid and binding obligations of the Debtor, enforceable against the Debtor and its estate in accordance with their terms. Each officer and director of the Debtor acting individually is authorized hereby to execute and deliver each of the DIP Loan Documents.

3. **DIP Obligations**. The DIP Loan Documents and this Final DIP Order shall constitute and evidence the validity and binding effect of the DIP Obligations. All DIP Obligations shall be enforceable against the Debtor, its estate and any successors thereto, including without

limitation the Subchapter V Trustee, or (i) if the Chapter 11 Case remains in chapter 11 of the Bankruptcy Code, but not subject to subchapter V of chapter 11, (ii) in any case under chapter 7 of the Bankruptcy Code upon the conversion of the Chapter 11 Case, or (iii) in any other proceeding superseding or related to any of the foregoing (each, a "Successor Case"). The DIP Obligations shall include, but not be limited to: (a) the payment by the Debtor of the unpaid principal amount of and all accrued and unpaid interest on the DIP Loans outstanding at any time, together with all fees, expenses and other monetary obligations owed by the Debtor under the DIP Loan Documents and this Final DIP Order, as and when due, whether at maturity, by acceleration, or otherwise, and (b) the payment and performance of all covenants, duties, agreements, obligations and liabilities of the Debtor to the DIP Lender under the DIP Loan Documents and this Final DIP Order. The Debtor and its successors shall be jointly and severally liable for repayment of any funds advanced pursuant to the DIP Loan Documents and the DIP Obligations. The DIP Obligations shall become due and payable, without notice or demand, on the Maturity Date (as defined in the DIP Credit Agreement) or as otherwise set forth in the DIP Loan Documents. No authorized obligation, payment, transfer or grant of collateral as security hereunder or under the DIP Loan Documents (including any DIP Obligation or DIP Lien) to or in favor of the DIP Lender shall be stayed, restrained, voidable, avoidable or recoverable, under the Bankruptcy Code or under any applicable law, or be subject to any disgorgement, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination, claim, counterclaim, charge, assessment, cross-claim, defense or any other liability or challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for any reason.

4. **Authorization to Borrow**. Subject to the terms and conditions set forth in the DIP Loan Documents and this Final DIP Order, the Debtor hereby is authorized to borrow

under the DIP Facility, which borrowings shall be used solely for purposes permitted under the DIP Loan Documents, including without limitation to provide working capital for the Debtor and to pay interest, fees, costs, charges and expenses, in each case, in accordance with this Final DIP Order, the DIP Loan Documents and the Approved Budget (subject to the Permitted Variance). Once repaid, the DIP Loans may not be re-borrowed. Under no circumstances shall the DIP Lender have any obligation to lend any amounts above its commitment to make the DIP Loans pursuant to and subject to the limitations set forth in the DIP Loan Documents.

5. **DIP Collateral**. The term "DIP Collateral" means, collectively, the Debtor's rights, title and interest in, to and under all its assets, including without limitation, in each case, whether now owned or existing or hereafter acquired, created or arising, and wherever located, all of the Debtor's property, whether real or personal, tangible or intangible, including, without limitation, all real estate, inventory, equipment, fixtures, leasehold interests, commercial tort claims, deposit accounts, investment property, documents, accounts, chattel paper (whether electronic or tangible), intercompany loans, general intangibles (including patents, trademarks and other intellectual property), instruments, insurance policies, supporting obligations and proceeds of all of the foregoing and the proceeds of any causes of action under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 549, 550 and 553 or any other similar state or federal law ("Avoidance Actions"), but not such Avoidance Actions themselves.

6. **Disposition of Collateral**. Notwithstanding anything otherwise provided herein, it shall be deemed an Event of Default if the Debtor sells, transfers, leases, encumbers or otherwise disposes of any portion of the DIP Collateral, other than in connection with the payments contemplated under this Final DIP Order or the Approved Budget (subject to the Permitted Variance), without the prior written consent of the DIP Lender.

7. **DIP Liens**. To secure the DIP Obligations, immediately upon and effective as of the entry of this Final DIP Order, without the necessity of execution, recordation or filing of any perfection document or instrument, or the possession or control by the DIP Lender of or over any DIP Collateral, and without any further action by the DIP Lender, the DIP Lender hereby is granted valid, binding, continuing, fully perfected, enforceable and non-avoidable security interests and liens on the DIP Collateral as follows, in all respects subject to the Carve-Out:

(i) **First Liens on Unencumbered Property**. Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Lender hereby is granted a valid, binding, continuing, enforceable, non-avoidable, fully perfected first-priority senior security interest in and continuing lien on all of the DIP Collateral to the extent such property is not otherwise subject to Permitted Prior Liens.

(ii) **Liens Junior to Certain Other Liens on Encumbered Property**. Pursuant to Bankruptcy Code section 364(c)(3), the DIP Lender hereby is granted a valid, binding, enforceable, non-avoidable and fully perfected security interest in and continuing lien on all of the DIP Collateral that is subject to a valid, perfected, enforceable and unavoidable lien or security interest on the Petition Date or subject to a valid lien or security interest in existence on the Petition Date that is perfected subsequent thereto as expressly permitted by section 546(b) of the Bankruptcy Code (the "Permitted Prior Liens"), which shall be senior to the security interest and liens in favor of the DIP Lender with respect to such DIP Collateral.

(iii) **DIP Cash Collateral**. For the avoidance of doubt, all of the Debtor's cash, including any cash in deposit accounts, wherever located, whether as original collateral or proceeds of other DIP Collateral, constitutes or shall constitute "cash

collateral" of the DIP Lender within the meaning of section 363(a) of the Bankruptcy Code.

Other than as set forth herein or in the DIP Loan Documents, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Case or any Successor Case, and shall be valid and enforceable against any trustee appointed in the Chapter 11 Case or any Successor Case, upon the conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), or upon the dismissal of the Chapter 11 Case or any Successor Case. The DIP Liens shall not be subject to subordination or avoidance, including without limitation under sections 510, 549, or 550 of the Bankruptcy Code.

8. **DIP Superpriority Claims**. Subject to the Carve-Out, the DIP Lender hereby is granted, pursuant to section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims in the above-captioned case, regardless of whether it proceeds under chapter 11 or chapter 7 of the Bankruptcy Code (collectively, the "DIP Superpriority Claims") for the DIP Facility, the DIP Obligations, and any other liabilities and obligations of the Debtor under this Final DIP Order and the DIP Loan Documents, with priority over any and all administrative expense claims and unsecured claims against the Debtor or its estate in the above-captioned case, regardless of whether it proceeds under chapter 11 or chapter 7 of the Bankruptcy Code, which DIP Superpriority Claims shall be senior to the rights of the Debtor, its estate and its successors or other representatives to the extent permitted by law.

9. **No Obligation to Extend Credit**. The DIP Lender shall have no obligation to make any loan or advance under the DIP Loan Documents unless (i) all of the applicable conditions precedent and other terms under the DIP Loan Documents and this Final DIP Order

have been satisfied in full or waived by the DIP Lender (in its sole discretion), and (ii) no default (or event that would give rise to a default after the passage of time) shall have occurred and be continuing under the DIP Loan Documents (including this Final DIP Order).

10. **Use of DIP Proceeds**. The Debtor shall be permitted to use DIP Proceeds and the DIP Cash Collateral only for the purposes specifically set forth in this Final DIP Order, the DIP Loan Documents, and the Approved Budget (subject to the Permitted Variance).

11. **No Monitoring Obligation**. The DIP Lender shall not have any obligation or responsibility to monitor the Debtor's use of the DIP Facility, and the DIP Lender may rely upon the Debtor's representation that the use of the DIP Facility at any time is in accordance with the requirements of this Final DIP Order and the DIP Loan Documents, including the Approved Budget (subject to the Permitted Variance).

12. **Authorization to Use DIP Cash Collateral**. Subject to the terms and conditions of this Final DIP Order and the DIP Loan Documents, and in accordance with the Approved Budget (subject to the Permitted Variance), the Debtor is authorized to use the DIP Cash Collateral until the date on which it has received a Termination Declaration Notice (as defined below), subject to the Remedies Notice Period.

13. **Amendment of the DIP Loan Documents**. The Debtor and the DIP Lender may amend, waive or modify the DIP Loan Documents, in each case in accordance with their terms, and no further approval of this Court shall be required for any amendment, waiver or modification (each, a "Non-Material Amendment") that does not materially and adversely affect the Debtor or (i) shorten the maturity of the DIP Facility; (ii) increase the principal amount of, the rate of interest on, or the fees payable in connection with the DIP Facility; or (iii) change any Event of Default or add or amend any covenants, in each case, so as to be materially more restrictive on

the Debtor; *provided*, *however*, that notice of any such Non-Material Amendment shall be provided by the Debtor to (a) the United States Trustee, (b) the Subchapter V Trustee, and (c) any statutory committee (if appointed), three days in advance of its effectiveness, to the extent reasonably practicable. The United States Trustee and the Subchapter V Trustee each shall retain the right to object to any such Non-Material Amendment on the grounds that the proposed amendment is material and requires further order of this Court. After obtaining the DIP Lender's prior written consent, the Debtor is authorized and empowered, without further notice, hearing or approval of this Court, to amend, modify, supplement or waive any provision of the DIP Loan Documents to reflect a Non-Material Amendment in accordance with the provisions thereof. Upon its effectiveness, any Non-Material Amendment shall be filed with this Court within three (3) business days. Any material amendment of the DIP Loan Documents by the DIP Lender and the Debtor shall be subject to approval by this Court upon notice and a hearing.

14. **DIP Facility Reporting**. The Debtor shall comply with the reporting requirements and obligations set forth in the DIP Loan Documents.

15. **Perfection of DIP Liens**. This Final DIP Order shall be sufficient and conclusive evidence of the creation, validity, perfection and priority of the DIP Liens granted herein, without the necessity of filing or recording any financing statement, mortgage, deed of trust, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens or to entitle the DIP Lender to the priorities granted herein. Notwithstanding the foregoing, the DIP Lender is authorized, but not required, to file, as it deems necessary or advisable, such financing statements, security agreements, mortgages, notices of liens and other

similar documents to perfect or otherwise evidence the DIP Liens in accordance with applicable non-bankruptcy law, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; *provided*, *however*, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens. The DIP Lender may, in its discretion, file an electronic copy or photocopy of this Final DIP Order as a financing statement with any filing or recording office or with any registry of deeds or similar office in addition to or in lieu of such financing statements, notices of lien or similar instruments.

16. **Modification of Automatic Stay**. The automatic stay of section 362 of the Bankruptcy Code hereby is modified to the extent necessary to permit the Debtor and the DIP Lender to accomplish the transactions contemplated by this Final DIP Order, to permit the Debtor to grant the DIP Liens and, subject to the procedures described in paragraph 21 hereof and the Remedies Notice Period, to allow the DIP Lender to enforce its rights and remedies under this Final DIP Order and the DIP Loan Documents.

17. **Proceeds of Subsequent Financing**. If the Debtor, any trustee, any examiner or any responsible officer subsequently appointed in the above-captioned case, regardless of whether it proceeds under chapter 11 or chapter 7 of the Bankruptcy Code, shall obtain credit or incur debt pursuant to sections 364(b), 364(c), or 364(d) of the Bankruptcy Code in violation of the DIP Loan Documents at any time prior to the indefeasible repayment in full in cash of all DIP Obligations (other than unasserted contingent obligations that expressly survive termination of the DIP Loan Documents) and the termination of the DIP Lender's obligation to extend credit under the DIP Facility, then, after satisfaction of the Carve-Out, and unless otherwise agreed by the DIP Lender, all cash proceeds derived from such credit or debt shall immediately be

turned over to the DIP Lender to be distributed in accordance with this Final DIP Order and the DIP Loan Documents.

18. **Payments Held in Trust**. Except as expressly permitted in this Final DIP Order or the DIP Loan Documents, or otherwise ordered by this Court, including in respect of the Carve-Out and the Permitted Prior Liens, in the event that any person or entity receives any payment on account of a security interest in the DIP Collateral or receives any DIP Collateral or any proceeds of DIP Collateral prior to indefeasible payment in full in cash of all DIP Obligations under the DIP Loan Documents and termination of the DIP Facility in accordance with the DIP Credit Agreement, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust and shall immediately turn over all such proceeds to the DIP Lender, for application in accordance with the DIP Credit Agreement and this Final DIP Order.

19. **Maintenance of DIP Collateral**. Until the payment in full of the DIP Obligations, the Debtor shall: (i) insure the DIP Collateral as required under the DIP Loan Documents; and (ii) maintain the cash-management system consistent with the terms and conditions of any order(s) governing the Debtor's cash-management systems and the DIP Loan Documents.

20. **Right to Credit Bid**. Subject to section 363(k) of the Bankruptcy Code, unless the court for cause orders otherwise, the DIP Lender may credit bid all or any portion of its claims, including, without limitation, the DIP Obligations and the DIP Superpriority Claims, in connection with any proposed sale of any, all or substantially all of the Debtor's assets, whether occurring pursuant to section 363 of the Bankruptcy Code or included as part of a plan under section 1190 of the Bankruptcy Code, including a plan subject to confirmation under section 1191

of the Bankruptcy Code, or a sale or disposition by a chapter 7 trustee for the Debtor under section 725 of the Bankruptcy Code. In connection with any such credit bid by the DIP Lender, the Debtor shall, upon reasonable advance notice by the DIP Lender, provide for the assignment of such DIP Lender's right to purchase the acquired assets to one or more of the applicable DIP Lender's sub-agents or a newly formed acquisition vehicle.

21. **Events of Default; Exercise of Remedies**.

(i) **Event of Default**. Immediately upon the occurrence and during the continuation of an Event of Default (and without the need for any further relief from the automatic stay), the DIP Lender may declare, subject to the Remedies Notice Period, (a) all DIP Loans, other DIP Obligations and any other amounts owing under any DIP Loan Documents to be immediately due and payable; (b) the termination, reduction or restriction of any further commitment to extend credit to the Debtor to the extent any such commitment remains (including, for the avoidance of doubt, any commitment to fund any DIP Loan); (c) the termination of the DIP Facility and any DIP Loan Documents as to any future liability of the DIP Lender, but without affecting any of the DIP Liens, the DIP Loans, any other DIP Obligation or the DIP Releases; and (d) the termination, reduction or restriction on the ability of the Debtor to use DIP Proceeds or DIP Cash Collateral, other than, during the Remedies Notice Period referenced below, for payroll in accordance with the Approved Budget (any such declaration made by the DIP Lender to the Debtor, a "Termination Declaration.")

(ii) **Termination Declaration Notice**. The Termination Declaration shall not be effective until notice has been provided by electronic mail to counsel to the Debtor,

counsel to any statutory committee (if appointed), the Subchapter V Trustee and counsel to the United States Trustee (the "Termination Declaration Notice").

(iii) **Exercise of Remedies**. Five business days following the receipt of the Termination Declaration Notice by the parties listed above or such extended period ordered by this Court (the "Remedies Notice Period"), the DIP Lender shall have relief from the automatic stay without any further action in the Chapter 11 Case, may foreclose on all or any portion of the DIP Collateral and may pursue any and all remedies available to it under this Final DIP Order, the DIP Loan Documents and applicable law. During the Remedies Notice Period, the Debtor, the Subchapter V Trustee and any statutory committee (if appointed) shall be entitled to seek an emergency hearing before the Court and, with respect to the Debtor only, for the sole purpose of contesting whether an Event of Default has occurred. Unless during such period the Court determines that an Event of Default has not occurred or is not continuing or the Court orders otherwise, the automatic stay shall automatically be terminated as to the DIP Lender at the end of the Remedies Notice Period without further notice or order.

22. **No Waiver by Failure to Seek Relief**. The rights and remedies of the DIP Lender specified herein are cumulative and not exclusive of any rights or remedies that the DIP Lender may have under the Interim DIP Orders, the DIP Credit Agreement, and other DIP Loan Documents, applicable law or otherwise. The failure or delay on the part of the DIP Lender to seek relief or otherwise exercise available rights and remedies shall not constitute a waiver of any of its respective rights or remedies. Except as expressly set forth herein, none of the rights or remedies of the DIP Lender under this Final DIP Order, the DIP Credit Agreement, or the other

DIP Loan Documents shall be deemed to have been amended, modified, suspended or waived unless such amendment, modification, suspension, or waiver is express, in writing and signed by the DIP Lender. No consent of the DIP Lender required hereunder shall be implied by any inaction or acquiescence by the DIP Lender.

23. **Carve-Out.**

(i) **Priority of Carve-Out**. The DIP Liens and the DIP Superpriority Claims shall be subject and subordinate to payment of the Carve-Out. The Carve-Out shall be senior to all claims and liens over all assets of the Debtor, including any DIP Collateral, except for any Permitted Prior Liens.

(ii) **Carve-Out**. The term "Carve-Out" shall mean the sum of: (a) statutory fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6), together with interest payable thereon pursuant to applicable law and any fees payable to the Clerk of the Court; (b) reasonable fees and expenses incurred by a trustee and payable under section 726(b) of the Bankruptcy Code in an aggregate amount not to exceed $25,000 (without regard to the Carve-Out Trigger Notice); (c) to the extent allowed, the accrued and unpaid reasonable fees and expenses of the Subchapter V Trustee; (d) to the extent allowed, accrued and unpaid reasonable fees and expenses of professionals employed by the Debtor and any statutory committee appointed in the Chapter 11 Case, pursuant to sections 327 and 330 of the Bankruptcy Code, not to exceed 125% (accounting for the Permitted Variance) of the total amounts set forth for such professionals, on an aggregate basis, in the Approved Budget; and (e) all allowed professional fees and expenses incurred after delivery of a Carve-Out Trigger Notice (as defined below), in an aggregate amount not to exceed $150,000.

Notwithstanding anything to the contrary contained herein or in the DIP Loan Documents, the Carve-Out shall be senior to the DIP Liens and the DIP Superpriority Claims.

(iii) **Carve-Out Trigger Notice**. For purposes hereof, "Carve-Out Trigger Notice" means a written (or electronic) notice delivered by the DIP Lender to the Debtor, the Subchapter V Trustee, counsel to the United States Trustee, and counsel to any statutory committee (if appointed), stating that an Event of Default has occurred and that the DIP Lender is invoking the Carve-Out cap.

(iv) **Carve-Out Account**. On the day that a Carve-Out Trigger Notice is received by the Debtor, the Carve-Out Trigger Notice shall constitute a demand to the Debtor to transfer cash to a segregated account (the "Carve-Out Account") in an amount sufficient to satisfy the Carve-Out. The funds on deposit in the Carve-Out Account shall be available only to satisfy the obligations owed to the persons benefiting from the Carve-Out in accordance with the terms of this Final DIP Order, and the DIP Lender shall have a security interest in and a lien upon the Carve-Out Account, which shall be available to the DIP Lender following satisfaction in cash in full of all the Carve-Out obligations as set forth herein. The amount in the Carve-Out Account shall be reduced on a dollar-for-dollar basis for amounts included in the Carve-Out that are paid after the delivery of the Carve-Out Trigger Notice, and the Carve-Out Account shall not be replenished for amounts so paid. The failure of the Carve-Out Account to satisfy in full the amount set forth in the Carve-Out shall not affect the priority of the Carve-Out.

(v) **No Direct Obligation to Pay Professional Fees; No Waiver of Right to Object to Fees**. The DIP Lender shall not be liable or otherwise responsible for the payment or reimbursement of any fees or disbursements of any estate professionals incurred in connection with the Chapter 11 Case or any Successor Case under any chapter of the Bankruptcy Code. Nothing in this Final DIP Order or otherwise obligates the DIP Lender in any way to pay compensation to or to reimburse expenses of any such professionals, or to guarantee that the Debtor or its estate have sufficient funds to pay such compensation or reimbursement. Nothing herein shall be construed as consent to the allowance of any fees or expenses of any person in the Chapter 11 Case or any Successor Case, or of any other person or entity, or shall affect the right of the Debtor, the DIP Lender or any other party in interest to object to the allowance or payment of any such fees and expenses or amounts incurred or requested.

24. **Approval of DIP Fees**. In consideration for the DIP Facility, the DIP Lender shall be paid all fees, expenses and other amounts payable under the DIP Loan Documents as such become due, including without limitation (collectively, the "DIP Fees"): (i) a commitment fee of 2.00% on undrawn commitments, earned upon entry of this Final DIP Order and payable in kind monthly; (ii) a closing fee of 2.00% of the First Interim DIP Loan, earned upon entry of the First Interim DIP Order and payable in kind on the Closing Date (as defined in the DIP Credit Agreement); and (iii) an exit fee (the "Exit Fee") of 2.00% of the aggregate commitment, earned and payable in kind on the date of the Final DIP Loan in the event that the Subchapter V Plan does not provide for other treatment of the Exit Fee in accordance with the terms hereof, or the DIP Obligations have not otherwise been indefeasibly paid in full in cash. For the avoidance of doubt,

all DIP Fees shall be paid-in-kind by capitalizing the relevant DIP Fee and adding it to (and thereby increasing) the aggregate then-outstanding principal balance of the DIP Loans (each, a "PIK Fee"). Each PIK Fee shall be treated as principal and shall itself accrue interest from and after the date it was due, which shall be due and payable on the Maturity Date (as defined in the DIP Credit Agreement).

25. **DIP Lender's Professional Fees.** The professionals retained by the DIP Lender shall provide summary copies of any invoices by email to counsel to the Debtor, counsel to the United States Trustee and the Subchapter V Trustee. Such invoices shall not be required to contain time entries and may be redacted or modified to the extent necessary to delete any privileged or confidential information. The provision of such invoices shall not constitute a waiver of any privilege or of any benefits of the attorney-work-product doctrine. The Debtor shall promptly pay in full all such invoiced fees and expenses at the conclusion of the Review Period (as defined below) other than any Disputed Invoiced Fees (as defined below). Any objections raised by the Debtor, the United States Trustee, or the Subchapter V Trustee with respect to such invoices (the "Disputed Invoiced Fees") must be in writing and state the grounds therefor and must be submitted to the applicable professional within 10 days of the receipt of such invoice (the "Review Period") (to be followed by the filing with this Court, if necessary, of a motion or other pleading, with at least 10 days' prior written notice by the submitting party of any hearing on such motion or other pleading). The United States Trustee and the Subchapter V Trustee retain the right to seek copies of invoices containing the detailed time entries of any professional and to seek to obtain unredacted copies of any invoices. No professional retained by the DIP Lender shall be required to file an application seeking compensation for services or reimbursement of expenses with this Court.

26. **Indemnification**. The Debtor and its estate shall indemnify, pay and hold harmless the DIP Lender and each of the Foundation Parties against any and all losses, liabilities, claims, damages, costs and expenses (including reasonable attorney's fees and expenses) incurred in connection with or arising out of the DIP Facility, the DIP Loan Documents, or the use or proposed use of DIP Proceeds, except to the extent resulting from their gross negligence, willful misconduct or bad faith, as determined by a final non-appealable judgment of a court of competent jurisdiction. This indemnification obligation shall (i) constitute an allowed administrative expense claim under section 503(b) of the Bankruptcy Code; (ii) survive the repayment of the DIP Obligations and the termination of the DIP Facility; and (iii) be payable on demand without further order of the Court.

27. **Proofs of Claim**. The DIP Lender shall not be required to file a proof of claim in the above-captioned case in respect of the DIP Obligations, regardless of whether the above-captioned case proceeds under chapter 11 or chapter 7 of the Bankruptcy Code, and the entry of this Final DIP Order shall be deemed to constitute a timely filed proof of claim. Any order entered by this Court in relation to the establishment of a bar date for any claim (including without limitation, administrative claims) in the above-captioned case, regardless of whether it proceeds under chapter 11 or chapter 7 of the Bankruptcy Code, shall not apply to the DIP Lender. Notwithstanding the foregoing, the DIP Lender may, in its sole discretion, file (and amend or supplement) a proof of claim or aggregate proofs of claim in the Chapter 11 Case for any claim allowed herein.

28. **Limitations on Use of DIP Proceeds and DIP Collateral**. No DIP Proceeds or DIP Collateral shall be used, directly or indirectly, by any of the Debtor, the Subchapter V Trustee, any committee (if one is appointed), any other trustee or estate

representative appointed in the above-captioned case, regardless of whether it proceeds under chapter 11 or chapter 7 of the Bankruptcy Code, or any other person or entity: (i) for any purpose that is prohibited under the Bankruptcy Code, the Interim DIP Orders or this Final DIP Order; or (ii) to investigate, commence, prosecute, join in or finance in any way (or reimburse for expenses incurred or to be incurred in connection with) any action, suit, arbitration, proceeding, application, motion, objection or other litigation adverse to the interests of the DIP Lender or any other Foundation Party, including with respect to or related to: (a) the claims, liens or security interest of the DIP Lender, or its rights and remedies under the Interim DIP Orders or this Final DIP Order, as the case may be, including to commence or prosecute or join in any action against the DIP Lender seeking (x) to avoid, subordinate or recharacterize the DIP Obligations, (y) any monetary, injunctive or other affirmative relief against the DIP Lender or (z) to prevent or restrict the exercise by the DIP Lender of any of its rights or remedies under the Interim DIP Orders or this Final DIP Order; (b) any claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness or obligations with respect to matters that otherwise would fall within the scope of the definition of DIP Releases as used herein; (c) the stipulations made by the Debtor and approved by the Interim DIP Orders or this Final DIP Order; or (d) any other action that with the giving of notice or passing of time would result in an Event of Default.

29. **Waivers**.

(i) **Limitation on Charging Expenses**. Effective as of the Petition Date, no costs or expenses of administration of the Chapter 11 Case or any conversion of the Chapter 11 Case to a chapter 7 case shall be charged against or recovered from or against the DIP Lender or the DIP Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Lender.

(ii) **No Marshaling**. Effective as of the Petition Date, in no event shall the DIP Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the DIP Obligations and all proceeds shall be received and applied in accordance with this Final DIP Order and the DIP Loan Documents.

30. **No Lender Liability**. In determining to make any loan (whether under the DIP Loan Documents or otherwise) or to permit the use of DIP Cash Collateral, the DIP Lender shall not owe any fiduciary duty to the Debtor or its creditors, shareholders or estate, and the DIP Lender shall not be deemed to be in control of the operations of the Debtor or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtor by virtue of making the DIP Loans. Nothing in this Final DIP Order, the Interim DIP Orders, the DIP Loan Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender of (i) any liability for any claims arising from the prepetition or postpetition activities of the Debtor or its affiliates (as defined in section 101(2) of the Bankruptcy Code) in the operation of their business, or in connection with their restructuring efforts; or (ii) any liability for any alleged fiduciary duties to the Debtor, its creditors, shareholders or estate. The DIP Lender shall not, in any way or manner, be liable or responsible for (a) the safekeeping of the DIP Collateral, (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (c) any diminution in value thereof or (d) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and all risk of loss, damage or destruction of the DIP Collateral shall be borne by the Debtor.

31. **No Third-Party Beneficiaries**. Except as explicitly provided for herein, this Final DIP Order does not create any rights for the benefit of any professional, third party, creditor, landlord, lessor, equity holder or any direct, indirect or incidental beneficiary.

32. **Insurance Proceeds and Policies**. The DIP Lender shall be, and shall be deemed to be, without any further action or notice, named as an additional insured and loss payee on each insurance policy maintained by the Debtor that in any way relates to the DIP Collateral.

33. **No Waivers or Modifications of Final DIP Order**. The Debtor has agreed not to — and shall not — seek any modification or extension of this Final DIP Order without the prior written consent of the DIP Lender, and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Lender.

34. **Binding Effect of Final DIP Order**. The terms and provisions of this Final DIP Order shall become valid and binding upon (and, as applicable, inure to the benefit of) the Debtor, the DIP Lender, all other creditors of the Debtor, all other parties in interest and their respective successors and assigns, including the Subchapter V Trustee and any other trustee or other fiduciary hereafter appointed in the Chapter 11 Case, any Successor Case, or upon dismissal of the Chapter 11 Case or any Successor Case; *provided, however*, under no circumstances shall the DIP Lender have any obligation to permit the use of DIP Collateral (including DIP Cash Collateral) by or extend any financing to any chapter 7 trustee, chapter 11 trustee, or similar responsible person appointed for the Debtor's estate.

35. **Discharge**. Except as otherwise agreed in writing by the DIP Lender, the DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization or liquidation in the Chapter 11 Case, notwithstanding the provisions of section 1192 of the Bankruptcy Code, unless the DIP Obligations have been indefeasibly paid in full in

cash, on or before the effective date of such confirmed plan. Upon the substantial consummation of the Subchapter V Plan and subject to the terms of the DIP Credit Agreement, all DIP Loans automatically shall convert to the Exit Facility without further notice to or order or other approval of the Court, act or action under applicable law, regulation, order or rule, or the vote, consent, authorization or approval of any person or entity (including the board of directors of the Debtor, except as otherwise required by the DIP Loan Documents). Solely for purposes of this paragraph 35, the DIP Loan Documents as in effect after the occurrence of the Exit Conversion are referred to as the "Exit Facility Documents". Upon the satisfaction or waiver of the conditions to effectiveness set forth in the Exit Facility Documents, the Debtor or its successor under the Subchapter V Plan (the "Litigation Trustee") shall be authorized and directed, in each case to the extent necessary, appropriate or desirable, to (i) enter into any notes, documents or agreements in connection with the Exit Facility, including, without limitation, any documents required in connection with the creation, perfection or continuation of the liens securing the Exit Facility, (ii) grant such liens and security interests as necessary to provide security for the Exit Facility in accordance with the Exit Facility Documents, (iii) continue to perform all of its obligations under the Exit Facility Documents, and (iv) take all such other actions as are necessary, appropriate or desirable in connection with the consummation of the transactions contemplated by the Exit Facility Documents. The Subchapter V Plan shall provide, among other things, that: (a) the Exit Facility shall continue to accrue interest, which shall be paid-in-kind, at the rates applicable to the DIP Loans, until all amounts owing thereunder are indefeasibly repaid in full; (b) recoveries from any claims prosecuted or settled by the Litigation Trustee shall be distributed according to a waterfall, whereby cash shall be used first, after the payment of current — and reservation for future — reasonable expenses of the Litigation Trustee, to repay the Exit Facility prior to any other

distributions to creditors; and (c) all DIP Liens, DIP Superpriority Claims, and other protections in favor of the DIP Lender shall survive confirmation and remain in full force and effect until all obligations under the DIP Loan Documents (including the DIP Loans) and the Exit Facility are indefeasibly paid in full in cash in accordance with the terms of the Subchapter V Plan and the Exit Facility Documents. For the avoidance of doubt, nothing in this Final Order constitutes confirmation or approval of the Subchapter V Plan, or any other plan or litigation trust agreement, and all parties' rights are reserved in connection therewith. Moreover, nothing herein shall constitute any finding with respect to the contribution of Contributed Claims pursuant to a Subchapter V Plan.

