**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 (Subchapter V) |
| MVMT Labs, Inc., | Case No. 26-11113 (TMH) |
| Debtor.[1] | **Ref. D.I. 19, 180, and 181** |

**DIP LENDER'S OMNIBUS REPLY TO (I) THE LIMITED OBJECTION AND RESERVATION OF RIGHTS OF METAVERSE TECHNOLOGY COMPANY – FZE YP TO ENTRY OF THE PROPOSED FINAL DIP ORDER AND (II) THE JOINDER OF MITHAI TRUST AND PORTICO CONSULTING LLC D/B/A DIGITAL INCUBATION GROUP**

MNF DIP SPV Ltd, in its capacity as DIP Lender (the "DIP Lender"), hereby submits this omnibus reply (this "Reply") to: (i) the *Limited Objection and Reservation of Rights of Metaverse Technology Company – FZE to Entry of the Proposed Final DIP Order* [Docket No. 180] (the "Metaverse Objection") and (ii) the *Joinder of Mithai Trust and Portico Consulting LLC d/b/a Digital Incubation Group to the Limited Objection and Reservation of Rights of Metaverse Technology Company – FZE to Entry of the Proposed Final DIP Order* [Docket No. 181] (the "Mithai/Portico Joinder" and, together with the Metaverse Objection, the "Objections") to the *Debtor's Motion for Entry of (I) Interim and Final Orders (A) Authorizing the Debtor to (1) Obtain Post-Petition Financing and (2) Grant Liens, Including Senior Secured Liens, and Superpriority Administrative Expense Claims; and (B) Modifying the Automatic Stay; (II) an Order Authorizing the Assumption of the Fenix Agreement with Movement Network Foundation Pursuant to Sections 365 and 363; (III) an Order Approving the Settlement Between the Debtor and the Foundation Parties Pursuant to Bankruptcy Rule 9019; (IV) an Order Scheduling a Final Hearing with*

[1] The last four digits of the Debtor's federal tax identification number are 5217. The Debtor's service address is c/o Legalinc Corporate Services Inc., 131 Continental Drive, Suite 305, Newark, New Castle County, DE 19713.

*Respect to the Foregoing; and (V) an Order Granting Related Relief* [Docket No. 19] (the "DIP Motion")[2] and to entry of the proposed final order (the "Proposed Final DIP Order"). Metaverse Technology Company – FZE ("Metaverse"), Mithai Trust and Portico Consulting LLC d/b/a Digital Incubation Group (collectively, "Mithai/Portico") are the objecting parties (collectively, the "Objectors"). In support of this Reply, the DIP Lender respectfully states as follows:

**PRELIMINARY STATEMENT**

1. There is no dispute that the facts and circumstances of this Chapter 11 Case are unique. The Debtor was an early-phase digital asset startup venture. Like other entities in that space, the Debtor entered into an agreement with an offshore foundation — here, the Cayman Islands-based Foundation — to maintain and support the ecosystem for the $MOVE tokens as a whole, and Foundation's British Virgin Islands subsidiary, to mint and issue the $MOVE tokens. *See* Declaration of Michael Robinson in Support of MVMT Labs, Inc.'s Chapter 11 Petition and First Day Motions [Docket No. 21] (the "First Day Declaration") ¶¶ 10–11. As it became apparent that allegations of misconduct by certain people and entities connected with the Debtor and one of its co-founders would imperil the $MOVE ecosystem, Foundation entered into the Fenix Agreement, pursuant to which it: (a) provided $6.9 million in cash, which included the forgiveness of a loan it made to Labs prior to the execution of the Fenix Agreement; and (b) effectively satisfied significant claims against Labs, by undertaking token delivery obligation commitments of Labs. First Day Declaration ¶¶ 25–27, 29.

2. When it became clear that Labs would not be able to survive outside of bankruptcy, Foundation again stepped forward to establish the DIP Lender to provide both DIP and exit financing to the Debtor in order to allow for the most orderly wind-down of Labs, and to allow it

[2] Capitalized terms used but not defined herein have the meaning set forth in the DIP Motion.

to pursue claims against the perpetrators of any wrongdoing. *See* First Day Declaration ¶¶ 38–39, 49–53. The formation of the DIP Lender and the financing to the Debtor thus reflect Foundation's continued and steadfast efforts to fulfill its role to support the $MOVE ecosystem while maintaining its distinct and separate status as an offshore foundation — an essential component of its formation — and any suggestions in the Objections to the contrary are simply unfounded.