36. **Survival**. To the extent provided in this Final DIP Order, the provisions of this Final DIP Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (i) confirming any chapter 11 plan in the Chapter 11 Case; (ii) converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code; (iii) dismissing the Chapter 11 Case or any Successor Case; or (iv) pursuant to which this Court abstains from hearing the Chapter 11 Case or any Successor Case. The terms and provisions of this Final DIP Order, including the claims, liens, security interests and other protections granted to the DIP Lender pursuant to this Final DIP Order and the DIP Loan Documents, shall continue in the Chapter 11 Case, in any Successor Case, or following dismissal of the Chapter 11 Case or any Successor Case, and shall maintain their priority as provided by this Final DIP Order until, in respect of the DIP Facility, all the DIP Obligations, pursuant to the DIP Loan Documents and this Final DIP Order, have been paid in full (such payment being without prejudice to any terms or provisions contained in the DIP Facility that survive such discharge by their terms). The terms and provisions concerning the indemnification of the DIP Lender shall continue in the Chapter 11 Case, in any Successor Case,

following dismissal of the Chapter 11 Case or any Successor Case and following termination of the DIP Facility or the indefeasible repayment of the DIP Obligations.

37. **DIP Releases**. The Debtor and its estate, on their own behalf and on behalf of each of their predecessors, successors and assigns, to the maximum extent permitted by law, hereby unconditionally, irrevocably, fully, and forever release, remise, acquit, relinquish, waive and discharge the DIP Lender and each of Foundation, its affiliates (including Movement Limited) and their current or future officers, employees, directors, agents (and the employers of any independent directors), representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates and predecessors in interest, each in their capacity as such (collectively, the "Foundation Parties") from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorney's fees, costs, expenses or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending or threatened, including without limitation all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, that exist on the date hereof, whether arising out of the prior conduct of the Foundation Parties or any interaction or relationship (alleged or otherwise) of the Debtor or any other person with any Foundation Party, including without limitation (a) any so-called "lender liability" or equitable subordination claims or defenses; (b) any and all Avoidance Actions or other claims and causes of action arising under the Bankruptcy Code; and (c) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection, and avoidability of the DIP Liens and the DIP Obligations; *provided, however*, that such releases shall not include any rights of the Debtor

with respect to any breach by a Foundation Party of its obligation under the Fenix Agreement (the "DIP Releases"). For the avoidance of doubt, (i) in the event that the DIP Lender assigns or participates any portion of its rights and obligations under the DIP Facility to any person or entity that is not a Foundation Party, no such assignee or participant shall benefit from the DIP Releases and (ii) the DIP Releases do not release, enjoin, impair, settle or adjudicate any claim, cause of action, defense, setoff, recoupment right or remedy belonging solely and directly to a person or entity other than the Debtor or its estate against any non-debtor, and all parties' rights and defenses are reserved in connection therewith.

38. **Approval of Global Resolution**. Pursuant to Bankruptcy Rule 9019 and section 105(a) of the Bankruptcy Code, the Global Resolution between the Debtor and the Foundation Parties hereby is approved on a final basis as fair, reasonable and in the best interests of the Debtor, its estate, its creditors and other parties in interest. The terms and conditions of the Global Resolution as set forth in the Motion, the DIP Loan Documents and this Final DIP Order shall be binding upon the Debtor, its estate and all parties in interest, and hereby are given full force and effect.

39. **Assumption of Fenix Agreement**. Pursuant to sections 105(a) and 365(a) of the Bankruptcy Code, the Debtor hereby is authorized to assume the Fenix Agreement and, effective as of the date hereof, the Fenix Agreement hereby is assumed by the Debtor. The Debtor is authorized and empowered to fully perform its obligations under the Fenix Agreement.

40. **Necessary Actions**. The Debtor is authorized and directed to take such actions as are reasonable and appropriate to implement the terms of this Final DIP Order and the DIP Loan Documents.

41. **Enforceability**. This Final DIP Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable immediately upon entry thereof. Notwithstanding Bankruptcy Rules 4001(a)(4), 6004(h), or any other applicable Bankruptcy Rules, any applicable Local Rules, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final DIP Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Final DIP Order.

42. **Final DIP Order Controls.** In the event of any conflict or inconsistency between or among the terms or provisions of this Final DIP Order, the Interim DIP Orders and any of the DIP Loan Documents, the terms and provisions of this Final DIP Order shall govern and control.

43. **Headings.** All paragraph headings used in this Final DIP Order are for ease of reference only and shall not affect the construction or interpretation hereof.

44. **Retention of Jurisdiction**. This Court shall retain jurisdiction over all matters arising from or related to the DIP Loan Documents or this Final DIP Order.

# **Exhibit 1**

## DIP Credit Agreement

# SECOND AMENDED AND RESTATED DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT

**by and between**

**MVMT LABS, INC.**

**as Borrower,**

**and**

**MNF DIP SPV LTD**
**as DIP Lender**

**Dated as of October [_], 2026**

**TABLE OF CONTENTS**

**Page**


1. DEFINITIONS AND CONSTRUCTION. ....................2
   1.1 Definitions....................2
   1.2 Accounting Terms....................12
   1.3 UCC....................12
   1.4 Construction....................12
   1.5 Schedules and Exhibits....................13

2. LOAN AND TERMS OF PAYMENT. ....................13
   2.1 Agreement to Lend; Security Documents; and DIP Loan Documents. ....................13
   2.2 Borrowing Procedures....................13
   2.3 [Reserved]. ....................13
   2.4 Payments; Reductions of the Commitment; Prepayments. ....................13
   2.5 Interest Rates and Rates, Payments and Calculations. ....................15
   2.6 Crediting Payments; Clearance Charge....................16
   2.7 Designated Account....................16
   2.8 Statements of Obligations....................16
   2.9 Fees. ....................16

3. CONDITIONS; TERM OF AGREEMENT. ....................16
   3.1 Conditions Precedent to Each DIP Loan....................16
   3.2 Conditions Precedent to Final DIP Loan....................18
   3.3 Maturity....................18
   3.4 Effect of Maturity....................18

4. REPRESENTATIONS AND WARRANTIES....................19
   4.1 Due Organization and Qualification....................19
   4.2 Due Authorization....................19
   4.3 Binding Obligations....................19
   4.4 Title to Properties....................19
   4.5 Accuracy of Information....................19
   4.6 Fraudulent Transfer....................19
   4.7 Indebtedness....................19
   4.8 Approved Budget....................19

4.9 Bank Accounts ....................20
4.10 No Other Representations ....................20

5. AFFIRMATIVE COVENANTS. ....................20
5.1 Notice of Certain Events ....................20
5.2 Reporting; Budget; Conference Calls. ....................20
5.3 Existence ....................21
5.4 Maintenance of Properties; Permits ....................21
5.5 Taxes ....................21
5.6 [Reserved]. ....................21
5.7 Inspection ....................21
5.8 Compliance with Laws ....................21
5.9 Disclosure Updates ....................21
5.10 Further Assurances ....................21
5.11 Approved Budget ....................22
5.12 [Reserved]. ....................22
5.13 [Reserved]. ....................22
5.14 Deposit Account Control Agreements ....................22
5.15 [Reserved]. ....................22
5.16 Material Contracts; Sale Offers ....................22
5.17 DIP Milestones ....................22

6. NEGATIVE COVENANTS. ....................22
6.1 Indebtedness ....................22
6.2 Liens ....................23
6.3 Restrictions on Fundamental Changes ....................23
6.4 Disposal of Assets ....................23
6.5 Change Name ....................23
6.6 Nature of Business ....................23
6.7 Material Leases or Contracts; Amendments ....................23
6.8 Change of Control ....................23
6.9 Accounting Methods ....................23
6.10 Transactions with Affiliates ....................24
6.11 Use of Proceeds ....................24
6.12 Limitation on Capital Expenditures ....................24

6.13 Chapter 11 Case ........ 24
6.14 Acquisitions, Loans, or Investments ........ 24
6.15 Payments on Indebtedness ........ 24
6.16 Distributions or Redemptions ........ 24
6.17 Formation of Subsidiaries ........ 24

7. [RESERVED]. ........ 25

8. EVENTS OF DEFAULT. ........ 25
8.1 Events of Default ........ 25
8.2 Rights and Remedies ........ 27
8.3 Application of Proceeds upon Event of Default ........ 28
8.4 Remedies Cumulative ........ 28

9. [RESERVED] ........ 28

10. PRIORITY AND COLLATERAL SECURITY ........ 28
10.1 Superpriority Claims; Subordination in favor of DIP Lender Liens ........ 28
10.2 Grant of Security Interest in the Collateral ........ 29
10.3 Representations and Warranties in Connection with Security Interest ........ 29
10.4 Power of Attorney ........ 29
10.5 DIP Lender's Ability to Perform Obligations on Behalf of Borrower with Respect to the Collateral ........ 30
10.6 Financing Statements ........ 30
10.7 No Discharge; Survival of Claims ........ 30

11. WAIVERS; INDEMNIFICATION. ........ 30
11.1 Demand; Protest, etc. ........ 30
11.2 DIP Lender's Liability for Collateral ........ 30
11.3 Indemnification ........ 30

12. NOTICES. ........ 31

13. CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER. ........ 32

14. AMENDMENTS; WAIVERS; SUCCESSORS. ........ 32
14.1 Amendments and Waivers ........ 32
14.2 No Waivers; Cumulative Remedies ........ 33
14.3 Successors ........ 33

15. GENERAL PROVISIONS. ....33
15.1 Effectiveness ....33
15.2 Section Headings ....33
15.3 Interpretation ....33
15.4 Severability of Provisions ....33
15.5 Debtor-Creditor Relationship ....33
15.6 Counterparts; Electronic Execution ....33
15.7 Revival and Reinstatement of Obligations ....34
15.8 Integration ....34
15.9 No Waiver of Right to Object to Professional Fees ....34
16. [RESERVED]. ....34
17. [RESERVED]. ....34
18. TREATMENT OF CERTAIN INFORMATION. ....34

<u>Exhibits</u>

Exhibit A – Initial Budget
Exhibit D – Form of Borrowing Notice

<u>Schedules</u>

Schedule A-1 – Authorized Persons
Schedule A-2 – Payment Account
Schedule D-1 – Designated Account and Designated Account Bank

**SECOND AMENDED AND RESTATED SENIOR SECURED, SUPERPRIORITY DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT**

**THIS SECOND AMENDED AND RESTATED SENIOR SECURED, SUPERPRIORITY DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT** (as it subsequently may be amended in accordance with its terms, this "Agreement"), is entered into as of October [_], 2026 (the "Closing Date"), by and among **MVMT LABS, INC.**, a Delaware corporation ("MVMT Labs" and the "Borrower"), and **MNF DIP SPV LTD.**, a Cayman Islands exempted company, as lender ("DIP Lender").

**WHEREAS**, on July 15, 2026 (the "Petition Date"), the Borrower filed a voluntary petition for relief under subchapter V of chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (together with any other court of competent jurisdiction exercising authority over the Chapter 11 Case, the "Bankruptcy Court"), which is being administered under Case No. 26-11113 (TMH) (the "Chapter 11 Case");

**WHEREAS**, the Borrower remains in possession of its business and manages its properties as debtor and debtor in possession pursuant to sections 1182 and 1184 of the Bankruptcy Code;

**WHEREAS**, the Borrower has requested that the DIP Lender provide financing to the Borrower consisting of a senior secured superpriority multiple draw term loan in a total aggregate principal amount of up to $5,700,000 (the "DIP Facility") pursuant to sections 363 and 364 of the Bankruptcy Code, subject to compliance with the terms, conditions and covenants described in this Agreement and the DIP Order;

**WHEREAS**, the DIP Lender and the Borrower have agreed that the DIP Lender will extend the DIP Facility to the Borrower on the terms and conditions set forth herein and in the other DIP Loan Documents (as defined in this Agreement), in accordance with sections 363 and 364 of the Bankruptcy Code, and that all of the obligations with respect to the DIP Facility will be (a) secured by first-priority senior secured Liens on the Collateral granted by the Borrower, subject only to the Carve-Out and the Permitted Prior Liens, as provided herein, in the DIP Order and in the other DIP Loan Documents, and (b) given the status of Superpriority Claims against the Borrower's estate, as provided in the DIP Order;

**WHEREAS,** on July 20, 2026, the Bankruptcy Court entered the *Interim Order (I) Authorizing the Debtor to (A) Obtain Postpetition Financing and (B) Grant Liens, Including Senior Secured Liens, and Superpriority Administrative Expense Claims; and (II) Modifying the Automatic Stay* [Docket No. 33] (the "First Interim Order"), which authorized the Debtor's entry into the DIP Loan Documents, and to borrow $750,000 in accordance with the terms of the First Interim Order (the "First Interim DIP Loan");

**WHEREAS**, on July 24, 2026 (the "Initial Funding Date"), the First Interim DIP Loan was advanced to the Borrower pursuant to the terms of the First Interim Order and the DIP Loan Documents;

**WHEREAS,** on September 18, 2026, the Bankruptcy Court entered the *Second Interim Order (I) Authorizing the Debtor to (A) Obtain Postpetition Financing and (B) Grant Liens, Including Senior Secured Liens, and Superpriority Administrative Expense Claims; and (II) Modifying the Automatic Stay* [Docket No. 171] (the "Second Interim Order"), which further authorized the Borrower to perform under the DIP Loan Documents on an interim basis and to borrow $3,450,000 in accordance with the terms of the Second Interim Order (the "Second Interim DIP Loan").

**WHEREAS**, on September 23, 2026 (the "Second Funding Date"), the Second Interim DIP Loan was advanced to the Borrower pursuant to the terms of the Second Interim Order and the DIP Loan Documents.

**NOW, THEREFORE**, in consideration of the premises and of the mutual covenants and agreements contained herein, the parties hereto hereby agree as follows:

**1. DEFINITIONS AND CONSTRUCTION.**

1.1 **Definitions**. As used in this Agreement, the following terms shall have the meanings set forth below:

"Account Debtor" means a person obligated on an account, chattel paper or general intangible, as that term is defined in the UCC. This term does not include persons obligated to pay a negotiable instrument, even if the instrument constitutes part of chattel paper.

"Additional Documents" has the meaning set forth in Section 5.10.

"Affiliate" means, as to any Person, any other Person (a) that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person or (b) which, directly or indirectly through one or more intermediaries, is the beneficial or record owner (as defined in Rule 13d-3 of the Securities Exchange Act of 1934, as amended, as the same is in effect on the Petition Date) of ten percent (10%) or more of any class of the outstanding voting equity interests, securities or other equity or ownership interests of such Person. For purposes of this definition, the term "control" (and the correlative terms "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies, whether through ownership of securities or other interests, by contract or otherwise.

"Agreement" has the meaning set forth in the preamble hereof.

"Approved Budget" means, in each case, once certified by an Authorized Person and approved by the DIP Lender: (a) the Initial Budget; or, as applicable, (b) an amended or otherwise modified budget updated every four weeks on a rolling basis, with reconciliation on a line-item basis of actual results to projections, and with narrative explanation prepared by the Debtor of any material variances exceeding the Permitted Variance.

"Authorized Person" means any of the individuals identified on Schedule A-1, which may be updated from time to time by written notice from the Borrower to the DIP Lender.

"Avoidance Actions" means any and all avoidance, recovery, subordination, derivative or other claims, actions or remedies that may be brought by or on behalf of the Borrower or its estate or other authorized parties in interest under the Bankruptcy Code or other applicable law, including actions or remedies under sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code or under similar, related or comparable state or federal statutes or common law, including fraudulent transfer laws, or under other applicable law.

"Bankruptcy Code" has the meaning set forth in the recitals to this Agreement.

"Bankruptcy Court" has the meaning set forth in the recitals to this Agreement.

"Borrowing Notice" has the meaning set forth in Section 2.2.

"Borrower" has the meaning set forth in the preamble to this Agreement.

"Business Day" means any day that is not Saturday, Sunday or another day on which banks are authorized or required to close in the State of New York, the State of Delaware or the Cayman Islands.

"Capital Expenditure" means, with respect to any Person for any period, any expenditure by such Person during such period that is a capital expenditure as determined in accordance with GAAP, whether such expenditure is paid in cash or financed.

"Capital Lease" means a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP as in effect prior to the adoption and effectiveness of Accounting Standards Codification No. 842 or any successor or replacement accounting provisions.

"Carve-Out" has the meaning set forth in the DIP Order.

"Change of Control" means the acquisition, through purchase or otherwise (including the agreement to act in concert without anything more), by any Person or group (as such term is used in section 13(d)(3) of the Securities Exchange Act of 1934, as amended), after the date of this Agreement, of (a) the beneficial ownership, directly or indirectly, of 100% of the voting equity interests of the Borrower or (b) all or substantially all of the assets of the Borrower, except as permitted in this Agreement.

"Chapter 11 Case" has the meaning set forth in the recitals to this Agreement.

"Closing Date" has the meaning set forth in the preamble to this Agreement.

"Closing Fee" means a fee equal to two percent (2.00%) of the First Interim DIP Loan, earned and non-refundable upon entry of the First Interim Order.

"Collateral" means, collectively, all of the Borrower's rights, title and interests in, to and under all its property, whether real or personal, tangible or intangible, now existing or hereafter acquired, including, without limitation, all real estate, inventory, equipment, fixtures, leasehold interests, commercial tort claims, deposit accounts, investment property, documents, accounts, chattel paper (whether electronic or tangible), intercompany loans, general intangibles (including patents, trademarks and other intellectual property), instruments, insurance policies, supporting obligations and proceeds of all of the foregoing and, subject to entry of the Final Order, the proceeds of any Avoidance Actions, but not such Avoidance Actions themselves.

"Commitment" means the commitment of the DIP Lender to make DIP Loans hereunder. The aggregate amount of the DIP Lender's Commitment is the principal amount of up to $5,700,000, subject to the terms of this Agreement and the DIP Order.

"Commitment Fee" means a fee equal to two percent (2.00%) of the undrawn principal amount of the Commitment, earned and non-refundable upon entry of the Final Order.

"Committee" means any statutory committee of unsecured creditors appointed by the Bankruptcy Court for cause in relation to the Chapter 11 Case.

"Confirmation Order" means a final order of the Bankruptcy Court, in form and substance acceptable to the DIP Lender, confirming the Subchapter V Plan.

"Contributed Claims" means the claims and causes of action (to be specified on a schedule to be mutually agreed by the DIP Lender and the Debtor) that the Foundation Parties have or may have against any third parties that arise from or are related to the launch of the $MOVE token, the Tripartite IP Licensing and Services Agreement, dated September 9, 2024, the Asset Transfer Agreement, dated November 26, 2025, and the Fenix Agreement.

"Daily Balance" means, as of any date of determination and with respect to any fixed monetary Obligations (which shall include interest accrued and paid-in-kind hereunder), the amount of such Obligations owed at the end of such day.

"Debtor" means the Borrower in its capacity as a debtor and debtor in possession in the Chapter 11 Case.

"Default" means an event, condition or default that, with the giving of notice, the passage of time, or both, would be an Event of Default, or any default under the terms of the DIP Order.

"Default Rate" has the meaning set forth in Section 2.5(b).

"Deposit Account" means any deposit account, as that term is defined in the UCC.

"Deposit Account Control Agreement" means, with respect to a Deposit Account, an agreement in form and substance reasonably satisfactory to the DIP Lender that (a) is entered into among the DIP Lender, the financial institution or other person at which such Deposit Account is maintained, and the Borrower maintaining such Deposit Account, and (b) is effective for the DIP Lender to obtain "control" (within the meaning of Articles 8 and 9 of the UCC) of such Deposit Account.

"Designated Account" means the Deposit Account of the Borrower identified on Schedule D-1, which shall be an account existing within the Borrower's cash-management system as of the Petition Date.

"Designated Account Bank" means the member FDIC institution designated on Schedule D-1.

"DIP Cash Collateral" means all of the Borrower's cash, including any cash in deposit accounts, wherever located, whether as original collateral or proceeds of other Collateral, as "cash collateral" of the DIP Lender within the meaning of section 363(a) of the Bankruptcy Code.

"DIP Facility" has the meaning set forth in the recitals to this Agreement.

"DIP Lender" has the meaning set forth in the preamble to this Agreement.

"DIP Lender Expenses" means all reasonable and documented (a) costs or expenses required to be paid by the Borrower under any of the DIP Loan Documents that are paid, advanced, or incurred by the DIP Lender; (b) out-of-pocket fees or charges paid or incurred by the DIP Lender in connection with its transactions with the Borrower under any of the DIP Loan Documents, including, but not limited to, fees or charges for photocopying, notarization, couriers and messengers, telecommunication, public record searches (including tax lien, litigation, and UCC searches and including searches with the patent and trademark office, the copyright office, or the department of motor vehicles); (c) out-of-pocket costs and expenses incurred by the DIP Lender in the disbursement of funds to the Borrower (by wire transfer or otherwise); (d) out-of-pocket charges paid or incurred by the DIP Lender resulting from the dishonoring of checks payable by or to the Borrower; (e) out-of-pocket costs, fees and expenses paid or incurred by the DIP Lender to correct any default or enforce any provision of the DIP Loan Documents, or during the continuance of an Event of Default, in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the Collateral, or any portion thereof, irrespective of whether a sale is consummated; (f) out-of-pocket audit fees and reasonable and documented expenses of the DIP Lender (including travel, meals, and lodging) related to any inspections or audits; (g) out-of-pocket costs and expenses of third party claims or any other suit paid or incurred by the DIP Lender in enforcing or defending the DIP Loan Documents or in connection with the transactions contemplated by the DIP Loan Documents or the DIP Lender's relationship with the Borrower; (h) reasonable and documented out-of-

pocket costs and expenses incurred by the DIP Lender in advising, structuring, drafting, reviewing, administering (including travel, meals, and lodging), amending, terminating, enforcing, or in exercising rights or remedies under the DIP Loan Documents; (i) reasonable and documented out-of-pocket fees and expenses of the DIP Lender (including travel, meals, and lodging) related to any due diligence in connection with the DIP Facility or meetings with the Borrower in connection with the DIP Facility; and (j) all reasonable and invoiced fees and expenses of the attorneys and other advisors of the DIP Lender in respect of the DIP Facility, without application to or approval of the Bankruptcy Court, and without the need for the DIP Lender or its professionals to provide time records or narrative descriptions of the work performed.

"DIP Loan" means each term loan advanced by the DIP Lender to the Borrower under this Agreement. The Interim DIP Loans and the Final DIP Loan shall be DIP Loans for purposes of this Agreement.

"DIP Loan Documents" means this Agreement, the DIP Order, the Additional Documents, and any other notes, account control agreements, financing statements or security agreements executed by the Borrower in connection with this Agreement in favor of the DIP Lender, any other agreement entered into, now or in the future, by the Borrower and the DIP Lender in connection with this Agreement and designated a DIP Loan Document, and all amendments, modifications, renewals, substitutions and replacements of any of the foregoing; *provided* that, for the avoidance of doubt, all DIP Loan Documents shall be in form and substance satisfactory to the DIP Lender.

"DIP Milestones" means the milestones listed in Section 5.17.

"DIP Order" means, as applicable, the Interim Orders or the Final Order.

"DIP Releases" mean releases and exculpations by the Borrower for the DIP Lender and each Foundation Party provided for in the Final Order, in form and substance acceptable to the DIP Lender, including, without limitation, releases from any claims against all Foundation Parties that may arise out of any prior conduct of the Foundation Parties, or any interaction or relationship (alleged or otherwise) with the Foundation Parties, including, for the avoidance of doubt, any Avoidance Actions; *provided*, *however*, that the releases shall not include any rights of the Debtor with respect to any breach by a Foundation Party of its obligations under the Fenix Agreement.

"Dollars" or "$" means United States dollars.

"Event of Default" has the meaning set forth in Section 8.1.

"Exit Conversion" means the conversion of the Obligations into the Exit Facility, without the payment of any fees that are not otherwise specified in the DIP Loan Documents, upon the Plan Effective Date.

"Exit Facility" means the exit loan facility to be provided for under the Subchapter V Plan, as will be set forth in the Exit Facility Documents, or, at the sole discretion of the DIP Lender, in the Subchapter V Plan and any other document related thereto.

"Exit Facility Documents" means the credit agreement and other documents, in form and substance reasonably acceptable to the DIP Lender, to implement the Exit Conversion; *provided*, that the credit agreement and other documentation shall provide for (until all obligations thereunder indefeasibly are repaid in cash in full) the accrual of quarterly interest paid-in-kind at the same interest rate as the DIP Loans and mandatory prepayments from amounts received by the Litigation Trust (subject to reserves for

reasonable projections of ongoing fees and expenses of the Litigation Trust), and otherwise be on terms and conditions reasonably acceptable to the DIP Lender.

"Exit Fee" means a fee equal to two percent (2.00%) of the Commitment, fully earned on the date of the Final DIP Loan.

"Fees" means all fees due to the DIP Lender under this Agreement, any DIP Loan Document or the DIP Order, including, but not limited to, the Commitment Fee, the Closing Fee and the Exit Fee.

"Fenix Agreement" means the Project Fenix Termination and Settlement Agreement, dated as of December 2, 2025, by and between the Borrower, Movement Network Foundation and Movement Limited, as the same may be amended, modified, restated or supplemented from time to time.

"Final DIP Loan" has the meaning set forth in Section 2.1(c).

"Final Order" means the order of the Bankruptcy Court, in form and substance satisfactory to the DIP Lender in its sole discretion, authorizing and approving the Borrower's entry into this Agreement and the other DIP Loan Documents on a final basis, which order is not subject to a stay, injunction or other limitation not approved by the DIP Lender.

"First Interim DIP Loan" has the meaning set forth in the recitals to this Agreement.

"First Interim Order" has the meaning set forth in the recitals to this Agreement.

"Foundation Party" means each of the DIP Lender, Movement Network Foundation, Movement Limited, their affiliates and their current or future officers, employees, directors (and the employers of any independent directors), agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates and predecessors in interest, each in their capacity as such.

"GAAP" means generally accepted accounting principles in the United States of America in effect from time to time consistently applied (except for accounting changes in response to the Financial Accounting Standards Board release, or other authoritative pronouncements).

"Governmental Authority" means any federal, state, local, or other governmental or administrative body, instrumentality, board, department, or agency or any court, tribunal, administrative hearing body, arbitration panel, commission, or other similar dispute-resolving panel or body.

"Indebtedness" means (a) all obligations for borrowed money, including, without limitation, the Obligations; (b) all obligations evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations in respect of letters of credit, banker's acceptances, or other financial products; (c) all obligations as a lessee under Capital Leases; (d) all obligations or liabilities of others secured by a Lien on any asset of such Person, irrespective of whether such obligation or liability is assumed; (e) all payment obligations to pay the deferred purchase price of assets (other than trade payables incurred in the ordinary course of business and repayable in accordance with customary trade practices); (f) all indebtedness created or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to property acquired by such Person; (g) the principal balance outstanding under any synthetic lease, off-balance sheet loan or similar off-balance sheet financing products; or (h) any obligation guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other Person that constitutes Indebtedness under any of clauses (a) through (h) above. For purposes of this definition, (i) the

amount of any Indebtedness represented by a guaranty or other similar instrument shall be the lesser of the principal amount of the obligations guaranteed and still outstanding and the maximum amount for which the guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Indebtedness, and (ii) the amount of any Indebtedness described in clause (d) above shall be the lower of the amount of the obligation and the fair market value of the assets of such Person securing such obligation.

"Information" has the meaning set forth in Section 18.

"Initial Budget" means the initial expense budget for the first four (4) months of the Chapter 11 Case prepared by the Borrower, a copy of which is annexed hereto as Exhibit A.

"Initial Funding Date" has the meaning set forth in the recitals to this Agreement.

"Interest Payment Date" means each March 31st, June 30th, September 30th and December 31st (or if such day is not a Business Day, the immediately preceding Business Day).

"Interim Orders" means, collectively, the First Interim Order and the Second Interim Order.

"Interim DIP Loans" means, collectively, the First Interim DIP Loan and the Second Interim DIP Loan.

"Lien" means any pledge, hypothecation, assignment (which is intended as security), charge, deposit arrangement (which is intended as security), encumbrance, easement, lien (statutory or other), mortgage, security interest, or other security arrangement and any other preference, priority, or preferential arrangement of any kind or nature whatsoever (which is intended as security), including any conditional sale contract or other title retention agreement, the interest of a lessor under a Capital Lease, and any synthetic or other financing lease having substantially the same economic effect as any of the foregoing.

"Litigation Trust" means a post-confirmation litigation trust to be established by the Subchapter V Plan for purposes of prosecuting claims against third parties held by, or assigned to, the Borrower.

"Loan Record" means the loan record maintained by the DIP Lender or its designee, in which shall be recorded the date and amount of each DIP Loan made by the DIP Lender and the amount of each payment in respect thereof.

"Manche" has the meaning set forth in the recitals to this Agreement.

"Manche Settlement" means the settlement, among the Debtor, Rushikesh Manche and certain Foundation Parties, as set forth in the Mediated Settlement Agreement dated as of September 28, 2026, to the extent such agreement is approved by the Bankruptcy Court.

"Material Adverse Change" means, any event, condition, circumstance or contingency that, individually or in the aggregate, (a) has had, or would reasonably be expected to have, a material adverse effect on the business, operations, properties, assets, performance or financial condition of the Borrower, taken as a whole, other than any change, event or occurrence, arising individually or in the aggregate, from events leading up to and that could reasonably be expected to result from the filing, commencement or continuation of the Chapter 11 Case or the announcement of the filing or commencement of the Chapter 11 Case, the effects thereof and any action required to be taken under the DIP Loan Documents or the DIP Order, and the Chapter 11 Case itself; (b) has resulted in, or would reasonably be expected to result in, a material adverse effect on the validity or enforceability of, or the rights, remedies or benefits available to the DIP Lender under this Agreement or the DIP Order (other than as permitted hereunder or as a result of

an action or failure to take action by the DIP Lender) or of the DIP Lender's ability to enforce the Obligations or realize upon the Collateral; (c) has had or would reasonably be expected to have, a material adverse effect on the ability of the Borrower, taken as a whole, to perform its payment obligations under this Agreement or the DIP Order; or (d) a material impairment of the enforceability or priority of the DIP Lender's Liens with respect to the Collateral, taken as a whole, or the priority of such Liens.