3. What also makes the facts of the DIP Facility unique to this Chapter 11 Case is that, in proposing the DIP, neither the DIP Lender nor Foundation is a prepetition creditor or equity holder of Labs. With the Debtor being clear that the primary goal of obtaining financing (including through the conversion of the DIP Facility to an Exit Facility) is to provide a source of funds to litigate claims, it is only natural that Foundation, which lacks any other equity or creditor interest to protect, would seek to ensure that any funds that the DIP Lender made available to the Debtor would not be weaponized and used against it to pursue claims against Foundation. As a result, the DIP Facility contains a requirement that there be full releases of the Foundation Parties as a condition to the advancement of DIP Loans (the "DIP Releases").

4. As originally envisioned, there only would have been $750,000 of the DIP Facility outstanding at the time of the entry of the Final DIP Order, which would have given the Debtor and its estate an easy ability to walk away if other financing sources emerged or if the Debtor determined that it would be improvident to provide the DIP Releases. Likewise, it was envisioned that, prior to the Foundation Parties providing additional financial accommodations to the Debtor by honoring new token undertaking agreements ("TUAs"),[3] the Debtor would have assumed the

[3] *See* Order Approving the Debtor's Motion Pursuant to Bankruptcy Code Sections 105 and 363 for Entry of an Order Authorizing the Debtor to Continue to Perform and Honor the Debtor's Contractual Obligations Under the Fenix Agreement by Entering into New Token Delivery Agreements in Connection Therewith [Docket No. 72].

Fenix Agreement. Due to exigencies in the Chapter 11 Case, and through no fault of the DIP Lender or the Foundation Parties, both of those events did not occur, and the outstanding principal amount of advances under the DIP is $4.2 million, with the Final Order (with DIP Releases) still having yet to be entered. If in fact there no longer is a desire to have the proceeds of the DIP Facility available, the Objectors (or any other party) had the ability to step forward and fund the Chapter 11 Case; however, the DIP Lender is not aware that they have offered to do so.

5. Sidestepping the lack of alternative financing entirely, the Objections do not challenge the DIP Facility itself, but instead target the Global Resolution, the DIP Releases and the proposed Litigation Trust under the Subchapter V Plan, seemingly positing a scenario under which the DIP Facility would remain available, but without key protections for the DIP Lender. Relatedly, Metaverse asks the Court to defer the DIP Releases and approval of the Global Resolution and 9019 Settlement pending claim-by-claim disclosure of the Debtor's investigation into potential litigation targets. Leaving aside that there is no basis for this relief in the Bankruptcy Code or any other applicable law, the Objectors should expect that the DIP Lender would require immediate repayment of the DIP Facility if it has to wait any longer for the entry of the Final DIP Order, including approval of the Global Resolution and the DIP Releases.

6. The Metaverse Objection also raises whether approval of the DIP Releases would limit Metaverse's ability to bring its own claims against non-debtor parties or impair its defenses in the event that it becomes the subject of litigation by the Litigation Trust. In making that argument, Metaverse also asserts concerns about the settlement reached among the Debtor, the Foundation Parties and Rushikesh Manche (the "Manche Settlement"), which instead is the subject of a separate motion (the "Manche Settlement Motion") that is not before the Court in connection

with the DIP Motion.[4] These stated concerns arise from a simple misunderstanding of the relief requested. Neither the DIP Releases nor the Manche Settlement release or impair any claim held solely and exclusively by a third-party against a non-debtor, but instead address only claims held by the Debtor (and in the case of the Manche Settlement, the Debtor and Foundation). Nonetheless, and although the original language in the Proposed Final Order made the point plainly clear, the Revised Proposed Final DIP Order has further clarifying language on that point to provide further assurances to the Objectors.