"Material Contract" means each contract or agreement as to which the breach, nonperformance, cancellation, termination, loss, expiration or failure to renew by any party thereto would reasonably be expected to result in a Material Adverse Change.

"Maturity Date" means the earliest of:

(a) the date that is 100 days after the Petition Date, unless the Final Order has been entered by the Bankruptcy Court on or prior to such date;

(b) the effective date of any plan of reorganization in the Chapter 11 Case, other than the Subchapter V Plan;

(c) the closing of any sale or other disposition of substantially all of the assets of the Borrower;

(d) the closing of any financing transaction that pays the Obligations in full;

(e) the conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code;

(f) the dismissal of the Chapter 11 Case by the Bankruptcy Court;

(g) the acceleration of the outstanding Obligations and termination of the Commitment, including as a result of the occurrence and continuation of an Event of Default; and

(h) the date that is 75 days after the entry of the Final Order.

"Maturity Event" means each of the events listed in the definition of "Maturity Date".

"Net Cash Proceeds" means with respect to any sale or disposition of the Collateral, in whole or in part, by any Person, the amount of cash proceeds received (directly or indirectly) from time to time (whether as initial consideration or through the payment of deferred consideration) by or on behalf of such Person, in connection therewith, after deducting therefrom only (a) fees, commissions, and expenses related thereto and required to be paid in connection with such sale or disposition and (b) taxes paid or payable to any taxing authorities in connection with such sale or disposition, in each case, only to the extent, that the amounts so deducted are payable to a Person that is not the Borrower or an Affiliate of the Borrower, and are properly attributable to such transaction.

"Obligations" means all obligations owing by the Borrower to the DIP Lender under this Agreement, the DIP Order or any DIP Loan Document, including, without limitation, the DIP Loans, debts, principal, interest, reimbursement or indemnification obligations, liabilities (including all amounts charged to the Loan Record pursuant to this Agreement), Fees (including the Commitment Fee, Closing Fee and the Exit Fee), the DIP Lender Expenses, premiums, costs, expenses and indemnities, whether primary, secondary, direct, indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise, guaranties, covenants and duties of any kind and description, in each case, irrespective

of whether for the payment of money, and including, without limitation, in connection with collection, enforcement or preservation of the rights of the DIP Lender under the DIP Loan Documents.

"Ordinary Course" and "Ordinary Course of Business" shall mean, in respect of any Person, the ordinary course and reasonable requirements of such Person's business, as conducted in accordance with past practices, and undertaken in good faith except as such conduct has been changed resulting from the filing of the Chapter 11 Case.

"Organizational Documents" means (a) for any corporation, the certificate or articles of incorporation, the bylaws, any certificate of designation or other instrument relating to the rights of preferred shareholders or stockholders of such corporation, any shareholder rights agreement and all applicable resolutions of the board of directors (or any committee thereof) of such corporation; (b) for any partnership, the partnership agreement and, if applicable, the certificate of limited partnership; (c) for any limited liability company, the operating agreement or limited liability company agreement and articles or certificate of formation or organization and all applicable resolutions of any managing member of such limited liability company; and (d) any agreement between the Borrower and its shareholders, members, partners or its equity owners, or among any of the foregoing relating to the governance of the Borrower.

"Payment Account" means the Deposit Account of the DIP Lender identified on Schedule A-2, or otherwise identified to the Borrower in writing by the DIP Lender.

"Permit" means any license, lease, power, permit, franchise, certificate, authorization, or approval issued by a Governmental Authority.

"Permitted Indebtedness" has the meaning set forth in Section 6.1.

"Permitted Prior Liens" means valid, enforceable and non-avoidable Liens on the Collateral that are in existence on the Petition Date and (a) are either perfected as of the Petition Date or perfected on or after the Petition Date solely to the extent permitted by section 546(b) of the Bankruptcy Code and (b) are not subject to avoidance, disallowance, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

"Permitted Protest" means the right of the Borrower to protest any Lien (other than any Lien that secures the Obligations), taxes (other than payroll taxes or taxes that are the subject of a United States federal tax lien), or rental payment, *provided* that (a) a reserve with respect to such obligation is established on the Borrower's books and records in such amount as is required under GAAP, (b) any such protest is instituted promptly and prosecuted diligently by the Borrower in good faith, and (c) the DIP Lender is satisfied in its sole discretion that, while any such protest is pending, there will be no impairment of the enforceability, validity or priority of any of DIP Lender's Liens.

"Permitted Transfers" means collectively (i) the sale or disposition of cash equivalents for fair market value and in a manner that is not otherwise prohibited by this Agreement or the DIP Loan Documents and (ii) the settlement of claims and causes of action of the Debtor in accordance with the terms of the Manche Settlement.

"Permitted Variance" means a twenty-five percent (25%) or less variance of cumulative disbursements from the Approved Budget (other than variances in the line item for the fees and expenses of the DIP Lender's professional advisors) for each four-week period set forth on an Approved Budget.

"Person" means any natural person, corporation, limited liability company, limited partnership, general partnership, limited liability partnership, joint venture, trust, land trust, business or statutory trust,

or other organization, irrespective of whether constituting a separate legal entity, and governments and agencies and political subdivisions thereof.

"Petition Date" has the meaning set forth in the recitals to this Agreement.

"Plan Effective Date" means the date of the substantial consummation (as defined in section 1101(2) of the Bankruptcy Code) of the Subchapter V Plan.

"Prepayment" has the meaning set forth in Section 2.4(c).

"Professional Fees" means all unpaid fees and expenses incurred by persons or firms retained by (a) the Borrower pursuant to sections 327, 328, 329, 330, 331, 363, or 503(b)(4) of the Bankruptcy Code; (b) any Committee (if appointed) pursuant to sections 328, 1103, or 1181(b) of the Bankruptcy Code; or (c) the Subchapter V trustee pursuant to 327 or 328; *provided* that, to the extent that any amount of the foregoing compensation or reimbursement is denied or reduced by the Bankruptcy Court or any other court of competent jurisdiction, such amount shall no longer constitute Professional Fees.

"Record" means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

"Remedies Notice Period" has the meaning set forth in the DIP Order.

"Required Lien Priority" has the meaning set forth in Section 10.1(a)(iii).

"Restricted Purpose" shall mean (a) any purpose that is prohibited under the Bankruptcy Code or the Interim Orders or the Final Order, (b) to investigate, commence, prosecute, join in, or finance in any way (or reimburse for expenses incurred or to be incurred in connection with) any action, suit, arbitration, proceeding, application, motion, objection or other litigation adverse to the interests of the DIP Lender or any Foundation Party, including with respect or related to (i) the claims, liens or security interest of the DIP Lender, or its rights and remedies under the Interim Orders or the Final Order, as the case may be, including to commence or prosecute or join in any action against the DIP Lender seeking (x) to avoid, subordinate or recharacterize the Obligations, (y) any monetary, injunctive or other affirmative relief against the DIP Lender or (z) to prevent or restrict the exercise by the DIP Lender of any of its rights or remedies under the Interim Orders or the Final Order, (ii) any claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness or obligations that are the subject of the DIP Releases, (iii) the stipulations, if any, made by the Borrower and approved by the DIP Order or (iv) any other action which with the giving of notice or passing of time would result in an Event of Default under the DIP Loan Documents.

"Schedules" means those certain schedules annexed hereto and made a part hereof.

"Second Funding Date" has the meaning set forth in the recitals to this Agreement.

"Second Interim DIP Loan" has the meaning set forth in the recitals to this Agreement.

"Second Interim Order" has the meaning set forth in the recitals to this Agreement.

"Security Documents" means (a) all UCC financing statements, or amendments or continuations thereof, and (b) all other security agreements, Deposit Account Control Agreements, documents or filings in connection with the perfection of the Liens granted or pledged pursuant to the terms of this Agreement, any other DIP Loan Document or the DIP Order, as same may be amended, modified, restated or supplemented from time to time.

"Subchapter V Plan" means a plan under subchapter V of Chapter 11 of the Bankruptcy Code in form and substance acceptable to the DIP Lender, in its sole discretion, and containing, without limitation, the following terms:

(a) Creation of the Litigation Trust; *provided*, *however*, that the Litigation Trust shall have no authority to investigate, commence, prosecute, join in or finance in any way (or reimburse for expenses incurred or to be incurred in connection with) any action, suit, arbitration, proceeding, application, motion, objection or other litigation adverse to the Foundation Parties;

(b) The DIP Lender shall allow all DIP Cash Collateral to be contributed on the Plan Effective Date to the Litigation Trust;

(c) The occurrence of the Exit Conversion on the Plan Effective Date;

(d) The Litigation Trust agreement, in form and substance consented to by the DIP Lender, with such consent not to be unreasonably withheld, shall have been executed and delivered;

(e) The trustee of the Litigation Trust shall be a person acceptable to the DIP Lender in its sole discretion, it being understood by the parties that the selection of David Dunn as trustee would be acceptable to the DIP Lender;

(f) Full releases by the Borrower of all Foundation Parties;

(g) The Foundation Parties shall contribute to the Litigation Trust the Contributed Claims; *provided*, *however*, that the contribution shall be structured so as to permit the Foundation Parties to retain the benefit of any claims or causes of action they may have to the extent that they may be used as counterclaims in the event of litigation against the Foundation Parties by any third party; *provided*, *further*, that Foundation shall be entitled to receive 33% of any recovery realized by the Litigation Trust in an amount greater than $12.5 million and less than or equal to $33.5 million;

(h) Upon contribution of the Contributed Claims by the Foundation Parties to the Litigation Trust, full releases by the Debtor of: (i) Cooper Scanlon, (ii) Joseph Golding-Ochsner, (iii) Ruby Sekhon, (iv) Move Ind. Inc., and all of its officers, directors and employees, including Torab Arya and (v) additional parties as the Borrower and the DIP Lender may agree; *provided*, *however*, that such releases shall not release any claims that the Borrower may have to avoid or recover excess or inadvertent payroll payments made to former employees of the Borrower; and

(i) All Liens, Superpriority Claims, and other protections in favor of the DIP Lender shall survive confirmation and remain in full force and effect until all Obligations are indefeasibly paid in full in cash in accordance with the terms of the DIP Loan Documents, the Subchapter V Plan and the Exit Facility documentation.

"Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company, association, or other business entity of which more than fifty percent (50%) of the total voting power of shares of stock (or equivalent ownership or controlling interest) entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, governors, or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof.

"Superpriority Claims" has the meaning set forth in Section 10.1(a)(i).

"UCC" means the Uniform Commercial Code as in effect in the State of New York; *provided*, that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection, or non-perfection or priority.

"United States" means the United States of America.

"Variance Report" means a report, which shall be certified in writing by an Authorized Person of the Borrower as being true and accurate, and shall (i) detail the variance, if any, of actual disbursements for each four-week period of an Approved Budget as compared to the budgeted disbursements for such period, and (ii) contain a written explanation of all variances greater than twenty-five percent (25%).

"Voidable Transfer" has the meaning set forth in Section 15.7.

1.2 **Accounting Terms**. All accounting terms not specifically defined herein shall be construed in accordance with GAAP; *provided* that, if the Borrower notifies the DIP Lender that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the DIP Lender notifies the Borrower that the DIP Lender requests an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then the DIP Lender and the Borrower agree that they will negotiate in good faith amendments to the provisions of this Agreement that are directly affected by such change in GAAP with the intent of having the respective positions of the DIP Lender and the Borrower after such change in GAAP conform as nearly as possible to their respective positions as of the date of this Agreement and, until any such amendments have been agreed upon, the provisions in this Agreement shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective. When used herein, the term "financial statements" shall include the notes and schedules thereto.

1.3 **UCC**. Any terms used in this Agreement that are defined in the UCC shall be construed and defined as set forth in the UCC unless otherwise defined herein; *provided*, that to the extent that the UCC is used to define any term herein and such term is defined differently in different Articles of the UCC, the definition of such term contained in Article 9 of the UCC shall govern.

1.4 **Construction**. Unless the context of this Agreement or the DIP Loan Documents clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the terms "includes" and "including" are not limiting, and the term "or" has, except as otherwise indicated, the inclusive meaning represented by the phrase "and/or." The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement or the DIP Loan Documents refer to this Agreement or such other DIP Loan Document, as the case may be, as a whole, and not to any particular provision of this Agreement or such other DIP Loan Document, as the case may be. Section, subsection, clause, schedule, and exhibit references herein are to this Agreement unless otherwise specified. Any reference in this Agreement or in any other DIP Loan Document to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein). The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts, and contract rights. Any reference herein or in any other DIP Loan Document to the satisfaction, repayment, or payment in full in cash of the Obligations shall mean the repayment in full in cash of all Obligations other than unasserted contingent indemnification Obligations (with all such

Obligations consisting of monetary or payment Obligations having been indefeasibly paid in full in cash). Any reference herein to any Person shall be construed to include such Person's successors and permitted assigns. Any requirement of a writing contained herein or in any DIP Loan Document shall be satisfied by the transmission of a Record.

1.5 **Schedules and Exhibits**. All of the schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference.

**2. LOAN AND TERMS OF PAYMENT.**

2.1 **Agreement to Lend; Security Documents; and DIP Loan Documents**.

(a) Subject to the terms and conditions of the First Interim Order, this Agreement, and the satisfaction or waiver of the conditions precedent in Sections 3.1, the DIP Lender made the First Interim DIP Loan on the Initial Funding Date. Subject to the terms and conditions of the Second Interim Order and this Agreement, the DIP Lender made the Second Interim DIP Loan on the Second Funding Date.

(b) [Reserved].

(c) Subject to the terms and conditions of the DIP Order, this Agreement, the Confirmation Order and the satisfaction or waiver of the conditions precedent in Section 3.1 and Section 3.2, the DIP Lender agrees to make a new money term loan to the Borrower in aggregate principal amount equal to $1,500,000 (the "Final DIP Loan").

(d) Each borrowing of DIP Loans shall permanently decrease the Commitment, and any Loan, or portion thereof, that is repaid or prepaid (whether as an optional prepayment or a mandatory prepayment) cannot be reborrowed.

(e) The DIP Loans shall be secured by the Collateral as set forth in this Agreement, the DIP Order and the other DIP Loan Documents.

(f) The Borrower promises to indefeasibly pay the Obligations (including principal, interest, fees, costs, and expenses) in full in cash (including, as applicable, the Commitment Fee, Closing Fee and the Exit Fee) on the Maturity Date.

2.2 **Borrowing Procedures**. Each borrowing under Section 2.1 shall be made by a written request substantially in the form of the Borrowing Notice attached hereto as Exhibit D (each such written request, a "Borrowing Notice") executed by an Authorized Person of the Borrower, and delivered to the DIP Lender no later than three (3) Business Days prior to the requested funding date, or such shorter time as may be agreed by the DIP Lender. Upon satisfaction or waiver of the conditions precedent specified in this Agreement, the DIP Lender shall make the proceeds of the relevant DIP Loan available to the Borrower on the requested funding date by causing the principal amount of the relevant borrowing to be credited to the Designated Account or, subject to the consent of the DIP Lender, another Deposit Account of the Borrower notified in writing to the DIP Lender.

2.3 **[Reserved]**.

2.4 **Payments; Reductions of the Commitment; Prepayments**.

(a) Payments by Borrower. Except as otherwise expressly provided herein, all payments by the Borrower that are required to be paid in cash shall be made to the Payment Account for the account of the DIP Lender and shall be made in immediately available funds, no later than 4:00 p.m. (prevailing Eastern Time) on the dates when such payments are due and payable hereunder. Any payment

received by the DIP Lender later than 4:00 p.m. (prevailing Eastern Time) shall be deemed to have been received on the following Business Day and any applicable interest or fee shall continue to accrue until such following Business Day.

(b) Application of Payments and Proceeds. Except as set forth in Section 8.3, all payments remitted to the DIP Lender and all proceeds of the Collateral received by the DIP Lender shall be applied as follows (unless otherwise directed by the DIP Lender):

(i) *first*, to pay any DIP Lender Expenses then owed to the DIP Lender (or any of its officers, directors, employees, attorneys, representatives or agents) in accordance with the DIP Order, or indemnities then due to the DIP Lender under the DIP Loan Documents, until indefeasibly paid in full in cash;

(ii) *second*, to pay any Fees then due to the DIP Lender under the DIP Loan Documents until indefeasibly paid in full in cash;

(iii) *third*, to pay uncapitalized interest due in respect of the DIP Loans until indefeasibly paid in full in cash;

(iv) *fourth*, to pay the principal of all DIP Loans until indefeasibly paid in full in cash;

(v) *fifth*, to pay any other Obligations until indefeasibly paid in full in cash; and

(vi) *sixth*, to the Borrower (to be wired to the Designated Account) or as otherwise required by applicable law.

In the event of a direct conflict between the priority provisions of this Section 2.4(b) and any other provision contained in any DIP Loan Document (except for the DIP Order), it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 2.4(b) shall control and govern. Notwithstanding the foregoing, to the extent there is a conflict between the DIP Order and any DIP Loan Document, the DIP Order shall control and govern.

(c) Optional Prepayments. After the entry of the Final Order, upon three (3) Business Days' prior written notice to the DIP Lender (or such shorter period agreed to by the DIP Lender), the Borrower may prepay in cash (the "Prepayment") all DIP Loans and Obligations under the DIP Loan Documents (including, for the avoidance of doubt, any unpaid DIP Lender Expenses), *plus* the amount (if any) by which (i) the interest that was to be capitalized pursuant to Section 2.5 in respect of the DIP Loans that are being prepaid for the period from the first date of funding of such DIP Loans to the date that is 120 days after the Petition Date *exceeds* (ii) the sum of the amount of interest that was actually capitalized pursuant to Section 2.5(a) with respect to the Prepayment *plus* the amount that the DIP Lender would be able to obtain by placing an amount equal to the principal amount that is prepaid on deposit with a leading bank in the interbank market for a period starting on the business day following the Prepayment and ending on the date that is 120 days after the Petition Date.

(d) Mandatory Prepayments.

(i) *Dispositions*. Except with respect to any Permitted Transfer, within one (1) Business Day of the date of receipt by the Borrower of the Net Cash Proceeds of any disposition (whether through a voluntary or involuntary sale, the loss, destruction or damage thereof or any actual condemnation, confiscation, requisition, seizure or taking thereof or otherwise) of Collateral described in Section 6.4, the Borrower shall prepay such portion of the outstanding amount of the Obligations in accordance with Section 2.4(b) in an amount equal to 100% of the Net Cash Proceeds (including insurance proceeds, condemnation awards, and payments in lieu thereof) received in connection with such sales or dispositions, *plus* the accrued interest and Exit Fee as applied to the amount of such prepayment. Nothing contained in this Section 2.4(d)(i) shall permit the Borrower to sell any Collateral other than in accordance with Section 6.4. In no event shall any amount paid to the DIP Lender under this Section 2.4(d)(i) exceed the outstanding amount of the Obligations.

(ii) *Indebtedness*. Within one (1) Business Day of the date on which the Borrower receives proceeds of any Indebtedness (other than Permitted Indebtedness), the Borrower shall prepay the outstanding principal amount of the Obligations in accordance with Section 2.4(b) in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection with the incurrence of such Indebtedness *plus* the accrued interest and Exit Fee as applied to the principal amount of such prepayment. The provisions of this Section 2.4(d)(ii) shall not be deemed to be implied consent to any such incurrence otherwise prohibited by the terms and conditions of this Agreement.

2.5 **Interest Rates and Rates, Payments and Calculations**.

(a) Interest Rate. Except as provided in Section 2.5(b), (x) prior to the entry of the Final Order, the Interim DIP Loans shall bear interest on the Daily Balance thereof at a rate equal to fifteen and one-half percent (15.5%) per annum and (y) on and after the date of the entry of the Final Order, all DIP Loans (including, for the avoidance of doubt, the Interim DIP Loans) shall bear interest on the Daily Balance thereof at a rate equal to ten and one-half percent (10.5%) per annum.

(b) Default Rate. Upon the occurrence and during the continuation of an Event of Default, all Obligations shall bear interest on the Daily Balance thereof at a per annum rate equal to two percent (2.0%) *plus* the then-applicable interest rate (the "Default Rate").

(c) Payment. Except to the extent provided to the contrary herein or as provided for in the DIP Order, the Commitment Fee, the Closing Fee and the Exit Fee, and any other fees payable hereunder or under any of the other DIP Loan Documents shall be due and payable in kind on the date any such amounts are owed, subject to the procedures set forth in the DIP Order (to the extent applicable). Interest shall be paid in kind on the applicable Interest Payment Date, and such interest amount shall be added to the principal amount of the applicable DIP Loan. DIP Lender Expenses, and any other costs and expenses payable hereunder or under any of the other DIP Loan Documents shall be due and payable in cash on the date any such amounts are owed, subject to the procedures set forth in the DIP Order.

(d) Computation. All interest and fees chargeable under the DIP Loan Documents shall be computed on the basis of a 360-day year, in each case, for the actual number of days elapsed in the period during which the interest or fees accrue.

(e) Intent to Limit Charges to Maximum Lawful Rate. In no event shall the interest rate or rates payable under this Agreement, *plus* any other amounts paid in connection herewith, exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination,

deem applicable. The Borrower and the DIP Lender, in executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and manner of payment stated within it; *provided* that anything contained herein to the contrary notwithstanding, if said rate or rates of interest or manner of payment exceed the maximum allowable under applicable law, then, *ipso facto*, as of the date of this Agreement, the Borrower is and shall be liable only for the payment of such maximum as allowed by law, and payment received from the Borrower in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the Obligations to the extent of such excess.

2.6 **Crediting Payments; Clearance Charge**. The receipt of any payment item by the DIP Lender shall not be considered a payment on account unless such payment item is a wire transfer of immediately available funds made to the Payment Account or unless and until such payment item is honored when presented for payment. Should any payment item not be honored when presented for payment, then the Borrower shall be deemed not to have made such payment and interest shall be calculated accordingly. Anything to the contrary contained herein notwithstanding, any payment item shall be deemed received by the DIP Lender only if it is received into the Payment Account on a Business Day on or before 4:00 p.m. (prevailing Eastern Time). If any payment item is received into the Payment Account on a non-Business Day or after 4:00 p.m. (prevailing Eastern Time) on a Business Day, it shall be deemed to have been received by the DIP Lender as of the opening of business on the immediately following Business Day.

2.7 **Designated Account**. The Borrower hereby agrees to maintain the Designated Account with the Designated Account Bank and to receive the proceeds of the DIP Loans requested by the Borrower and made by the DIP Lender hereunder in such Designated Account, unless the Borrower changes the Designated Account and the Designated Account Bank with the DIP Lender's consent.

2.8 **Statements of Obligations**. The DIP Lender shall maintain true, correct and complete electronic or written records evidencing the Indebtedness and other Obligations owed by the Borrower to the DIP Lender, in which the DIP Lender will record in the Loan Record (a) the amount of all DIP Loans made under this Agreement, (b) the amount of any principal or interest due and payable or to become due and payable from the Borrower to the DIP Lender under this Agreement, and (c) all amounts received by the DIP Lender under this Agreement from the Borrower.

2.9 **Fees**.

(a) Commitment Fee. The Borrower shall pay to the DIP Lender the Commitment Fee monthly. The Commitment Fee shall be paid monthly in kind and added to the outstanding principal amount of the DIP Loans on the applicable payment date.

(b) Closing Fee. The Borrower shall pay to the DIP Lender the Closing Fee on the Closing Date, which shall be paid in kind and added to the outstanding principal amount of the DIP Loans.

(c) Exit Fee. The Borrower shall pay to the DIP Lender the Exit Fee, which shall be paid in kind on the date of the Final DIP Loan, unless the Subchapter V Plan provides for other treatment of the Exit Fee, or the Obligations have otherwise been indefeasibly paid in full in cash.

Except as otherwise expressly set forth herein, in the DIP Order, or in any of the other DIP Loan Documents, the Fees payable to the DIP Lender under this Agreement, the DIP Order, or any of the other DIP Loan Documents shall not be subject to proration and shall be non-refundable and non-avoidable obligations of the Borrower.

**3. CONDITIONS; TERM OF AGREEMENT.**

3.1 **Conditions Precedent to Each DIP Loan**. The effectiveness of this Agreement, and the agreement of the DIP Lender hereunder to make any DIP Loan, shall be subject to the satisfaction of the

conditions specified below (unless waived in writing by the DIP Lender in its sole discretion); *provided, however*, that the agreement of the DIP Lender to make the Final DIP Loan is subject to Section 3.2:

(a) Chapter 11 Case. The Chapter 11 Case shall be pending in the Bankruptcy Court.

(b) Approved Budget. Other than with respect to the First Interim DIP Loan, the DIP Lender shall have received from the Borrower an Approved Budget to the extent required to be delivered by Section 5.2(b) on or before the making of such borrowing, which such updated Approved Budget shall be subject to Section 5.2(b) and the DIP Order.

(c) DIP Order. The Interim Orders (with respect to the Interim DIP Loans) or the Final Order (with respect to any other DIP Loan), each in form and substance satisfactory to the DIP Lender, shall (i) have been entered by the Bankruptcy Court and be in full force and effect and shall not have been appealed, vacated, reversed, modified, amended or stayed, and (ii) grant for the benefit of the DIP Lender a perfected lien on the Collateral on the terms and conditions and, with the requisite priority, set forth herein and in the other DIP Loan Documents.

(d) Credit Agreement and Other DIP Loan Documents. The parties shall have executed and delivered this Agreement, the DIP Loan Documents, and all other documents required by the DIP Lender as a condition to the Initial Funding Date and in connection with the transactions contemplated by this Agreement, and each shall be in form and substance reasonably satisfactory to the DIP Lender.

(e) No Default. No Default or Event of Default (or any event that would give rise to a Default or Event of Default after the passage of time) shall have occurred and be continuing immediately prior to, or after giving effect to, the making of any DIP Loan, or would immediately result from this Agreement or the other DIP Loan Documents becoming effective in accordance with its or their respective terms.

(f) Representations and Warranties. The representations and warranties of the Borrower contained in this Agreement and in any other DIP Loan Documents shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the date of funding any DIP Loan, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date).

(g) No Stay. The making of any DIP Loan shall not violate any requirement of law, shall not be subject to a pending appeal, and shall not be enjoined temporarily, preliminarily or permanently.

(h) No Excess Funding. The making of any DIP Loan shall not result in the aggregate outstanding obligations under the DIP Facility exceeding the amount authorized under the Interim Orders (with respect to the Interim DIP Loans) or the Final Order (with respect to any other DIP Loan).

(i) DIP Milestones. The Borrower shall be in compliance with the DIP Milestones.

(j) Officer's Certificate. The DIP Lender shall have received, in form and substance satisfactory to the DIP Lender, a certificate of the Borrower, dated as of the Closing Date and certified by an Authorized Person of the Borrower, which shall attach resolutions of the governing body of the Borrower approving the transactions and each DIP Loan Document to which it is or is to be a party.

(k) Fees and Expenses. As of the date of the entry of the Second Interim Order, all accrued and unpaid DIP Lender Expenses for which invoices have been presented (and such invoices shall contain information only to the extent required by Paragraph 25 of the First Interim Order) and all accrued

DIP Lender Expenses required to be paid shall have been paid (or shall be paid simultaneously with the borrowing).

(l) Compliance with the DIP Loan Documents. The Borrower shall be in compliance in all respects with the DIP Loan Documents.

(m) Borrowing Notice. The DIP Lender shall have received a fully executed and delivered Borrowing Notice from the Borrower in accordance with Section 2.2.

(n) Trustee or Examiner. (i) No trustee with enlarged powers (beyond those set forth in section 1183(b)(1)–(4), (7) and (c) of the Bankruptcy Code) shall have been appointed in the Chapter 11 Case, and (ii) no Person other than the Borrower shall have been granted control over the Collateral by the Bankruptcy Court in the Chapter 11 Case.

3.2 **Conditions Precedent to Final DIP Loan**. The agreement of the DIP Lender to make the Final DIP Loan shall not become effective unless and until:

(a) all of the conditions specified in Section 3.1 have been satisfied (unless waived in writing by the DIP Lender in its sole discretion);

(b) the Bankruptcy Court shall have entered the Confirmation Order, and such order shall have become a final non-appealable order; and

(c) to the extent not already assumed, the Fenix Agreement shall have been assumed by the Debtor.

3.3 **Maturity**.

(a) This Agreement shall continue in full force and effect until the indefeasible payment in full in cash of the Obligations (other than continuing Obligations with respect to indemnification), including, without limitation, the outstanding unpaid principal balance, all accrued and unpaid (or uncapitalized) interest on the DIP Loans and all uncapitalized Fees.

(b) Upon a Maturity Event, the Debtor shall repay the DIP Lender, indefeasibly and in full, the aggregate principal amount of all DIP Loans outstanding on such date, together with all accrued and unpaid interest on the principal amount of the DIP Loans and all fees, expenses, and other Obligations payable under the DIP Facility.

3.4 **Effect of Maturity**. Upon a Maturity Event, the Commitment of the DIP Lender to provide any additional credit or other accommodations under the DIP Loan Documents automatically shall terminate and all Obligations (other than continuing Obligations with respect to indemnification) immediately shall become due and payable without notice or demand. No termination of the obligations of the DIP Lender (other than payment in full in cash of the Obligations and termination of the Commitment) shall relieve or discharge the Borrower of its duties, obligations, or covenants hereunder or under any DIP Loan Document, and the DIP Lender's Liens in the Collateral shall continue to secure the Obligations and shall remain in effect until all Obligations (other than continuing Obligations with respect to indemnification) indefeasibly have been paid in full in cash and the Commitment has been terminated. When all of the Obligations (other than continuing Obligations with respect to indemnification) indefeasibly have been paid in full in cash and the DIP Lender has no further obligation hereunder to fund further DIP Loans, the DIP Lender, at the Borrower's expense, will execute and deliver any payoff letters, termination statements, lien releases, discharges of security interests and other similar discharge or release documents (and, if applicable, in recordable form) as are reasonably necessary to evidence and confirm the repayment

in full of the Obligations (other than continuing Obligations with respect to indemnification) and to release, as of record, the DIP Lender's Liens and all notices of security interests and Liens previously filed by the DIP Lender with respect to the Obligations.