7. The balance of the Objections, at bottom, are premature plan objections. What remain are two unacceptable requests the Court should deny. First, Metaverse asks the Court to override a negotiated use-of-proceeds restriction and allow an estate representative to investigate the Foundation Parties with "non-DIP resources," without the DIP Lender's consent and without consequence under the DIP documents. Most importantly, Metaverse offers no reason why such an investigation would be useful other than for *in terrorem* purposes to intimidate Foundation. In fact, and perhaps tellingly, the vast majority of the Debtor's stakeholders have entered into TUAs, which contain releases of Foundation. *See* Notice of Filing of Exhibit B to Debtor's Motion for Entry of an Order Approving Postpetition Financing Under Seal [Docket No. 20], Ex. B (Fenix Agreement), Ex. A (form of TUA). Apart from the merits (or lack thereof) of any such investigation, the DIP Lender is not aware of the Debtor having "non-DIP resources" in this case. All of the Debtor's assets in this case are either DIP Proceeds or DIP Collateral. If Metaverse or some future lender were to come in and relieve the DIP Lender of the burden of funding this

---

4 *See* Debtor's Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019 for Approval of Settlement Agreement Among Debtors, the Manche Parties, and the Foundation Parties [Docket No. 193] (the "Manche Settlement Motion.". It is noteworthy that, as the Court is well aware, the Manche Settlement was not entered into, and had not been anticipated, at the time the Debtors and the DIP Lenders entered into the DIP Facility.

Chapter 11 Case, then the Fenix carve-out would leave the Debtor (and such lender) free to investigate and pursue any claims against the DIP Lender or its affiliates arising under the Fenix Agreement. Such an investigation, however, would be inappropriate while the DIP Lender is funding all the Debtor's activities.

8. The Mithai/Portico Joinder adopts the Metaverse Objection in its entirety and also alleges a need to appoint an independent fiduciary, such as an official committee, to investigate "complex cryptocurrency related" issues. Mithai/Portico Joinder ¶¶ 6–7. Simply put, that request is not properly raised by a joinder to a financing objection, and it is not supported by any evidence. *Prima facie*, the idea that an official committee (including the attendant professional costs) would add any value to a case with no secured prepetition debt and 18 filed claims seems unlikely. Even had this been a timely and appropriate request, if it delays the entry of the Final DIP Order, with the releases requested, it should be expected that the DIP Lender would require immediate repayment of the DIP Facility.

9. The DIP Lender views all these objections as unfounded. However, in the interest of avoiding any further confusion, it has consented to the inclusion of terms in the revised proposed final DIP financing order (the "Revised Proposed Final DIP Order"), filed contemporaneously herewith, that address the underlying concerns of the Objectors, while also preserving the Debtor's and the DIP Lender's rights.

10. For these reasons and those set forth below, the Objections should be overruled to the extent not resolved by the Revised Proposed Final DIP Order.

## REPLY

### I. THE RECORD SUPPORTS FINAL APPROVAL OF THE GLOBAL RESOLUTION AND THE DIP RELEASES.

11. Metaverse argues that the Court should not approve the Global Resolution or the DIP Releases until the Debtor discloses the Manche Settlement, a completed schedule of Contributed Claims, the identity of any additional plan release recipients, and its "supporting evaluation" of the released claims. Metaverse Objection ¶¶ 16, 18, 21. Each component of that argument is moot, misdirected or inconsistent with the governing standard.

#### A. The Manche Settlement Has Been Filed.

12. When Metaverse filed its objection, the Manche Settlement had not yet been filed. *See* Metaverse Objection ¶ 16. The Debtor has since filed the Manche Settlement together with the Manche Settlement Motion. *See* Docket No. 194. This portion of the Metaverse Objection, therefore, is moot, and any objection to the terms of the Manche Settlement properly should be raised in connection with the Manche Settlement Motion.

#### B. The *Martin* Factors Are Satisfied on the Existing Record.

13. Metaverse agrees that the Global Resolution is governed by the four factors articulated in *Myers v. Martin* (*In re Martin*), 91 F.3d 389, 393 (3d Cir. 1996): (i) the probability of success in litigation; (ii) the likely difficulties in collection; (iii) the complexity of the litigation involved and the attendant expense, inconvenience, and delay; and (iv) the paramount interest of creditors. Metaverse Objection ¶ 17. The Court need not decide the numerous questions of law and fact raised by the settlement or conclude that it is the best possible outcome; it need only find that the settlement falls above the "lowest point in the range of reasonableness." *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 833 (Bankr. D. Del. 2008) (quoting *In re Coram Healthcare Corp.*, 315 B.R. 321, 330 (Bankr. D. Del. 2004)). Nor does Rule 9019 require a mini-trial or a claim-by-