## 4. REPRESENTATIONS AND WARRANTIES.

In order to induce the DIP Lender to enter into this Agreement, the Borrower makes the following representations and warranties to the DIP Lender. The Borrower further represents that such representations and warranties shall be true, correct and complete, in all material respects, as of the Closing Date, and shall be true, correct and complete, in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that are already qualified or modified by materiality in the text thereof), as of the date of the making of each DIP Loan (or other extension of credit) made thereafter, as though made on and as of the date of such DIP Loan (or other extension of credit) (except to the extent that such representations and warranties relate solely to an earlier date) and such representations and warranties shall survive the execution and delivery of this Agreement until all Obligations indefeasibly have been paid in full in cash:

4.1 **Due Organization and Qualification**. The Borrower (a) is duly formed and existing under the laws of the jurisdiction of its formation and (b) subject to the Bankruptcy Court's entry of the DIP Order and any limitation under the Bankruptcy Code or other debtor relief law, has all requisite power and authority to own and operate its property, to carry on its business as now conducted and as proposed to be conducted, to enter into the DIP Loan Documents to which it is a party and to carry out the transactions contemplated thereby.

4.2 **Due Authorization**. The execution, delivery and performance by the Borrower of the DIP Loan Documents to which it is a party have been duly authorized by all necessary corporate or limited liability company action on the part of the Borrower and is subject only to the Bankruptcy Court's entry of the DIP Order.

4.3 **Binding Obligations**. Each DIP Loan Document has been duly executed and delivered by the Borrower and, subject to the entry of the DIP Order, is the legally valid and binding obligation of the Borrower, enforceable against the Borrower in accordance with its respective terms.

4.4 **Title to Properties**. The Borrower has good, sufficient and legal title to (and in the case of personal property, good and marketable title to) all of the Borrower's right, interest and title in the Collateral, subject to no other Liens as of the Petition Date.

4.5 **Accuracy of Information**. All financial statements and information delivered by the Borrower to the DIP Lender and the Foundation Parties are true, correct and complete in all material respects.

4.6 **Fraudulent Transfer**. No transfer of property is being made by the Borrower, and no obligation is being incurred by the Borrower in connection with the transactions contemplated by this Agreement or the DIP Loan Documents, with the intent to hinder, delay or defraud either present or future creditors of the Borrower.

4.7 **Indebtedness**. The Borrower has no material Indebtedness outstanding as of the Petition Date, except as disclosed in documents filed in the Bankruptcy Court on the Petition Date.

4.8 **Approved Budget**. Attached to this Agreement as Exhibit A is a true and complete copy of the Approved Budget as of the Closing Date. The Approved Budget may be amended or otherwise modified from time to time in accordance with the procedures specified in Section 5.2(b) of this Agreement; *provided, however,* that, the total amount of DIP Loans provided pursuant to the Initial Budget shall not exceed the total amount of the Commitment that is available as Interim DIP Loans.

4.9 **Bank Accounts**. The Designated Account is maintained solely in the Borrower's name, and the Borrower is the sole legal and beneficial owner of the Designated Account, free and clear of any Lien, right of setoff, claim, co-ownership interest, trust or fiduciary arrangement, or the interest, authority or control of any other Person, other than (i) any Liens securing the Obligations and (ii) customary rights of setoff, banker's liens or similar rights in favor of the Designated Account Bank, arising solely under the Designated Account Bank's standard account terms or applicable law in the Ordinary Course and securing only customary fees, service charges, chargebacks and overdrafts incidental to the maintenance and operation of the Designated Account. No Person other than the Borrower and the DIP Lender has signatory authority, withdrawal or transfer rights, or "control" (within the meaning of Article 9 of the UCC) over the Designated Account, and the Designated Account and any funds or property credited thereto are not subject to any garnishment, attachment, restraining order, freeze, hold, recoupment or other legal or contractual restriction, claim or process imposed by any Person, including any Governmental Authority, other than in favor of the DIP Lender. No funds or property of any Person other than the Borrower are commingled with, deposited into or held in the Designated Account. The Borrower does not act as agent, custodian, bailee or trustee for any other Person with respect to the Designated Account or the funds or property therein, and no other Person acts as agent, custodian, bailee or trustee for the Borrower with respect to the Designated Account or the funds or property therein.

4.10 **No Other Representations**. Except for the representations and warranties contained in this Article 4 (including the related portions of the Schedules), the Borrower or any other Person do not make and have not made any other express or implied representation or warranty, either written or oral, on behalf of the Borrower. The DIP Lender hereby acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, the DIP Lender has relied solely upon its own investigation and the express representations and warranties of the Borrower set forth in this Article 4 (including the related portions of the Schedules); and (b) the Borrower or any other Person has not made any representation or warranty except as expressly set forth in this Article 4 (including the related portions of the Schedules).

## 5. AFFIRMATIVE COVENANTS.

The Borrower hereby covenants and agrees that, until termination of the Commitment and indefeasible payment in full in cash of the Obligations (other than continuing Obligations with respect to indemnification), it shall comply with each of the following, as applicable:

5.1 **Notice of Certain Events**. The Borrower shall deliver to the DIP Lender (a) promptly, but in any event within one (1) Business Day, upon becoming aware of any Default or Event of Default, notice of such Default or Event of Default; and (b) promptly, but in any event within three (3) Business Days, upon becoming aware of any litigation threatened in writing against the Borrower or filed (other than any adversary proceeding or other pleading filed in the Chapter 11 Case), or any event (other than events of public knowledge in the Chapter 11 Case), notice of such litigation or event. In addition, the Borrower agrees to maintain a system of accounting that enables the Borrower to produce unaudited financial statements in accordance with GAAP.

5.2 **Reporting; Budget; Conference Calls**.

(a) [Reserved].

(b) The Borrower, on the first Business Day after each four-week period as set forth on an Approved Budget, will: (i) prepare and deliver to the DIP Lender a supplement to the initial Approved Budget (or the previously supplemented Approved Budget) updating or extending the period covered by the initial Approved Budget (or the previously supplemented Approved Budget) so that it covers at least a four-month period from the date of such initial Approved Budget or supplemental Approved Budget, as applicable, which supplemental Approved Budget shall be in form and substance subject to the DIP

Lender's approval, without further order of the Bankruptcy Court and (ii) deliver a Variance Report for the preceding four-week period.

(c) If requested by the DIP Lender, the Borrower shall participate in a conference call occurring every week, commencing on the first week following the Initial Funding Date regarding the Approved Budget and other financial matters.

5.3 **Existence**. At all times, the Borrower shall maintain and preserve its existence in full force and effect.

5.4 **Maintenance of Properties; Permits**. The Borrower shall (a) maintain and preserve the Collateral that is necessary to the proper conduct of its business in good working order and condition, ordinary wear, tear and casualty excepted, to the extent permitted by the Approved Budget and the Permitted Variance; (b) comply with the material provisions of all material leases related to the Collateral pledged by it, so as to prevent the loss or forfeiture thereof, unless such provisions are the subject of a Permitted Protest; and (c) maintain, comply with and keep in full force and effect its Permits in respect of the Collateral pledged by it and all Permits required for the operation of its business, unless failure to do so would not result in a Material Adverse Change.

5.5 **Taxes**. Except to the extent such payment is excused by, or otherwise is prohibited by the provisions of the Bankruptcy Code or an order of the Bankruptcy Court, the Borrower shall pay in full or discharge all assessments and taxes imposed, levied, or assessed after the Petition Date against any Collateral, before delinquency or before the expiration of any extension period, except to the extent that any such assessments and taxes shall be paid as part of a sale or pursuant to the Approved Budget (subject to the Permitted Variances) or is subject to a Permitted Protest.

5.6 **[Reserved]**.

5.7 **Inspection**. The Borrower shall permit the DIP Lender and each of its duly authorized representatives or agents to inspect any of its Collateral or books and records, to conduct appraisals and valuations, to examine and make copies of its books and records, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its officers and employees at such reasonable times during regular business hours and intervals as the DIP Lender may reasonably require, in each case other than information subject to confidentiality obligations or attorney-client or other privilege.

5.8 **Compliance with Laws**. Subject to any limitations imposed by the Approved Budget or by the Borrower's operation as a debtor-in-possession in the Chapter 11 Case, the Borrower shall comply with the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority, other than laws, rules, regulations, and orders with which, individually, non-compliance could not reasonably be expected to result in a Material Adverse Change.

5.9 **Disclosure Updates**. The Borrower shall promptly, but in any event within five (5) Business Days after obtaining actual knowledge thereof, notify the DIP Lender of any written information, exhibit, or report (other than materials marked as drafts and forward-looking information, projections, estimates, and information of a general economic nature and general information about the Borrower's industry) furnished (after giving effect to any supplements thereto) to the DIP Lender that contained, at the time it was furnished, any untrue statement of a material fact or omitted to state any material fact necessary to make the statements contained therein (taken as a whole) not misleading in light of the circumstances in which made. Any notification pursuant to the foregoing provision will not cure or remedy the effect of the prior untrue statement of a material fact or omission of any material fact nor shall any such notification have the effect of amending or modifying this Agreement or any of the Schedules or reports hereto.

5.10 **Further Assurances**. Upon reasonable written notice from the DIP Lender, the Borrower shall promptly execute and deliver to the DIP Lender any and all Security Documents, financing statements,

and all other documents (collectively, the "Additional Documents") that the DIP Lender may request in writing, in each case in form and substance satisfactory to the DIP Lender, to create, perfect and continue the DIP Lender's Liens in all the Collateral (whether now owned or hereafter arising or acquired, tangible or intangible, real or personal).

5.11 **Approved Budget**. The Borrower shall comply with the Approved Budget (as updated and supplemented in accordance with this Agreement), subject to the Permitted Variance.

5.12 **[Reserved].**

5.13 **[Reserved].**

5.14 **Deposit Account Control Agreements**. The Borrower shall, and shall use commercially reasonable efforts to cause each relevant financial institution or other person at which each Deposit Account is maintained to, enter into a Deposit Account Control Agreement with respect to such Deposit Account, in each case, promptly and not later than thirty (30) days following the written request of the DIP Lender at any time after the Closing Date.

5.15 **[Reserved].**

5.16 **Material Contracts; Sale Offers**. The Borrower shall deliver to the DIP Lender (a) promptly (but in any event within five (5) Business Days) of the Borrower becoming aware of any default (other than the filing of the Chapter 11 Case) or other material breach under any Material Contract to which the Borrower is a party, notice of such defaults or breaches, and (b) prompt notification of any written offer by a third party to purchase all or substantially all of the assets of the Borrower, or to purchase all or substantially all of the equity interests of the Borrower, or otherwise explore or enter into a material transaction in respect of the Borrower or its assets outside the Ordinary Course.

5.17 **DIP Milestones**. The Borrower shall comply with the following milestones:

(a) No later than September 21, 2026, the Bankruptcy Court shall have entered the Second Interim Order in form and substance acceptable to the DIP Lender in its sole discretion;

(b) No later than October 20, 2026, the Bankruptcy Court shall have entered the Final Order in form and substance acceptable to the DIP Lender in its sole discretion;

(c) No later than 120 days following the Petition Date, the Borrower shall have filed the Subchapter V Plan;

(d) No later than 135 days following the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order in form and substance acceptable to the DIP Lender; and

(e) No later than 70 days following entry of the Final Order, the Plan Effective Date shall have occurred.

## 6. NEGATIVE COVENANTS.

The Borrower hereby covenants and agrees that, until termination of the Commitment and the indefeasible payment in full in cash of the Obligations (other than continuing Obligations with respect to indemnification), the Borrower will not do any of the following without the prior written consent of the DIP Lender:

6.1 **Indebtedness**. Create, incur, assume, suffer to exist, guarantee, or otherwise become or remain, directly or indirectly, liable with respect to any Indebtedness with respect to the Collateral, except for the following ("Permitted Indebtedness"):

(a) Indebtedness evidenced by this Agreement and the DIP Loan Documents (including the Carve-Out);

(b) Indebtedness outstanding as of the Petition Date;

(c) obligations under any cash management agreement and other Indebtedness in respect of netting services, automatic clearinghouse arrangements, overdraft protections, employee credit card programs, and other cash management and similar arrangements incurred in the Ordinary Course of Business; and

(d) unsecured Indebtedness consisting of the financing of insurance premiums incurred in the Ordinary Course of Business.

6.2 **Liens**. Create, incur, assume or suffer to exist on or after the date of this Agreement, directly or indirectly, any Lien that is equal to or superior to the priority of any Liens granted by this Agreement and the DIP Order to or in favor of the DIP Lender on or with respect to any of the Collateral, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, except for Permitted Prior Liens.

6.3 **Restrictions on Fundamental Changes**. Except in connection with a Subchapter V Plan approved by the Bankruptcy Court or otherwise with the prior written consent of the DIP Lender, the Borrower shall not:

(a) enter into any merger, consolidation, reorganization or recapitalization, or reclassify its equity interests;

(b) liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution); or

(c) suspend or close a substantial portion of its business.

6.4 **Disposal of Assets**. Except in connection with a Subchapter V Plan, convey, sell, lease, license, assign, transfer or otherwise dispose of (or enter into an agreement to convey, sell, lease, license, assign, transfer or otherwise dispose of) any Collateral pledged by the Borrower, other than Permitted Transfers.

6.5 **Change Name**. Change the Borrower's name, state of organization or organizational identity.

6.6 **Nature of Business**. Make any material change in the nature of the Borrower's business or acquire any properties or assets that are not reasonably related to the conduct of such business activities; *provided*, that the foregoing shall not prevent the Borrower from (i) engaging in any business that is reasonably related or ancillary to its business, or (ii) complying with any requirement of the Bankruptcy Code.

6.7 **Material Leases or Contracts; Amendments**. Change or modify (a) the material terms of any of its Material Contracts in connection with Collateral except in a manner that could not reasonably be expected to result in a Material Adverse Change, or (b) any of its Organizational Documents in a manner that is adverse to the DIP Lender.

6.8 **Change of Control**. Except in connection with a Subchapter V Plan, cause, permit, or suffer, directly or indirectly, any Change of Control.

6.9 **Accounting Methods**. Modify or change its fiscal year or its method of accounting (other than as may be required to conform to GAAP).

6.10 **Transactions with Affiliates**. Directly or indirectly enter into or permit to exist any transaction with any Affiliate of the Borrower, except for (a) transactions that are in the Ordinary Course of Business of the Borrower, and (b) transactions or arrangements otherwise approved by the Bankruptcy Court pursuant to an order in form and substance satisfactory to the DIP Lender.

6.11 **Use of Proceeds**. Use the proceeds of the DIP Loans for any Restricted Purpose or for any purpose other than to fund payments, subject in all respects to the Approved Budget and the Permitted Variance, related to the: (a) working capital and other general corporate purposes of the Borrower, including the payment of the Fees, the DIP Lender Expenses, and Professional Fees; (b) payments permitted or required under the DIP Order, including the Carve-Out, and (c) bankruptcy-related expenses.

6.12 **Limitation on Capital Expenditures**. Except as set forth in the Approved Budget, make or incur any Capital Expenditure.

6.13 **Chapter 11 Case**. Directly or indirectly seek, consent or suffer to exist, without the prior written consent of the DIP Lender:

(a) any modification, stay, vacation or amendment to the DIP Order;

(b) in connection with the Collateral, a priority claim for any administrative expense or unsecured claim against the Borrower (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of any kind specified in section 503(b), 506(b) or (c) or 507(b) of the Bankruptcy Code) equal to or superior to the priority claim of the DIP Lender in respect to the Collateral or otherwise, other than those permitted by the DIP Order (including the Carve-Out and the Permitted Prior Liens); and

(c) Any proposal for a chapter 11 plan or asset sale that is not a Subchapter V Plan.

6.14 **Acquisitions, Loans, or Investments**. Make any acquisition, advance, loan or any other investment of any kind or nature other than:

(a) [Reserved];

(b) investments held by the Borrower in the form of cash or cash equivalents;

(c) investments existing as of the Closing Date;

(d) [Reserved];

(e) [Reserved];

(f) [Reserved]; and

(g) investments consisting of Indebtedness, Liens, fundamental changes or other dispositions or transactions permitted under Sections 6.1, 6.2, 6.3, and 6.4, respectively.

6.15 **Payments on Indebtedness**. Other than with respect to the Obligations or pursuant to the Approved Budget, make any payment with respect to any Indebtedness.

6.16 **Distributions or Redemptions**. Pay any dividends or distributions on, or make any redemptions of, any equity interest of the Borrower.

6.17 **Formation of Subsidiaries**. Form any direct or indirect Subsidiary or acquire any direct or indirect Subsidiary after the Closing Date without the DIP Lender's prior written consent.

**7. [RESERVED].**

**8. EVENTS OF DEFAULT.**

8.1 **Events of Default**. Any one or more of the following events shall constitute an event of default following giving of any applicable notice (if required) and the expiration of the applicable cure period (if any) (each, an "Event of Default") under this Agreement:

(a) the Bankruptcy Court shall have entered an order or the Borrower shall have filed a motion or application seeking an order (without the prior written consent of the DIP Lender) or the Borrower fails to timely contest a motion or application filed by another party seeking an order (i) converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, (ii) determining that the Debtor is ineligible for Subchapter V of chapter 11 of the Bankruptcy Code, (iii) appointing (x) an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code, (y) a trustee (other than a Subchapter V trustee) or expanding the powers of the Subchapter V trustee, or (z) a responsible officer in the Chapter 11 Case, or (iv) dismissing the Chapter 11 Case;

(b) the entry of a DIP Order that is not in form and substance acceptable to the DIP Lender in its sole discretion;

(c) the failure of the Borrower to comply with any of the DIP Milestones, unless such DIP Milestone is extended or waived with the prior written consent of the DIP Lender;

(d) the failure of the Borrower to be in compliance in all material respects with the DIP Loan Documents, including for the avoidance of doubt by making any payment not in accordance with the Approved Budget or that otherwise would not constitute a valid use of proceeds of the DIP Loans;

(e) the Borrower's breach, rejection or termination of the Fenix Agreement without the prior written consent of the DIP Lender;

(f) failure of any representation or warranty set forth in the DIP Loan Documents to be true and correct in all material respects (or, to the extent qualified by materiality, in all respects) when made;

(g) the Borrower grants any liens, security interests, or encumbrances other than those existing immediately prior to the date hereof or arising under the DIP Order;

(h) the most recently entered DIP Order ceases to be in full force and effect for any reason or an order shall be entered (or the Borrower seeks an order) reversing, amending, supplementing, staying, vacating, or otherwise modifying such DIP Order without the prior written consent of the DIP Lender;

(i) the Borrower files or supports a plan of liquidation or reorganization in the Chapter 11 Case that does not conform to the terms of this DIP Loan Documents or otherwise is not in form and substance acceptable to the DIP Lender;

(j) failure of the Borrower to make any payment under the DIP Loan Documents to the DIP Lender as and when due;

(k) the bringing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto by the Borrower: (A) to obtain additional financing under section 364(c) or section 364(d) of the Bankruptcy Code unless such additional financing is

(x) permitted pursuant to the DIP Loan Documents, or (y) a Prepayment; (B) to grant any lien other than Permitted Prior Liens upon or affecting any Collateral; (C) except as provided in the DIP Loan Documents, Interim Orders or Final Order, as the case may be, to use the DIP Cash Collateral under section 363(c) of the Bankruptcy Code without the prior written consent of the DIP Lender; (D) to sell any of the Collateral except to the extent expressly permitted by the terms of the DIP Loan Documents or with the prior written approval of the DIP Lender; or (E) to the extent that any action or actions may be adverse to the DIP Lender or its rights and remedies hereunder or its interest in the Collateral, that is otherwise not reasonably satisfactory to the DIP Lender;

(l) without the prior written consent of the DIP Lender, the granting of relief from the automatic stay by the Bankruptcy Court to any other creditor or party in interest in the Chapter 11 Case with respect to any portion of the Collateral;

(m) the Borrower shall fail to comply with its obligations under (i) Sections 5.1, 5.2(c), 5.3, 5.4, 5.10, 5.16, 6, or 10, or (ii) Section 5.2(b), and in the case of this clause (ii), such failure or breach shall continue for five (5) days after the earlier to occur of (x) the date on which such failure to comply or breach is known to any officer of the Borrower and (y) the date on which the DIP Lender shall have notified such that the Borrower or its applicable representative of such failure;

(n) other than as set forth in any other sub-section of this Section 8.1, the Borrower shall fail to perform, or otherwise breach, any of its covenants or obligations contained in this Agreement, which failure or breach shall continue for three (3) Business Days after the earlier to occur of (i) the date on which such failure to comply is known to any officer of the Borrower and (ii) the date on which the DIP Lender shall have notified the Borrower or its applicable representative of such failure; *provided, however*, that such three (3) Business Day grace period shall not apply in the case of any failure that is not capable of being cured at all or within such three (3) Business Day period;

(o) one or more final non-appealable judgments (and the same shall remain undischarged for a period of thirty (30) consecutive calendar days during which execution shall not be effectively stayed) and orders for the payment of money exceeding $100,000 in the aggregate (in each case to the extent not paid or covered by insurance or indemnities as to which the insurer or indemnifying party has been notified of such judgment or order and the applicable insurance company or indemnifying party has not denied coverage thereof) shall be rendered against the Borrower and shall be subject to immediate collection and remain unsatisfied;

(p) the entry of an order (i) surcharging any of the Collateral under section 506(c), or any other section of the Bankruptcy Code or applicable law; (ii) allowing any administrative expense claim having priority over or ranking in parity with the DIP Lender's claims or rights (subject to the Carve-Out) under the DIP Loan Documents; or (iii) otherwise adversely impacting the DIP Lender's Liens and priority in the Collateral, as specified in Section 10 of this Agreement and the DIP Order;

(q) sale of any of the Collateral, unless expressly permitted by the DIP Loan Documents or with the written consent of the DIP Lender;

(r) the occurrence of any Event of Default and the continuance thereof after any applicable grace or cure period provided in the DIP Order (if any) or granted by order of the Bankruptcy Court;

(s) the entry of an order granting the relief sought in a motion which seeks to prosecute or settle a claim or controversy on account of, or that is part of, the Collateral (including, without limitation,

any commercial tort claims held by the Borrower or its estate), without the prior written consent of the DIP Lender; and

(t) the occurrence of a Change of Control.

8.2 **Rights and Remedies**.

(a) Immediately upon the occurrence and during the continuance of an Event of Default, subject to the Remedies Notice Period as set forth in the DIP Order, and in addition to any other rights or remedies provided for hereunder or under any DIP Loan Document (including the DIP Order) or by the UCC or any other applicable law, the DIP Lender may do any one or more of the following:

(i) declare the Obligations, whether evidenced by this Agreement or by any DIP Loan Document, due and payable, and the Commitment terminated, whereupon the Obligations shall become and be immediately due and payable, without presentment, demand, protest, further notice or other requirements of any kind, all of which are hereby expressly waived by the Borrower;

(ii) reduce or terminate the Commitment and restrict the funding of any future DIP Loans to the Borrower;

(iii) terminate the DIP Facility and any DIP Loan Documents as to any future liability of the DIP Lender (without affecting any of the Liens, the DIP Loans, or any other Obligation, or the DIP Releases);

(iv) terminate, restrict, or reduce the Borrower's ability to use the proceeds of the DIP Loans or the DIP Cash Collateral, other than during the Remedies Notice Period, to pay payroll in accordance in the Approved Budget;

(v) charge interest at the Default Rate;

(vi) foreclose upon, obtain and liquidate the Collateral in accordance with applicable law;

(v) require the Borrower to assemble all of the Collateral constituting personal property without judicial process pursuant to section 9-609 of the UCC;

(vi) take possession of all Collateral constituting tangible personal property without judicial process pursuant to section 9-609 of the UCC; and

(vii) exercise any of its other rights and remedies under the DIP Loan Documents (including the DIP Order) and applicable law.

(b) Subject to the terms of the DIP Order (including with respect to the Remedies Notice Period), to the extent an Event of Default occurs as a result of the Borrower's failure to indefeasibly satisfy the Obligations in full in cash (other than continuing Obligations with respect to indemnification) by the Maturity Date, the Borrower waives any right (i) to any notice period (except to the extent a notice period is required by operation of law) and (ii) to challenge (x) whether or not the Maturity Date or an Event of Default has occurred, (y) the DIP Lender's exercise of its rights and remedies against the Collateral, including without limitation, any foreclosure through the Bankruptcy Court, a state court, or other applicable proceeding, and (z) the applicability of the Default Rate.

8.3 **Application of Proceeds upon Event of Default**. The DIP Lender shall apply the cash proceeds actually received from any foreclosure sale, other disposition of the Collateral upon an Event of Default as follows: (a) first, to fund the Carve-Out (to the extent not fully funded by the Borrower at such time); (b) second, to the DIP Lender Expenses; (c) third, to the discharge of any accrued but unpaid Fees (including, but not limited to, the Commitment Fee, Closing Fee and the Exit Fee); (d) fourth, to the discharge of any accrued but unpaid interest on the Obligations; (e) fifth, to the outstanding principal balance of any Obligations; and (f) sixth, to pay any remaining surplus to the Borrower.

8.4 **Remedies Cumulative**. The rights and remedies of the DIP Lender under this Agreement, the DIP Loan Documents, and all other agreements shall be cumulative. The DIP Lender shall have all rights and remedies not inconsistent herewith or with the DIP Order, as provided under the UCC, by law, or in equity. No exercise by the DIP Lender of one right or remedy shall be deemed an election, and no waiver by the DIP Lender of any Event of Default shall be deemed a continuing waiver. No delay by the DIP Lender shall constitute a waiver, election, or acquiescence by it.

**9. [RESERVED]**

**10. PRIORITY AND COLLATERAL SECURITY.**

10.1 **Superpriority Claims; Subordination in favor of DIP Lender Liens**.

(a) Subject to the terms and conditions of, and entry of, the DIP Order, the Obligations of the Borrower under the DIP Loan Documents:

(i) shall, in accordance with section 364(c)(1) of the Bankruptcy Code, constitute allowed senior administrative expense claims against the Borrower and its estate (the "Superpriority Claims") with priority in payment over any and all administrative expenses at any time existing or arising, of any kind or nature whatsoever, including, without limitation, the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), and 726 of the Bankruptcy Code or otherwise, including those resulting from the conversion of any of the Chapter 11 Case pursuant to section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; *provided, however*, that the Superpriority Claims shall be subject and subordinate to only (x) the Carve-Out and (y) Permitted Prior Liens;

(ii) shall be, pursuant to section 364(c)(2) of the Bankruptcy Code, secured by valid, enforceable, non-avoidable and perfected and automatic first priority liens on and security interests in favor of the DIP Lender in all Collateral that is not otherwise subject to the Permitted Prior Liens, subject only to the Carve-Out; and

(iii) shall be, pursuant to section 364(c)(3) of the Bankruptcy Code, secured by valid, enforceable, non-avoidable and perfected and automatic junior liens on and security interests in favor of the DIP Lender in all Collateral (other than the Collateral described in Section 10.1(a)(ii) hereof, as to which Liens are described in such Section), subject to the Carve-Out and the Permitted Prior Liens (the foregoing lien priorities set forth in clauses (i) – (iii) shall be referred to herein as the "Required Lien Priority").

(b) [Reserved].

(c) [Reserved].

(d) The Superpriority Claims referred to in this Section 10.1 shall have the priority afforded to such Superpriority Claims in the DIP Order.

10.2 **Grant of Security Interest in the Collateral**. Subject to the terms and conditions of, and entry of, the DIP Order, to secure the payment and performance of the Obligations, the Borrower hereby grants, collaterally pledges, and assigns to the DIP Lender the following:

(a) *Liens on Unencumbered Property*. Pursuant to section 364(c)(2) of the Bankruptcy Code, subject only to the Carve-Out, valid, binding, continuing, enforceable, non-avoidable automatically, and fully perfected first-priority liens on and security interests in all Collateral that is not otherwise subject to any Permitted Prior Lien.

(b) *Liens Junior to Other Liens*. Pursuant to section 364(c)(3) of the Bankruptcy Code, valid, binding, continuing, enforceable, non-avoidable automatically and fully perfected junior liens on and security interests in all Collateral (other than as set forth in clause (a) above).

10.3 **Representations and Warranties in Connection with Security Interest**. The Borrower represents and warrants to the DIP Lender as follows:

(a) subject to the entry of the DIP Order, the Borrower has full right and power to grant to the DIP Lender perfected security interests and Liens, in accordance with the Required Lien Priority, on the Borrower's respective interests in the Collateral pursuant to this Agreement and the other DIP Loan Documents;

(b) upon the entry of the First Interim Order, the DIP Lender will have good, valid and automatically perfected Liens and security interests in the Collateral granted by the applicable Borrower, in accordance with the Required Lien Priority, subject to no transfer or other restrictions or Liens of any kind in favor of any other Person, other than Permitted Prior Liens; *provided* that, notwithstanding the automatic perfection and priority of the DIP Lender's Liens under the DIP Order, the DIP Lender may, in its sole discretion, file any financing statements and other appropriate filings or recordations or delivery of any necessary certificates, as applicable, in respect of the Collateral and the Liens granted hereunder (including, without limitation, as contemplated in Section 10.6); and

(c) as of the Closing Date, no financing statement relating to any of the Collateral granted by the Borrower is on file in any public office except those on behalf of the DIP Lender and those listed on Schedule 6.2.

10.4 **Power of Attorney**. The DIP Lender hereby irrevocably is made, constituted and appointed the true and lawful attorney for the Borrower (without requiring the DIP Lender to act as such) with full power of substitution to, do the following (which appointment is irrevocable and coupled with an interest) subject to the DIP Order: (a) execute in the name of such Person any financing statements, schedules, assignments, instruments, documents, and statements that it is obligated to give the DIP Lender under any of the DIP Loan Documents; (b) do such other and further lawful acts and deeds in the name of such Person that the DIP Lender may deem reasonably necessary or desirable to perfect the DIP Lender's security interest or lien in any Collateral or (c) after the occurrence of an Event of Default which is continuing, (i) enforce an Account, (ii) exercise any voting or consensual rights with respect to the pledged securities, (iii) settle, compromise, compound, adjust or defend any actions, suits or proceedings relating to all or any of the Collateral, (iv) notify, or to require the Borrower to notify, an Account Debtor to make payment directly to the DIP Lender, (v) make, settle and adjust claims in respect of Collateral under policies of insurance, indorsing the name of the Borrower on any check, draft, instrument or other item of payment for the proceeds of such policies of insurance and for making all determinations and decisions with respect thereto; provided that, nothing herein contained shall be construed as requiring or obligating the DIP Lender

to make any commitment or to make any inquiry as to the nature or sufficiency of any payment received by the DIP Lender, or to present or file any claim or notice, or to take any action with respect to the Collateral or any part thereof or the moneys due or to become due in respect thereof or any property covered thereby, or (vi) commence and prosecute any and all suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect or otherwise realize on all or any of the Collateral or to enforce any rights in respect of any Collateral. Notwithstanding the foregoing, the foregoing power of attorney is a right, but not an obligation of the DIP Lender, and neither the DIP Lender nor its officers, directors, employees or agents shall be responsible to the Borrower for failure to exercise any of the foregoing rights.