claim valuation of the compromised claims. *See In re W.R. Grace & Co.*, 475 B.R. 34, 77–78 (D. Del. 2012) (holding that "[i]n analyzing the compromise or settlement agreement under the Martin factors, courts should not have a 'mini-trial' on the merits, but rather should canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness") (internal citations and quotations omitted), *aff'd sub nom. In re WR Grace & Co.*, 729 F.3d 332 (3d Cir. 2013), *and aff'd*, 532 F. App'x 264 (3d Cir. 2013), and aff'd, 729 F.3d 311 (3d Cir. 2013). *See also In re Key3Media Grp., Inc.*, 336 B.R. 87, 92 (Bankr. D. Del. 2005) (holding that "[i]n its efforts to resolve the matter, it is not necessary for a bankruptcy court to conclusively determine claims subject to a compromise, nor must the court have all of the information necessary to resolve the factual dispute, for by so doing, there would be no need of settlement.") (internal citations omitted), *aff'd*, No. 03-10323 (MFW), 2006 WL 2842462 (D. Del. Oct. 2, 2006). Instead, the court only need be "apprised of all relevant information that will enable it to determine what course of action will be in the best interest of the estate." *Key3Media*, 336 B.R. at 92 (citing *Martin*, 91 F.3d at 394).

14. Here, the record establishes that the Global Resolution is a necessary condition for the only financing available to the Debtor, and that without that financing the estate cannot be administered. The Debtor's Chief Restructuring Officer testified that the DIP Facility "represents the best and only financing option available to the Debtor under the unique circumstances of the case." First Day Declaration ¶¶ 44, 49. The financing also funds the estate's principal source of creditor recovery by allowing "a litigation trustee to pursue claims and causes of action, which would otherwise be lost without funding, against the rightful targets, for the benefit of the Debtor's estate." *Id.* ¶ 53. "[W]ithout the settlement, there is no funding, and the Debtor — and its estate — would lose significant value." DIP Motion ¶ 92. Furthermore, the Debtor "is not aware of

viable claims that it may have against the Foundation Parties, including avoidance actions." *Id.* ¶ 89. On that basis, the Chief Restructuring Officer concluded that "the proposed global resolution that is intertwined with the DIP Facility is fair, reasonable, and in the interest of the estate." First Day Declaration ¶ 54.

15. Metaverse does not argue that the Global Resolution is below the "lowest point in the range of reasonableness," because it cannot do so credibly. Instead, it sidesteps the *Martin* factors entirely by arguing only that the Court requires a more copious record. That is not necessary where, as is the case here, the record unambiguously shows that the Global Resolution is reasonable and in the best interests of the estate. *See Key3Media*, 336 B.R. at 92–93; DIP Motion ¶¶ 88–92; First Day Declaration ¶¶ 53–54.

**C. The Contributed Claims Will Be Disclosed in Connection with the Plan Process.**

16. The Contributed Claims are intended to be claims that the Foundation Parties hold against third parties arising from the launch of the $MOVE token and various prepetition agreements, including the Fenix Agreement, which the Foundation Parties will contribute to the Litigation Trust on the effective date of the Subchapter V Plan. DIP Credit Agreement § 1.1 ("Contributed Claims"). As something that would happen only following confirmation of a Subchapter V Plan, the questions regarding Contributed Claims are premature at best. It nevertheless should be observed that a Subchapter V Plan containing provisions for the contribution of the Contributed Claims, would be far from being a one-sided transactions, as such a contribution would add non-estate claims to the Litigation Trust and allow all related litigation to be prosecuted in a coordinated manner, eliminating the risk of a race to judgment between the Debtor and Foundation. DIP Motion ¶¶ 43, 86. Avoiding a race to the courthouse on claims against potential wrongdoers would represent a significant boon to the Debtor's estate, since

Foundation is by far the largest victim of the market-making irregularities. Although there is a split on recoveries from the Litigation Trust within a fixed range, which was added since the entry of the First Interim DIP Order, this provision actually was negotiated as part of a compromise to allow the Debtor to obtain an amendment of the provision in the DIP Facility that would have required a mandatory prepayment of the Manche Settlement under the terms of the DIP Loan Documents.[5] Assuming that the Subchapter V Plan is confirmed with the elements relating to the contribution of the Contributed Claims, the Foundation Parties' ability to retain the use of the Contributed Claims for defensive purposes simply provides basic protection in the event that third parties bring litigation against the Foundation Parties, and the ability to share in a portion of the recovery from the Litigation Trust (which will include Contributed Claims of Foundation) is only fair.