10.5 **DIP Lender's Ability to Perform Obligations on Behalf of Borrower with Respect to the Collateral**. The DIP Lender shall have the right, but not the obligation, after the occurrence of an Event of Default which is continuing, to perform on the Borrower's behalf, any or all of the Borrower's obligations under this Agreement with respect to the Collateral, when such obligations are due, at the expense, for the account, and at the sole risk of the Borrower.

10.6 **Financing Statements**. The Borrower irrevocably authorizes the DIP Lender, without notice to the Borrower, to prepare and file financing statements provided for by the UCC, including, without limitation, describing such property as "all assets, whether now owned or hereafter acquired, developed or created" or words of similar effect, to perfect the DIP Lender's security interest in the Collateral, in all jurisdictions in which the DIP Lender believes in its sole opinion that such filing is appropriate. The Borrower also irrevocably authorizes the DIP Lender to file such continuation statements and amendments and to take such other action with respect to the filing of financing statements as may be required or appropriate, in either case in the DIP Lender's sole judgment, in order to perfect and to continue the perfection of the DIP Lender's security interests in the Collateral, unless prohibited by law.

10.7 **No Discharge; Survival of Claims**. Pursuant to section 1141(d)(4) of the Bankruptcy Code, the Borrower hereby waives any discharge of the Obligations with respect to any chapter 11 plan that is not a Subchapter V Plan.

**11. WAIVERS; INDEMNIFICATION.**

11.1 **Demand; Protest, etc.**. To the extent permitted by applicable law or as expressly required pursuant to the terms of this Agreement, the Borrower hereby waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, nonpayment at maturity, release, compromise, settlement, extension, or renewal of documents, instruments, chattel paper, and guarantees at any time held by the DIP Lender on which the Borrower may in any way be liable.

11.2 **DIP Lender's Liability for Collateral.** As long as the DIP Lender complies with its obligations, if any, under the UCC, the DIP Lender shall not in any way or manner be liable or responsible for: (a) the safekeeping of the Collateral, (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (c) any diminution in the value thereof, or (d) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other Person. All risk of loss, damage, or destruction of the Collateral shall be borne by the Borrower, except any thereof resulting from the gross negligence, bad faith, fraud, or willful misconduct of the DIP Lender or its representatives or agents as finally determined by the Bankruptcy Court or other court of competent jurisdiction.

11.3 **Indemnification**.

The Borrower shall indemnify, pay and hold harmless the DIP Lender and the other Foundation Parties against any and all losses, liabilities, claims, damages, costs, and expenses (including reasonable attorneys' fees and expenses) incurred in connection with or arising out of the DIP Facility, the DIP Loan Documents, or the use or proposed use of proceeds, except to the extent resulting from their gross negligence, willful misconduct, or bad faith, as determined by a final non-appealable judgment of a court of competent jurisdiction. This indemnification obligation shall (a) constitute an allowed administrative

expense claim under section 503(b) of the Bankruptcy Code, (b) survive the repayment of the Obligations and the termination of the DIP Facility, and (c) be payable on demand without further order of the Bankruptcy Court.

**12. NOTICES.**

All notices or demands relating to this Agreement or any DIP Loan Document shall be in writing and shall be personally delivered or sent by registered or certified mail (postage prepaid, return receipt requested), overnight courier, or electronic mail (at such email addresses as a party may designate in accordance herewith). In the case of notices or demands to any party hereunder or any service of process to any party hereunder, they shall be sent to the respective addresses set forth below:

If to the Borrower:

MVMT Labs, Inc.
c/o Province, LLC
Attn: Michael Robinson
2360 Corporate Circle, Suite 340
Henderson, NV 89074

with a copy to (which shall not constitute notice):

Potter Anderson & Corroon LLP
Jeremy W. Ryan
Gregory J. Flasser
1313 N. Market Street
7th Floor
Wilmington, DE 19801-6108
Phone: (302) 984-6000
Email: jryan@potteranderson.com
gflasser@potteranderson.com

If to the DIP Lender:

MNF DIP SPV Ltd
c/o CO Services Cayman Limited
P.O. Box 10008
Pavilion East, Cricket Square
Grand Cayman KY1-1001
Cayman Islands
Phone: +1 (345) 749-2000

with a copy to (which shall not constitute notice):

Allen Overy Shearman Sterling US LLP
Fredric Sosnick
William S. Holste
599 Lexington Avenue
New York, NY 10022
Phone: (212) 848-4000
Email: fsosnick@aoshearman.com

william.holste@aoshearman.com

Any party hereto may change the address at which they are to receive notices hereunder, by notice given in writing in the foregoing manner to the other party. All notices or demands sent in accordance with this Section 12, shall be deemed received on the earlier of the date of actual receipt or five (5) Business Days after the deposit thereof certified, return receipt requested in the mail; *provided*, that (a) notices sent by overnight courier service shall be deemed to have been given when received, and (b) notices by electronic mail shall be deemed received when sent upon confirmation of transmission as evidenced by a delivery receipt or similar electronic mail function. If any notice, disclosure, or report is required to be delivered pursuant to the terms of this Agreement on a day that is not a Business Day, such notice, disclosure, or report shall be deemed to have been required to be delivered on the immediately following Business Day.

**13. CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER.**

(a) THE VALIDITY OF THIS AGREEMENT AND THE DIP LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN THE DIP LOAN DOCUMENT IN RESPECT OF SUCH OTHER DIP LOAN DOCUMENT), THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF AND THEREOF, AND THE RIGHTS OF THE PARTIES HERETO AND THERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

(b) THE BORROWER AND DIP LENDER AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND THE OTHER DIP LOAN DOCUMENTS SHALL BE TRIED AND LITIGATED ONLY IN THE BANKRUPTCY COURT. THE BORROWER AND DIP LENDER HEREBY WAIVE, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF *FORUM NON CONVENIENS* OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION 13(b).

(c) **THE BORROWER AND DIP LENDER HEREBY IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THE DIP LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY AND AGREE THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. THE BORROWER AND DIP LENDER ACKNOWLEDGE THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THE DIP LOAN DOCUMENTS, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN THEIR RELATED FUTURE DEALINGS. THE BORROWER AND DIP LENDER EACH WARRANTS AND REPRESENTS THAT IT HAS HAD THE OPPORTUNITY OF REVIEWING THIS JURY WAIVER WITH LEGAL COUNSEL, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS.**

**14. AMENDMENTS; WAIVERS; SUCCESSORS.**

14.1 **Amendments and Waivers**. No amendment, waiver, or other modification of any provision of this Agreement or any DIP Loan Document, and no consent with respect to any departure therefrom, shall be effective unless the same shall be in writing and signed by the DIP Lender and the

Borrower and then any such waiver or consent shall be effective, but only in the specific instance and for the specific purpose for which given.

14.2 **No Waivers; Cumulative Remedies**. No failure by the DIP Lender to exercise any right, remedy, or option under this Agreement or any DIP Loan Document, or delay by the DIP Lender in exercising the same, shall operate as a waiver thereof. No waiver by the DIP Lender shall be effective unless it is in writing, and then only to the extent specifically stated. No waiver by the DIP Lender on any occasion shall affect or diminish the DIP Lender's rights thereafter to require strict performance by the Borrower of any provision of this Agreement. The DIP Lender's rights under this Agreement and the DIP Loan Documents shall be cumulative and not exclusive of any other right or remedy that the DIP Lender may have.

14.3 **Successors**. This Agreement shall bind and inure to the benefit of the respective successors and permitted assigns of each of the parties; *provided*, that the Borrower may not assign this Agreement or any rights or duties hereunder without the DIP Lender's prior written consent and such consent shall not, unless otherwise provided in such consent, release the Borrower from its Obligations. Any assignment by the Borrower that is not explicitly permitted hereunder shall be void *ab initio*. The DIP Lender may freely assign all or part of its rights and duties hereunder to any Person. For the avoidance of doubt, in the event that the DIP Lender assigns or participates any portion of its rights and obligations under the DIP Facility to any person or entity that is not a Foundation Party, no such assignee or participant shall benefit from the DIP Releases.

**15. GENERAL PROVISIONS.**

15.1 **Effectiveness**. This Agreement shall be binding and deemed effective when executed by the Borrower and the DIP Lender.

15.2 **Section Headings**. Headings and numbers have been set forth herein for convenience only. Unless the contrary is compelled by the context, everything contained in each Section applies equally to this entire Agreement.

15.3 **Interpretation**. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed against the DIP Lender or the Borrower, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to accomplish fairly the purposes and intentions of all parties hereto.

15.4 **Severability of Provisions**. Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

15.5 **Debtor-Creditor Relationship**. The relationship between the DIP Lender, on the one hand, and the Borrower, on the other hand, is solely that of creditor and debtor, as applicable. The DIP Lender has not (and shall not be deemed to have) any fiduciary relationship or duty to the Borrower arising out of or in connection with the DIP Loan Documents or the transactions contemplated thereby, and there is no agency or joint venture relationship between the DIP Lender, on the one hand, and the Borrower, on the other hand, by virtue of any DIP Loan Document or any transaction contemplated therein.

15.6 **Counterparts; Electronic Execution**. This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same agreement. Delivery of an executed counterpart of this Agreement by facsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. The foregoing shall apply to each other DIP Loan Document *mutatis mutandis*.

15.7 **Revival and Reinstatement of Obligations**. If the incurrence or payment of the Obligations by the Borrower or the transfer to the DIP Lender of any property should for any reason subsequently be asserted, or declared, to be void or voidable under any state or federal law relating to creditors' rights, including provisions of the Bankruptcy Code relating to fraudulent conveyances, preferences, or other voidable or recoverable payments of money or transfers of property (each, a "Voidable Transfer"), and if the DIP Lender is required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the reasonable advice of its counsel, then, as to any such Voidable Transfer, or the amount thereof that the DIP Lender is required or elects to repay or restore, and as to all reasonable, documented, and actual out-of-pocket costs, expenses, and attorneys' fees of the DIP Lender related thereto, the liability of the Borrower automatically shall be revived, reinstated, and restored and shall exist as though such Voidable Transfer had never been made.

15.8 **Integration**. This Agreement, together with the DIP Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

15.9 **No Waiver of Right to Object to Professional Fees**. Notwithstanding anything set forth herein or in any DIP Loan Document with respect to the Carve-Out or any item in an Approved Budget, nothing herein shall be construed to impair the ability of the DIP Lender to object to any request for the payment of Professional Fees on any grounds.

**16. [RESERVED].**

**17. [RESERVED].**

**18. TREATMENT OF CERTAIN INFORMATION.**

The DIP Lender agrees to use reasonable precautions to keep confidential, in accordance with its customary procedures for handling confidential information of the same nature, all non-public information regarding the Borrower pursuant to this Agreement ("Information"); *provided*, *however*, that nothing herein shall limit the disclosure of any such Information: (a) to any Foundation Party (on a confidential basis) as need to know such Information; *provided* that, before any such disclosure, the Persons to who such disclosure is made are informed of the confidential nature of such Information and instructed to keep such Information confidential; (b) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, or requested by any bank regulatory authority, or to comply with any law or requirement made by a Governmental Authority, as necessary to respond to a document request, interrogatory, or other legal process, or to cooperate with a Governmental Authority regarding any governmental investigation; (c) to auditors or accountants, and any analogous counterpart thereof; *provided* that, before any such disclosure, the Persons to whom such disclosure is made are informed of the confidential nature of such Information and instructed to keep such Information confidential; (d) in connection with any litigation to which the DIP Lender is a party arising from or related to this Agreement or the DIP Loan Documents; (e) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Agreement, (ii) becomes available to the DIP Lender on a confidential basis from a source other than the Borrower, so long as such source is not known by the DIP Lender to be bound by obligations of confidentiality with respect to such Information, or (iii) was available to the DIP Lender on a non-confidential basis prior its disclosure to the DIP Lender by the Borrower or any of its advisors; and (f) to the extent that the Borrower shall have consented to such disclosure in writing.

[*Signature pages follow*]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

**BORROWER:**

**MVMT LABS, INC.**

By: ___________________________________________
Name: Michael Robinson
Title: Chief Restructuring Officer

**LENDER:**

**MNF DIP SPV LTD,**
as DIP Lender

By: ___________________________________________
Name: _________________________________________
Title: __________________________________________

**Exhibit 2**

**Redline**

**SECOND AMENDED AND RESTATED DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT**

**by and between**

**MVMT LABS, INC.**

**as Borrower,**

**and**

**MNF DIP SPV LTD**
**as DIP Lender**

**Dated as of ~~September 21~~October [_], 2026**

**TABLE OF CONTENTS**


| | | | Page |
|---|---|---|---|
| 1. | DEFINITIONS AND CONSTRUCTION. | | 1 |
| | 1.1 | Definitions | 1 |
| | 1.2 | Accounting Terms | 11 |
| | 1.3 | UCC | 11 |
| | 1.4 | Construction | 11 |
| | 1.5 | Schedules and Exhibits | 12 |
| 2. | LOAN AND TERMS OF PAYMENT. | | 12 |
| | 2.1 | Agreement to Lend; Security Documents; and DIP Loan Documents. | 12 |
| | 2.2 | Borrowing Procedures | 13 |
| | 2.3 | [Reserved]. | 13 |
| | 2.4 | Payments; Reductions of the Commitment; Prepayments. | 13 |
| | 2.5 | Interest Rates and Rates, Payments and Calculations. | 14 |
| | 2.6 | Crediting Payments; Clearance Charge | 15 |
| | 2.7 | Designated Account | 15 |
| | 2.8 | Statements of Obligations | 15 |
| | 2.9 | Fees. | 16 |
| 3. | CONDITIONS; TERM OF AGREEMENT. | | 16 |
| | 3.1 | Conditions Precedent to Each DIP Loan | 16 |
| | 3.2 | Conditions Precedent to Final DIP Loan | 17 |
| | 3.3 | Maturity | 18 |
| | 3.4 | Effect of Maturity | 18 |
| 4. | REPRESENTATIONS AND WARRANTIES. | | 18 |
| | 4.1 | Due Organization and Qualification | 18 |
| | 4.2 | Due Authorization | 18 |
| | 4.3 | Binding Obligations | 19 |
| | 4.4 | Title to Properties | 19 |
| | 4.5 | Accuracy of Information | 19 |
| | 4.6 | Fraudulent Transfer | 19 |
| | 4.7 | Indebtedness | 19 |
| | 4.8 | Approved Budget | 19 |

4.9 Bank Accounts 19
4.10 No Other Representations 19

5. AFFIRMATIVE COVENANTS. 20
5.1 Notice of Certain Events 20
5.2 Reporting; Budget; Conference Calls. 20
5.3 Existence 20
5.4 Maintenance of Properties; Permits 20
5.5 Taxes 20
5.6 [Reserved]. 21
5.7 Inspection 21
5.8 Compliance with Laws 21
5.9 Disclosure Updates 21
5.10 Further Assurances 21
5.11 Approved Budget 21
5.12 [Reserved]. 21
5.13 [Reserved]. 21
5.14 Deposit Account Control Agreements 21
5.15 [Reserved]. 21
5.16 Material Contracts; Sale Offers 21
5.17 DIP Milestones 22

6. NEGATIVE COVENANTS. 22
6.1 Indebtedness 22
6.2 Liens 22
6.3 Restrictions on Fundamental Changes 22
6.4 Disposal of Assets 23
6.5 Change Name 23
6.6 Nature of Business 23
6.7 Material Leases or Contracts; Amendments 23
6.8 Change of Control 23
6.9 Accounting Methods 23
6.10 Transactions with Affiliates 23
6.11 Use of Proceeds 23
6.12 Limitation on Capital Expenditures 23

6.13 Chapter 11 Case 23
6.14 Acquisitions, Loans, or Investments 24
6.15 Payments on Indebtedness 24
6.16 Distributions or Redemptions 24
6.17 Formation of Subsidiaries 24

7. [RESERVED]. 24

8. EVENTS OF DEFAULT. 24
8.1 Events of Default 24
8.2 Rights and Remedies. 26
8.3 Application of Proceeds upon Event of Default 27
8.4 Remedies Cumulative 27

9. [RESERVED] 28

10. PRIORITY AND COLLATERAL SECURITY. 28
10.1 Superpriority Claims; Subordination in favor of DIP Lender Liens. 28
10.2 Grant of Security Interest in the Collateral 28
10.3 Representations and Warranties in Connection with Security Interest 29
10.4 Power of Attorney 29
10.5 DIP Lender's Ability to Perform Obligations on Behalf of Borrower with Respect to the Collateral 29
10.6 Financing Statements 30
10.7 No Discharge; Survival of Claims 30

11. WAIVERS; INDEMNIFICATION. 30
11.1 Demand; Protest, etc. 30
11.2 DIP Lender's Liability for Collateral 30
11.3 Indemnification 30

12. NOTICES. 30

13. CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER. 31

14. AMENDMENTS; WAIVERS; SUCCESSORS. 32
14.1 Amendments and Waivers 32
14.2 No Waivers; Cumulative Remedies 32
14.3 Successors 32

15. GENERAL PROVISIONS. 33
15.1 Effectiveness 33
15.2 Section Headings 33
15.3 Interpretation 33
15.4 Severability of Provisions 33
15.5 Debtor-Creditor Relationship 33
15.6 Counterparts; Electronic Execution 33
15.7 Revival and Reinstatement of Obligations 33
15.8 Integration 33
15.9 No Waiver of Right to Object to Professional Fees 33
16. [RESERVED]. 34
17. [RESERVED]. 34
18. TREATMENT OF CERTAIN INFORMATION. 34

Exhibits

Exhibit A – Initial Budget
Exhibit D – Form of Borrowing Notice

Schedules

Schedule A-1 – Authorized Persons
Schedule A-2 – Payment Account
Schedule D-1 – Designated Account and Designated Account Bank

**SECOND AMENDED AND RESTATED SENIOR SECURED, SUPERPRIORITY DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT**

**THIS SECOND AMENDED AND RESTATED SENIOR SECURED, SUPERPRIORITY DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT** (as it subsequently may be amended in accordance with its terms, this "Agreement"), is entered into as of ~~September 21~~October [_], 2026 (the "Closing Date"), by and among **MVMT LABS, INC.**, a Delaware corporation ("MVMT Labs" and the "Borrower"), and **MNF DIP SPV LTD.**, a Cayman Islands exempted company, as lender ("DIP Lender").

**WHEREAS**, on July 15, 2026 (the "Petition Date"), the Borrower filed a voluntary petition for relief under subchapter V of chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (together with any other court of competent jurisdiction exercising authority over the Chapter 11 Case, the "Bankruptcy Court"), which is being administered under Case No. 26-11113 (TMH) (the "Chapter 11 Case");

**WHEREAS**, the Borrower remains in possession of its business and manages its properties as debtor and debtor in possession pursuant to sections 1182 and 1184 of the Bankruptcy Code;

**WHEREAS**, the Borrower has requested that the DIP Lender provide financing to the Borrower consisting of a senior secured superpriority multiple draw term loan in a total aggregate principal amount of up to $5,700,000 (the "DIP Facility") pursuant to sections 363 and 364 of the Bankruptcy Code, subject to compliance with the terms, conditions and covenants described in this Agreement and the DIP Order;

**WHEREAS**, the DIP Lender and the Borrower have agreed that the DIP Lender will extend the DIP Facility to the Borrower on the terms and conditions set forth herein and in the other DIP Loan Documents (as defined in this Agreement), in accordance with sections 363 and 364 of the Bankruptcy Code, and that all of the obligations with respect to the DIP Facility will be (a) secured by first-priority senior secured Liens on the Collateral granted by the Borrower, subject only to the Carve-Out and the Permitted Prior Liens, as provided herein, in the DIP Order and in the other DIP Loan Documents, and (b) given the status of Superpriority Claims against the Borrower's estate, as provided in the DIP Order;

**WHEREAS,** on July 20, 2026, the Bankruptcy Court entered the *Interim Order (I) Authorizing the Debtor to (A) Obtain Postpetition Financing and (B) Grant Liens, Including Senior Secured Liens, and Superpriority Administrative Expense Claims; and (II) Modifying the Automatic Stay* [Docket No. 33] (the "First Interim Order"), which authorized the Debtor's entry into the DIP Loan Documents~~ herein~~, and to borrow $750,000 in accordance with the terms of the First Interim Order (the "First Interim DIP Loan");

**WHEREAS**, on July 24, 2026 (the "Initial Funding Date"), the First Interim DIP Loan was advanced to the Borrower pursuant to the terms of the First Interim Order and the DIP Loan Documents; ~~and~~

~~**WHEREAS,** in order to accommodate an adjournment of the final hearing on approval of the entry into this Agreement and the other DIP Loan Documents on a final basis, the Borrower has sought an order of the Bankruptcy Court (the "Second Interim Order"), in form and substance satisfactory to the DIP Lender in its sole discretion, authorizing the Borrower to borrow the Second Interim DIP Loan (as defined in this Agreement) and further authorizing the Borrower to perform under the Agreement on an interim basis.~~

**WHEREAS,** on September 18, 2026, the Bankruptcy Court entered the *Second Interim Order (I) Authorizing the Debtor to (A) Obtain Postpetition Financing and (B) Grant Liens, Including Senior Secured Liens, and Superpriority Administrative Expense Claims; and (II) Modifying the Automatic Stay* [Docket No. 171] (the "Second Interim Order"), which further authorized the Borrower to perform under the DIP Loan Documents on an interim basis and to borrow $3,450,000 in accordance with the terms of the Second Interim Order (the "Second Interim DIP Loan").

**WHEREAS**, on September 23, 2026 (the "Second Funding Date"), the Second Interim DIP Loan was advanced to the Borrower pursuant to the terms of the Second Interim Order and the DIP Loan Documents.

**NOW, THEREFORE**, in consideration of the premises and of the mutual covenants and agreements contained herein, the parties hereto hereby agree as follows:

**1. DEFINITIONS AND CONSTRUCTION.**

1.1 **Definitions**. As used in this Agreement, the following terms shall have the meanings set forth below:

"Account Debtor" means a person obligated on an account, chattel paper or general intangible, as that term is defined in the UCC. This term does not include persons obligated to pay a negotiable instrument, even if the instrument constitutes part of chattel paper.

"Additional Documents" has the meaning set forth in Section 5.10.

"Affiliate" means, as to any Person, any other Person (a) that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person or (b) which, directly or indirectly through one or more intermediaries, is the beneficial or record owner (as defined in Rule 13d-3 of the Securities Exchange Act of 1934, as amended, as the same is in effect on the Petition Date) of ten percent (10%) or more of any class of the outstanding voting equity interests, securities or other equity or ownership interests of such Person. For purposes of this definition, the term "control" (and the correlative terms "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies, whether through ownership of securities or other interests, by contract or otherwise.

"Agreement" has the meaning set forth in the preamble hereof.

"Approved Budget" means, in each case, once certified by an Authorized Person and approved by the DIP Lender: (a) the Initial Budget; or, as applicable, (b) an amended or otherwise modified budget updated every four weeks on a rolling basis, with reconciliation on a line-item basis of actual results to projections, and with narrative explanation prepared by the Debtor of any material variances exceeding the Permitted Variance.

"Authorized Person" means any of the individuals identified on Schedule A-1, which may be updated from time to time by written notice from the Borrower to the DIP Lender.

"Avoidance Actions" means any and all avoidance, recovery, subordination, derivative or other claims, actions or remedies that may be brought by or on behalf of the Borrower or its estate or other authorized parties in interest under the Bankruptcy Code or other applicable law, including actions or remedies under sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code or under

similar, related or comparable state or federal statutes or common law, including fraudulent transfer laws, or under other applicable law.

"Bankruptcy Code" has the meaning set forth in the recitals to this Agreement.

"Bankruptcy Court" has the meaning set forth in the recitals to this Agreement.

"Borrowing Notice" has the meaning set forth in Section 2.2.

"Borrower" has the meaning set forth in the preamble to this Agreement.

"Business Day" means any day that is not Saturday, Sunday or another day on which banks are authorized or required to close in the State of New York, the State of Delaware or the Cayman Islands.

"Capital Expenditure" means, with respect to any Person for any period, any expenditure by such Person during such period that is a capital expenditure as determined in accordance with GAAP, whether such expenditure is paid in cash or financed.

"Capital Lease" means a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP as in effect prior to the adoption and effectiveness of Accounting Standards Codification No. 842 or any successor or replacement accounting provisions.

"Carve-Out" has the meaning set forth in the DIP Order.

"Change of Control" means the acquisition, through purchase or otherwise (including the agreement to act in concert without anything more), by any Person or group (as such term is used in section 13(d)(3) of the Securities Exchange Act of 1934, as amended), after the date of this Agreement, of (a) the beneficial ownership, directly or indirectly, of 100% of the voting equity interests of the Borrower or (b) all or substantially all of the assets of the Borrower, except as permitted in this Agreement.

"Chapter 11 Case" has the meaning set forth in the recitals to this Agreement.

"Closing Date" has the meaning set forth in the preamble to this Agreement.

"Closing Fee" means a fee equal to two percent (2.00%) of the First Interim DIP Loan, earned and non-refundable upon entry of the First Interim Order.

"Collateral" means, collectively, all of the Borrower's rights, title and interests in, to and under all its property, whether real or personal, tangible or intangible, now existing or hereafter acquired, including, without limitation, all real estate, inventory, equipment, fixtures, leasehold interests, commercial tort claims, deposit accounts, investment property, documents, accounts, chattel paper (whether electronic or tangible), intercompany loans, general intangibles (including patents, trademarks and other intellectual property), instruments, insurance policies, supporting obligations and proceeds of all of the foregoing and, subject to entry of the Final Order, the proceeds of any Avoidance Actions, but not such Avoidance Actions themselves.

"Commitment" means the commitment of the DIP Lender to make DIP Loans hereunder. The aggregate amount of the DIP Lender's Commitment is the principal amount of up to $5,700,000, subject to the terms of this Agreement and the DIP Order.

"Commitment Fee" means a fee equal to two percent (2.00%) of the undrawn principal amount of the Commitment, earned and non-refundable upon entry of the Final Order.

"Committee" means any statutory committee of unsecured creditors appointed by the Bankruptcy Court for cause in relation to the Chapter 11 Case.

"Confirmation Order" means a final order of the Bankruptcy Court, in form and substance acceptable to the DIP Lender, confirming the Subchapter V Plan.

"Contributed Claims" means the claims and causes of action (to be specified on a schedule to be mutually agreed by the DIP Lender and the Debtor) that the Foundation Parties have or may have against any third parties that arise from or are related to the launch of the $MOVE token, the Tripartite IP Licensing and Services Agreement, dated September 9, 2024, the Asset Transfer Agreement, dated November 26, 2025, and the Fenix Agreement.

"Daily Balance" means, as of any date of determination and with respect to any fixed monetary Obligations (which shall include interest accrued and paid-in-kind hereunder), the amount of such Obligations owed at the end of such day.

"Debtor" means the Borrower in its capacity as a debtor and debtor in possession in the Chapter 11 Case.

"Default" means an event, condition or default that, with the giving of notice, the passage of time, or both, would be an Event of Default, or any default under the terms of the DIP Order.

"Default Rate" has the meaning set forth in Section 2.5(b).

"Deposit Account" means any deposit account, as that term is defined in the UCC.

"Deposit Account Control Agreement" means, with respect to a Deposit Account, an agreement in form and substance reasonably satisfactory to the DIP Lender that (a) is entered into among the DIP Lender, the financial institution or other person at which such Deposit Account is maintained, and the Borrower maintaining such Deposit Account, and (b) is effective for the DIP Lender to obtain "control" (within the meaning of Articles 8 and 9 of the UCC) of such Deposit Account.

"Designated Account" means the Deposit Account of the Borrower identified on Schedule D-1, which shall be an account existing within the Borrower's cash-management system as of the Petition Date.

"Designated Account Bank" means the member FDIC institution designated on Schedule D-1.

"DIP Cash Collateral" means all of the Borrower's cash, including any cash in deposit accounts, wherever located, whether as original collateral or proceeds of other Collateral, as "cash collateral" of the DIP Lender within the meaning of section 363(a) of the Bankruptcy Code.

"DIP Facility" has the meaning set forth in the recitals to this Agreement.

"DIP Lender" has the meaning set forth in the preamble to this Agreement.

"DIP Lender Expenses" means all reasonable and documented (a) costs or expenses required to be paid by the Borrower under any of the DIP Loan Documents that are paid, advanced, or incurred by the DIP Lender; (b) out-of-pocket fees or charges paid or incurred by the DIP Lender in connection with

its transactions with the Borrower under any of the DIP Loan Documents, including, but not limited to, fees or charges for photocopying, notarization, couriers and messengers, telecommunication, public record searches (including tax lien, litigation, and UCC searches and including searches with the patent and trademark office, the copyright office, or the department of motor vehicles); (c) out-of-pocket costs and expenses incurred by the DIP Lender in the disbursement of funds to the Borrower (by wire transfer or otherwise); (d) out-of-pocket charges paid or incurred by the DIP Lender resulting from the dishonoring of checks payable by or to the Borrower; (e) out-of-pocket costs, fees and expenses paid or incurred by the DIP Lender to correct any default or enforce any provision of the DIP Loan Documents, or during the continuance of an Event of Default, in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the Collateral, or any portion thereof, irrespective of whether a sale is consummated; (f) out-of-pocket audit fees and reasonable and documented expenses of the DIP Lender (including travel, meals, and lodging) related to any inspections or audits; (g) out-of-pocket costs and expenses of third party claims or any other suit paid or incurred by the DIP Lender in enforcing or defending the DIP Loan Documents or in connection with the transactions contemplated by the DIP Loan Documents or the DIP Lender's relationship with the Borrower; (h) reasonable and documented out-of-pocket costs and expenses incurred by the DIP Lender in advising, structuring, drafting, reviewing, administering (including travel, meals, and lodging), amending, terminating, enforcing, or in exercising rights or remedies under the DIP Loan Documents; (i) reasonable and documented out-of-pocket fees and expenses of the DIP Lender (including travel, meals, and lodging) related to any due diligence in connection with the DIP Facility or meetings with the Borrower in connection with the DIP Facility; and (j) all reasonable and invoiced fees and expenses of the attorneys and other advisors of the DIP Lender in respect of the DIP Facility, without application to or approval of the Bankruptcy Court, and without the need for the DIP Lender or its professionals to provide time records or narrative descriptions of the work performed.