17. In raising issues regarding the Contributed Claims, Metaverse makes little effort to hide its real concern, which is that the Contributed Claims "could include claims against Metaverse." Metaverse Objection ¶ 19. That self-interested concern, however, does not justify the claim-by-claim disclosure Metaverse demands — in fact it makes clear why tactically the Debtor should not be required to make that record today. Metaverse is a creditor of the Debtor with a pending arbitration and a related action in the Southern District of New York, *id.* ¶ 36, and may be a potential litigation target. The Debtor is not required, as a condition of Rule 9019

---

[5] The DIP Credit Agreement requires the Debtor to prepay the DIP Obligations with 100% of the Net Cash Proceeds of any disposition of Collateral other than a "Permitted Transfer," originally defined as "the sale or disposition of cash equivalents for fair market value and in a manner that is not otherwise prohibited by this Agreement or the DIP Loan Documents." *See* Second Interim Order (I) Authorizing the Debtor to (A) Obtain Postpetition Financing and (B) Grant Liens, Including Senior Secured Liens, and Superpriority Administrative Expense Claims; and (II) Modifying the Automatic Stay [Docket No. 171] (the "Second Interim DIP Order"), Ex. 1 §§ 1.1, 2.4(d)(i). The proposed Second Amended and Restated DIP Credit Agreement expands "Permitted Transfers" to include "the settlement of claims and causes of action of the Debtor in accordance with the terms of the Manche Settlement," so the Debtor's settlement with Manche will not trigger a mandatory prepayment. DIP Credit Agreement § 1.1 (definition of "Permitted Transfers").

approval, to disclose to a potential defendant the specific claims that may be asserted against it, the Debtor's investigation of those claims, or its privileged assessment of their merits. Each of those is classic attorney work product. *See* Fed. R. Civ. P. 26(b)(3)(B), *made applicable by* Fed. R. Bankr. P. 7026. Requiring their disclosure to a potential defendant would prejudice the estate's ability to prosecute those claims for the benefit of all creditors.

**D. The Identity of Plan Release Recipients is a Confirmation Issue.**

18. Metaverse's objection to the "additional parties" who may receive releases is misdirected. The only releases now before the Court are the DIP Releases. The plan releases are not proposed for approval by the Proposed Final DIP Order. They are terms that the Subchapter V Plan must contain, and they become effective only upon contribution of the Contributed Claims under a confirmed plan. DIP Credit Agreement § 1.1 ("Subchapter V Plan," cl. (h)). If at that time it is the considered opinion of the Debtor not to utilize funds advanced by the DIP Lender to fund the Subchapter V Plan and the Litigation Trust, and assuming that the Debtor has another source of financing from Metaverse or any other party, the DIP Facility can be repaid at that time, and the plan releases would not be a necessary provision of a plan in the Chapter 11 Case. If the decision is to seek confirmation of a Subchapter V Plan that provides for the conversion of the DIP Facility into an Exit Facility, confirmation of such a plan (which presumably would contain disclosures satisfying the requirements of section 1190(a) of the Bankruptcy Code) will be sought after solicitation of votes, and Metaverse and every other party in interest will have the ability to object at confirmation.

**E. The Global Resolution Does Not Release Direct Creditor Claims.**

19. Metaverse acknowledges that paragraph 37 of the Proposed Final DIP Order, "read alone, releases claims of the Debtor and estate," but suggests that the binding-effect provisions in paragraphs 34 and 38 create uncertainty as to claims owned directly by creditors. Metaverse

Objection ¶ 29. They do not. The Global Resolution is a settlement between the Debtor and the Foundation Parties, which binds parties in interest only insofar as estate claims are released, and it does not purport to release any non-debtor's direct claims. *See* Proposed Final DIP Order ¶¶ 37–38. Nonetheless, to provide further comfort on this issue, the DIP Lender has agreed to include further clarifying language in the Revised Proposed Final DIP Order.