"DIP Loan" means each term loan advanced by the DIP Lender to the Borrower under this Agreement. The Interim DIP Loans and the Final DIP Loan shall be DIP Loans for purposes of this Agreement.

"DIP Loan Documents" means this Agreement, the DIP Order, the Additional Documents, and any other notes, account control agreements, financing statements or security agreements executed by the Borrower in connection with this Agreement in favor of the DIP Lender, any other agreement entered into, now or in the future, by the Borrower and the DIP Lender in connection with this Agreement and designated a DIP Loan Document, and all amendments, modifications, renewals, substitutions and replacements of any of the foregoing; *provided* that, for the avoidance of doubt, all DIP Loan Documents shall be in form and substance satisfactory to the DIP Lender.

"DIP Milestones" means the milestones listed in Section 5.17.

"DIP Order" means, as applicable, the Interim Orders or the Final Order.

"DIP Releases" mean releases and exculpations by the Borrower for the DIP Lender and each Foundation Party provided for in the Final Order, in form and substance acceptable to the DIP Lender, including, without limitation, releases from any claims against all Foundation Parties that may arise out of any prior conduct of the Foundation Parties, or any interaction or relationship (alleged or otherwise) with the Foundation Parties, including, for the avoidance of doubt, any Avoidance Actions; *provided*, *however*, that the releases shall not include any rights of the Debtor with respect to any breach by a Foundation Party of its obligations under the Fenix Agreement.

"Dollars" or "$" means United States dollars.

"Event of Default" has the meaning set forth in Section 8.1.

"Exit Conversion" means the conversion of the Obligations into the Exit Facility, without the payment of any fees that are not otherwise specified in the DIP Loan Documents, upon the Plan Effective Date.

"Exit Facility" means the exit loan facility to be provided for under the Subchapter V Plan, as will be set forth in the Exit Facility Documents, or, at the sole discretion of the DIP Lender, in the Subchapter V Plan and any other document related thereto.

"Exit Facility Documents" means the credit agreement and other documents, in form and substance reasonably acceptable to the DIP Lender, to implement the Exit Conversion; *provided*, that the credit agreement and other documentation shall provide for (until all obligations thereunder indefeasibly are repaid in cash in full) the accrual of quarterly interest paid-in-kind at the same interest rate as the DIP Loans and mandatory prepayments from amounts received by the Litigation Trust (subject to reserves for reasonable projections of ongoing fees and expenses of the Litigation Trust), and otherwise be on terms and conditions reasonably acceptable to the DIP Lender.

"Exit Fee" means a fee equal to two percent (2.00%) of the Commitment, fully earned on the date of the Final DIP Loan.

"Fees" means all fees due to the DIP Lender under this Agreement, any DIP Loan Document or the DIP Order, including, but not limited to, the Commitment Fee, the Closing Fee and the Exit Fee.

"Fenix Agreement" means the Project Fenix Termination and Settlement Agreement, dated as of December 2, 2025, by and between the Borrower, Movement Network Foundation and Movement Limited, as the same may be amended, modified, restated or supplemented from time to time.

"Final DIP Loan" has the meaning set forth in Section 2.1(c).

"Final Order" means the order of the Bankruptcy Court, in form and substance satisfactory to the DIP Lender in its sole discretion, authorizing and approving the Borrower's entry into this Agreement and the other DIP Loan Documents on a final basis, which order is not subject to a stay, injunction or other limitation not approved by the DIP Lender.

"First Interim DIP Loan" has the meaning set forth in the recitals to this Agreement.

"First Interim Order" has the meaning set forth in the recitals to this Agreement.

"Foundation Party" means each of the DIP Lender, Movement Network Foundation, Movement Limited, their affiliates and their current or future officers, employees, directors (and the employers of any independent directors), agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates and predecessors in interest, each in their capacity as such.

"GAAP" means generally accepted accounting principles in the United States of America in effect from time to time consistently applied (except for accounting changes in response to the Financial Accounting Standards Board release, or other authoritative pronouncements).

"Governmental Authority" means any federal, state, local, or other governmental or administrative body, instrumentality, board, department, or agency or any court, tribunal, administrative hearing body, arbitration panel, commission, or other similar dispute-resolving panel or body.

"Indebtedness" means (a) all obligations for borrowed money, including, without limitation, the Obligations; (b) all obligations evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations in respect of letters of credit, banker's acceptances, or other financial products; (c) all obligations as a lessee under Capital Leases; (d) all obligations or liabilities of others secured by a Lien on any asset of such Person, irrespective of whether such obligation or liability is assumed; (e) all payment obligations to pay the deferred purchase price of assets (other than trade payables incurred in the ordinary course of business and repayable in accordance with customary trade practices); (f) all indebtedness created or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to property acquired by such Person; (g) the principal balance outstanding under any synthetic lease, off-balance sheet loan or similar off-balance sheet financing products; or (h) any obligation guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other Person that constitutes Indebtedness under any of clauses (a) through (h) above. For purposes of this definition, (i) the amount of any Indebtedness represented by a guaranty or other similar instrument shall be the lesser of the principal amount of the obligations guaranteed and still outstanding and the maximum amount for which the guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Indebtedness, and (ii) the amount of any Indebtedness described in clause (d) above shall be the lower of the amount of the obligation and the fair market value of the assets of such Person securing such obligation.

"Information" has the meaning set forth in Section 18.

"Initial Budget" means the initial expense budget for the first four (4) months of the Chapter 11 Case prepared by the Borrower, a copy of which is annexed hereto as Exhibit A.

"Initial Funding Date" has the meaning set forth in the recitals to this Agreement.

"Interest Payment Date" means each March 31st, June 30th, September 30th and December 31st (or if such day is not a Business Day, the immediately preceding Business Day).

"Interim Orders" means, collectively, the First Interim Order and the Second Interim Order.

"Interim DIP Loans" means, collectively, the First Interim DIP Loan and the Second Interim DIP Loan.

"Lien" means any pledge, hypothecation, assignment (which is intended as security), charge, deposit arrangement (which is intended as security), encumbrance, easement, lien (statutory or other), mortgage, security interest, or other security arrangement and any other preference, priority, or preferential arrangement of any kind or nature whatsoever (which is intended as security), including any conditional sale contract or other title retention agreement, the interest of a lessor under a Capital Lease, and any synthetic or other financing lease having substantially the same economic effect as any of the foregoing.

"Litigation Trust" means a post-confirmation litigation trust to be established by the Subchapter V Plan for purposes of prosecuting claims against third parties held by, or assigned to, the Borrower.

"Loan Record" means the loan record maintained by the DIP Lender or its designee, in which shall be recorded the date and amount of each DIP Loan made by the DIP Lender and the amount of each payment in respect thereof.

"Manche" has the meaning set forth in the recitals to this Agreement.

"Manche Settlement" means the settlement, among the Debtor, Rushikesh Manche and certain Foundation Parties, as set forth in the Mediated Settlement Agreement dated as of September 28, 2026, to the extent such agreement is approved by the Bankruptcy Court.

"Material Adverse Change" means, any event, condition, circumstance or contingency that, individually or in the aggregate, (a) has had, or would reasonably be expected to have, a material adverse effect on the business, operations, properties, assets, performance or financial condition of the Borrower, taken as a whole, other than any change, event or occurrence, arising individually or in the aggregate, from events leading up to and that could reasonably be expected to result from the filing, commencement or continuation of the Chapter 11 Case or the announcement of the filing or commencement of the Chapter 11 Case, the effects thereof and any action required to be taken under the DIP Loan Documents or the DIP Order, and the Chapter 11 Case itself; (b) has resulted in, or would reasonably be expected to result in, a material adverse effect on the validity or enforceability of, or the rights, remedies or benefits available to the DIP Lender under this Agreement or the DIP Order (other than as permitted hereunder or as a result of an action or failure to take action by the DIP Lender) or of the DIP Lender's ability to enforce the Obligations or realize upon the Collateral; (c) has had or would reasonably be expected to have, a material adverse effect on the ability of the Borrower, taken as a whole, to perform its payment obligations under this Agreement or the DIP Order; or (d) a material impairment of the enforceability or priority of the DIP Lender's Liens with respect to the Collateral, taken as a whole, or the priority of such Liens.

"Material Contract" means each contract or agreement as to which the breach, nonperformance, cancellation, termination, loss, expiration or failure to renew by any party thereto would reasonably be expected to result in a Material Adverse Change.

"Maturity Date" means the earliest of:

(a) the date that is ~~80~~100 days after the Petition Date, unless the Final Order has been entered by the Bankruptcy Court on or prior to such date;

(b) the effective date of any plan of reorganization in the Chapter 11 Case, other than the Subchapter V Plan;

(c) the closing of any sale or other disposition of substantially all of the assets of the Borrower;

(d) the closing of any financing transaction that pays the Obligations in full;

(e) the conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code;

(f) the dismissal of the Chapter 11 Case by the Bankruptcy Court;

(g) the acceleration of the outstanding Obligations and termination of the Commitment, including as a result of the occurrence and continuation of an Event of Default; and

(h) the date that is 75 days after the entry of the Final Order.

"Maturity Event" means each of the events listed in the definition of "Maturity Date".

"Net Cash Proceeds" means with respect to any sale or disposition of the Collateral, in whole or in part, by any Person, the amount of cash proceeds received (directly or indirectly) from time to time (whether as initial consideration or through the payment of deferred consideration) by or on behalf of such Person, in connection therewith, after deducting therefrom only (a) fees, commissions, and expenses related thereto and required to be paid in connection with such sale or disposition and (b) taxes paid or payable to any taxing authorities in connection with such sale or disposition, in each case, only to the extent, that the amounts so deducted are payable to a Person that is not the Borrower or an Affiliate of the Borrower, and are properly attributable to such transaction.

"Obligations" means all obligations owing by the Borrower to the DIP Lender under this Agreement, the DIP Order or any DIP Loan Document, including, without limitation, the DIP Loans, debts, principal, interest, reimbursement or indemnification obligations, liabilities (including all amounts charged to the Loan Record pursuant to this Agreement), Fees (including the Commitment Fee, Closing Fee and the Exit Fee), the DIP Lender Expenses, premiums, costs, expenses and indemnities, whether primary, secondary, direct, indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise, guaranties, covenants and duties of any kind and description, in each case, irrespective of whether for the payment of money, and including, without limitation, in connection with collection, enforcement or preservation of the rights of the DIP Lender under the DIP Loan Documents.

"Ordinary Course" and "Ordinary Course of Business" shall mean, in respect of any Person, the ordinary course and reasonable requirements of such Person's business, as conducted in accordance with past practices, and undertaken in good faith except as such conduct has been changed resulting from the filing of the Chapter 11 Case.

"Organizational Documents" means (a) for any corporation, the certificate or articles of incorporation, the bylaws, any certificate of designation or other instrument relating to the rights of preferred shareholders or stockholders of such corporation, any shareholder rights agreement and all applicable resolutions of the board of directors (or any committee thereof) of such corporation; (b) for any partnership, the partnership agreement and, if applicable, the certificate of limited partnership; (c) for any limited liability company, the operating agreement or limited liability company agreement and articles or certificate of formation or organization and all applicable resolutions of any managing member of such limited liability company; and (d) any agreement between the Borrower and its shareholders, members, partners or its equity owners, or among any of the foregoing relating to the governance of the Borrower.

"Payment Account" means the Deposit Account of the DIP Lender identified on Schedule A-2, or otherwise identified to the Borrower in writing by the DIP Lender.

"Permit" means any license, lease, power, permit, franchise, certificate, authorization, or approval issued by a Governmental Authority.

"Permitted Indebtedness" has the meaning set forth in Section 6.1.

"Permitted Prior Liens" means valid, enforceable and non-avoidable Liens on the Collateral that are in existence on the Petition Date and (a) are either perfected as of the Petition Date or perfected on or after the Petition Date solely to the extent permitted by section 546(b) of the Bankruptcy Code and (b)

are not subject to avoidance, disallowance, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

"Permitted Protest" means the right of the Borrower to protest any Lien (other than any Lien that secures the Obligations), taxes (other than payroll taxes or taxes that are the subject of a United States federal tax lien), or rental payment, *provided* that (a) a reserve with respect to such obligation is established on the Borrower's books and records in such amount as is required under GAAP, (b) any such protest is instituted promptly and prosecuted diligently by the Borrower in good faith, and (c) the DIP Lender is satisfied in its sole discretion that, while any such protest is pending, there will be no impairment of the enforceability, validity or priority of any of DIP Lender's Liens.

"Permitted Transfers" means collectively (i) the sale or disposition of cash equivalents for fair market value and in a manner that is not otherwise prohibited by this Agreement or the DIP Loan Documents and (ii) the settlement of claims and causes of action of the Debtor in accordance with the terms of the Manche Settlement.

"Permitted Variance" means a twenty-five percent (25%) or less variance of cumulative disbursements from the Approved Budget (other than variances in the line item for the fees and expenses of the DIP Lender's professional advisors) for each four-week period set forth on an Approved Budget.

"Person" means any natural person, corporation, limited liability company, limited partnership, general partnership, limited liability partnership, joint venture, trust, land trust, business or statutory trust, or other organization, irrespective of whether constituting a separate legal entity, and governments and agencies and political subdivisions thereof.

"Petition Date" has the meaning set forth in the recitals to this Agreement.

"Plan Effective Date" means the date of the substantial consummation (as defined in section 1101(2) of the Bankruptcy Code) of the Subchapter V Plan.

"Prepayment" has the meaning set forth in Section 2.4(c).

"Professional Fees" means all unpaid fees and expenses incurred by persons or firms retained by (a) the Borrower pursuant to sections 327, 328, 329, 330, 331, 363, or 503(b)(4) of the Bankruptcy Code; (b) any Committee (if appointed) pursuant to sections 328, 1103, or 1181(b) of the Bankruptcy Code; or (c) the Subchapter V trustee pursuant to 327 or 328; *provided* that, to the extent that any amount of the foregoing compensation or reimbursement is denied or reduced by the Bankruptcy Court or any other court of competent jurisdiction, such amount shall no longer constitute Professional Fees.

"Record" means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

"Remedies Notice Period" has the meaning set forth in the DIP Order.

"Required Lien Priority" has the meaning set forth in Section 10.1(a)(iii).

"Restricted Purpose" shall mean (a) any purpose that is prohibited under the Bankruptcy Code or the Interim Orders or the Final Order, (b) to investigate, commence, prosecute, join in, or finance in any way (or reimburse for expenses incurred or to be incurred in connection with) any action, suit, arbitration, proceeding, application, motion, objection or other litigation adverse to the interests of the DIP Lender or any Foundation Party, including with respect or related to (i) the claims, liens or security interest of the DIP Lender, or its rights and remedies under the Interim Orders or the Final Order, as the

case may be, including to commence or prosecute or join in any action against the DIP Lender seeking (x) to avoid, subordinate or recharacterize the Obligations, (y) any monetary, injunctive or other affirmative relief against the DIP Lender or (z) to prevent or restrict the exercise by the DIP Lender of any of its rights or remedies under the Interim Orders or the Final Order, (ii) any claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness or obligations that are the subject of the DIP Releases, (iii) the stipulations, if any, made by the Borrower and approved by the DIP Order or (iv) any other action which with the giving of notice or passing of time would result in an Event of Default under the DIP Loan Documents.

"Schedules" means those certain schedules annexed hereto and made a part hereof.

"Second Funding Date" has the meaning set forth in the recitals to this Agreement.

"Second Interim DIP Loan" has the meaning set forth in ~~Section 2.1(a)~~the recitals to this Agreement.

"Second Interim Order" has the meaning set forth in the recitals to this Agreement.

"Security Documents" means (a) all UCC financing statements, or amendments or continuations thereof, and (b) all other security agreements, Deposit Account Control Agreements, documents or filings in connection with the perfection of the Liens granted or pledged pursuant to the terms of this Agreement, any other DIP Loan Document or the DIP Order, as same may be amended, modified, restated or supplemented from time to time.

"Subchapter V Plan" means a plan under subchapter V of Chapter 11 of the Bankruptcy Code in form and substance acceptable to the DIP Lender, in its sole discretion, and containing, without limitation, the following terms:

(a) Creation of the Litigation Trust; *provided*, *however*, that the Litigation Trust shall have no authority to investigate, commence, prosecute, join in or finance in any way (or reimburse for expenses incurred or to be incurred in connection with) any action, suit, arbitration, proceeding, application, motion, objection or other litigation adverse to the Foundation Parties;

(b) The DIP Lender shall allow all DIP Cash Collateral to be contributed on the Plan Effective Date to the Litigation Trust;

(c) The occurrence of the Exit Conversion on the Plan Effective Date;

(d) The Litigation Trust agreement, in form and substance consented to by the DIP Lender, with such consent not to be unreasonably withheld, shall have been executed and delivered;

(e) The trustee of the Litigation Trust shall be a person acceptable to the DIP Lender in its sole discretion, it being understood by the parties that the selection of David Dunn as trustee would be acceptable to the DIP Lender;

(f) Full releases by the Borrower of all Foundation Parties;

(g) The Foundation Parties shall contribute to the Litigation Trust the Contributed Claims; *provided*, *however*, that the contribution shall be structured so as to permit the Foundation Parties to retain the benefit of any claims or causes of action they may have to the extent that they may be used as counterclaims in the event of litigation against the Foundation Parties by any third party;

*provided*, *further*, that Foundation shall be entitled to receive 33% of any recovery realized by the Litigation Trust in an amount greater than $12.5 million and less than or equal to $33.5 million;

(h) Upon contribution of the Contributed Claims by the Foundation Parties to the Litigation Trust, full releases by the Debtor of: (i) Cooper Scanlon, (ii) Joseph Golding-Ochsner, (iii) Ruby Sekhon, (iv) Move Ind. Inc., and all of its officers, directors and employees, including Torab Arya and (v) additional parties as the Borrower and the DIP Lender may agree; *provided*, *however*, that such releases shall not release any claims that the Borrower may have to avoid or recover excess or inadvertent payroll payments made to former employees of the Borrower; and

(i) All Liens, Superpriority Claims, and other protections in favor of the DIP Lender shall survive confirmation and remain in full force and effect until all Obligations are indefeasibly paid in full in cash in accordance with the terms of the DIP Loan Documents, the Subchapter V Plan and the Exit Facility documentation.

"Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company, association, or other business entity of which more than fifty percent (50%) of the total voting power of shares of stock (or equivalent ownership or controlling interest) entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, governors, or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof.

"Superpriority Claims" has the meaning set forth in Section 10.1(a)(i).

"UCC" means the Uniform Commercial Code as in effect in the State of New York; *provided*, that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection, or non-perfection or priority.

"United States" means the United States of America.

"Variance Report" means a report, which shall be certified in writing by an Authorized Person of the Borrower as being true and accurate, and shall (i) detail the variance, if any, of actual disbursements for each four-week period of an Approved Budget as compared to the budgeted disbursements for such period, and (ii) contain a written explanation of all variances greater than twenty-five percent (25%).

"Voidable Transfer" has the meaning set forth in Section 15.7.

1.2 **Accounting Terms**. All accounting terms not specifically defined herein shall be construed in accordance with GAAP; *provided* that, if the Borrower notifies the DIP Lender that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the DIP Lender notifies the Borrower that the DIP Lender requests an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then the DIP Lender and the Borrower agree that they will negotiate in good faith amendments to the provisions of this Agreement that are directly affected by such change in GAAP with the intent of having the respective positions of the DIP Lender and the Borrower after such change in GAAP conform as nearly as possible to their respective positions as of the date of this Agreement and, until any such amendments have been agreed upon, the provisions in this Agreement shall be interpreted

on the basis of GAAP as in effect and applied immediately before such change shall have become effective. When used herein, the term "financial statements" shall include the notes and schedules thereto.

1.3 **UCC**. Any terms used in this Agreement that are defined in the UCC shall be construed and defined as set forth in the UCC unless otherwise defined herein; *provided*, that to the extent that the UCC is used to define any term herein and such term is defined differently in different Articles of the UCC, the definition of such term contained in Article 9 of the UCC shall govern.

1.4 **Construction**. Unless the context of this Agreement or the DIP Loan Documents clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the terms "includes" and "including" are not limiting, and the term "or" has, except as otherwise indicated, the inclusive meaning represented by the phrase "and/or." The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement or the DIP Loan Documents refer to this Agreement or such other DIP Loan Document, as the case may be, as a whole, and not to any particular provision of this Agreement or such other DIP Loan Document, as the case may be. Section, subsection, clause, schedule, and exhibit references herein are to this Agreement unless otherwise specified. Any reference in this Agreement or in any other DIP Loan Document to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein). The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts, and contract rights. Any reference herein or in any other DIP Loan Document to the satisfaction, repayment, or payment in full in cash of the Obligations shall mean the repayment in full in cash of all Obligations other than unasserted contingent indemnification Obligations (with all such Obligations consisting of monetary or payment Obligations having been indefeasibly paid in full in cash). Any reference herein to any Person shall be construed to include such Person's successors and permitted assigns. Any requirement of a writing contained herein or in any DIP Loan Document shall be satisfied by the transmission of a Record.

1.5 **Schedules and Exhibits**. All of the schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference.

## 2. LOAN AND TERMS OF PAYMENT.

2.1 **Agreement to Lend; Security Documents; and DIP Loan Documents**.

(a) Subject to the terms and conditions of the First Interim Order, this Agreement, and the satisfaction or waiver of the conditions precedent in Sections 3.1, the DIP Lender made the First Interim DIP Loan on the Initial Funding Date. Subject to the terms and conditions of the Second Interim Order and this Agreement, the DIP Lender ~~agrees to make a new money term loan to the Borrower in aggregate principal amount equal to $3,450,000 (the "~~made the Second Interim DIP Loan~~"), which shall be funded as a single disbursement within seven days after the entry of~~ on the Second ~~Interim Order (the "Second~~ Funding Date~~")~~.

(b) [Reserved].

(c) Subject to the terms and conditions of the DIP Order, this Agreement, the Confirmation Order and the satisfaction or waiver of the conditions precedent in Section 3.1 and

Section 3.2, the DIP Lender agrees to make a new money term loan to the Borrower in aggregate principal amount equal to $1,500,000 (the "Final DIP Loan").

(d) Each borrowing of DIP Loans shall permanently decrease the Commitment, and any Loan, or portion thereof, that is repaid or prepaid (whether as an optional prepayment or a mandatory prepayment) cannot be reborrowed.

(e) The DIP Loans shall be secured by the Collateral as set forth in this Agreement, the DIP Order and the other DIP Loan Documents.

(f) The Borrower promises to indefeasibly pay the Obligations (including principal, interest, fees, costs, and expenses) in full in cash (including, as applicable, the Commitment Fee, Closing Fee and the Exit Fee) on the Maturity Date.

2.2 **Borrowing Procedures**. Each borrowing under Section 2.1 shall be made by a written request substantially in the form of the Borrowing Notice attached hereto as Exhibit D (each such written request, a "Borrowing Notice") executed by an Authorized Person of the Borrower, and delivered to the DIP Lender no later than three (3) Business Days prior to the requested funding date, or such shorter time as may be agreed by the DIP Lender. Upon satisfaction or waiver of the conditions precedent specified in this Agreement, the DIP Lender shall make the proceeds of the relevant DIP Loan available to the Borrower on the requested funding date by causing the principal amount of the relevant borrowing to be credited to the Designated Account or, subject to the consent of the DIP Lender, another Deposit Account of the Borrower notified in writing to the DIP Lender.

2.3 **[Reserved]**.

2.4 **Payments; Reductions of the Commitment; Prepayments**.

(a) Payments by Borrower. Except as otherwise expressly provided herein, all payments by the Borrower that are required to be paid in cash shall be made to the Payment Account for the account of the DIP Lender and shall be made in immediately available funds, no later than 4:00 p.m. (prevailing Eastern Time) on the dates when such payments are due and payable hereunder. Any payment received by the DIP Lender later than 4:00 p.m. (prevailing Eastern Time) shall be deemed to have been received on the following Business Day and any applicable interest or fee shall continue to accrue until such following Business Day.

(b) Application of Payments and Proceeds. Except as set forth in Section 8.3, all payments remitted to the DIP Lender and all proceeds of the Collateral received by the DIP Lender shall be applied as follows (unless otherwise directed by the DIP Lender):

(i) *first*, to pay any DIP Lender Expenses then owed to the DIP Lender (or any of its officers, directors, employees, attorneys, representatives or agents) in accordance with the DIP Order, or indemnities then due to the DIP Lender under the DIP Loan Documents, until indefeasibly paid in full in cash;

(ii) *second*, to pay any Fees then due to the DIP Lender under the DIP Loan Documents until indefeasibly paid in full in cash;

(iii) *third*, to pay uncapitalized interest due in respect of the DIP Loans until indefeasibly paid in full in cash;

(iv) *fourth*, to pay the principal of all DIP Loans until indefeasibly paid in full in cash;

(v) *fifth*, to pay any other Obligations until indefeasibly paid in full in cash; and

(vi) *sixth*, to the Borrower (to be wired to the Designated Account) or as otherwise required by applicable law.

In the event of a direct conflict between the priority provisions of this Section 2.4(b) and any other provision contained in any DIP Loan Document (except for the DIP Order), it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 2.4(b) shall control and govern. Notwithstanding the foregoing, to the extent there is a conflict between the DIP Order and any DIP Loan Document, the DIP Order shall control and govern.

(c) Optional Prepayments. After the entry of the Final Order, upon three (3) Business Days' prior written notice to the DIP Lender (or such shorter period agreed to by the DIP Lender), the Borrower may prepay in cash (the "Prepayment") all DIP Loans and Obligations under the DIP Loan Documents (including, for the avoidance of doubt, any unpaid DIP Lender Expenses), *plus* the amount (if any) by which (i) the interest that was to be capitalized pursuant to Section 2.5 in respect of the DIP Loans that are being prepaid for the period from the first date of funding of such DIP Loans to the date that is 120 days after the Petition Date *exceeds* (ii) the sum of the amount of interest that was actually capitalized pursuant to Section 2.5(a) with respect to the Prepayment *plus* the amount that the DIP Lender would be able to obtain by placing an amount equal to the principal amount that is prepaid on deposit with a leading bank in the interbank market for a period starting on the business day following the Prepayment and ending on the date that is 120 days after the Petition Date.

(d) Mandatory Prepayments.

(i) *Dispositions*. Except with respect to any Permitted Transfer, within one (1) Business Day of the date of receipt by the Borrower of the Net Cash Proceeds of any disposition (whether through a voluntary or involuntary sale, the loss, destruction or damage thereof or any actual condemnation, confiscation, requisition, seizure or taking thereof or otherwise) of Collateral described in Section 6.4, the Borrower shall prepay such portion of the outstanding amount of the Obligations in accordance with Section 2.4(b) in an amount equal to 100% of the Net Cash Proceeds (including insurance proceeds, condemnation awards, and payments in lieu thereof) received in connection with such sales or dispositions, *plus* the accrued interest and Exit Fee as applied to the amount of such prepayment. Nothing contained in this Section 2.4(d)(i) shall permit the Borrower to sell any Collateral other than in accordance with Section 6.4. In no event shall any amount paid to the DIP Lender under this Section 2.4(d)(i) exceed the outstanding amount of the Obligations.

(ii) *Indebtedness*. Within one (1) Business Day of the date on which the Borrower receives proceeds of any Indebtedness (other than Permitted Indebtedness), the Borrower shall prepay the outstanding principal amount of the Obligations in accordance with Section 2.4(b) in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection with the incurrence of such Indebtedness *plus* the accrued interest and Exit Fee as applied to the principal amount of such prepayment. The provisions of this Section 2.4(d)(ii)

shall not be deemed to be implied consent to any such incurrence otherwise prohibited by the terms and conditions of this Agreement.

2.5 **Interest Rates and Rates, Payments and Calculations**.

(a) Interest Rate. Except as provided in Section 2.5(b), (x) prior to the entry of the Final Order, the Interim DIP Loans shall bear interest on the Daily Balance thereof at a rate equal to fifteen and one-half percent (15.5%) per annum and (y) on and after the date of the entry of the Final Order, all DIP Loans (including, for the avoidance of doubt, the Interim DIP Loans) shall bear interest on the Daily Balance thereof at a rate equal to ten and one-half percent (10.5%) per annum.

(b) Default Rate. Upon the occurrence and during the continuation of an Event of Default, all Obligations shall bear interest on the Daily Balance thereof at a per annum rate equal to two percent (2.0%) *plus* the then-applicable interest rate (the "Default Rate").

(c) Payment. Except to the extent provided to the contrary herein or as provided for in the DIP Order, the Commitment Fee, the Closing Fee and the Exit Fee, and any other fees payable hereunder or under any of the other DIP Loan Documents shall be due and payable in kind on the date any such amounts are owed, subject to the procedures set forth in the DIP Order (to the extent applicable). Interest shall be paid in kind on the applicable Interest Payment Date, and such interest amount shall be added to the principal amount of the applicable DIP Loan. DIP Lender Expenses, and any other costs and expenses payable hereunder or under any of the other DIP Loan Documents shall be due and payable in cash on the date any such amounts are owed, subject to the procedures set forth in the DIP Order.

(d) Computation. All interest and fees chargeable under the DIP Loan Documents shall be computed on the basis of a 360-day year, in each case, for the actual number of days elapsed in the period during which the interest or fees accrue.

(e) Intent to Limit Charges to Maximum Lawful Rate. In no event shall the interest rate or rates payable under this Agreement, *plus* any other amounts paid in connection herewith, exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable. The Borrower and the DIP Lender, in executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and manner of payment stated within it; *provided* that anything contained herein to the contrary notwithstanding, if said rate or rates of interest or manner of payment exceed the maximum allowable under applicable law, then, *ipso facto*, as of the date of this Agreement, the Borrower is and shall be liable only for the payment of such maximum as allowed by law, and payment received from the Borrower in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the Obligations to the extent of such excess.