20. Metaverse's alternative request that the Court approve only the financing while deferring paragraphs 37 and 38 of the Proposed Final DIP Order, Metaverse Objection ¶ 33, should likewise be rejected. Metaverse acknowledges that the DIP Lender has expressly conditioned further funding on approval of the DIP Releases, *id.*, and that the Court cannot compel uncommitted lending, *id.* Deferring the DIP Releases, therefore, would deprive the estate of the financing that Metaverse agrees is necessary, and require an immediate repayment of the amounts already advanced.

## II. THE FENIX CARVE-OUT IS NOT ILLUSORY.

21. The Objectors contend that the carve-out from the DIP Releases for breaches of the Fenix Agreement is illusory because paragraph 28 of the Second Interim DIP Order prohibits use of DIP Proceeds and DIP Collateral to investigate or pursue litigation adverse to the Foundation Parties, and the Subchapter V Plan would impose a similar restriction on the Litigation Trust. Metaverse Objection ¶¶ 15, 24; Mithai/Portico Joinder ¶ 6. They ask the Court to authorize the Subchapter V Trustee, the trustee of the Litigation Trust, or another estate representative to investigate and enforce the Fenix Agreement using non-DIP funds, without the DIP Lender's consent and without triggering a default. Metaverse Objection ¶ 25 & Ex. A ¶ C. This request should be denied.

22. *First*, there is nothing to investigate. The Debtor has represented that the Foundation Parties have fully performed their obligations under the Fenix Agreement, and that the Debtor does not believe there are any claims for breach. DIP Motion ¶ 8. Neither Metaverse nor Mithai/Portico identifies any potential breach, or any fact suggesting one.

23. *Second*, the restriction on using DIP Proceeds and DIP Collateral to litigate against the DIP Lender and its affiliates is a customary and commercially sensible financing term. No lender funds litigation against itself. Use restrictions of this kind are routinely approved in this district. *See, e.g.*, *In re Big Lots, Inc.*, No. 24-11967 (JKS) (Bankr. D. Del. Oct. 22, 2024), Docket No. 584, ¶ 30; *In re Joann Inc.*, No. 24-10418 (CTG) (Bankr. D. Del. Apr. 12, 2024), Docket No. 224, ¶ 30; *In re Clovis Oncology, Inc.*, No. 22-11292 (JKS) (Bankr. D. Del. Jan. 24, 2023), Docket No. 256, ¶ 9; *In re TPC Grp. Inc.*, No. 22-10493 (CTG) (Bankr. D. Del. Aug. 2, 2022), Docket No. 566, ¶ 26; *In re Forever 21, Inc.*, No. 19-12122 (KG) (Bankr. D. Del. Nov. 5, 2019), Docket No. 397, ¶ 40; *In re ABT Molecular Imaging, Inc.*, No. 18-11398 (LSS) (Bankr. D. Del. June 15, 2018), Docket No. 33, ¶ 3; *In re Exide Techs.*, No. 02-11125 (JCA) (Bankr. D. Del. May 10, 2002), Docket No. 218, ¶ 17.

24. *Third*, Metaverse's proposed language would rewrite the Debtor's and the DIP Lender's bargain, after the DIP Lender already has funded millions of dollars into the Debtor's estate. It would operate "[n]otwithstanding paragraph 28 of the Second Interim DIP Order, any restriction in the DIP Documents, or any term of the proposed Subchapter V Plan," and would provide that the investigation and enforcement it authorizes "shall not constitute a default under any DIP Document or Exit Facility Document." Metaverse Objection, Ex. A ¶ C. The DIP Credit Agreement prohibits use of DIP proceeds for any "Restricted Purpose," a term that includes investigating or litigating matters adverse to the Foundation Parties, and makes any action adverse

to the DIP Lender that is not reasonably satisfactory to it an event of default. DIP Credit Agreement §§ 1.1 (“Restricted Purpose”), 6.11, 8.1(k). Because all of the Debtor’s assets, including cash, constitute DIP Collateral, there are no meaningful “non-DIP funds” for an estate representative to use. Proposed Final DIP Order ¶ 5. No reasonable lender, including the DIP Lender, would continue lending into such a situation.