2.6 **Crediting Payments; Clearance Charge**. The receipt of any payment item by the DIP Lender shall not be considered a payment on account unless such payment item is a wire transfer of immediately available funds made to the Payment Account or unless and until such payment item is honored when presented for payment. Should any payment item not be honored when presented for payment, then the Borrower shall be deemed not to have made such payment and interest shall be calculated accordingly. Anything to the contrary contained herein notwithstanding, any payment item shall be deemed received by the DIP Lender only if it is received into the Payment Account on a Business Day on or before 4:00 p.m. (prevailing Eastern Time). If any payment item is received into the Payment Account on a non-Business Day or after 4:00 p.m. (prevailing Eastern Time) on a Business Day,

it shall be deemed to have been received by the DIP Lender as of the opening of business on the immediately following Business Day.

2.7 **Designated Account**. The Borrower hereby agrees to maintain the Designated Account with the Designated Account Bank and to receive the proceeds of the DIP Loans requested by the Borrower and made by the DIP Lender hereunder in such Designated Account, unless the Borrower changes the Designated Account and the Designated Account Bank with the DIP Lender's consent.

2.8 **Statements of Obligations**. The DIP Lender shall maintain true, correct and complete electronic or written records evidencing the Indebtedness and other Obligations owed by the Borrower to the DIP Lender, in which the DIP Lender will record in the Loan Record (a) the amount of all DIP Loans made under this Agreement, (b) the amount of any principal or interest due and payable or to become due and payable from the Borrower to the DIP Lender under this Agreement, and (c) all amounts received by the DIP Lender under this Agreement from the Borrower.

2.9 **Fees**.

(a) Commitment Fee. The Borrower shall pay to the DIP Lender the Commitment Fee monthly. The Commitment Fee shall be paid monthly in kind and added to the outstanding principal amount of the DIP Loans on the applicable payment date.

(b) Closing Fee. The Borrower shall pay to the DIP Lender the Closing Fee on the Closing Date, which shall be paid in kind and added to the outstanding principal amount of the DIP Loans.

(c) Exit Fee. The Borrower shall pay to the DIP Lender the Exit Fee, which shall be paid in kind on the date of the Final DIP Loan, unless the Subchapter V Plan provides for other treatment of the Exit Fee, or the Obligations have otherwise been indefeasibly paid in full in cash.

Except as otherwise expressly set forth herein, in the DIP Order, or in any of the other DIP Loan Documents, the Fees payable to the DIP Lender under this Agreement, the DIP Order, or any of the other DIP Loan Documents shall not be subject to proration and shall be non-refundable and non-avoidable obligations of the Borrower.

## 3. CONDITIONS; TERM OF AGREEMENT.

3.1 **Conditions Precedent to Each DIP Loan**. The effectiveness of this Agreement, and the agreement of the DIP Lender hereunder to make any DIP Loan, shall be subject to the satisfaction of the conditions specified below (unless waived in writing by the DIP Lender in its sole discretion); *provided, however*, that the agreement of the DIP Lender to make the Final DIP Loan is subject to Section 3.2:

(a) Chapter 11 Case. The Chapter 11 Case shall be pending in the Bankruptcy Court.

(b) Approved Budget. Other than with respect to the First Interim DIP Loan, the DIP Lender shall have received from the Borrower an Approved Budget to the extent required to be delivered by Section 5.2(b) on or before the making of such borrowing, which such updated Approved Budget shall be subject to Section 5.2(b) and the DIP Order.

(c) DIP Order. The Interim Orders (with respect to the Interim DIP Loans) or the Final Order (with respect to any other DIP Loan), each in form and substance satisfactory to the DIP Lender, shall (i) have been entered by the Bankruptcy Court and be in full force and effect and shall not

have been appealed, vacated, reversed, modified, amended or stayed, and (ii) grant for the benefit of the DIP Lender a perfected lien on the Collateral on the terms and conditions and, with the requisite priority, set forth herein and in the other DIP Loan Documents.

(d) Credit Agreement and Other DIP Loan Documents. The parties shall have executed and delivered this Agreement, the DIP Loan Documents, and all other documents required by the DIP Lender as a condition to the Initial Funding Date and in connection with the transactions contemplated by this Agreement, and each shall be in form and substance reasonably satisfactory to the DIP Lender.

(e) No Default. No Default or Event of Default (or any event that would give rise to a Default or Event of Default after the passage of time) shall have occurred and be continuing immediately prior to, or after giving effect to, the making of any DIP Loan, or would immediately result from this Agreement or the other DIP Loan Documents becoming effective in accordance with its or their respective terms.

(f) Representations and Warranties. The representations and warranties of the Borrower contained in this Agreement and in any other DIP Loan Documents shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the date of funding any DIP Loan, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date).

(g) No Stay. The making of any DIP Loan shall not violate any requirement of law, shall not be subject to a pending appeal, and shall not be enjoined temporarily, preliminarily or permanently.

(h) No Excess Funding. The making of any DIP Loan shall not result in the aggregate outstanding obligations under the DIP Facility exceeding the amount authorized under the Interim Orders (with respect to the Interim DIP Loans) or the Final Order (with respect to any other DIP Loan).

(i) DIP Milestones. The Borrower shall be in compliance with the DIP Milestones.

(j) Officer's Certificate. The DIP Lender shall have received, in form and substance satisfactory to the DIP Lender, a certificate of the Borrower, dated as of the Closing Date and certified by an Authorized Person of the Borrower, which shall attach resolutions of the governing body of the Borrower approving the transactions and each DIP Loan Document to which it is or is to be a party.

(k) Fees and Expenses. As of the date of the entry of the Second Interim Order, all accrued and unpaid DIP Lender Expenses for which invoices have been presented (and such invoices shall contain information only to the extent required by Paragraph 25 of the First Interim Order) and all accrued DIP Lender Expenses required to be paid shall have been paid (or shall be paid simultaneously with the borrowing).

(l) Compliance with the DIP Loan Documents. The Borrower shall be in compliance in all respects with the DIP Loan Documents.

(m) Borrowing Notice. The DIP Lender shall have received a fully executed and delivered Borrowing Notice from the Borrower in accordance with Section 2.2.

(n) Trustee or Examiner. (i) No trustee with enlarged powers (beyond those set forth in section 1183(b)(1)–(4), (7) and (c) of the Bankruptcy Code) shall have been appointed in the Chapter 11 Case, and (ii) no Person other than the Borrower shall have been granted control over the Collateral by the Bankruptcy Court in the Chapter 11 Case.

3.2 **Conditions Precedent to Final DIP Loan**. The agreement of the DIP Lender to make the Final DIP Loan shall not become effective unless and until:

(a) all of the conditions specified in Section 3.1 have been satisfied (unless waived in writing by the DIP Lender in its sole discretion);

(b) the Bankruptcy Court shall have entered the Confirmation Order, and such order shall have become a final non-appealable order; and

(c) to the extent not already assumed, the Fenix Agreement shall have been assumed by the Debtor.

3.3 **Maturity**.

(a) This Agreement shall continue in full force and effect until the indefeasible payment in full in cash of the Obligations (other than continuing Obligations with respect to indemnification), including, without limitation, the outstanding unpaid principal balance, all accrued and unpaid (or uncapitalized) interest on the DIP Loans and all uncapitalized Fees.

(b) Upon a Maturity Event, the Debtor shall repay the DIP Lender, indefeasibly and in full, the aggregate principal amount of all DIP Loans outstanding on such date, together with all accrued and unpaid interest on the principal amount of the DIP Loans and all fees, expenses, and other Obligations payable under the DIP Facility.

3.4 **Effect of Maturity**. Upon a Maturity Event, the Commitment of the DIP Lender to provide any additional credit or other accommodations under the DIP Loan Documents automatically shall terminate and all Obligations (other than continuing Obligations with respect to indemnification) immediately shall become due and payable without notice or demand. No termination of the obligations of the DIP Lender (other than payment in full in cash of the Obligations and termination of the Commitment) shall relieve or discharge the Borrower of its duties, obligations, or covenants hereunder or under any DIP Loan Document, and the DIP Lender's Liens in the Collateral shall continue to secure the Obligations and shall remain in effect until all Obligations (other than continuing Obligations with respect to indemnification) indefeasibly have been paid in full in cash and the Commitment has been terminated. When all of the Obligations (other than continuing Obligations with respect to indemnification) indefeasibly have been paid in full in cash and the DIP Lender has no further obligation hereunder to fund further DIP Loans, the DIP Lender, at the Borrower's expense, will execute and deliver any payoff letters, termination statements, lien releases, discharges of security interests and other similar discharge or release documents (and, if applicable, in recordable form) as are reasonably necessary to evidence and confirm the repayment in full of the Obligations (other than continuing Obligations with respect to indemnification) and to release, as of record, the DIP Lender's Liens and all notices of security interests and Liens previously filed by the DIP Lender with respect to the Obligations.

## 4. REPRESENTATIONS AND WARRANTIES.

In order to induce the DIP Lender to enter into this Agreement, the Borrower makes the following representations and warranties to the DIP Lender. The Borrower further represents that such

representations and warranties shall be true, correct and complete, in all material respects, as of the Closing Date, and shall be true, correct and complete, in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that are already qualified or modified by materiality in the text thereof), as of the date of the making of each DIP Loan (or other extension of credit) made thereafter, as though made on and as of the date of such DIP Loan (or other extension of credit) (except to the extent that such representations and warranties relate solely to an earlier date) and such representations and warranties shall survive the execution and delivery of this Agreement until all Obligations indefeasibly have been paid in full in cash:

4.1 **Due Organization and Qualification**. The Borrower (a) is duly formed and existing under the laws of the jurisdiction of its formation and (b) subject to the Bankruptcy Court's entry of the DIP Order and any limitation under the Bankruptcy Code or other debtor relief law, has all requisite power and authority to own and operate its property, to carry on its business as now conducted and as proposed to be conducted, to enter into the DIP Loan Documents to which it is a party and to carry out the transactions contemplated thereby.

4.2 **Due Authorization**. The execution, delivery and performance by the Borrower of the DIP Loan Documents to which it is a party have been duly authorized by all necessary corporate or limited liability company action on the part of the Borrower and is subject only to the Bankruptcy Court's entry of the DIP Order.

4.3 **Binding Obligations**. Each DIP Loan Document has been duly executed and delivered by the Borrower and, subject to the entry of the DIP Order, is the legally valid and binding obligation of the Borrower, enforceable against the Borrower in accordance with its respective terms.

4.4 **Title to Properties**. The Borrower has good, sufficient and legal title to (and in the case of personal property, good and marketable title to) all of the Borrower's right, interest and title in the Collateral, subject to no other Liens as of the Petition Date.

4.5 **Accuracy of Information**. All financial statements and information delivered by the Borrower to the DIP Lender and the Foundation Parties are true, correct and complete in all material respects.

4.6 **Fraudulent Transfer**. No transfer of property is being made by the Borrower, and no obligation is being incurred by the Borrower in connection with the transactions contemplated by this Agreement or the DIP Loan Documents, with the intent to hinder, delay or defraud either present or future creditors of the Borrower.

4.7 **Indebtedness**. The Borrower has no material Indebtedness outstanding as of the Petition Date, except as disclosed in documents filed in the Bankruptcy Court on the Petition Date.

4.8 **Approved Budget**. Attached to this Agreement as Exhibit A is a true and complete copy of the Approved Budget as of the Closing Date. The Approved Budget may be amended or otherwise modified from time to time in accordance with the procedures specified in Section 5.2(b) of this Agreement; *provided, however,* that, the total amount of DIP Loans provided pursuant to the Initial Budget shall not exceed the total amount of the Commitment that is available as Interim DIP Loans.

4.9 **Bank Accounts**. The Designated Account is maintained solely in the Borrower's name, and the Borrower is the sole legal and beneficial owner of the Designated Account, free and clear of any Lien, right of setoff, claim, co-ownership interest, trust or fiduciary arrangement, or the interest, authority or control of any other Person, other than (i) any Liens securing the Obligations and (ii) customary rights

of setoff, banker's liens or similar rights in favor of the Designated Account Bank, arising solely under the Designated Account Bank's standard account terms or applicable law in the Ordinary Course and securing only customary fees, service charges, chargebacks and overdrafts incidental to the maintenance and operation of the Designated Account. No Person other than the Borrower and the DIP Lender has signatory authority, withdrawal or transfer rights, or "control" (within the meaning of Article 9 of the UCC) over the Designated Account, and the Designated Account and any funds or property credited thereto are not subject to any garnishment, attachment, restraining order, freeze, hold, recoupment or other legal or contractual restriction, claim or process imposed by any Person, including any Governmental Authority, other than in favor of the DIP Lender. No funds or property of any Person other than the Borrower are commingled with, deposited into or held in the Designated Account. The Borrower does not act as agent, custodian, bailee or trustee for any other Person with respect to the Designated Account or the funds or property therein, and no other Person acts as agent, custodian, bailee or trustee for the Borrower with respect to the Designated Account or the funds or property therein.

4.10 **No Other Representations**. Except for the representations and warranties contained in this Article 4 (including the related portions of the Schedules), the Borrower or any other Person do not make and have not made any other express or implied representation or warranty, either written or oral, on behalf of the Borrower. The DIP Lender hereby acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, the DIP Lender has relied solely upon its own investigation and the express representations and warranties of the Borrower set forth in this Article 4 (including the related portions of the Schedules); and (b) the Borrower or any other Person has not made any representation or warranty except as expressly set forth in this Article 4 (including the related portions of the Schedules).

## 5. AFFIRMATIVE COVENANTS.

The Borrower hereby covenants and agrees that, until termination of the Commitment and indefeasible payment in full in cash of the Obligations (other than continuing Obligations with respect to indemnification), it shall comply with each of the following, as applicable:

5.1 **Notice of Certain Events**. The Borrower shall deliver to the DIP Lender (a) promptly, but in any event within one (1) Business Day, upon becoming aware of any Default or Event of Default, notice of such Default or Event of Default; and (b) promptly, but in any event within three (3) Business Days, upon becoming aware of any litigation threatened in writing against the Borrower or filed (other than any adversary proceeding or other pleading filed in the Chapter 11 Case), or any event (other than events of public knowledge in the Chapter 11 Case), notice of such litigation or event. In addition, the Borrower agrees to maintain a system of accounting that enables the Borrower to produce unaudited financial statements in accordance with GAAP.

5.2 **Reporting; Budget; Conference Calls**.

(a) [Reserved].

(b) The Borrower, on the first Business Day after each four-week period as set forth on an Approved Budget, will: (i) prepare and deliver to the DIP Lender a supplement to the initial Approved Budget (or the previously supplemented Approved Budget) updating or extending the period covered by the initial Approved Budget (or the previously supplemented Approved Budget) so that it covers at least a four-month period from the date of such initial Approved Budget or supplemental Approved Budget, as applicable, which supplemental Approved Budget shall be in form and substance

subject to the DIP Lender's approval, without further order of the Bankruptcy Court and (ii) deliver a Variance Report for the preceding four-week period.

(c) If requested by the DIP Lender, the Borrower shall participate in a conference call occurring every week, commencing on the first week following the Initial Funding Date regarding the Approved Budget and other financial matters.

5.3 **Existence**. At all times, the Borrower shall maintain and preserve its existence in full force and effect.

5.4 **Maintenance of Properties; Permits**. The Borrower shall (a) maintain and preserve the Collateral that is necessary to the proper conduct of its business in good working order and condition, ordinary wear, tear and casualty excepted, to the extent permitted by the Approved Budget and the Permitted Variance; (b) comply with the material provisions of all material leases related to the Collateral pledged by it, so as to prevent the loss or forfeiture thereof, unless such provisions are the subject of a Permitted Protest; and (c) maintain, comply with and keep in full force and effect its Permits in respect of the Collateral pledged by it and all Permits required for the operation of its business, unless failure to do so would not result in a Material Adverse Change.

5.5 **Taxes**. Except to the extent such payment is excused by, or otherwise is prohibited by the provisions of the Bankruptcy Code or an order of the Bankruptcy Court, the Borrower shall pay in full or discharge all assessments and taxes imposed, levied, or assessed after the Petition Date against any Collateral, before delinquency or before the expiration of any extension period, except to the extent that any such assessments and taxes shall be paid as part of a sale or pursuant to the Approved Budget (subject to the Permitted Variances) or is subject to a Permitted Protest.

5.6 **[Reserved]**.

5.7 **Inspection**. The Borrower shall permit the DIP Lender and each of its duly authorized representatives or agents to inspect any of its Collateral or books and records, to conduct appraisals and valuations, to examine and make copies of its books and records, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its officers and employees at such reasonable times during regular business hours and intervals as the DIP Lender may reasonably require, in each case other than information subject to confidentiality obligations or attorney-client or other privilege.

5.8 **Compliance with Laws**. Subject to any limitations imposed by the Approved Budget or by the Borrower's operation as a debtor-in-possession in the Chapter 11 Case, the Borrower shall comply with the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority, other than laws, rules, regulations, and orders with which, individually, non-compliance could not reasonably be expected to result in a Material Adverse Change.

5.9 **Disclosure Updates**. The Borrower shall promptly, but in any event within five (5) Business Days after obtaining actual knowledge thereof, notify the DIP Lender of any written information, exhibit, or report (other than materials marked as drafts and forward-looking information, projections, estimates, and information of a general economic nature and general information about the Borrower's industry) furnished (after giving effect to any supplements thereto) to the DIP Lender that contained, at the time it was furnished, any untrue statement of a material fact or omitted to state any material fact necessary to make the statements contained therein (taken as a whole) not misleading in light of the circumstances in which made. Any notification pursuant to the foregoing provision will not cure or remedy the effect of the prior untrue statement of a material fact or omission of any material fact

nor shall any such notification have the effect of amending or modifying this Agreement or any of the Schedules or reports hereto.

5.10 **Further Assurances**. Upon reasonable written notice from the DIP Lender, the Borrower shall promptly execute and deliver to the DIP Lender any and all Security Documents, financing statements, and all other documents (collectively, the "Additional Documents") that the DIP Lender may request in writing, in each case in form and substance satisfactory to the DIP Lender, to create, perfect and continue the DIP Lender's Liens in all the Collateral (whether now owned or hereafter arising or acquired, tangible or intangible, real or personal).

5.11 **Approved Budget**. The Borrower shall comply with the Approved Budget (as updated and supplemented in accordance with this Agreement), subject to the Permitted Variance.

5.12 **[Reserved].**

5.13 **[Reserved].**

5.14 **Deposit Account Control Agreements**. The Borrower shall, and shall use commercially reasonable efforts to cause each relevant financial institution or other person at which each Deposit Account is maintained to, enter into a Deposit Account Control Agreement with respect to such Deposit Account, in each case, promptly and not later than thirty (30) days following the written request of the DIP Lender at any time after the Closing Date.

5.15 **[Reserved].**

5.16 **Material Contracts; Sale Offers**. The Borrower shall deliver to the DIP Lender (a) promptly (but in any event within five (5) Business Days) of the Borrower becoming aware of any default (other than the filing of the Chapter 11 Case) or other material breach under any Material Contract to which the Borrower is a party, notice of such defaults or breaches, and (b) prompt notification of any written offer by a third party to purchase all or substantially all of the assets of the Borrower, or to purchase all or substantially all of the equity interests of the Borrower, or otherwise explore or enter into a material transaction in respect of the Borrower or its assets outside the Ordinary Course.

5.17 **DIP Milestones**. The Borrower shall comply with the following milestones:

(a) No later than September 21, 2026, the Bankruptcy Court shall have entered the Second Interim Order in form and substance acceptable to the DIP Lender in its sole discretion;

(b) No later than October ~~2~~20, 2026, the Bankruptcy Court shall have entered the Final Order in form and substance acceptable to the DIP Lender in its sole discretion;

(c) No later than ~~90~~120 days following the Petition Date, the Borrower shall have filed the Subchapter V Plan;

(d) No later than ~~105~~135 days following the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order in form and substance acceptable to the DIP Lender; and

(e) No later than 70 days following entry of the Final Order, the Plan Effective Date shall have occurred.

## 6. NEGATIVE COVENANTS.

The Borrower hereby covenants and agrees that, until termination of the Commitment and the indefeasible payment in full in cash of the Obligations (other than continuing Obligations with respect to indemnification), the Borrower will not do any of the following without the prior written consent of the DIP Lender:

6.1 **Indebtedness**. Create, incur, assume, suffer to exist, guarantee, or otherwise become or remain, directly or indirectly, liable with respect to any Indebtedness with respect to the Collateral, except for the following ("Permitted Indebtedness"):

(a) Indebtedness evidenced by this Agreement and the DIP Loan Documents (including the Carve-Out);

(b) Indebtedness outstanding as of the Petition Date;

(c) obligations under any cash management agreement and other Indebtedness in respect of netting services, automatic clearinghouse arrangements, overdraft protections, employee credit card programs, and other cash management and similar arrangements incurred in the Ordinary Course of Business; and

(d) unsecured Indebtedness consisting of the financing of insurance premiums incurred in the Ordinary Course of Business.

6.2 **Liens**. Create, incur, assume or suffer to exist on or after the date of this Agreement, directly or indirectly, any Lien that is equal to or superior to the priority of any Liens granted by this Agreement and the DIP Order to or in favor of the DIP Lender on or with respect to any of the Collateral, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, except for Permitted Prior Liens.

6.3 **Restrictions on Fundamental Changes**. Except in connection with a Subchapter V Plan approved by the Bankruptcy Court or otherwise with the prior written consent of the DIP Lender, the Borrower shall not:

(a) enter into any merger, consolidation, reorganization or recapitalization, or reclassify its equity interests;

(b) liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution); or

(c) suspend or close a substantial portion of its business.

6.4 **Disposal of Assets**. Except in connection with a Subchapter V Plan, convey, sell, lease, license, assign, transfer or otherwise dispose of (or enter into an agreement to convey, sell, lease, license, assign, transfer or otherwise dispose of) any Collateral pledged by the Borrower, other than Permitted Transfers.

6.5 **Change Name**. Change the Borrower's name, state of organization or organizational identity.

6.6 **Nature of Business**. Make any material change in the nature of the Borrower's business or acquire any properties or assets that are not reasonably related to the conduct of such business activities; *provided*, that the foregoing shall not prevent the Borrower from (i) engaging in any business

that is reasonably related or ancillary to its business, or (ii) complying with any requirement of the Bankruptcy Code.

6.7 **Material Leases or Contracts; Amendments**. Change or modify (a) the material terms of any of its Material Contracts in connection with Collateral except in a manner that could not reasonably be expected to result in a Material Adverse Change, or (b) any of its Organizational Documents in a manner that is adverse to the DIP Lender.

6.8 **Change of Control**. Except in connection with a Subchapter V Plan, cause, permit, or suffer, directly or indirectly, any Change of Control.

6.9 **Accounting Methods**. Modify or change its fiscal year or its method of accounting (other than as may be required to conform to GAAP).

6.10 **Transactions with Affiliates**. Directly or indirectly enter into or permit to exist any transaction with any Affiliate of the Borrower, except for (a) transactions that are in the Ordinary Course of Business of the Borrower, and (b) transactions or arrangements otherwise approved by the Bankruptcy Court pursuant to an order in form and substance satisfactory to the DIP Lender.

6.11 **Use of Proceeds**. Use the proceeds of the DIP Loans for any Restricted Purpose or for any purpose other than to fund payments, subject in all respects to the Approved Budget and the Permitted Variance, related to the: (a) working capital and other general corporate purposes of the Borrower, including the payment of the Fees, the DIP Lender Expenses, and Professional Fees; (b) payments permitted or required under the DIP Order, including the Carve-Out, and (c) bankruptcy-related expenses.

6.12 **Limitation on Capital Expenditures**. Except as set forth in the Approved Budget, make or incur any Capital Expenditure.

6.13 **Chapter 11 Case**. Directly or indirectly seek, consent or suffer to exist, without the prior written consent of the DIP Lender:

(a) any modification, stay, vacation or amendment to the DIP Order;

(b) in connection with the Collateral, a priority claim for any administrative expense or unsecured claim against the Borrower (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of any kind specified in section 503(b), 506(b) or (c) or 507(b) of the Bankruptcy Code) equal to or superior to the priority claim of the DIP Lender in respect to the Collateral or otherwise, other than those permitted by the DIP Order (including the Carve-Out and the Permitted Prior Liens); and

(c) Any proposal for a chapter 11 plan or asset sale that is not a Subchapter V Plan.

6.14 **Acquisitions, Loans, or Investments**. Make any acquisition, advance, loan or any other investment of any kind or nature other than:

(a) [Reserved];

(b) investments held by the Borrower in the form of cash or cash equivalents;

(c) investments existing as of the Closing Date;

(d) [Reserved];

(e) [Reserved];

(f) [Reserved]; and

(g) investments consisting of Indebtedness, Liens, fundamental changes or other dispositions or transactions permitted under Sections 6.1, 6.2, 6.3, and 6.4, respectively.

6.15 **Payments on Indebtedness**. Other than with respect to the Obligations or pursuant to the Approved Budget, make any payment with respect to any Indebtedness.

6.16 **Distributions or Redemptions**. Pay any dividends or distributions on, or make any redemptions of, any equity interest of the Borrower.

6.17 **Formation of Subsidiaries**. Form any direct or indirect Subsidiary or acquire any direct or indirect Subsidiary after the Closing Date without the DIP Lender's prior written consent.

**7. [RESERVED].**

**8. EVENTS OF DEFAULT.**

8.1 **Events of Default**. Any one or more of the following events shall constitute an event of default following giving of any applicable notice (if required) and the expiration of the applicable cure period (if any) (each, an "Event of Default") under this Agreement:

(a) the Bankruptcy Court shall have entered an order or the Borrower shall have filed a motion or application seeking an order (without the prior written consent of the DIP Lender) or the Borrower fails to timely contest a motion or application filed by another party seeking an order (i) converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, (ii) determining that the Debtor is ineligible for Subchapter V of chapter 11 of the Bankruptcy Code, (iii) appointing (x) an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code, (y) a trustee (other than a Subchapter V trustee) or expanding the powers of the Subchapter V trustee, or (z) a responsible officer in the Chapter 11 Case, or (iv) dismissing the Chapter 11 Case;

(b) the entry of a DIP Order that is not in form and substance acceptable to the DIP Lender in its sole discretion;

(c) the failure of the Borrower to comply with any of the DIP Milestones, unless such DIP Milestone is extended or waived with the prior written consent of the DIP Lender;

(d) the failure of the Borrower to be in compliance in all material respects with the DIP Loan Documents, including for the avoidance of doubt by making any payment not in accordance with the Approved Budget or that otherwise would not constitute a valid use of proceeds of the DIP Loans;

(e) the Borrower's breach, rejection or termination of the Fenix Agreement without the prior written consent of the DIP Lender;

(f) failure of any representation or warranty set forth in the DIP Loan Documents to be true and correct in all material respects (or, to the extent qualified by materiality, in all respects) when made;

(g) the Borrower grants any liens, security interests, or encumbrances other than those existing immediately prior to the date hereof or arising under the DIP Order;

(h) the most recently entered DIP Order ceases to be in full force and effect for any reason or an order shall be entered (or the Borrower seeks an order) reversing, amending, supplementing, staying, vacating, or otherwise modifying such DIP Order without the prior written consent of the DIP Lender;

(i) the Borrower files or supports a plan of liquidation or reorganization in the Chapter 11 Case that does not conform to the terms of this DIP Loan Documents or otherwise is not in form and substance acceptable to the DIP Lender;

(j) failure of the Borrower to make any payment under the DIP Loan Documents to the DIP Lender as and when due;

(k) the bringing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto by the Borrower: (A) to obtain additional financing under section 364(c) or section 364(d) of the Bankruptcy Code unless such additional financing is (x) permitted pursuant to the DIP Loan Documents, or (y) a Prepayment; (B) to grant any lien other than Permitted Prior Liens upon or affecting any Collateral; (C) except as provided in the DIP Loan Documents, Interim Orders or Final Order, as the case may be, to use the DIP Cash Collateral under section 363(c) of the Bankruptcy Code without the prior written consent of the DIP Lender; (D) to sell any of the Collateral except to the extent expressly permitted by the terms of the DIP Loan Documents or with the prior written approval of the DIP Lender; or (E) to the extent that any action or actions may be adverse to the DIP Lender or its rights and remedies hereunder or its interest in the Collateral, that is otherwise not reasonably satisfactory to the DIP Lender;

(l) without the prior written consent of the DIP Lender, the granting of relief from the automatic stay by the Bankruptcy Court to any other creditor or party in interest in the Chapter 11 Case with respect to any portion of the Collateral;

(m) the Borrower shall fail to comply with its obligations under (i) Sections 5.1, 5.2(c), 5.3, 5.4, 5.10, 5.16, 6, or 10, or (ii) Section 5.2(b), and in the case of this clause (ii), such failure or breach shall continue for five (5) days after the earlier to occur of (x) the date on which such failure to comply or breach is known to any officer of the Borrower and (y) the date on which the DIP Lender shall have notified such that the Borrower or its applicable representative of such failure;

(n) other than as set forth in any other sub-section of this Section 8.1, the Borrower shall fail to perform, or otherwise breach, any of its covenants or obligations contained in this Agreement, which failure or breach shall continue for three (3) Business Days after the earlier to occur of (i) the date on which such failure to comply is known to any officer of the Borrower and (ii) the date on which the DIP Lender shall have notified the Borrower or its applicable representative of such failure; *provided, however*, that such three (3) Business Day grace period shall not apply in the case of any failure that is not capable of being cured at all or within such three (3) Business Day period;

(o) one or more final non-appealable judgments (and the same shall remain undischarged for a period of thirty (30) consecutive calendar days during which execution shall not be effectively stayed) and orders for the payment of money exceeding $100,000 in the aggregate (in each case to the extent not paid or covered by insurance or indemnities as to which the insurer or indemnifying party has been notified of such judgment or order and the applicable insurance company or indemnifying

party has not denied coverage thereof) shall be rendered against the Borrower and shall be subject to immediate collection and remain unsatisfied;

(p) the entry of an order (i) surcharging any of the Collateral under section 506(c), or any other section of the Bankruptcy Code or applicable law; (ii) allowing any administrative expense claim having priority over or ranking in parity with the DIP Lender's claims or rights (subject to the Carve-Out) under the DIP Loan Documents; or (iii) otherwise adversely impacting the DIP Lender's Liens and priority in the Collateral, as specified in Section 10 of this Agreement and the DIP Order;

(q) sale of any of the Collateral, unless expressly permitted by the DIP Loan Documents or with the written consent of the DIP Lender;

(r) the occurrence of any Event of Default and the continuance thereof after any applicable grace or cure period provided in the DIP Order (if any) or granted by order of the Bankruptcy Court;

(s) the entry of an order granting the relief sought in a motion which seeks to prosecute or settle a claim or controversy on account of, or that is part of, the Collateral (including, without limitation, any commercial tort claims held by the Borrower or its estate), without the prior written consent of the DIP Lender; and

(t) the occurrence of a Change of Control.