## III. THE REMAINING OBJECTIONS ARE CONFIRMATION ISSUES.

25. The Objectors argue that the plan terms in the DIP Credit Agreement give the DIP Lender control over the Litigation Trust agreement, the selection of its trustee, its litigation targets, and future releases. Metaverse Objection ¶¶ 14, 23, 27; Mithai/Portico Joinder ¶ 6. But Metaverse itself concedes that “[a] lender may condition future advances on acceptable plan treatment.” Metaverse Objection ¶ 26. That is all the DIP Credit Agreement does. If the Debtor files and confirms a plan that is not acceptable to the DIP Lender, the consequence is a default under the DIP Facility and the loss of funding. DIP Credit Agreement § 8.1(i). The Debtor remains free to find other funding and pursue whatever plan terms its new lender would find acceptable. Moreover, even a plan that is acceptable to the DIP Lender must still satisfy the requirements of the Bankruptcy Code and obtain confirmation by this Court. Metaverse’s argument here does not reflect the reality of the circumstances.

26. In addition, Mithai/Portico’s characterization of the DIP Lender as having “unfettered” control grossly overstates the real terms. Mithai/Portico Joinder ¶ 6. The Litigation Trust agreement is subject to the DIP Lender’s consent, which may not be unreasonably withheld. DIP Credit Agreement § 1.1, “Subchapter V Plan” (d).

27. Every creditor’s right to object to the Subchapter V Plan and the Litigation Trust agreement is preserved. For the avoidance of doubt, the DIP Lender has agreed to include language to that effect in the Revised Proposed Final DIP Order.

## IV. THE REQUEST FOR A CREDITORS' COMMITTEE IS UNWARRANTED.

28. Mithai/Portico's request for the appointment of "an independent fiduciary, such as a Creditors Committee," Mithai/Portico Joinder ¶ 7, is not properly before the Court. Apart from the fact that there is an independent fiduciary in the form of the Subchapter V Trustee that was appointed in accordance with section 1183 of the Bankruptcy Code, the request is raised as an aside in a joinder to a financing objection rather than by motion on notice, and it is unsupported by any evidence. Mithai/Portico does not even cite to section 1102(a)(3) of the Bankruptcy Code, which provides that the court may only appoint a creditors' committee in a subchapter V case "for cause." 11 U.S.C. § 1102(a)(3). "Cause" is undefined in the Bankruptcy Code, but it at least requires a showing that a committee will "improve recoveries to creditors, will assist in the prompt resolution of [the] case, and is necessary to provide effective oversight of the Debtors." *In re Bonert*, 619 B.R. 248, 254 (Bankr. C.D. Cal. 2020). Mithai/Portico's vague assertion that the issues in this case are "complex" and "cryptocurrency related," Mithai/Portico Joinder ¶ 7, does not come close to establishing the "cause" required under section 1102(a)(3). *See In re Cinemex Holdings USA, Inc.*, 672 B.R. 53, 57 (Bankr. S.D. Fla. 2025) (stating that "[t]he enhanced role of the United States trustee or that of a subchapter V trustee in cases involving small business debtors makes the appointment of a committee less necessary to protect the interests of unsecured creditors") (quoting 7 Collier on Bankruptcy ¶ 1102.04 (16th ed. 2025)).

## RESERVATION OF RIGHTS

29. The DIP Lender reserves all rights to supplement this Reply and to respond to any further objection or supplement filed by any of the Objectors, at or before the final hearing on the DIP Motion.

## CONCLUSION

For the foregoing reasons, the DIP Lender respectfully requests that the Court overrule the Objections to the extent not resolved by the Revised Proposed Final DIP Order and grant such other and further relief as the Court deems just and proper.

[*Remainder of page intentionally left blank*]

Dated: October 14, 2026

Respectfully submitted,

*<u>/s/ Kenneth J. Enos</u>*
YOUNG CONAWAY STARGATT &
TAYLOR, LLP
Kenneth J. Enos (No. 4544)
1000 North King Street
Wilmington, DE 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: kenos@ycst.com

-and-

ALLEN OVERY SHEARMAN STERLING
US LLP
Fredric Sosnick (admitted *pro hac vice*)
William S. Holste (admitted *pro hac vice*)
599 Lexington Avenue
New York, NY 10022
Telephone: (212) 848-4000
Email: fsosnick@aoshearman.com
william.holste@aoshearman.com

*Counsel to the DIP Lender*