8.2 **<u>Rights and Remedies</u>**.

(a) Immediately upon the occurrence and during the continuance of an Event of Default, subject to the Remedies Notice Period as set forth in the DIP Order, and in addition to any other rights or remedies provided for hereunder or under any DIP Loan Document (including the DIP Order) or by the UCC or any other applicable law, the DIP Lender may do any one or more of the following:

(i) declare the Obligations, whether evidenced by this Agreement or by any DIP Loan Document, due and payable, and the Commitment terminated, whereupon the Obligations shall become and be immediately due and payable, without presentment, demand, protest, further notice or other requirements of any kind, all of which are hereby expressly waived by the Borrower;

(ii) reduce or terminate the Commitment and restrict the funding of any future DIP Loans to the Borrower;

(iii) terminate the DIP Facility and any DIP Loan Documents as to any future liability of the DIP Lender (without affecting any of the Liens, the DIP Loans, or any other Obligation, or the DIP Releases);

(iv) terminate, restrict, or reduce the Borrower's ability to use the proceeds of the DIP Loans or the DIP Cash Collateral, other than during the Remedies Notice Period, to pay payroll in accordance in the Approved Budget;

(v) charge interest at the Default Rate;

(vi) foreclose upon, obtain and liquidate the Collateral in accordance with applicable law;

(v) require the Borrower to assemble all of the Collateral constituting personal property without judicial process pursuant to section 9-609 of the UCC;

(vi) take possession of all Collateral constituting tangible personal property without judicial process pursuant to section 9-609 of the UCC; and

(vii) exercise any of its other rights and remedies under the DIP Loan Documents (including the DIP Order) and applicable law.

(b) Subject to the terms of the DIP Order (including with respect to the Remedies Notice Period), to the extent an Event of Default occurs as a result of the Borrower's failure to indefeasibly satisfy the Obligations in full in cash (other than continuing Obligations with respect to indemnification) by the Maturity Date, the Borrower waives any right (i) to any notice period (except to the extent a notice period is required by operation of law) and (ii) to challenge (x) whether or not the Maturity Date or an Event of Default has occurred, (y) the DIP Lender's exercise of its rights and remedies against the Collateral, including without limitation, any foreclosure through the Bankruptcy Court, a state court, or other applicable proceeding, and (z) the applicability of the Default Rate.

8.3 **Application of Proceeds upon Event of Default**. The DIP Lender shall apply the cash proceeds actually received from any foreclosure sale, other disposition of the Collateral upon an Event of Default as follows: (a) first, to fund the Carve-Out (to the extent not fully funded by the Borrower at such time); (b) second, to the DIP Lender Expenses; (c) third, to the discharge of any accrued but unpaid Fees (including, but not limited to, the Commitment Fee, Closing Fee and the Exit Fee); (d) fourth, to the discharge of any accrued but unpaid interest on the Obligations; (e) fifth, to the outstanding principal balance of any Obligations; and (f) sixth, to pay any remaining surplus to the Borrower.

8.4 **Remedies Cumulative**. The rights and remedies of the DIP Lender under this Agreement, the DIP Loan Documents, and all other agreements shall be cumulative. The DIP Lender shall have all rights and remedies not inconsistent herewith or with the DIP Order, as provided under the UCC, by law, or in equity. No exercise by the DIP Lender of one right or remedy shall be deemed an election, and no waiver by the DIP Lender of any Event of Default shall be deemed a continuing waiver. No delay by the DIP Lender shall constitute a waiver, election, or acquiescence by it.

**9. [RESERVED]**

**10. PRIORITY AND COLLATERAL SECURITY.**

10.1 **Superpriority Claims; Subordination in favor of DIP Lender Liens**.

(a) Subject to the terms and conditions of, and entry of, the DIP Order, the Obligations of the Borrower under the DIP Loan Documents:

(i) shall, in accordance with section 364(c)(1) of the Bankruptcy Code, constitute allowed senior administrative expense claims against the Borrower and its estate (the "Superpriority Claims") with priority in payment over any and all administrative expenses at any time existing or arising, of any kind or nature whatsoever, including, without limitation, the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), and 726 of the Bankruptcy Code or otherwise, including those resulting from the conversion of any of the Chapter 11 Case pursuant to section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; *provided,*

*however*, that the Superpriority Claims shall be subject and subordinate to only (x) the Carve-Out and (y) Permitted Prior Liens;

(ii) shall be, pursuant to section 364(c)(2) of the Bankruptcy Code, secured by valid, enforceable, non-avoidable and perfected and automatic first priority liens on and security interests in favor of the DIP Lender in all Collateral that is not otherwise subject to the Permitted Prior Liens, subject only to the Carve-Out; and

(iii) shall be, pursuant to section 364(c)(3) of the Bankruptcy Code, secured by valid, enforceable, non-avoidable and perfected and automatic junior liens on and security interests in favor of the DIP Lender in all Collateral (other than the Collateral described in Section 10.1(a)(ii) hereof, as to which Liens are described in such Section), subject to the Carve-Out and the Permitted Prior Liens (the foregoing lien priorities set forth in clauses (i) – (iii) shall be referred to herein as the "Required Lien Priority").

(b) [Reserved].

(c) [Reserved].

(d) The Superpriority Claims referred to in this Section 10.1 shall have the priority afforded to such Superpriority Claims in the DIP Order.

10.2 **Grant of Security Interest in the Collateral**. Subject to the terms and conditions of, and entry of, the DIP Order, to secure the payment and performance of the Obligations, the Borrower hereby grants, collaterally pledges, and assigns to the DIP Lender the following:

(a) *Liens on Unencumbered Property*. Pursuant to section 364(c)(2) of the Bankruptcy Code, subject only to the Carve-Out, valid, binding, continuing, enforceable, non-avoidable automatically, and fully perfected first-priority liens on and security interests in all Collateral that is not otherwise subject to any Permitted Prior Lien.

(b) *Liens Junior to Other Liens*. Pursuant to section 364(c)(3) of the Bankruptcy Code, valid, binding, continuing, enforceable, non-avoidable automatically and fully perfected junior liens on and security interests in all Collateral (other than as set forth in clause (a) above).

10.3 **Representations and Warranties in Connection with Security Interest**. The Borrower represents and warrants to the DIP Lender as follows:

(a) subject to the entry of the DIP Order, the Borrower has full right and power to grant to the DIP Lender perfected security interests and Liens, in accordance with the Required Lien Priority, on the Borrower's respective interests in the Collateral pursuant to this Agreement and the other DIP Loan Documents;

(b) upon the entry of the First Interim Order, the DIP Lender will have good, valid and automatically perfected Liens and security interests in the Collateral granted by the applicable Borrower, in accordance with the Required Lien Priority, subject to no transfer or other restrictions or Liens of any kind in favor of any other Person, other than Permitted Prior Liens; *provided* that, notwithstanding the automatic perfection and priority of the DIP Lender's Liens under the DIP Order, the DIP Lender may, in its sole discretion, file any financing statements and other appropriate filings or recordations or delivery of any necessary certificates, as applicable, in respect of the Collateral and the Liens granted hereunder (including, without limitation, as contemplated in Section 10.6); and

(c) as of the Closing Date, no financing statement relating to any of the Collateral granted by the Borrower is on file in any public office except those on behalf of the DIP Lender and those listed on Schedule 6.2.

10.4 **Power of Attorney**. The DIP Lender hereby irrevocably is made, constituted and appointed the true and lawful attorney for the Borrower (without requiring the DIP Lender to act as such) with full power of substitution to, do the following (which appointment is irrevocable and coupled with an interest) subject to the DIP Order: (a) execute in the name of such Person any financing statements, schedules, assignments, instruments, documents, and statements that it is obligated to give the DIP Lender under any of the DIP Loan Documents; (b) do such other and further lawful acts and deeds in the name of such Person that the DIP Lender may deem reasonably necessary or desirable to perfect the DIP Lender's security interest or lien in any Collateral or (c) after the occurrence of an Event of Default which is continuing, (i) enforce an Account, (ii) exercise any voting or consensual rights with respect to the pledged securities, (iii) settle, compromise, compound, adjust or defend any actions, suits or proceedings relating to all or any of the Collateral, (iv) notify, or to require the Borrower to notify, an Account Debtor to make payment directly to the DIP Lender, (v) make, settle and adjust claims in respect of Collateral under policies of insurance, indorsing the name of the Borrower on any check, draft, instrument or other item of payment for the proceeds of such policies of insurance and for making all determinations and decisions with respect thereto; provided that, nothing herein contained shall be construed as requiring or obligating the DIP Lender to make any commitment or to make any inquiry as to the nature or sufficiency of any payment received by the DIP Lender, or to present or file any claim or notice, or to take any action with respect to the Collateral or any part thereof or the moneys due or to become due in respect thereof or any property covered thereby, or (vi) commence and prosecute any and all suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect or otherwise realize on all or any of the Collateral or to enforce any rights in respect of any Collateral. Notwithstanding the foregoing, the foregoing power of attorney is a right, but not an obligation of the DIP Lender, and neither the DIP Lender nor its officers, directors, employees or agents shall be responsible to the Borrower for failure to exercise any of the foregoing rights.

10.5 **DIP Lender's Ability to Perform Obligations on Behalf of Borrower with Respect to the Collateral**. The DIP Lender shall have the right, but not the obligation, after the occurrence of an Event of Default which is continuing, to perform on the Borrower's behalf, any or all of the Borrower's obligations under this Agreement with respect to the Collateral, when such obligations are due, at the expense, for the account, and at the sole risk of the Borrower.

10.6 **Financing Statements**. The Borrower irrevocably authorizes the DIP Lender, without notice to the Borrower, to prepare and file financing statements provided for by the UCC, including, without limitation, describing such property as "all assets, whether now owned or hereafter acquired, developed or created" or words of similar effect, to perfect the DIP Lender's security interest in the Collateral, in all jurisdictions in which the DIP Lender believes in its sole opinion that such filing is appropriate. The Borrower also irrevocably authorizes the DIP Lender to file such continuation statements and amendments and to take such other action with respect to the filing of financing statements as may be required or appropriate, in either case in the DIP Lender's sole judgment, in order to perfect and to continue the perfection of the DIP Lender's security interests in the Collateral, unless prohibited by law.

10.7 **No Discharge; Survival of Claims**. Pursuant to section 1141(d)(4) of the Bankruptcy Code, the Borrower hereby waives any discharge of the Obligations with respect to any chapter 11 plan that is not a Subchapter V Plan.

**11. WAIVERS; INDEMNIFICATION.**

11.1 **Demand; Protest, etc.**. To the extent permitted by applicable law or as expressly required pursuant to the terms of this Agreement, the Borrower hereby waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, nonpayment at maturity, release, compromise, settlement, extension, or renewal of documents, instruments, chattel paper, and guarantees at any time held by the DIP Lender on which the Borrower may in any way be liable.

11.2 **DIP Lender's Liability for Collateral.** As long as the DIP Lender complies with its obligations, if any, under the UCC, the DIP Lender shall not in any way or manner be liable or responsible for: (a) the safekeeping of the Collateral, (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (c) any diminution in the value thereof, or (d) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other Person. All risk of loss, damage, or destruction of the Collateral shall be borne by the Borrower, except any thereof resulting from the gross negligence, bad faith, fraud, or willful misconduct of the DIP Lender or its representatives or agents as finally determined by the Bankruptcy Court or other court of competent jurisdiction.

11.3 **Indemnification**.

The Borrower shall indemnify, pay and hold harmless the DIP Lender and the other Foundation Parties against any and all losses, liabilities, claims, damages, costs, and expenses (including reasonable attorneys' fees and expenses) incurred in connection with or arising out of the DIP Facility, the DIP Loan Documents, or the use or proposed use of proceeds, except to the extent resulting from their gross negligence, willful misconduct, or bad faith, as determined by a final non-appealable judgment of a court of competent jurisdiction. This indemnification obligation shall (a) constitute an allowed administrative expense claim under section 503(b) of the Bankruptcy Code, (b) survive the repayment of the Obligations and the termination of the DIP Facility, and (c) be payable on demand without further order of the Bankruptcy Court.

**12. NOTICES.**

All notices or demands relating to this Agreement or any DIP Loan Document shall be in writing and shall be personally delivered or sent by registered or certified mail (postage prepaid, return receipt requested), overnight courier, or electronic mail (at such email addresses as a party may designate in accordance herewith). In the case of notices or demands to any party hereunder or any service of process to any party hereunder, they shall be sent to the respective addresses set forth below:

If to the Borrower:

MVMT Labs, Inc.
c/o Province, LLC
Attn: Michael Robinson
2360 Corporate Circle, Suite 340
Henderson, NV 89074

with a copy to (which shall not constitute notice):

Potter Anderson & Corroon LLP
Jeremy W. Ryan
Gregory J. Flasser
1313 N. Market Street
7th Floor
Wilmington, DE 19801-6108
Phone: (302) 984-6000
Email: jryan@potteranderson.com
gflasser@potteranderson.com

If to the DIP Lender:

MNF DIP SPV Ltd
c/o CO Services Cayman Limited
P.O. Box 10008
Pavilion East, Cricket Square
Grand Cayman KY1-1001
Cayman Islands
Phone: +1 (345) 749-2000

with a copy to (which shall not constitute notice):

Allen Overy Shearman Sterling US LLP
Fredric Sosnick
William S. Holste
599 Lexington Avenue
New York, NY 10022
Phone: (212) 848-4000
Email: fsosnick@aoshearman.com
william.holste@aoshearman.com

Any party hereto may change the address at which they are to receive notices hereunder, by notice given in writing in the foregoing manner to the other party. All notices or demands sent in accordance with this Section 12, shall be deemed received on the earlier of the date of actual receipt or five (5) Business Days after the deposit thereof certified, return receipt requested in the mail; *provided*, that (a) notices sent by overnight courier service shall be deemed to have been given when received, and (b) notices by electronic mail shall be deemed received when sent upon confirmation of transmission as evidenced by a delivery receipt or similar electronic mail function. If any notice, disclosure, or report is required to be delivered pursuant to the terms of this Agreement on a day that is not a Business Day, such notice, disclosure, or report shall be deemed to have been required to be delivered on the immediately following Business Day.

**13. CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER.**

(a) THE VALIDITY OF THIS AGREEMENT AND THE DIP LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN THE DIP LOAN DOCUMENT IN RESPECT OF SUCH OTHER DIP LOAN DOCUMENT), THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF AND THEREOF, AND THE RIGHTS OF THE PARTIES HERETO AND THERETO WITH RESPECT TO ALL MATTERS ARISING

HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

(b) THE BORROWER AND DIP LENDER AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND THE OTHER DIP LOAN DOCUMENTS SHALL BE TRIED AND LITIGATED ONLY IN THE BANKRUPTCY COURT. THE BORROWER AND DIP LENDER HEREBY WAIVE, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF *FORUM NON CONVENIENS* OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION 13(b).

(c) **THE BORROWER AND DIP LENDER HEREBY IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THE DIP LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY AND AGREE THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. THE BORROWER AND DIP LENDER ACKNOWLEDGE THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THE DIP LOAN DOCUMENTS, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN THEIR RELATED FUTURE DEALINGS. THE BORROWER AND DIP LENDER EACH WARRANTS AND REPRESENTS THAT IT HAS HAD THE OPPORTUNITY OF REVIEWING THIS JURY WAIVER WITH LEGAL COUNSEL, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS.**

## 14. AMENDMENTS; WAIVERS; SUCCESSORS.

14.1 **Amendments and Waivers**. No amendment, waiver, or other modification of any provision of this Agreement or any DIP Loan Document, and no consent with respect to any departure therefrom, shall be effective unless the same shall be in writing and signed by the DIP Lender and the Borrower and then any such waiver or consent shall be effective, but only in the specific instance and for the specific purpose for which given.

14.2 **No Waivers; Cumulative Remedies**. No failure by the DIP Lender to exercise any right, remedy, or option under this Agreement or any DIP Loan Document, or delay by the DIP Lender in exercising the same, shall operate as a waiver thereof. No waiver by the DIP Lender shall be effective unless it is in writing, and then only to the extent specifically stated. No waiver by the DIP Lender on any occasion shall affect or diminish the DIP Lender's rights thereafter to require strict performance by the Borrower of any provision of this Agreement. The DIP Lender's rights under this Agreement and the DIP Loan Documents shall be cumulative and not exclusive of any other right or remedy that the DIP Lender may have.

14.3 **Successors**. This Agreement shall bind and inure to the benefit of the respective successors and permitted assigns of each of the parties; *provided*, that the Borrower may not assign this Agreement or any rights or duties hereunder without the DIP Lender's prior written consent and such consent shall not, unless otherwise provided in such consent, release the Borrower from its Obligations. Any assignment by the Borrower that is not explicitly permitted hereunder shall be void *ab initio*. The DIP Lender may freely assign all or part of its rights and duties hereunder to any Person. For the avoidance of doubt, in the event that the DIP Lender assigns or participates any portion of its rights and

obligations under the DIP Facility to any person or entity that is not a Foundation Party, no such assignee or participant shall benefit from the DIP Releases.

**15. GENERAL PROVISIONS.**

15.1 **Effectiveness**. This Agreement shall be binding and deemed effective when executed by the Borrower and the DIP Lender.

15.2 **Section Headings**. Headings and numbers have been set forth herein for convenience only. Unless the contrary is compelled by the context, everything contained in each Section applies equally to this entire Agreement.

15.3 **Interpretation**. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed against the DIP Lender or the Borrower, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to accomplish fairly the purposes and intentions of all parties hereto.

15.4 **Severability of Provisions**. Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

15.5 **Debtor-Creditor Relationship**. The relationship between the DIP Lender, on the one hand, and the Borrower, on the other hand, is solely that of creditor and debtor, as applicable. The DIP Lender has not (and shall not be deemed to have) any fiduciary relationship or duty to the Borrower arising out of or in connection with the DIP Loan Documents or the transactions contemplated thereby, and there is no agency or joint venture relationship between the DIP Lender, on the one hand, and the Borrower, on the other hand, by virtue of any DIP Loan Document or any transaction contemplated therein.

15.6 **Counterparts; Electronic Execution**. This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same agreement. Delivery of an executed counterpart of this Agreement by facsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. The foregoing shall apply to each other DIP Loan Document *mutatis mutandis*.

15.7 **Revival and Reinstatement of Obligations**. If the incurrence or payment of the Obligations by the Borrower or the transfer to the DIP Lender of any property should for any reason subsequently be asserted, or declared, to be void or voidable under any state or federal law relating to creditors' rights, including provisions of the Bankruptcy Code relating to fraudulent conveyances, preferences, or other voidable or recoverable payments of money or transfers of property (each, a "Voidable Transfer"), and if the DIP Lender is required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the reasonable advice of its counsel, then, as to any such Voidable Transfer, or the amount thereof that the DIP Lender is required or elects to repay or restore, and as to all reasonable, documented, and actual out-of-pocket costs, expenses, and attorneys' fees of the DIP Lender related thereto, the liability of the Borrower automatically shall be revived, reinstated, and restored and shall exist as though such Voidable Transfer had never been made.

15.8 **Integration**. This Agreement, together with the DIP Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

15.9 **No Waiver of Right to Object to Professional Fees**. Notwithstanding anything set forth herein or in any DIP Loan Document with respect to the Carve-Out or any item in an Approved Budget, nothing herein shall be construed to impair the ability of the DIP Lender to object to any request for the payment of Professional Fees on any grounds.

**16. [RESERVED].**

**17. [RESERVED].**

**18. TREATMENT OF CERTAIN INFORMATION.**

The DIP Lender agrees to use reasonable precautions to keep confidential, in accordance with its customary procedures for handling confidential information of the same nature, all non-public information regarding the Borrower pursuant to this Agreement ("Information"); *provided*, *however*, that nothing herein shall limit the disclosure of any such Information: (a) to any Foundation Party (on a confidential basis) as need to know such Information; *provided* that, before any such disclosure, the Persons to who such disclosure is made are informed of the confidential nature of such Information and instructed to keep such Information confidential; (b) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, or requested by any bank regulatory authority, or to comply with any law or requirement made by a Governmental Authority, as necessary to respond to a document request, interrogatory, or other legal process, or to cooperate with a Governmental Authority regarding any governmental investigation; (c) to auditors or accountants, and any analogous counterpart thereof; *provided* that, before any such disclosure, the Persons to whom such disclosure is made are informed of the confidential nature of such Information and instructed to keep such Information confidential; (d) in connection with any litigation to which the DIP Lender is a party arising from or related to this Agreement or the DIP Loan Documents; (e) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Agreement, (ii) becomes available to the DIP Lender on a confidential basis from a source other than the Borrower, so long as such source is not known by the DIP Lender to be bound by obligations of confidentiality with respect to such Information, or (iii) was available to the DIP Lender on a non-confidential basis prior its disclosure to the DIP Lender by the Borrower or any of its advisors; and (f) to the extent that the Borrower shall have consented to such disclosure in writing.

[*Signature pages follow*]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

**<u>BORROWER</u>:**

**MVMT LABS, INC.**

By: ____________________________________________
Name: Michael Robinson
Title: Chief Restructuring Officer

**<u>LENDER</u>:**

**MNF DIP SPV LTD,**
as DIP Lender

By: ____________________________________________
Name: __________________________________________
Title: ___________________________________________

# **Exhibit 3**

## **Approved Budget**

**MVMT Labs, Inc.**

**Updated Budget for the Period from the Petition Date through December 9, 2026 (Budget Weeks 1 through 21)**

***$ in 000s | As of 10/8/2026***

| Week No. | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending | 7/22 | 7/29 | 8/5 | 8/12 | 8/19 | 8/26 | 9/2 | 9/9 | 9/16 | 9/23 | 9/30 | 10/7 | 10/14 | 10/21 | 10/28 | 11/4 | 11/11 | 11/18 | 11/25 | 12/2 | 12/9 | 1 - 21 |
| | Actual | Actual | Actual | Actual | Actual | Actual | Actual | Actual | Actual | Actual | Actual | Actual | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | |
| *RECEIPTS* | | | | | | | | | | | | | | | | | | | | | | |
| Misc. Inflows | 1 | - | 0 | 1 | 0 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 2 |
| Settlement Proceeds | - | - | - | - | - | - | - | - | - | - | - | - | | 2,875 | - | - | - | - | - | - | - | 2,875 |
| **Total Receipts** | **$ 1** | **$ -** | **$ 0** | **$ 1** | **$ 0** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ 2,875** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ 2,877** |
| *DISBURSEMENTS* | | | | | | | | | | | | | | | | | | | | | | |
| Payroll / Contractors | - | - | - | (6) | - | - | (6) | - | - | - | (10) | - | (10) | (20) | - | (20) | - | - | - | (20) | - | (92) |
| Data Storage/Tech | - | - | - | - | - | - | - | - | - | - | (5) | - | (40) | (38) | (38) | (38) | (5) | (5) | (5) | (5) | (5) | (184) |
| Other Operating Expenses | - | - | - | - | - | - | - | - | - | (22) | - | - | (53) | (51) | (51) | (51) | (10) | (10) | (10) | (10) | (10) | (278) |
| Independent Director | - | - | (20) | - | - | - | (20) | - | - | - | - | (20) | - | - | - | (20) | - | - | - | (20) | - | (100) |
| **Total Disbursements** | **$ -** | **$ -** | **$ (20)** | **$ (6)** | **$ -** | **$ -** | **$ (26)** | **$ -** | **$ -** | **$ (22)** | **$ (15)** | **$ (20)** | **$ (104)** | **$ (108)** | **$ (88)** | **$ (128)** | **$ (15)** | **$ (15)** | **$ (15)** | **$ (55)** | **$ (15)** | **$ (653)** |
| *RESTRUCTURING CHARGES* | | | | | | | | | | | | | | | | | | | | | | |
| Debtor Professionals | - | - | - | - | - | - | - | - | - | - | - | - | (587) | - | (399) | - | (772) | - | - | - | (1,308) | (3,065) |
| DIP Lender Professionals | - | - | - | - | - | - | - | - | - | - | - | - | (1,515) | (4) | (54) | (54) | (54) | (54) | (54) | (104) | (104) | (2,000) |
| Special Counsel | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (70) | - | - | - | - | - | (30) | (100) |
| Claims & Noticing Agent | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (100) | (100) |
| Sub-Chapter V Trustee | - | - | - | - | - | - | - | - | - | - | - | - | (40) | - | - | - | (20) | - | - | - | (40) | (100) |
| **Total Restructuring Charges** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ (2,142)** | **$ (4)** | **$ (523)** | **$ (54)** | **$ (846)** | **$ (54)** | **$ (54)** | **$ (104)** | **$ (1,582)** | **$ (5,365)** |
| **Net Cash Flow** | **$ 1** | **$ -** | **$ (20)** | **$ (5)** | **$ 0** | **$ -** | **$ (26)** | **$ -** | **$ -** | **$ (22)** | **$ (15)** | **$ (20)** | **$ (2,245)** | **$ 2,762** | **$ (612)** | **$ (183)** | **$ (861)** | **$ (69)** | **$ (69)** | **$ (159)** | **$ (1,597)** | **$ (3,142)** |
| **Beginning Cash** | **66** | **67** | **817** | **797** | **792** | **792** | **792** | **766** | **766** | **766** | **744** | **4,179** | **4,159** | **1,914** | **4,676** | **4,064** | **3,881** | **3,020** | **2,951** | **2,881** | **2,722** | **66** |
| (+/-) Net Cash Flow | 1 | - | (20) | (5) | 0 | - | (26) | - | - | (22) | (15) | (20) | (2,245) | 2,762 | (612) | (183) | (861) | (69) | (69) | (159) | (1,597) | (3,142) |
| (+) DIP Financing Draws | - | 750 | - | - | - | - | - | - | - | - | 3,450 | - | - | - | - | - | - | - | - | - | 1,500 | 5,700 |
| (-) Litigation Trust Funding | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (2,400) | (2,400) |
| **Ending Cash** | **$ 67** | **$ 817** | **$ 797** | **$ 792** | **$ 792** | **$ 792** | **$ 766** | **$ 766** | **$ 766** | **$ 744** | **$ 4,179** | **$ 4,159** | **$ 1,914** | **$ 4,676** | **$ 4,064** | **$ 3,881** | **$ 3,020** | **$ 2,951** | **$ 2,881** | **$ 2,722** | **$ 224** | **$ 224** |

| Period Ending | July | August | September | 10/7 | 10/14 | 10/21 | 10/28 | 11/4 | 11/11 | 11/18 | 11/25 | 12/2 | 12/9 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *ESTIMATED ACCRUAL OF PROFESSIONAL FEES* [(1)] | *Estimate* | *Estimate* | *Estimate* | *Estimate* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | *Forecast* | |
| Potter Anderson & Corroon LLP | 207 | 192 | 461 | 91 | 41 | 41 | 91 | 41 | 41 | 41 | 91 | 116 | 116 | 1,568 |
| Province, LLC | 241 | 346 | 311 | 31 | 31 | 30 | 30 | 30 | 30 | 33 | 74 | 94 | 217 | 1,497 |
| DIP Lender Professionals | 500 | 500 | 458 | 50 | 7 | 4 | 54 | 54 | 54 | 54 | 54 | 104 | 104 | 2,000 |
| Crowell & Moring LLP | - | 70 | - | - | - | - | - | - | - | - | - | - | 30 | 100 |
| Reliable Companies | 16 | 20 | 14 | - | - | - | - | 25 | - | - | - | - | 25 | 100 |
| Sub-Chapter V Trustee | 20 | 20 | 20 | - | 10 | - | - | - | 10 | - | - | - | 20 | 100 |
| **Total Estimated Accrual of Professional Fees** | **984** | **1,148** | **1,264** | **172** | **89** | **75** | **175** | **150** | **135** | **128** | **219** | **314** | **512** | **5,365** |
| Beginning Accrued & Unpaid Pro Fees | - | 984 | 2,131 | 3,395 | 3,567 | 1,515 | 1,586 | 1,238 | 1,334 | 623 | 697 | 861 | 1,070 | - |
| (+) Fees Accrued | 984 | 1,148 | 1,264 | 172 | 89 | 75 | 175 | 150 | 135 | 128 | 219 | 314 | 512 | 5,365 |
| (-) Fees Paid | - | - | - | - | (2,142) | (4) | (523) | (54) | (846) | (54) | (54) | (104) | (1,582) | (5,365) |
| **Ending Accrued & Unpaid Pro Fees** | **984** | **2,131** | **3,395** | **3,567** | **1,515** | **1,586** | **1,238** | **1,334** | **623** | **697** | **861** | **1,070** | **-** | **-** |
| **Total Liquidity (Ending Cash - Ending Accrued & Unpaid Professional Fees)** [(2)] | **$ (167)** | **$ (1,339)** | **$ (2,629)** | **$ 591** | **$ 399** | **$ 3,090** | **$ 2,826** | **$ 2,547** | **$ 2,397** | **$ 2,254** | **$ 2,020** | **$ 1,652** | **$ 224** | **$ 224** |

(1) Professional fees are presented on an accrual basis and reflect fees estimated to be earned but unpaid, whether or not yet billed. July, August, and Sept. MTD columns reflect monthly estimates through 9/10/26; weekly columns reflect forecast accruals. Payments of professional fees are reflected in Restructuring Charges in the week forecast to be paid. The Debtor does not maintain a professional fee escrow; Total Liquidity reflects Ending Cash less accrued and unpaid professional fees.

(2) Monthly Total Liquidity reflects Ending Cash as of the last budget week ending in the period (7/29/26 for July, 8/26/26 for August, and 9/9/26 for Sept. MTD), less accrued and unpaid professional fees as of the same date.