**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>MVMT Labs, Inc.,<br><br>Debtor.[1] | Chapter 11 (Subchapter V)<br><br>Case No. 26-11113 (TMH) |

# MVMT LABS, INC.'S SUBCHAPTER V PLAN OF LIQUIDATION


**POTTER ANDERSON & CORROON LLP**
1313 North Market Street, Sixth Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Jeremy W. Ryan (No. 4057)
Gregory J. Flasser (No. 6154)
Sameen Rizvi (No. 6902)
Wenting Wu (No. 7679)
Email: jryan@potteranderson.com
gflasser@potteranderson.com
srizvi@potteranderson.com
wwu@potteranderson.com

*Counsel to the Debtor and Debtor in Possession*


Date: November 9, 2026

[1] The last four digits of the Debtor's federal tax identification number are 5217. The Debtor's service address is c/o Legalinc Corporate Services Inc., 131 Continental Drive, Suite 305, Newark, New Castle County, DE 19713.

# MVMT LABS, INC.'S SUBCHAPTER V PLAN OF LIQUIDATION

This Plan of Liquidation sets forth the process for liquidating the remaining assets of MVMT Labs, Inc. (the "Debtor" or "Labs"), and making distributions to Creditors in satisfaction of its debts.

You are encouraged to review the full text of this document carefully, including all exhibits and attachments, before deciding how to vote on the Plan. To assist you in your review, please note that a list of definitions and a section of frequently asked questions appear at the end of this document. Capitalized terms used in the Plan are defined in the definitions section at the end of the Plan.

**IN ADDITION TO CASTING YOUR VOTE TO ACCEPT OR REJECT THE PLAN, YOU MAY OBJECT TO CONFIRMATION OF THE PLAN. IF YOU WISH TO OBJECT TO CONFIRMATION OF THE PLAN, YOU MUST DO SO BY DECEMBER 9, 2026, AT 4:00 P.M. (PREVAILING EASTERN TIME).**

**YOUR BALLOT STATING HOW YOU ARE VOTING ON THE PLAN MUST BE RETURNED BY DECEMBER 9, 2026, AT 4:00 P.M. (PREVAILING EASTERN TIME). THE BALLOT MUST BE PROPERLY EXECUTED, COMPLETED AND DELIVERED, (A) THROUGH THE CLAIMS AGENT'S ELECTRONIC BALLOT PORTAL AT HTTPS://SECUREMAIL.RELIABLE-CO.COM/FILEDROP/MVMT, OR (B) BY MAIL, OVERNIGHT COURIER, OR PERSONAL DELIVERY TO THE FOLLOWING ADDRESS: MVMT LABS, INC. C/O RELIABLE COMPANIES, ATTN: GENE MATTHEWS, 1007 NORTH ORANGE STREET, SUITE 110, WILMINGTON, DE 19801.**

**A HEARING ON THE CONFIRMATION OF THE PLAN IS SCHEDULED FOR DECEMBER 16, 2026, AT 2:00 P.M. (PREVAILING EASTERN TIME) IN COURTROOM NO. 7, 3RD FLOOR, AT THE U.S. BANKRUPTCY COURT, DISTRICT OF DELAWARE, 824 N. MARKET STREET, WILMINGTON, DELAWARE 19801.**

Parties wishing to participate must make arrangements with the Bankruptcy Court in advance. Please consult the Bankruptcy Court's website for details.

Your rights may be affected by the Plan. You should consider discussing this document with an attorney.

# TABLE OF CONTENTS


SUMMARY OF THE PLAN AND DISTRIBUTIONS TO CREDITORS .................................. 1
ARTICLE 1 .................................................................................................. 2
HISTORY OF THE BUSINESS OPERATIONS OF THE DEBTOR ......................................... 2
Section 1.1 Nature and History of the Debtor's Business. ........................................ 2
Section 1.2 Filing of the Debtor's Chapter 11 Case. ............................................ 2
Section 1.3 Legal Structure and Ownership. ........................................................ 2
Section 1.4 Debtor's Assets ................................................................................ 3
Section 1.5 Debtor's Liabilities and the General Claims Bar Date. ..................... 3
Section 1.6 Current and Historical Financial Conditions. .................................... 4
Section 1.7 Events Leading to the Chapter 11 Case ............................................ 4
Section 1.8 The Global Resolution with the Foundation Parties. ........................ 6
Section 1.9 Significant Events During the Chapter 11 Case. ............................... 7
ARTICLE 2 .................................................................................................. 9
THE PLAN .................................................................................................. 9
Section 2.1 Unclassified Claims .......................................................................... 9
A. DIP Facility Claims ........................................................................................ 9
B. Exit Facility Terms ........................................................................................ 10
C. Administrative Expense Claims .................................................................... 11
D. Priority Tax Claims ........................................................................................ 14
Section 2.2 Classes of Claims and Interests ........................................................ 14
A. Class of Priority Non-Tax Claims .................................................................. 16
B. Class of General Unsecured Claims .............................................................. 17
C. Classes of Holders of Interests ....................................................................... 17
Section 2.3 Objections to Claims or Interests ...................................................... 18
Section 2.4 Treatment of Executory Contracts and Unexpired Leases ............... 18
Section 2.5 Means of Implementation of the Plan ............................................... 19
A. Overview of the Litigation Trust ................................................................... 19
B. Appointment of Litigation Trustee ................................................................ 19
C. Compensation of Litigation Trustee .............................................................. 20
D. Treatment ....................................................................................................... 20
E. Implementation of the Global Resolution and Contributed Claims ............... 22
F. Estate Causes of Action .................................................................................. 23

G. Source of Funding for the Litigation Trust ..... 23
H. Litigation Trust Assets ..... 24
I. Claims Reconciliation Process ..... 24
J. Preservation of Right to Conduct Investigations ..... 25
K. Preservation of Estate Causes of Action and Contributed Claims ..... 25
L. Risks Related to Causes of Action ..... 26
M. Vesting of Assets; Retention of Jurisdiction ..... 26
N. Preservation of Privilege and Defenses ..... 27
O. Indemnification and Exculpation ..... 27
P. Litigation Trust Agreement Controlling ..... 27
Section 2.6 Payments. ..... 28
Section 2.7 Post-Confirmation Management ..... 28
Section 2.8 Tax Consequences of the Plan ..... 28
Section 2.9 Administrative and Priority Claims Reserve; Professional Fee Account ..... 28
ARTICLE 3 ..... 29
FEASIBILITY OF THE PLAN ..... 29
Section 3.1. Ability to Initially Fund Plan ..... 29
Section 3.2. Ability to Make Further Plan Payments and Operate Without Further Reorganization29
ARTICLE 4 ..... 29
LIQUIDATION ANALYSIS ..... 29
ARTICLE 5 ..... 30
NO DISCHARGE OF DEBTOR ..... 30
ARTICLE 6 ..... 30
GENERAL PROVISIONS ..... 30
Section 6.1. Title to Assets. ..... 30
Section 6.2. Binding Effect ..... 31
Section 6.3. Severability ..... 31
Section 6.4. Retention of Subject Matter Jurisdiction ..... 31
Section 6.5. Captions ..... 33
Section 6.6. Modification of Plan ..... 33
Section 6.7. Final Decree ..... 34
Section 6.8. Compromise and Settlement of Claims and Controversies ..... 34
Section 6.9. Releases by the Debtor ..... 34
Section 6.10. Exculpation ..... 35

Section 6.11. Injunction Related to Third Parties ........ 35
Section 6.12. Term of Injunctions or Stays. ........ 36
Section 6.13. Conditions Precedent to the Effective Date ........ 36
ARTICLE 7 ........ 37
ATTACHMENTS ........ 37
ARTICLE 8 ........ 37
FREQUENTLY ASKED QUESTIONS ........ 37
ARTICLE 9 ........ 39
DEFINITIONS ........ 39
A. Scope of Definitions ........ 39
B. Definitions ........ 39

## SUMMARY OF THE PLAN AND DISTRIBUTIONS TO CREDITORS

MVMT Labs, Inc., as the debtor and debtor-in-possession in the above-captioned chapter 11 case, subchapter V, files this proposed Plan of Liquidation pursuant to applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Bankruptcy Rules, including without limitation 11 U.S.C. §§1189-1191.

The Plan provides that, upon the Effective Date, all DIP Cash Collateral shall be contributed to the Litigation Trust and the DIP Obligations shall automatically convert and be refinanced into the Exit Facility on the terms set forth in the DIP Credit Agreement and Exit Facility Documents. The Exit Facility will be used to fund the fees and expenses of the Litigation Trust and to investigate, pursue, and prosecute Estate Causes of Action and Contributed Claims. Recoveries from such litigation will be used to make distributions to Creditors and Holders of Interests as set forth in the Plan.

Distributions to Creditors and Holders of Interests under the Plan will be made solely from recoveries from the Litigation Trust that will be created under the Plan, other than Distributions made on the Effective Date. Accordingly, on the Effective Date, after the Debtor pays or reserves for Allowed Administrative Expense Claims, Priority Tax Claims and Priority Non-Tax Claims, the Debtor's remaining Assets, including the Estate Causes of Action, will be transferred to the Litigation Trust, subject to the Exit Facility Liens; the Foundation Parties will contribute the Contributed Claims to the Litigation Trust; and the Debtor will be dissolved. A Litigation Trustee will be appointed as the fiduciary responsible for administering the Litigation Trust, including pursuing the Vested Causes of Action, objecting to Disputed Claims and Interests, and making Distributions on account of Allowed Claims and Interests.

On the Effective Date, the DIP Obligations shall automatically convert into the Exit Facility on the terms set forth in Section 2.1.B of the Plan, the Exit Facility Agreement and the Confirmation Order. Other than the Final DIP Loan, which will be funded before the Effective Date, the Exit Facility does not provide for additional advances. The fees and expenses of the Litigation Trust, including the investigation and prosecution of the Vested Causes of Action, will be funded from the DIP Cash Collateral (including the remaining proceeds of the Final DIP Loan) contributed to the Litigation Trust, and the Litigation Trust's recoveries will be applied to repay the Exit Facility before any other Distributions, as set forth in the Waterfall.

The exact amounts of recoveries to Creditors and Holders of Interests will depend on the outcome of the contemplated litigation conducted by the Litigation Trust. The table in Section 2.2 below sets forth each class of Claims and Interests along with the range of potential recoveries. There is no guarantee that any recovery will be achieved, and the estimates below represent the Debtor's good-faith estimates as of the date hereof.

# ARTICLE 1

## HISTORY OF THE BUSINESS OPERATIONS OF THE DEBTOR

### Section 1.1 Nature and History of the Debtor's Business.

Labs, a Delaware corporation, was founded in 2023 by its then-sole directors Cooper Scanlon ("Scanlon") and Rushikesh Manche ("Manche"). Labs was formed as a development company in the crypto industry that developed and licensed intellectual property, including specialized software, applications, smart contracts, and blockchain protocols, associated with the blockchain-based network known as the "Movement Network", in connection with the governance, deployment and minting of cryptocurrency, called $MOVE tokens.

Like other entities in that space, the Debtor entered into an agreement with an independent offshore foundation — here, Movement Network Foundation, a Cayman Islands exempted foundation company ("Foundation") — to maintain and support the ecosystem for the $MOVE tokens as a whole, and Foundation's British Virgin Islands subsidiary, Movement Limited ("ML") to mint and issue the $MOVE tokens. Foundation and ML are not affiliates of, and do not share any common control or ownership with, Labs.

Under the Tripartite IP Licensing and Services Agreement (the "Tripartite Agreement") dated September 9, 2024, among Labs, Foundation, and ML, among other things, Labs licensed its software and intellectual property rights ("IP") to ML, transferred certain IP rights to Foundation and provided engineering and technical services required for the purposes of launching and supporting the $MOVE token. In exchange for Labs's services and IP rights under the Tripartite Agreement, Labs received an allocation of $MOVE tokens payable by ML.

On December 9, 2024, the $MOVE token was launched, following which it briefly traded at prices in excess of $1.00 per $MOVE token. The price has since declined by nearly 99% and $MOVE tokens were trading around $0.01 per $MOVE token around the time of the Petition Date.

### Section 1.2 Filing of the Debtor's Chapter 11 Case.

On July 15, 2026, the Debtor filed a voluntary petition for relief under subchapter V of chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. On July 16, 2026, the United States Trustee appointed Jeffrey Schwendeman of RPA Advisors, LLC, to serve as the Subchapter V Trustee in this case pursuant to Bankruptcy Code section 1183(a). No other trustee, examiner or official committee has been appointed in this case.

### Section 1.3 Legal Structure and Ownership.

The vast majority of Labs's common stock is held directly by its two co-founders: Scanlon holds approximately 65.75%; and Manche holds approximately 34.25%. In addition, Lucas Vinzon holds less than 0.1% of the outstanding shares of common stock.

In addition to common stock, the Debtor raised in excess of $42 million by the issuance of Simple Agreements for Future Equity (the "SAFE Agreements") to investors. Had certain

transaction events occurred as specified in the SAFE Agreements, the Holders of SAFE Interests would have received preferred stock in the Debtor. The Debtor did not achieve any such transaction as of the Petition Date. Upon the occurrence of certain events as specified in the SAFE Agreements, the Holders of SAFE Interests are entitled to a return of their investment amounts. The SAFE Agreements specifically state that, in such an event, the SAFE Agreements are to be treated as and have the characteristics and priority of preferred stock with respect to any return of investment amounts.

Currently, Labs's board consists of Matt Kahn ("Kahn") as the sole independent director. There are no other directors or officers, except for Michael Robinson in his capacity as CRO. Prior to the Petition Date, Scanlon had served as the sole director of Labs and its Chief Executive Officer. In the interest of ensuring independent governance and administration for the Debtor during this Chapter 11 Case, Scanlon resigned from both his director and officer positions. He has agreed to remain available and assist with this Chapter 11 Case as a consultant and independent contractor to assist Mr. Kahn and Mr. Robinson.

**Section 1.4 Debtor's Assets.**

The Debtor filed detailed Schedules with the Bankruptcy Court on August 27, 2026. The Schedules set forth the Debtor's Assets and Liabilities as of the Petition Date. The Debtor's Assets as of the Petition Date consisted primarily of: (a) approximately $60,000 in cash on hand; (b) residual contract rights; and (c) litigation claims and causes of action related to the irregularities surrounding the launch of the $MOVE token, as described below.

**Section 1.5 Debtor's Liabilities and the General Claims Bar Date.**

As of the Petition Date, the Debtor had no secured debt. After the Petition Date, the Debtor borrowed $4.2 million under the DIP Facility, and after the Confirmation Order becomes a Final Order, the Debtor expects to borrow the Final DIP Loan, of $1.5 million, under the DIP Facility. The amounts due under the DIP Facility, including the principal amount borrowed of $5.7 million, plus accrued interest and accrued fees, will convert to the Exit Facility.[2] Subject to the Carve-Out, the DIP Lender holds valid, first-priority DIP Liens on substantially all of the Debtor's Assets to secure repayment of the DIP Obligations.

The General Claims Bar Date occurred on September 14, 2026.[3] Although additional unsecured claims were filed prior to the General Claims Bar Date, the Debtor's records as of the Petition Date indicate that total unsecured liabilities, including contingent and/or disputed Claims against the Debtor as of the Petition Date, were approximately $2.1 million. There were also unliquidated (and, in some cases, contingent or disputed) Claims against the Debtor not included in the $2.1 million estimate. As of the Petition Date, the Debtor's estimate of potential Priority Tax Claims against the estate was approximately $25,000.

---

[2] Under the terms of the DIP Facility, all interest and fees are paid in kind, and added to the principal amount of DIP Loans then outstanding.

[3] As of the date hereof, despite the passage of the General Claims Bar Date, the Governmental Claims Bar Date has not yet passed.

Certain Creditors and Holders of SAFE Interests asserted unscheduled Claims against the Debtor of approximately $12.5 million. While the formal claims reconciliation process will be carried out by the Litigation Trustee, upon preliminary review, the Debtor disputes the validity or amount of the majority of the Claims filed by Creditors and believes that Claims filed by Holders of SAFE Interests are subject to recharacterization.

**Section 1.6 Current and Historical Financial Conditions.**

The Debtor has filed monthly operating reports through September 2026 [Docket Nos. 173 and 222] and incorporates those statements by reference.

As of the Petition Date, Labs held no material operating assets. Its remaining assets consisted principally of limited cash on hand, contract rights and litigation claims. With only approximately $60,000 on hand on the Petition Date, Labs did not have sufficient cash to satisfy its outstanding liabilities, fulfill its obligations under the Fenix Agreement, administer the Chapter 11 Case or wind down its affairs, especially amidst pending litigation. Further, Labs lacked sufficient liquidity to pursue its litigation claims, which constitute its most valuable assets. To address these issues, the Debtor obtained post-petition financing in the form of the DIP Facility provided by the DIP Lender.

**Section 1.7 Events Leading to the Chapter 11 Case.**

The key events precipitating this Chapter 11 filing relate to the launch of the $MOVE token and the subsequent dilution of the token price, alleged wrongful activity in connection therewith, and related counterparty actions.

In early 2025, Binance Holdings Limited ("Binance"), the operator of a major cryptocurrency exchange on which $MOVE tokens were traded, commenced an investigation after discovering that an unnamed market-maker sold approximately 66 million $MOVE tokens for a profit of approximately $38 million, without executing corresponding buy orders. To protect its users, Binance notified Labs and Foundation about the violations, froze the market-maker's proceeds, and banned the market-maker from continuing to engage in market-making activities on its platform.

Upon learning of these allegations, Labs initiated an internal investigation in late April and early May 2025 into the alleged market-making irregularities. In connection therewith, Labs implemented certain governance actions to separate co-founder Manche as an employee and officer and remove him as a director of the company. Manche had primary responsibility at Labs for matters relating to the launch and market-making of the $MOVE token. Manche disputed these actions by Labs in Delaware Chancery Court before ultimately dismissing his claims with prejudice.

Following the commencement of the internal investigation, Foundation, ML and Labs agreed to terminate the Tripartite Agreement. Foundation informed Labs that it believed Labs was in breach of the agreement, and that Foundation and ML wished to sever their association with Labs in light of the serious allegations surrounding the launch of the $MOVE token and the resulting harm to the Movement Network. Contemporaneously therewith, Labs was running out

of operating capital. Ultimately, Labs's remaining board, including a disinterested then-board member designated by Labs's lead investor, determined that it was in the best interests of Labs and those to whom Labs's board owed fiduciary duties, including Labs's investors—many of whom were $MOVE token holders—to maximize the value of Labs's assets, minimize cash burn and help preserve the $MOVE token ecosystem by removing Labs from any active involvement in the Movement Network, thereby creating a clean go-forward structure for the Movement Network to continue.

To continue building, operating and growing the Movement Network after the contemplated termination of the Tripartite Agreement, however, Labs needed to be replaced by another cryptocurrency development company. Foundation, whose remit is to foster and support the research, development, extension and use of the Movement Network, $MOVE tokens and related technology, selected Move Ind. Inc. ("Move Industries") to fill that role. Labs considered various options to monetize the value of the team it had built—but which imposed substantial operating expenses—and concluded that a transaction in which Labs, in exchange for cash consideration, would release the bulk of its team from employment agreements in order to allow them to transfer to Move Industries was the only realistic way to maximize value. Otherwise, Labs would have had to terminate the majority, if not all, of its employees and contractor relationships for no value, and incur liabilities relating to those terminations. To that end, on October 14, 2025, Labs and Move Industries entered into the Project Fenix (Labs – Industries) Term Sheet, which outlined a transaction under which, in exchange for $1.2 million, Labs would release certain employees and contractors from non-compete agreements, allowing Move Industries to employ or engage them, as applicable. On November 26, 2025, Labs and Move Industries entered into the Team and Asset Transfer Agreement (the "Transfer Agreement") that formally memorialized the transaction.

To address disputes under the Tripartite Agreement and as a way to resolve Labs's $MOVE token delivery obligations to the greatest extent possible, on or about December 2, 2025, Labs, Foundation and ML entered into the Termination and Settlement Agreement (the "Fenix Agreement"), pursuant to which (i) the Tripartite Agreement was terminated; (ii) Foundation agreed, subject to know-your-customer ("KYC") and know-your-business ("KYB") checks satisfactory to Foundation, to settle, pursuant to a form of token undertaking agreement between Foundation, ML, Labs and the token recipient, Labs's obligation to deliver $MOVE tokens to counterparties pursuant to valid (and not fraudulent) and undisputed token delivery agreements with Labs; (iii) Foundation agreed to pay Labs $6.9 million (inclusive of loan forgiveness with respect to amounts borrowed from Foundation prior to the execution of the Fenix Agreement); (iv) Labs assigned to Foundation remaining IP rights and key operating agreements relating to the Movement Network and technologies that allow users to transact in $MOVE tokens; (v) Labs agreed to provide certain transition services to assist with the transfer and delivery of IP rights and the KYC and KYB process; and (vi) the parties granted mutual releases, subject to certain exclusions (including for fraud and willful misconduct). Labs determined that the Fenix Agreement was the transaction most likely to maximize the value of its assets that would remain after the Transfer Agreement, because it would result in a much-needed cash infusion for Labs, Foundation's settlement of Labs's obligation to deliver $MOVE tokens to counterparties pursuant to valid (and not fraudulent) and undisputed token delivery agreements with Labs, and the avoidance of potential litigation with Foundation and ML that Labs would not have been able to

afford, and which almost certainly could not have resulted in an outcome more favorable to Labs or its creditors.

At the time of the Fenix Agreement, Labs was aware of an investigation by the Department of Justice (the "DOJ Investigation") related to the activities surrounding the launch and market-making of the $MOVE token. Labs lacks D&O insurance that would cover the defense or indemnification of Manche and the other officers and directors serving at the time of the $MOVE launch and market-making activities that arose prior to the commencement of the Chapter 11 Case, including with respect to the DOJ Investigation.

Given the complexity of issues and the potential for litigation on multiple fronts to exhaust Labs's limited funds, and the need for Scanlon and then-General Counsel Joseph Golding-Ochsner ("Golding") to remain on to facilitate the orderly implementation of the Fenix Agreement, at the request of Labs, Foundation agreed to (i) enter into indemnification and release agreements with Scanlon and Golding and (ii) provide sufficient cash consideration under the Fenix Agreement to allow Labs to retain Scanlon's and Golding's services and settle certain litigation claims.

As of the Petition Date, the Debtor was involved in two active litigations related to the $MOVE token issuance. On January 16, 2025, Metaverse Technology Company FZE commenced an arbitration claim in a JAMS arbitration seated in New York, JAMS Ref. No. 5425003221, asserting claims arising out of Labs's failure to deliver crypto assets owed under an advisory agreement. The Debtor has asserted counterclaims against Metaverse and Lihuimei Lei, its founder (the "Metaverse Litigation"). The Metaverse Litigation has been stayed since the Petition Date.

On December 3, 2025, Manche filed an action in the Court of Chancery of the State of Delaware, *Rushikesh Manche v. MVMT Labs, Inc.*, Case No. 2025-1407-CDW, seeking advancement from the corporation for fees and expenses incurred in connection with the federal investigation of Labs. On March 6, 2026, Magistrate Wright issued a report granting Manche's claim for advancement and holding that Manche was entitled to an advancement of fees-on-fees, without reaching issues regarding Manche's ultimate entitlement to fees. On March 11, 2026, Labs filed a notice of exceptions to the Magistrate's report. On June 12, 2026, Vice Chancellor Laster issued an order overruling the exceptions and adopting the report as final. Manche made a claim upon the Debtor for over $1.6 million in legal fees.

Collectively, the investigation conducted by the Debtor, the Metaverse Litigation, the Manche's action in the Court of Chancery and other resolved pre-petition litigation were a significant drain on the Debtor's resources. The Debtor estimated that it incurred in excess of $11 million in professional fees in the eighteen (18) months prior to the Petition Date addressing issues raised by the launch of the $MOVE token and the associated market-making irregularities.

**Section 1.8 The Global Resolution with the Foundation Parties.**

As discussed above, when the Debtor filed its petition, it lacked sufficient liquidity to prosecute the Chapter 11 Case or fund the Litigation Trust. In the weeks leading up to the filing, the Debtor and the Foundation Parties engaged in significant, arm's-length negotiations to obtain the necessary funding. While the Foundation Parties were willing to fund the Chapter 11 Case,

they required assurances that the Chapter 11 Case and the establishment of the Litigation Trust would not result in the Foundation Parties funding litigation against themselves or other parties to whom the Foundation Parties have indemnity obligations. The Debtor and the Foundation Parties each also wanted assurances that the orderly wind-down of the Debtor's business and Foundation's settlement of Labs's valid (and not fraudulent) token delivery obligations would continue during the Chapter 11 Case.

Ultimately, the Debtor and the Foundation Parties reached an agreement (the "Global Resolution"), which provided the following:

(a) The Foundation Parties, through the DIP Lender, would provide a debtor-in-possession facility of $5.7 million to fund the Chapter 11 Case.

(b) The Debtor would assume the Fenix Agreement pursuant to section 365 of the Bankruptcy Code.

(c) The Debtor would release any potential claims and causes of action against the Foundation Parties not already released in the Fenix Agreement.

(d) The Debtor would release claims and causes of action against entities and individuals to which the Foundation Parties owed indemnity obligations including: (i) Scanlon, (ii) Golding, (iii) Ruby Sekhon, and (iv) Move Industries and all of its officers, directors and employees (the "Plan Releases").

(e) Upon confirmation and effectiveness of an acceptable subchapter V plan, the DIP Facility would be converted into an Exit Facility secured by the assets of the Litigation Trust, and the Litigation Trust would retain all DIP Cash Collateral and the Debtor's other Assets

(f) The Foundation Parties would contribute the Contributed Claims to the Litigation Trust to be monetized for the benefit of Creditors and Holders of Interests.

Certain components of the Global Resolution were required to become effective in connection with the Final DIP Order—including the Foundation Parties' releases and the Debtor's assumption of the Fenix Agreement. Other components were expressly conditioned upon, or are to be implemented through, confirmation and consummation of the Plan, including the Plan Releases, the conversion of the DIP Facility into the Exit Facility and contribution of the Contributed Claims.

**Section 1.9 Significant Events During the Chapter 11 Case.**

After the Petition Date, the Debtor sought and received approval of a number of orders from the Bankruptcy Court to ensure smooth administration of the Chapter 11 Case. The Debtor also retained Potter Anderson & Corroon LLP ("Potter Anderson") as counsel and Province Fiduciary Services, LLC ("Province") to provide the Debtor with a CRO. The Debtor designated Michael Robinson as CRO to help it navigate and administer the Chapter 11 Case. The Bankruptcy Court entered orders approving the retention of Potter Anderson and Province on August 25, 2026. *See* Docket Nos. 106 and 110. The Bankruptcy Court also authorized the Debtor to retain Crowell

& Moring LLP as Special Litigation Counsel on September 4, 2026. *See* Docket No. 142. Finally, the Bankruptcy Court authorized the Debtor to retain Reliable as claims and noticing agent and as administrative agent. *See* Docket Nos. 30 and 93.

On July 17, 2026, the Debtor filed the *Debtor's Motion for Entry of (I) Interim and Final Orders (A) Authorizing the Debtor to (1) Obtain Postpetition Financing and (2) Grant Liens, Including Senior Secured Liens, and Superpriority Administrative Expense Claims; and (B) Modifying the Automatic Stay; (II) an Order Authorizing the Assumption of the Fenix Agreement with Movement Network Foundation Pursuant to Sections 365 and 363; (III) an Order Approving the Settlement Between the Debtor and the Foundation Parties Pursuant to Bankruptcy Rule 9019: (IV) an Order Scheduling a Final Hearing with Respect to the Foregoing; and (V) an Order Granting Related Relief* [Docket No. 19] (the "DIP Motion"), which sought approval of the DIP Facility and authorization for the Debtor to enter into the DIP Credit Agreement with the DIP Lender. The DIP Motion and corresponding documents thoroughly disclosed the terms of the DIP Facility and the process for selecting the DIP Lender.

On July 20, 2026, the Bankruptcy Court entered an order approving the DIP Motion and DIP Facility on an interim basis, with an initial DIP Loan of $750,000 [Docket No. 33] (the "Interim DIP Order"). On September 18, 2026, the Bankruptcy Court entered the Second Interim DIP Order approving the DIP Motion on an interim basis and authorizing an additional interim borrowing of $3.45 million. *See* Docket No. 171. In connection with the Second Interim DIP Order, the Debtor entered into an amended and restated DIP Credit Agreement that extended certain deadlines and addressed changes in the structure of the facility to reflect the delay in the entry of the Final DIP Order.

On September 8, 2026, the Debtor, Manche and the DIP Lender participated in a mediation with the Hon. Christopher S. Sontchi (Ret.), which resulted in a settlement in principle of all outstanding issues among and between the DIP Lender, ML and Foundation (collectively, the "Foundation Settlement Parties") and the Debtor, on the one hand, and Manche, Bedford Crypto L.P., Bedford Crypto G.P. and Midas Foundation (collectively, the "Manche Parties"), on the other hand. The essential terms of the settlement agreement (the "Manche Settlement Agreement") among the Debtor, the Foundation Settlement Parties and the Manche Parties were as follows: (a) the Manche Parties would pay the Debtor $2,875,000; (b) Manche would withdraw all pending objections and the Manche Parties would refrain from any future objections to relief the Debtor intended to seek in this Chapter 11 Case, (c) Manche would dismiss the Advancement Action with prejudice; (d) the Manche Parties would provide reasonable cooperation to the Debtor and any successor (including the Litigation Trust) in the prosecution of Causes of Action; and (e) the Debtor and Foundation Settlement Parties on the one hand and the Manche Parties on the other hand would mutually release each other. On September 28, 2026, the Debtor filed the *Debtor's Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019 for Approval of Settlement Agreement Among Debtors, the Manche Parties, and the Foundation Parties* (the "9019 Motion"), seeking approval of the Manche Settlement Agreement.

On October 15, 2026, the Bankruptcy Court entered an order granting the 9019 Motion and approving the Manche Settlement Agreement. On October 19, 2026, the Bankruptcy Court entered a final order approving the DIP Motion, which authorized the Debtor to enter into the DIP Credit Agreement (as amended), approved the Global Resolution and authorized assumption of the Fenix

Agreement. In connection with the Final DIP Order, the Debtor entered into a second amended and restated DIP Credit Agreement that extended certain deadlines, exempted proceeds of the Manche Settlement Agreement from the mandatory prepayment provisions of the DIP Credit Agreement and, as consideration therefor and as additional consideration for the contribution of the Contributed Claims, provided that an acceptable subchapter V plan would entitle Foundation to receive thirty-three percent (33%) of any litigation recoveries achieved by the Litigation Trust in an amount greater than $12.5 million and less than or equal to $33.5 million, meaning that Foundation potentially could receive up to $6.93 million in litigation proceeds sharing.

## ARTICLE 2

## THE PLAN

As required by the Bankruptcy Code, the Plan places Claims and Interests in various classes and describes the treatment each class will receive. The Plan also states whether each class of Claims or Interests is impaired or unimpaired. A Claim or Interest can be impaired if the Plan alters the legal, equitable or contractual rights to which the Holders of such Claims or Interests are otherwise entitled. If the Plan is confirmed, each Holder's recovery is limited to the amount provided in the Plan.

Only Holders in classes that are impaired may vote on whether to accept or reject the Plan, and only Holders holding Claims or Interests that have been Allowed for voting purposes may vote. A class accepts the Plan when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the Allowed Claims or Interests that actually vote, vote in favor of the Plan. Also, a class of Holders of Interests accepts the Plan when at least two-thirds (2/3) in amount of the Allowed Interests that actually vote, vote in favor of the Plan. A class that is not impaired is deemed to accept the Plan.

### Section 2.1 Unclassified Claims

Certain types of Claims are automatically entitled to specific treatment under the Bankruptcy Code. For example, DIP Facility Claims, Administrative Expense Claims and Priority Tax Claims are not classified. They are not considered Impaired, and Holders of such Claims do not vote on the Plan. They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Bankruptcy Code. Accordingly, the Plan does not place the following Claims in any Class.

### A. DIP Facility Claims

The DIP Facility Claims shall be Allowed in full in the aggregate amount of the DIP Obligations as of the Effective Date (including principal, accrued and unpaid interest, fees, costs, expenses, indemnities, and all other amounts due and owing under the DIP Loan Documents) plus all amounts accruing thereafter. They shall not be subject to any avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise),

counterclaim, defense, disallowance or challenge of any kind by any Person, including the Litigation Trust and the Litigation Trustee.

The DIP Lender has consented, for purposes of section 1129(a)(9) of the Bankruptcy Code, to the treatment of the DIP Facility Claims set forth in this Section 2.1.A. Except to the extent that the DIP Lender agrees in writing, in its sole discretion, to different treatment, on the Effective Date: (i) the DIP Obligations shall convert into, and continue as Exit Facility Obligations, with the DIP Liens automatically converting into Exit Facility Liens; and (ii) the Litigation Trust shall assume the Exit Facility Obligations on the terms set forth in Section 2.1.B and the Exit Facility Agreement. Litigation Trust Distributable Cash shall be applied to the Exit Facility Obligations before any Distribution to any other Creditor or Holder of an Interest, as provided in the Waterfall.

**B. Exit Facility Terms**

On the Effective Date, the Exit Conversion shall occur automatically, without the payment of any fees not otherwise specified in the DIP Loan Documents and without further action, order or approval of any Person, and the Confirmation Order shall constitute approval of the Exit Facility on the following terms, which shall bind the Litigation Trust and the Litigation Trustee:

(i) Principal: The aggregate principal amount of the Exit Facility shall equal all DIP Obligations outstanding on the Effective Date (including the Final DIP Loan, all interest and fees paid in kind, and the Exit Fee, which shall be paid in kind and added to principal on the date of the Final DIP Loan);

(ii) Interest: Interest shall accrue at ten and one-half percent (10.5%) per annum and shall be paid in kind quarterly on each March 31, June 30, September 30 and December 31, and, upon the occurrence and during the continuance of an Event of Default, at the Default Rate of an additional two percent (2.0%) per annum;

(iii) Mandatory Prepayments: The Exit Facility shall provide for mandatory prepayments of the Exit Facility Obligations in accordance with clause *second* of the Waterfall and in such order of application as shall be set forth in the Exit Facility Agreement;

(iv) Security and Priority: The Exit Facility Obligations shall be secured by the Exit Facility Liens;

(v) Budget: The Litigation Trust shall operate in accordance with an Approved Budget;

(vi) Covenants and Reporting: The Litigation Trust shall be subject to the covenants of the Exit Facility Agreement, and the Litigation Trustee shall provide the Exit Facility Lender with quarterly reports on the status of the Vested Causes of Action and the Litigation Trust's receipts and disbursements;

(vii) Use of Proceeds: Proceeds of the Exit Facility and other Litigation Trust Assets may not be used for any Restricted Purpose;

(viii) Events of Default: Each of the following shall constitute an Event of Default: (a) the Litigation Trust's failure to comply with the Approved Budget (subject to the Permitted Variance) or the terms of this Plan (including the Plan Supplement), the Confirmation Order, the Exit Facility Agreement or, to the extent not superseded thereby, the Final DIP Order; (b) any action by the Litigation Trust adverse to a Foundation Party or for a Restricted Purpose; (c) the removal or replacement of the Litigation Trustee without the Exit Facility Lender's prior written consent; and (d) the failure to pay the Exit Facility Obligations in full on the maturity date;

(ix) Maturity: The Exit Facility Obligations shall mature not less than five years after the Effective Date with further extensions from time to time on the terms and conditions to be set forth in the Exit Facility Agreement; and

(x) Remedies: Upon the occurrence and during the continuance of an Event of Default, and following five (5) Business Days' written notice to the Litigation Trustee, the Exit Facility Lender may (a) declare all Exit Facility Obligations immediately due and payable, (b) charge interest at the Default Rate, (c) restrict the Litigation Trust's use of Cash to amounts necessary to preserve the Litigation Trust Assets in accordance with the Approved Budget, and (d) exercise all other rights and remedies available to the Exit Facility Lender under the Exit Facility Agreement, the Confirmation Order, the Final DIP Order and applicable law against the Litigation Trust Assets, in each case without further order of the Bankruptcy Court.

Notwithstanding anything to the contrary in the Plan, the Confirmation Order or the Litigation Trust Agreement, all rights, remedies and protections of the DIP Lender under the DIP Loan Documents and the Final DIP Order (including the stipulations, waivers, and releases therein) shall survive Confirmation and the Effective Date and bind the Litigation Trust and the Litigation Trustee. Moreover, to the extent that anything in the Litigation Trust Agreement or any other Plan Document conflicts with the provisions of the Exit Facility Agreement, the provisions of the Exit Facility Agreement shall control.

### C. Administrative Expense Claims

The Debtor must pay all Administrative Expense Claims in full. If an Administrative Expense Claim is disputed, the Bankruptcy Court must determine the validity and amount of the Administrative Expense Claim, or in other words, "allow" the Administrative Expense Claim. Any Administrative Expense Claim that is undisputed and is due and owing on the Confirmation Date must be paid in accordance with the Plan, or upon such other terms as may be agreed upon by the Debtor and the Holder of the Administrative Expense Claim or court order.

Except to the extent that a Holder agrees to less favorable treatment, each Holder of an Allowed Administrative Expense Claim (other than a DIP Facility Claim) shall be paid in full in Cash (a) on the Effective Date, if Allowed and due on or before the Effective Date, or (b) if Allowed after the Effective Date, as soon as practicable after allowance, from the Administrative and Priority Claims Reserve or, in the case of Professional Fee Claims, the Professional Fee Account. A Disputed Administrative Expense Claim shall be paid only after it is Allowed by the Bankruptcy Court.

**The deadline for filing a request for payment of an Administrative Expense Claim (other than a Professional Fee Claim) arising after the Petition Date but prior to the Effective Date is the Administrative Expense Bar Date**. Any Administrative Expense Claim may be barred if the Claim is not timely filed by the applicable Administrative Expense Bar Date, unless the Bankruptcy Court orders otherwise.

There are several types of Administrative Expense Claims, including the following:

1. If the Debtor incurs debt in the ordinary course of business following its filing of the Chapter 11 Case, Holders of such Administrative Expenses Claims are entitled to be paid in full for the goods or services provided. To the extent there was any ordinary trade debt incurred by the Debtor after the Petition Date, such debt will be paid on an ongoing basis in accordance with the ordinary business practices and terms between the Debtor and its trade creditors prior to the Effective Date.

2. Administrative Expense Claims also include any post-petition fees and expenses allowed to Professionals, the CRO, the Subchapter V Trustee, and attorneys and accountants employed upon Bankruptcy Court authority to render services to the Debtor during the course of the Chapter 11 Case. Pursuant to the Interim Compensation Order, the fees and expenses of Professionals must be noticed and approved by the Bankruptcy Court prior to payment.

The following chart lists the Debtor's estimated Administrative Expense Claims (other than DIP Facility Claims), and the proposed treatment of each under the Plan:

| Type | Estimated Amount Owed | Proposed Treatment |
|---|---|---|
| Expenses arising in the ordinary course of business after the Petition Date and prior to the Effective Date. | Approximately $50,000 | Paid in full when due in the ordinary course of business, or on the Effective Date; provided that for any Administrative Expense Claim that is not Allowed on the Effective Date, payment shall be made only upon such Administrative Expense Claim becoming Allowed. |
| Administrative Expense Claims for taxes | $0.00 to *de minimis* | Payment of such expenses in full in Cash: (i) if disputed, upon allowance of such Claim; or (ii) if not disputed, on the date such Claim would fall due in the normal course of business, or upon the Effective Date |

| | | |
|---|---|---|
| The value of goods received in the ordinary course of business within 20 days before the Petition Date. | $0.00 | Not applicable. |
| Professional Fees | Approximately $ 1.4 million to $1.7 million | On the Effective Date, the Debtor shall fund the Professional Fee Account, in accordance with the Approved Budget, in an amount equal to the Professionals' good-faith estimates of all accrued and unpaid Professional Fee Claims. Each Professional shall file with the Bankruptcy Court, and serve on all parties required to receive notice, a final Fee Application on or before the Professional Fee Bar Date. Professional Fee Claims shall be paid by the Litigation Trustee from the Professional Fee Account, after application of any retainer held by such Professional, only to the extent Allowed by Final Order. Any amounts in the Professional Fee Account that are not used to pay Professional Fee Claims shall be transferred to the Litigation Trust. |
| Subchapter V Trustee | Approximately $50,000 | Allowed Administrative Expense Claims of the Subchapter V Trustee that are due and owing as of the Effective Date shall be paid in full on the Effective Date. Any such Claims that are Allowed after the Effective Date shall be paid by the Litigation Trust as soon as practicable from the Administrative and Priority Claims Reserve. |
| Clerk's Office Fees | *de minimis* | Paid in full on the Effective Date. |
| Other Administrative Expenses | *de minimis* | Paid in full on the Effective Date. |
| **Total** | $1.5 million to $1.75 million | |

### D. Priority Tax Claims

Priority Tax Claims are unsecured income, employment, and other taxes described by section 507(a)(8) of the Bankruptcy Code. Unless the Holder of such Allowed Priority Tax Claim agrees otherwise, it must receive the present value of such Claim, in regular installments paid over a period not exceeding five years from the order for relief.

Each Holder of an Allowed Priority Tax Claim will be paid as set forth in the chart below:

| Type | Estimated Amount Owed | Proposed Treatment |
|---|---|---|
| Priority Tax Claims | Approximately $25,000 | Allowed Priority Tax Claims that are due and owing as of the Effective Date shall be paid in full in Cash on the Effective Date. Any Priority Tax Claims that are Allowed after the Effective Date shall be paid as soon as practicable by the Litigation Trust from the Administrative and Priority Claims Reserve. |

### Section 2.2 Classes of Claims and Interests

The classification of Claims against and Interests in the Debtor pursuant to the Plan and the proposed treatment that each class will receive are as follows:

| Class | Description | Treatment | Estimated Amount of Claims or Interests | Status | Entitled to Vote | Projected Recovery[4] |
|---|---|---|---|---|---|---|

[4] The estimated percentage recovery is based on, among other things, an estimate of the Allowed Claims against the Debtor in the Chapter 11 Case. The actual amount of the Allowed Claims may be greater or lower than estimated. Thus, the actual recoveries may be higher or lower than projected, depending on, among other things, the amounts and priorities of Claims that are actually Allowed by the Bankruptcy Court and the actual amount of Cash available for Distribution. Actual recoveries will depend on the ultimate litigation, settlement, or other monetization and realization of value with respect to the Vested Causes of Action. Such value is inherently unknowable and speculative and, therefore, not included in the "projected recovery" presented herein. *See* Sections 2.5.K (Preservation of Estate Causes of Action and Contributed Claims) and 2.5.L (Risks Related to Causes of Action) below for more discussion on this topic.

| | | | | | | |
|---|---|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | Except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment, each Holder of an Allowed Priority Non-Tax Claim shall receive, in full and final satisfaction of and in exchange for such Allowed Priority Non-Tax Claim: (i) payment in full in Cash of such Holder's Allowed Priority Non-Tax Claim; or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | *de minimis* | Unimpaired | No (Presumed to Accept) | 100% |
| 2 | General Unsecured Claims | *Pro Rata* share of Litigation Trust Distributable Cash, in accordance with the Waterfall, after the Exit Facility Obligations have been indefeasibly paid in full in Cash | \$200,000 - \$10,000,000 | Impaired | Yes | 0-100% |

| | | | | | | |
|---|---|---|---|---|---|---|
| 3 | SAFE Interests | *Pro Rata* share of Litigation Trust Distributable Cash, in accordance with the Waterfall, after the Exit Facility Obligations have been indefeasibly paid in full in Cash and Allowed General Unsecured Claims have been paid in full. | Approximately $42 million | Impaired | Yes | 0-25% |
| 4 | Common Stock Interests | *Pro Rata* share of Litigation Trust Distributable Cash, in accordance with the Waterfall, after the Exit Facility Obligations have been indefeasibly paid in full in Cash and Allowed General Unsecured Claims and Allowed SAFE Interests have been paid in full. | N/A | Impaired | Yes | 0-10% |

The following is a more complete discussion of the classes set forth in the Plan and the proposed treatment that each class will receive under the Plan:

### A. Class of Priority Non-Tax Claims

Certain priority Claims that are referred to in §§ 507(a)(1), (4), (5), (6), and (7) of the Bankruptcy Code are required to be placed in classes. The Bankruptcy Code requires that each Holder of such a Claim receive Cash on the Effective Date of the Plan equal to the Allowed amount of such Claim. However, a class of Holders of such Claims may agree to accept different treatment. The Debtor or Litigation Trustee, as applicable, shall pay all Priority Non-Tax Claims

in full in accordance with section 1129(a)(9)(B)(i) of the Bankruptcy Code, and therefore such Class is Unimpaired.

The following chart identifies the Plan's proposed treatment of Class 1, which contains Priority Non-Tax Claims under §§ 507(a)(1), (4), (5), (6), and (7) of the Bankruptcy Code against the Debtor:

| Class | Description | Status | Treatment |
|---|---|---|---|
| 1 | Priority Non-Tax Claims<br><br>Estimated Amount of Claims: *de minimis* | Unimpaired (Presumed to Accept) | Except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment, each Holder of an Allowed Priority Non-Tax Claim shall receive, in full and final satisfaction of and in exchange for such Allowed Priority Non-Tax Claim: (i) payment in full in Cash of such Holder's Allowed Priority Non-Tax Claim; or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |

## B. <u>Class of General Unsecured Claims</u>

General Unsecured Claims are not secured by property of the Estate and are not entitled to priority under § 507(a) of the Bankruptcy Code.

The following chart identifies the Plan's proposed treatment of Class 2, which contains General Unsecured Claims against the Debtor:

| Class | Description | Status | Treatment |
|---|---|---|---|
| 2 | General Unsecured Claims<br><br>Estimated Amount of Claims: $200,000 - $10,000,000 | Impaired | Except to the extent that a Holder of an Allowed General Unsecured Claim has been paid prior to the Effective Date or agrees to less favorable treatment, all Allowed General Unsecured Claims shall be paid Pro Rata from Litigation Trust Distributable Cash, in accordance with the Waterfall, after the Exit Facility Obligations have been indefeasibly paid in full in Cash. |

## C. <u>Classes of Holders of Interests</u>

Holders of Interests are parties who hold an interest (*i.e.*, SAFE Interests or Common Stock Interests) in the Debtor.

The following chart sets forth the Plan's proposed treatment of the classes of Holders of Interests:

| Class | Description | Status | Treatment |
|---|---|---|---|
| 3 | SAFE Interests<br><br>Estimated Amount of Interests: $42,000,000 | Impaired | Except to the extent that a Holder of a SAFE Interest agrees to less favorable treatment, all Allowed SAFE Interests shall be paid Pro Rata from Litigation Trust Distributable Cash, in accordance with the Waterfall, after the Exit Facility Obligations have been indefeasibly paid in full in Cash and Allowed General Unsecured Claims have been paid in full. |
| 4 | Common Stock Interests | Impaired | Except to the extent that a Holder of a Common Stock Interest agrees to less favorable treatment, all Allowed Common Stock Interests shall be paid Pro Rata from Litigation Trust Distributable Cash, in accordance with the Waterfall, after the Exit Facility Obligations have been indefeasibly paid in full in Cash and Allowed General Unsecured Claims and Allowed SAFE Interests have been paid in full. |

**Section 2.3 <u>Objections to Claims or Interests</u>**

The Debtor or the Litigation Trustee, as applicable, may object to the amount or validity of any Claim or Interest on or before the Claims Objection Deadline by filing an objection with the Bankruptcy Court and serving a copy of the objection on the Holder of the Claim or Interest. The Claim or Interest objected to will be treated as a Disputed Claim or a Disputed Interest, as applicable, under the Plan. If and when a Disputed Claim or Disputed Interest is finally resolved by the allowance of the Claim or Interest in whole or in part, the Debtor or the Litigation Trustee, as applicable, will pay the Allowed Claim or Allowed Interest in accordance with the Plan.

**Section 2.4 <u>Treatment of Executory Contracts and Unexpired Leases</u>**

Executory Contracts are contracts for which significant performance remains for both the Debtor and another party to the contract. The Debtor has the right to reject, assume (*i.e.*, accept), or assume and assign these types of contracts to another party, subject to the Bankruptcy Court's approval. The paragraphs below explain the Debtor's intended treatment of its Executory Contracts and the impact such treatment would have on the other parties to such Executory Contracts.

The Debtor will reject any Executory Contract that is not expressly included on the Assumed Contract List (to be provided with the Plan Supplement) unless it previously has been assumed under section 365 of the Bankruptcy Code pursuant to an order of the Bankruptcy Court. For the avoidance of doubt, the Fenix Agreement shall be on the Assumed Contract List.

**The deadline for filing a Proof of Claim based on a Rejection Claim arising from the rejection of an Executory Contract pursuant to the Plan is 30 days after service of notice of the Effective Date**. Any Rejection Claim may be barred if the Proof of Claim is not timely filed by the Rejection Claims Bar Date, unless the Bankruptcy Court orders otherwise.

**Section 2.5 <u>Means of Implementation of the Plan</u>**

The Plan will be implemented by, among other things: (i) the payment or reservation in full on the Effective Date of Allowed Administrative Expense Claims, Priority Tax Claims and Priority Non-Tax Claims; (ii) the establishment of the Litigation Trust; (iii) the appointment of the Litigation Trustee; (iv) the transfer of the Debtor's remaining Assets, and the contribution of the Contributed Claims, to the Litigation Trust; (v) the Exit Conversion; and (vi) the making of Distributions from the Litigation Trust Assets in accordance with the Waterfall.

**A. <u>Overview of the Litigation Trust</u>**

On or prior to the Effective Date, the Litigation Trust shall be established pursuant to the Litigation Trust Agreement for the purpose of liquidating the Litigation Trust Assets, prosecuting and resolving the Vested Causes of Action, objecting to Claims and Interests, resolving Disputed Claims and Disputed Interests, and making the Distributions required by the Plan. The Beneficiaries of the Litigation Trust shall be the Holders of Allowed Class 2 Claims (General Unsecured Claims), Allowed Class 3 Interests (SAFE Interests) and Allowed Class 4 Interests (Common Stock Interests). Holders of Allowed Administrative Expense Claims, Allowed Priority Tax Claims and Allowed Priority Non-Tax Claims shall be paid on the Effective Date or from the Administrative and Priority Claims Reserve or the Professional Fee Account, which the Litigation Trustee shall hold and disburse as disbursing agent, and are not Beneficiaries. On the Effective Date, and before any Cash is transferred to the Litigation Trust, the Debtor shall, from DIP Cash Collateral (including the proceeds of the Final DIP Loan) and in accordance with the Approved Budget, (i) pay in full in Cash all Allowed Administrative Expense Claims (other than DIP Facility Claims and Professional Fee Claims), Allowed Priority Tax Claims and Allowed Priority Non-Tax Claims then due, (ii) fund the Professional Fee Account and (iii) fund the Administrative and Priority Claims Reserve, each as provided in Section 2.9. Cash so paid or reserved shall not be subject to the Waterfall, except that any excess shall be released to the Litigation Trust as provided in Section 2.9. The Foundation Litigation Share is governed by Section 2.5.E.6 and the Litigation Trust Agreement, and shall not be subject to the Waterfall and shall not constitute Litigation Trust Distributable Cash. All Litigation Trust Distributable Cash shall be applied in the following order of priority (the "<u>Waterfall</u>"): *first*, to fund the Litigation Trust Reserve (including for the payment of the fees, expenses and indemnification obligations of the Litigation Trust and the Litigation Trustee); *second*, to the Exit Facility Lender until the Exit Facility Obligations have been indefeasibly paid in full in Cash; *third*, Pro Rata to Holders of Allowed General Unsecured Claims until paid in full; *fourth*, Pro Rata to Holders of Allowed SAFE Interests until paid in full; and *fifth*, Pro Rata to Holders of Allowed Common Stock Interests. The Litigation Trust Agreement shall implement, and may not modify, the Waterfall, and all beneficial interests in the Litigation Trust shall be subject to the Waterfall.

**B. <u>Appointment of Litigation Trustee</u>**

On or before the Plan Supplement Deadline, the Litigation Trustee shall be designated by the Debtor, with the consent of the DIP Lender in its reasonable discretion and after consultation with the United States Trustee and the Subchapter V Trustee, and the Litigation Trustee shall be appointed pursuant to the Confirmation Order. Until the Exit Facility Obligations have been

indefeasibly paid in full in Cash, the Litigation Trust Agreement shall provide for customary protections of the Exit Facility Lender, consistent with the terms and covenants of the Exit Facility Agreement. The Litigation Trustee may be removed for cause, and any successor Litigation Trustee shall be selected, only with the prior written consent of the Exit Facility Lender until the Exit Facility Obligations have been indefeasibly paid in full in Cash. The Litigation Trustee shall be the exclusive trustee of the Litigation Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3) and the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code. Subject to the consent rights and covenants in the Exit Facility Agreement, the Waterfall and Section 2.5.E, the powers, rights and responsibilities of the Litigation Trustee shall be specified in the Litigation Trust Agreement and shall include the authority and responsibility to: (a) receive the Vested Causes of Action and exercise all rights with respect thereto, including by reviewing, reconciling, pursuing, commencing, prosecuting, compromising, settling, dismissing, releasing, waiving, withdrawing, abandoning, resolving, or electing not to pursue any Vested Cause of Action; (b) invest monies held from time to time by the Litigation Trust; (c) make or arrange to make payment of expenses and other obligations of the Litigation Trust; (d) establish such funds, reserves, and accounts within the Litigation Trust as the Litigation Trustee deems useful in carrying out the purposes of the Litigation Trust; (e) retain and compensate, without further order of the Bankruptcy Court, Litigation Trust Professionals to advise and assist in the administration, prosecution and Distribution of Litigation Trust Assets; (f) enter into such other arrangements with third parties as the Litigation Trustee deems useful in carrying out the purposes of the Litigation Trust; (g) distribute the Foundation Litigation Share; (h) calculate and implement Distributions of Litigation Trust Distributable Cash; and (i) pay, from the Professional Fee Account and the Administrative and Priority Claims Reserve, as applicable, Professional Fee Claims and other Claims payable therefrom that are Allowed by order of the Bankruptcy Court.

### C. Compensation of Litigation Trustee

The Litigation Trustee shall be reasonably compensated out of the Litigation Trust for his services and be reimbursed out of the Litigation Trust for his reasonable expenses in accordance with the compensation schedule attached to the Litigation Trust Agreement.

### D. Treatment

It is intended that the Litigation Trust be classified for federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulations Section 301.7701-4(d) and as a "grantor trust" within the meaning of Sections 671 through 679 of the Internal Revenue Code, with no objective to continue or engage in the conduct of a trade or business. In furtherance of this objective, the Litigation Trustee shall, in his business judgment, make continuing best efforts not to prolong unduly the duration of the Litigation Trust. All Litigation Trust Assets on the Effective Date shall be deemed for federal income tax purposes (i) to have been distributed (subject to any obligations relating to such assets, including the Exit Facility Obligations) by the Debtor to the Beneficiaries (other than the Litigation Trust Assets allocable to the Litigation Trust Reserve and any reserves created with respect to any Disputed Claims or Disputed Interests) in satisfaction of their Allowed Claims and Allowed Interests and (ii) immediately thereafter contributed by such Beneficiaries to the Litigation Trust in exchange for their respective beneficial interests. The

Beneficiaries will be treated as the deemed owners of the Litigation Trust (other than the assets allocable to any Litigation Trust Reserve and any reserves created with respect to Disputed Claims or Disputed Interests). The Litigation Trustee will be responsible for filing information on behalf of the Litigation Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a). Subject to contrary definitive guidance from the Internal Revenue Service or a court of competent jurisdiction (including the receipt by the Litigation Trustee of a private letter ruling if the Litigation Trustee so requests, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the Litigation Trustee), the Litigation Trustee may (i) timely elect to treat any disputed claims reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. All parties (including the Litigation Trustee, the Debtor and the Beneficiaries) shall report for U.S. federal, foreign, state and local income tax purposes consistently with the foregoing. The Litigation Trustee may withhold and pay to the appropriate taxing authority all amounts required to be withheld pursuant to the Internal Revenue Code or any provision of any foreign, state or local tax law with respect to any payment or distribution to the Beneficiaries. All such amounts withheld and paid to the appropriate taxing authority shall be treated as amounts distributed to such Beneficiaries for all purposes of the Litigation Trust Agreement. The Litigation Trustee shall be authorized to collect such tax information from the Beneficiaries (including, without limitation, social security numbers or other tax identification numbers) and forms (including without limitation IRS Form W-8 and IRS Form W-9) as the Litigation Trustee, in his sole discretion, reasonably deems necessary to effectuate the Plan, the Confirmation Order and the Litigation Trust Agreement in accordance with the tax laws of the United States and any state, commonwealth or territory thereof (any such information or forms, "Beneficiary Tax Information"). In order to receive Distributions under the Plan, all Beneficiaries shall identify themselves to the Litigation Trustee and provide tax information and the specifics of their holdings, to the extent the Litigation Trustee reasonably deems appropriate in his sole discretion. The Litigation Trustee may refuse to make a Distribution to any Beneficiary that fails to furnish such information within sixty (60) days of any request therefor by the Litigation Trustee, until such information is delivered; provided, however, that, upon the delivery of such information by a Beneficiary, the Litigation Trustee shall make such Distribution to which the Beneficiary is entitled, without interest; and, provided, further, that, if the Litigation Trustee fails to withhold in respect of amounts received or distributable with respect to any such Beneficiary and the Litigation Trustee is later held liable for the amount of such withholding, such Beneficiary shall reimburse the Litigation Trustee for such liability. The Litigation Trustee shall reserve all Distributions due to any Beneficiary that does not timely provide Beneficiary Tax Information (any such Distribution collectively, the "Beneficiary Tax Reserve") until the earlier of (a) such time that the Beneficiary provides the Beneficiary Tax Information and (b) the final Distribution Date. Any Beneficiary that does not timely provide Beneficiary Tax Information to the Litigation Trustee as of the final Distribution Date shall not be entitled to receive any Distributions from the Litigation Trust. Any funds that remain in the Beneficiary Tax Reserve as of the final Distribution Date shall be distributed in accordance with the Waterfall. The Litigation Trustee shall be responsible for filing all federal, state, and local tax returns for the Debtor and the Litigation Trust. The Litigation Trust shall comply with all withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all Distributions made by the Litigation Trust shall be subject to any such withholding and reporting requirements.

## E. Implementation of the Global Resolution and Contributed Claims

As discussed above, the Bankruptcy Court approved the Global Resolution in connection with the Final DIP Order.

As a condition to the Foundation Parties' support of the Plan and provision of the Exit Facility, the DIP Credit Agreement requires that the Plan contain the following terms, each of which is incorporated into and made part of the Plan and shall bind the Litigation Trust and the Litigation Trustee:

1. The Litigation Trust shall have no authority to investigate, commence, prosecute, join in or finance in any way (or reimburse for expenses incurred or to be incurred in connection with) any action, suit, arbitration, proceeding, application, motion, objection or other litigation adverse to the Foundation Parties.

2. All Assets, including all DIP Cash Collateral, shall be contributed to the Litigation Trust on the Effective Date, other than Cash applied on the Effective Date, to the payments and reserves required by Section 2.5.A.

3. The Exit Conversion shall occur on the Effective Date.

4. The Litigation Trust Agreement to be included in the Plan Supplement shall be in a form and substance consented to by the DIP Lender, with such consent not to be unreasonably withheld.

5. The Debtor releases all Foundation Parties as set forth in Section 6.9 of the Plan.

6. On the Effective Date, the Foundation Parties shall contribute the Contributed Claims to the Litigation Trust; *provided*, *however*, that (i) notwithstanding such contribution, the Foundation Parties shall retain the benefit of such claims and causes of action to the extent they may be used as counterclaims in any litigation against the Foundation Parties by any third party; and (ii) Foundation shall retain, and shall be entitled to receive directly, the Foundation Litigation Share. The Foundation Litigation Share is Foundation's retained interest in the recoveries of the Litigation Trust, reserved as part of the consideration for the contribution of the Contributed Claims and the Exit Conversion under the Global Resolution. The Litigation Trust Agreement shall set forth the means of calculating the Foundation Litigation Share.

7. On the Effective Date, following the contribution of the Contributed Claims to the Litigation Trust, the Debtor releases (i) Scanlon, (ii) Golding, (iii) Ruby Sekhon, and (iv) Move Industries and all of its officers, directors and employees, as set forth in, and subject to the exceptions in, Section 6.9 of the Plan.

8. All DIP Liens, DIP Superpriority Claims and other protections in favor of the DIP Lender shall survive Confirmation and upon the Exit Conversion shall be converted into Exit Facility Liens and Exit Facility Obligations. The Exit Facility Liens shall remain in full force and effect until all Exit Facility Obligations indefeasibly are paid in full in Cash, as provided in Section 2.1 of the Plan.

F. **Estate Causes of Action**

The Debtor's claims and Causes of Action constitute a principal remaining Asset of the Estate and are referred to herein as the "Estate Causes of Action." The Estate Causes of Action include, without limitation, (i) claims and Causes of Action relating to the irregularities surrounding the $MOVE Token Launch; (ii) claims and Causes of Action against any market-maker that sold $MOVE tokens without corresponding buy orders, and against any other third parties that participated in, facilitated, or benefited from the market-making irregularities, including claims for fraud, aiding and abetting breach of fiduciary duty, conversion, unjust enrichment, and related theories, including claims and Causes of Action arising from the activities that are the subject of the DOJ Investigation; (iii) all Avoidance Actions and other claims and Causes of Action arising under chapter 5 of the Bankruptcy Code or applicable non-bankruptcy law; and (iv) any other claim or Cause of Action held by the Estate to be pursued in accordance with the best interests of the Litigation Trust. Further investigation and prosecution of the Estate Causes of Action by the Litigation Trust is a critical and integral component of the Plan, and the Estate Causes of Action are highly material to recoveries and constitute a principal source of value for Distributions to Creditors and Holders of Interests under the Plan. The Estate Causes of Action, together with the Contributed Claims, are the only potential sources of recovery for Creditors and Holders of Interests, and the preservation and prosecution of the Estate Causes of Action, together with the Contributed Claims, by the Litigation Trust is the entire purpose of Confirmation of the Plan and the creation of the Litigation Trust. Consistent with section 1141(b) of the Bankruptcy Code, which permits a plan to provide that a specified cause of action remains estate property after the Effective Date. The Debtor submits that the confirmation record will establish that retaining the Vested Causes of Action as property of the Estate is necessary to the Plan's success and satisfies the functional limits identified in *In re Resorts International, Inc.*, 372 F.3d 154 (3d Cir. 2004), such that adjudication of the Vested Causes of Action will have a direct effect on the remaining Estate and consummation of the Plan (including the repayment of the Exit Facility Obligations, Distributions under the Waterfall) and thus satisfy the ordinary related to jurisdictional test. The Estate Causes of Action are identified with specificity herein, bear a material connection to the Debtor's financial distress and anticipated creditor recoveries, and are retained as property of the Estate as necessary to the Plan's implementation and not merely as a means of selecting a litigation forum. For the avoidance of doubt, the Estate Causes of Action do not include: (i) any claims or Causes of Action released pursuant to the Global Resolution, including the (x) DIP Releases in favor of the Foundation Parties, or (y) any claims resolved under the Fenix Agreement as assumed pursuant to the Final DIP Order, except to the extent of the Debtor's preserved rights with respect to any breach by a Foundation Party of its obligations under the Fenix Agreement, or released pursuant to the terms of this Plan; and (ii) any claims or Causes of Action released pursuant to the Manche Settlement Agreement.

G. **Source of Funding for the Litigation Trust**

Upon the Confirmation Order becoming a Final Order and the satisfaction or waiver of the other conditions set forth in the DIP Credit Agreement, the DIP Lender shall make the Final DIP Loan in accordance with the DIP Credit Agreement. On the Effective Date, after the payments and reserves required by Section 2.5.A, all remaining DIP Cash Collateral (including the remaining proceeds of the Final DIP Loan) shall be contributed to the Litigation Trust. Other than the Final DIP Loan, which will be funded before the Effective Date, the Exit Facility does not provide for

additional advances. The fees and expenses of the Litigation Trust, including the investigation and prosecution of the Vested Causes of Action, shall be funded from the DIP Cash Collateral so contributed and from other Litigation Trust Assets, in accordance with the Approved Budget and subject to the restrictions set forth in Section 2.5.E. Recoveries from such litigation or other monetization of the Litigation Trust Assets will be distributed in accordance with the Waterfall.

### H. Litigation Trust Assets

On the Effective Date, pursuant to section 1123(b)(3) of the Bankruptcy Code and by operation of the Plan, the Debtor's Assets (other than Cash applied to the payments and reserves required by Section 2.5.A) shall be transferred (and deemed transferred) to the Litigation Trust, subject to the Exit Facility Liens but free and clear of all other Claims, Liens, charges, encumbrances, rights, and interests, without the need for any Person to take any further action or obtain any approval.

On the Effective Date, the Foundation Parties shall contribute the Contributed Claims to the Litigation Trust subject to the terms and conditions set forth in Section 2.5.E.

Other than as set forth herein, in the DIP Credit Agreement, the Exit Facility Agreement or the Litigation Trust Agreement, the Litigation Trust may pursue any Cause of Action and Contributed Claims in accordance with the best interests of the Litigation Trust and in accordance with the terms of this Plan. No person may rely on the absence of a specific reference in the Plan or the Plan Supplement, to any Cause of Action or Contributed Claim against them as any indication that the Litigation Trust will not pursue any and all available Causes of Action or Contributed Claims.

Other than as set forth herein, in the DIP Credit Agreement, the Exit Facility Agreement or the Litigation Trust Agreement, the Plan expressly reserves for the Litigation Trust all rights to prosecute any and all Causes of Action and Contributed Claims against any person, except as otherwise provided in the Plan. Unless any Cause of Action or Contributed Claim against any person is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or an order of the Bankruptcy Court, the Litigation Trust expressly reserves all Causes of Action and Contributed Claims for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action or Contributed Claims upon, after, or as a consequence of confirmation or consummation of the Plan.

### I. Claims Reconciliation Process

From and after the Effective Date, the Litigation Trust shall be solely responsible for: (i) objecting to Claims or Interests that are not otherwise Allowed or Disallowed on the Effective Date, (ii) all related aspects of the Claims reconciliation process, and (iii) the payment of all costs and expenses incurred by the Litigation Trust in connection with the reconciliation process.

### J. Preservation of Right to Conduct Investigations

Any and all rights to conduct investigations pursuant to Bankruptcy Rule 2004 held by the Debtor prior to the Effective Date shall vest with the Litigation Trust upon the Effective Date and shall continue in effect until dissolution or termination of the Litigation Trust.

### K. Preservation of Estate Causes of Action and Contributed Claims

The Bankruptcy Code preserves the Debtor's rights to prosecute claims and Causes of Action that exist outside of bankruptcy and empowers the Debtor to prosecute certain claims and Causes of Action established by the Bankruptcy Code, including Causes of Action to recover preferential transfers and fraudulent conveyances. In accordance with section 1123(b)(3) of the Bankruptcy Code, and except as otherwise provided in the Plan, the Confirmation Order, or any contract, instrument, release, or other agreement entered into or delivered in connection with the Plan, the Plan provides for all Estate Causes of Action, together with the Contributed Claims contributed to the Litigation Trust pursuant to the Global Resolution, to be assigned and transferred to, and to vest in, the Litigation Trust on the Effective Date, subject to the Exit Facility Liens but free and clear of all other Claims, Liens, charges, encumbrances, rights, and interests. Upon such vesting, the Estate Causes of Action and the Contributed Claims shall constitute Vested Causes of Action, and shall be held, administered, and monetized as Litigation Trust Assets, in accordance with the Litigation Trust Agreement. On the Effective Date, the Litigation Trustee shall serve as the successor-in-interest to, and the representative of, the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, with respect to the Estate Causes of Action, shall have and retain all rights and defenses the Debtor held immediately before the Effective Date, and pursuant to section 1141(b) of the Bankruptcy Code the Estate shall continue to exist after the Effective Date to the extent necessary for the Litigation Trustee to pursue, and for the Bankruptcy Court to retain jurisdiction over, the Estate Causes of Action and the Contributed Claims.

Subject to the Litigation Trust Agreement and the consent rights and covenants in the Exit Facility, the Litigation Trustee shall have the power and authority to review, reconcile, pursue, commence, prosecute, compromise, settle, dismiss, release, waive, withdraw, abandon, resolve, or elect not to pursue any and all Estate Causes of Action and Contributed Claims, in the exercise of the Litigation Trustee's reasonable business judgment and for the benefit of the Beneficiaries. The Litigation Trustee shall succeed to and may preserve, assert, or waive the attorney-client privilege, work-product protection, and other privileges and immunities of the Debtor and the Estate with respect to the Estate Causes of Action and the Contributed Claims, and shall be authorized to examine any Person pursuant to Bankruptcy Rule 2004 in connection therewith.

A non-exclusive schedule of the Estate Causes of Action and the Contributed Claims may be filed with the Plan Supplement. The inclusion or failure to include any Cause of Action in the Plan or the Plan Supplement shall not be deemed an admission, denial, or waiver of any claim, right, or Cause of Action that the Debtor, the Estate, or the Litigation Trust may have against any Person. No Person may rely on the absence of a specific reference in the Plan or the Plan Supplement to any Cause of Action or Contributed Claim against it as any indication that the Litigation Trust will not pursue any and all available Causes of Action or Contributed Claims against it. Unless a Cause of Action or Contributed Claim is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or an order of the Bankruptcy Court, the

Litigation Trust expressly reserves all Estate Causes of Action and Contributed Claims for later adjudication, and no preclusion doctrine, including res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action or Contributed Claims upon, after, or as a consequence of Confirmation or consummation of the Plan. The preservation, investigation, and prosecution of the Estate Causes of Action and the Contributed Claims is a critical and integral component of the Plan, and such Causes of Action and Contributed Claims constitute the majority of the Litigation Trust Assets that will be monetized for the benefit of Holders of Allowed Claims and Allowed Interests entitled to Distributions under the Plan.

### L. Risks Related to Causes of Action

There is no guarantee that any of the Estate Causes of Action or Contributed Claims will be prosecuted, or that any such Cause of Action or Contributed Claim is viable as a matter of fact and/or law. Furthermore, to the extent the Litigation Trustee determines to prosecute any such Cause of Action or Contributed Claim, there is no guarantee as to the outcome, timing, or amount of any recovery, or that, if successful, there will be an increase in the funds available for Distribution. The success in pursuing such Causes of Action and Contributed Claims, as well as the expenses incurred in investigating and prosecuting them, may materially affect the recoveries for Holders of Allowed Claims and Allowed Interests. These risks are heightened because many of the Estate Causes of Action and Contributed Claims arise out of the $MOVE token launch and the related market-making irregularities and will be vigorously disputed, may be subject to defenses, counterclaims, and collection difficulties, and involve conduct that is also the subject of an ongoing investigation by the United States Department of Justice. For purposes of the Plan, no value has been ascribed to the Estate Causes of Action or the Contributed Claims.

### M. Vesting of Assets; Continued Existence of the Estate

Except as otherwise provided in the Plan, the Plan Supplement, the Confirmation Order, or the Litigation Trust Agreement, on the Effective Date, all of the Debtor’s Assets, including the Litigation Trust Assets, shall immediately vest in the Litigation Trust for the benefit of the Beneficiaries, subject to the Exit Facility Liens. On and after the Effective Date, except as otherwise provided herein (including Section 2.5.B) or in the Litigation Trust Agreement, the Litigation Trustee may use, acquire, or dispose of the Litigation Trust Assets, and may compromise or settle any Claims or Causes of Action, without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules. Pursuant to section 1141 of the Bankruptcy Code, all property transferred to the Litigation Trust shall be transferred free and clear of all Claims, Interests, Liens, encumbrances, charges, and other interests, except as expressly provided in the Plan, the Confirmation Order, or the Final DIP Order. For the avoidance of doubt, on the formation of the Litigation Trust, the Litigation Trust Assets shall be subject to the Exit Facility Liens, in accordance with the Final DIP Order, the Exit Facility Agreement, Section 2.1.B of the Plan, and the Confirmation Order, until all Exit Facility Obligations are indefeasibly paid in full in cash.

On the Effective Date and following contribution of the Contributed Claims, the Estate Causes of Action and the Contributed Claims (a) shall in the first instance remain property of the Estate pursuant to sections 1123(a)(5)(B), 1123(b)(3) and 1141(b) of the Bankruptcy Code, and,

with respect to the Contributed Claims, shall be contributed to the Estate as property of the Estate without the need for execution of any assignment of interests therein, or (b) if not property of the Estate for any reason or at any time, shall be deemed to have been transferred to and vested in the Litigation Trust as of the Effective Date, subject to the Exit Facility Liens and Section 2.5.E. The Litigation Trustee shall serve as the successor-in-interest to the Debtor and the representative of the Estate with respect to the Estate Causes of Action and the successor and assignee of the Foundation Parties with respect to the Contributed Claims. Accordingly, (x) pursuant to section 1141(b) of the Bankruptcy Code, the Estate shall continue to exist after the Effective Date, notwithstanding the dissolution of the Debtor, to the extent necessary for the Bankruptcy Court to retain jurisdiction over the Estate Causes of Action and the Contributed Claims; and (y) pursuant to section 1123(b)(3)(B) of the Bankruptcy Code, the Litigation Trust, acting through the Litigation Trustee, may prosecute the Estate Causes of Action and the Contributed Claims.

### N. Preservation of Privilege and Defenses

No action taken by the Debtor in connection with the Plan shall be (or be deemed to be) a waiver of any privilege or immunity of the Debtor, as applicable, including any attorney-client privilege or work-product privilege attaching to any documents or communications (whether written or oral). The Confirmation Order shall provide that notwithstanding the Debtor providing any privileged information to the Litigation Trustee, the Litigation Trust, or any party or person associated with the Litigation Trust, such privileged information shall be without waiver in recognition of the joint and/or successorship interest in prosecuting any Claim or Cause of Action or Contributed Claims on behalf of the Estate and shall remain privileged. The sharing of privileged information by the Foundation Parties with respect to the Contributed Claims shall not be a waiver of any privilege or defense and shall be protected to the fullest extent of applicable law by the attorney-client privilege, work-product doctrine, common interest privilege or any other common law or statutory privilege that may apply.

### O. Indemnification and Exculpation

The Litigation Trustee, the Litigation Trust Professionals, and any professionals retained by the Litigation Trust Professionals, shall be entitled to the fullest extent of exculpation available under Delaware law and unless such law provides otherwise, shall not be liable for actions taken or omitted in such capacities, except those acts arising out of its or their own willful misconduct or gross negligence. As will be more fully set forth in the Litigation Trust Agreement, the Litigation Trustee, the Litigation Trust Professionals and any professionals retained by the Litigation Trust Professionals shall be entitled to indemnification and reimbursement by the Litigation Trust for fees and expenses in defending any and all of its actions or inactions in such capacities, except for any actions or inactions involving willful misconduct or gross negligence and any such claim for indemnification will be paid in accordance with the terms of the Litigation Trust Agreement.

### P. Litigation Trust Agreement Controlling

In the event of any conflict between this summary or any other provision of the Plan and the Litigation Trust Agreement, then the terms and provisions of the Litigation Trust Agreement

shall control; *provided*, *however*, that Section 2.1.A, Section 2.1.B, Section 2.5.E, the Waterfall and the rights of the DIP Lender, the Exit Facility Lender and the Foundation Parties under the Plan, the Confirmation Order, the Exit Facility Agreement and the Final DIP Order shall control over any conflicting provision of the Litigation Trust Agreement. In the event of any conflict between the Confirmation Order and the Litigation Trust Agreement, then the terms of the Confirmation Order shall control. These descriptions of the Litigation Trust and the scope and terms of the Litigation Trust Agreement are qualified in their entirety by reference to the specific terms and conditions of the Litigation Trust Agreement, subject to the foregoing proviso.

**Section 2.6 Payments.**

If the Plan is confirmed under section 1191(a) or (b) of the Bankruptcy Code, payments to Creditors and Holders of Interests provided for in the Plan will be made by the Litigation Trust. Notwithstanding section 1194(b) of the Bankruptcy Code, if the Plan is confirmed under section 1191(b), the Subchapter V Trustee shall not serve as disbursing agent, and all Distributions shall be made by the Litigation Trust in accordance with the Waterfall. Any Unclaimed Property that remains unclaimed ninety (90) days after the applicable Distribution Date shall be forfeited by the applicable Holder, shall revert to the Litigation Trust free of any claim of such Holder, and shall be distributed in accordance with the Waterfall.

**Section 2.7 Post-Confirmation Management**

The Debtor is liquidating and dissolving and there will be no post-confirmation management.

**Section 2.8 Tax Consequences of the Plan**

***Creditors and Holders of Interests concerned with how the Plan may affect their tax liability should consult with their own accountants, attorneys, and/or advisors.***

**Section 2.9 Administrative and Priority Claims Reserve; Professional Fee Account**

On the Effective Date, before the transfer of any Cash to the Litigation Trust, the Debtor shall fund (i) the Administrative and Priority Claims Reserve in the Administrative and Priority Claims Reserve Amount and (ii) the Professional Fee Account, in each case from DIP Cash Collateral (including the proceeds of the Final DIP Loan) in accordance with the Approved Budget. After the Effective Date, the Litigation Trustee shall use (a) the Administrative and Priority Claims Reserve solely to pay Administrative Expense Claims (other than DIP Facility Claims and Professional Fee Claims), Priority Tax Claims and Priority Non-Tax Claims that are Allowed but unpaid as of the Effective Date or become Allowed thereafter, and (b) the Professional Fee Account solely to pay Allowed Professional Fee Claims. Funds remaining in the Administrative and Priority Claims Reserve after all Claims payable from it have been paid in full or Disallowed shall be applied first to any Allowed Professional Fee Claims that cannot be paid in full from the Professional Fee Account, and any funds remaining thereafter in either account shall be released to the Litigation Trust and distributed in accordance with the Waterfall. If the Administrative and Priority Claims Reserve and the Professional Fee Account are together insufficient to pay any such

Allowed Claim in full, the Litigation Trust shall pay the deficiency as an expense of the Litigation Trust under clause *first* of the Waterfall.

## ARTICLE 3

## FEASIBILITY OF THE PLAN

The Bankruptcy Court must find that Confirmation of the Plan is not likely to be followed by the liquidation, or need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan.

### Section 3.1. Ability to Initially Fund Plan

Pursuant to the DIP Credit Agreement and the Final DIP Order, the Debtor expects to receive $1,500,000 in proceeds of the Final DIP Loan, in addition to its remaining cash on hand, all of which constitutes DIP Cash Collateral. From those sources, the Debtor expects to have sufficient Cash on the Effective Date to pay all Claims required to be paid on the Effective Date, fund the Administrative and Priority Claims Reserve and the Professional Fee Account, and contribute the balance to the Litigation Trust. Tables showing the projected amount and sources of Cash on hand on the Effective Date shall be set forth in the Plan Supplement.

### Section 3.2. Ability to Make Further Plan Payments and Operate Without Further Reorganization

The Debtor is liquidating and transferring all of its remaining Assets to the Litigation Trust. Each Holder of an Allowed Claim or Interest will be entitled to Distributions pursuant to the terms of this Plan and the Litigation Trust Agreement, which will be made by the Litigation Trustee. As described elsewhere in this Plan, the majority of the Litigation Trust Assets will be the Vested Causes of Action, which are litigation assets whose value is highly contingent and speculative and the timing of whose monetization is uncertain. As such, the likelihood, amount and timing of any Distributions by the Litigation Trust are uncertain.

**YOU SHOULD CONSULT WITH YOUR ACCOUNTANT OR OTHER FINANCIAL ADVISOR IF YOU HAVE ANY QUESTIONS.**

## ARTICLE 4

## LIQUIDATION ANALYSIS

To confirm the Plan, the Bankruptcy Court must find that Holders of Claims and Interests who do not accept the Plan will receive at least as much under the Plan as such Holders of Claims or Interests would receive in a liquidation under chapter 7 of the Bankruptcy Code. A liquidation analysis shall be included in the Plan Supplement.

## ARTICLE 5

## NO DISCHARGE OF DEBTOR

If the Plan is confirmed under section 1191(a) of the Bankruptcy Code, the Debtor will not receive a discharge pursuant to section 1141(d)(3) of the Bankruptcy Code, because the Plan provides for the liquidation of all or substantially all of the property of the Estate and the Debtor will not engage in business after consummation of the Plan. If the Plan is confirmed under section 1191(b) of the Bankruptcy Code, section 1141(d) does not apply pursuant to section 1181(c), and the Debtor shall not seek, and shall not receive, a discharge under section 1192 of the Bankruptcy Code. In either case, and consistent with paragraph 35 of the Final DIP Order, the DIP Obligations and the Exit Facility Obligations shall not be discharged. Bankruptcy Code section 1141(c) nevertheless provides, among other things, that the property dealt with by the Plan is free and clear of all Claims and Interests against the Debtor, except as otherwise provided in the Plan. As such, no Entity or Person holding a Claim against or Interest in the Debtor may receive any payment from, or seek recourse against, any assets that are to be distributed under the Plan other than assets required to be distributed to that Entity under the Plan. Distributions to any such Holder of any such Claim or Interest shall be as expressly set forth in the Plan. All Entities and Persons are precluded from asserting against any property to be distributed under the Plan any Claims, rights, Causes of Action, Liabilities, or Interests based upon any act, omission, transaction, or other activity that occurred before the Effective Date except as expressly provided in the Plan or the Confirmation Order.

## ARTICLE 6

## GENERAL PROVISIONS

### Section 6.1. Title to Assets.

Except as otherwise provided in the Plan or in the Confirmation Order, whether the Plan is confirmed under section 1191(a) or section 1191(b) of the Bankruptcy Code, on the Effective Date all property of the Estate shall vest in the Litigation Trust as provided in Section 2.5 of the Plan, subject to the Exit Facility Liens, and after the Effective Date of the Plan, the property dealt with by the Plan shall be free and clear of all Claims and Interests except the Exit Facility Liens and as expressly provided in the Plan.

If the Plan is confirmed under section 1191(b) of the Bankruptcy Code, property of the Estate includes, in addition to the property specified in section 541 of the Bankruptcy Code, all property of the kind specified in that section that the Debtor acquires, as well as earnings from services performed by the Debtor, after the date of commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 12, or 13 of the Bankruptcy Code, whichever occurs first. As permitted by section 1186(b) of the Bankruptcy Code, on the Effective Date such property shall vest in the Litigation Trust as provided in Section 2.5 of the Plan, subject to the Exit Facility Liens, and the Debtor shall not remain in possession of any such property.

**Section 6.2. Binding Effect**

Notwithstanding Bankruptcy Rules 3020(e), 6004(h) or 7062 or any other Bankruptcy Rule, upon the occurrence of the Effective Date, the terms of this Plan shall be immediately effective and enforceable and deemed binding upon the Debtor, the Litigation Trust, the Litigation Trustee, any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted this Plan), all persons that are parties to or are subject to the settlements, compromises, releases and injunctions described in this Plan, each person acquiring property under this Plan, and any and all non-Debtor parties to Executory Contracts with the Debtor.

**Section 6.3. Severability**

If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

**Section 6.4. Retention of Subject Matter Jurisdiction**

Pursuant to Bankruptcy Code sections 105(a) and 1142, and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, and related to, the Chapter 11 Case and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a) allow, disallow, determine, subordinate, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest (whether filed before or after the Effective Date and whether or not contingent, Disputed or unliquidated or for contribution, indemnification or reimbursement), including the compromise, settlement and resolution of any request for payment of any Claims or Interests, the resolution of any objections to the allowance or priority of Claims or Interests and to hear and determine any other issue presented hereby or arising hereunder, including during the pendency of any appeal relating to any objection to such Claim or Interest to the extent permitted under applicable law;

(b) grant or deny any applications for allowance of compensation or reimbursement of expenses, including to Professionals and for other Administrative Expense Claims, authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

(c) hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters, including, but not limited to, all Causes of Action and actions based upon the Contributed Claims, and consider and act upon the compromise and settlement of any Cause of Action or Contributed Claim;

(d) determine and resolve any matters related to the assumption, assumption and assignment or rejection of any Executory Contract to which the Debtor is a party or with respect to which the Debtor may be liable, and to hear, determine and, if necessary, liquidate any Claims arising therefrom;

(e) ensure that all Distributions to Holders of Allowed Claims and Allowed Interests under the Plan and the performance of the provisions of the Plan are accomplished as provided herein and resolve any issues relating to Distributions to Holders of Allowed Claims or Interests pursuant to the provisions of the Plan;

(f) construe, take any action and issue such orders, prior to and following Confirmation and consistent with Bankruptcy Code section 1142, as may be necessary for the enforcement, implementation, execution and consummation of the Plan and all contracts, instruments, releases, other agreements or documents created in connection with the Plan, including, without limitation, the Confirmation Order, for the maintenance of the integrity of the Plan in accordance with Bankruptcy Code section 1141 following the occurrence of the Effective Date;

(g) determine and resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation, implementation or enforcement of the Plan (and all exhibits and schedules thereto) or the Confirmation Order, including the releases and injunction provisions set forth in and contemplated by the Plan or the Confirmation Order, or any entity's rights arising under or obligations incurred in connection therewith;

(h) modify the Plan or the Confirmation Order before or after the Effective Date, pursuant to Bankruptcy Code section 1127, as well as any contract, instrument, release, or other agreement or document created in connection with the Plan or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code and the Plan;

(i) issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

(j) enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(k) determine any other matters that may arise in connection with or relating to the Plan, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with the Plan or the Confirmation Order;

(l) determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m) hear and determine matters concerning state, local and federal taxes in accordance with Bankruptcy Code sections 346, 505 and 1146;

(n) enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Case;

(o) determine and resolve controversies related to the Estate, the Debtor, or the Litigation Trustee from and after the Effective Date, including with respect to the Exit Facility, the Exit Facility Liens, the Contributed Claims and the Foundation Litigation Share;

(p) hear and determine any other matter relating to the Plan and any other matter not inconsistent with the provisions of the Bankruptcy Code; and

(q) enter a final decree closing the Chapter 11 Case.

**Section 6.5. Captions**

The headings contained in this Plan are for convenience of reference only and do not affect the meanings or interpretation of this Plan.

**Section 6.6. Modification of Plan.**

The Debtor may modify the Plan at any time before Confirmation of the Plan pursuant to § 1193(a), subject to the prior written consent of the DIP Lender in its sole discretion. Notwithstanding anything to the contrary in this Section 6.6, no modification, amendment or supplement to the Plan, the Plan Supplement (or any document contained therein) or the Confirmation Order, whether before or after Confirmation, shall be effective without the prior written consent of the DIP Lender (or, as applicable, the Exit Facility Lender), which consent shall be in the DIP Lender's (or Exit Facility Lender's) sole discretion; provided that the DIP Lender's (or Exit Facility Lender's) consent to the Litigation Trust Agreement and any modification thereof shall not be unreasonably withheld. Under certain circumstances, upon the modification of the Plan, the Debtor may seek or be ordered by the Bankruptcy Court to resolicit votes on the Plan.

If the Plan is confirmed under § 1191(a), the Debtor or Litigation Trustee, as applicable, may also seek to modify the Plan at any time after Confirmation only if (1) the Plan has not been substantially consummated and (2) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

If the Plan is confirmed under § 1191(b), the Debtor or Litigation Trustee, as applicable, may seek to modify the Plan at any time only if (1) it is within three years of the Confirmation Date, or such longer time not to exceed five years as fixed by the court and (2) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

**Section 6.7. Final Decree**

Once the estate has been fully administered, as provided in Bankruptcy Rule 3022, the Litigation Trustee, or such other party as the Bankruptcy Court shall designate in the Confirmation Order, shall file a motion with the Bankruptcy Court to obtain a final decree to close the Case. Alternatively, the Bankruptcy Court may enter such a final decree on its own motion. The entry of a final decree shall not impair the Bankruptcy Court's retention of jurisdiction under Section 6.4 or the Exit Facility Lender's rights under the Plan, the Confirmation Order and the Final DIP Order.

**Section 6.8. Compromise and Settlement of Claims and Controversies**

Pursuant to sections 363 and 1123(b) of the Bankruptcy Code and in consideration for the Distributions and other benefits provided pursuant to this Plan, the provisions of this Plan shall constitute a good faith compromise of all Claims and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any Distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor, its Estate and Holders of Claims and Interests and is fair, equitable and reasonable.

**Section 6.9. Releases by the Debtor**

**Except as otherwise expressly provided herein, or elsewhere in the Plan or the Confirmation Order, on the Effective Date, for good and valuable consideration, the Debtor, on its own behalf and as a representative of the Estate, and the Litigation Trust and the Litigation Trustee as successors thereto, to the fullest extent permitted under applicable law, shall, and shall be deemed to, completely and forever release, waive, void and extinguish unconditionally any and all Claims, Causes of Action, obligations, rights, suits, damages and liabilities whatsoever, whether known or unknown, including any Avoidance Actions, based in whole or in part on any act, omission, transaction or other occurrence taking place on or before the Effective Date, as against each and all of (i) Kahn, (ii) the DIP Lender and each other Foundation Party, (iii) Scanlon, (iv) Golding, (v) Ruby Sekhon and (vi) Move Industries and all of its officers, directors and employees (collectively, the "Released Parties"); provided, however, that the foregoing releases shall not release (x) any rights of the Debtor, the Estate or the Litigation Trust with respect to any breach by a Foundation Party of the Fenix Agreement or (y) any claims or Causes of Action that the Debtor may have against any former employees of the Debtor to recover or avoid excess or inadvertent payroll payments following the cessation of such former employees' employment with the Debtor. The releases in this Section 6.9 are in addition to, and shall not limit, the DIP Releases granted under the Final DIP Order, which shall survive Confirmation and the Effective Date.**

**Section 6.10. Exculpation**

None of the Debtor, its Professionals, or the Subchapter V Trustee (collectively, the "Exculpated Parties") shall have or incur any liability to any Holder of a Claim or Interest, or other party in interest, or any of their respective members, officers, directors, employees, advisors, professionals, attorneys or agents or any of their successors and assigns, with respect to any Exculpated Claim, including, without limitation, any act or omission in connection with, related to, or arising out of, in whole or in part, the Debtor's Chapter 11 Case, except for their fraud, gross negligence, or willful misconduct as determined by a Final Order, and, in all respects, the Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under this Plan.

**Notwithstanding any other provision of the Plan, the Exculpated Parties shall not have or incur any liability to, or be subject to any right of action by, any Holder of a Claim or Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, or attorneys acting in such capacity, or any of their successors or assigns, for any act or omission occurring between the Petition Date and the Effective Date relating to, in any way, or arising from the Chapter 11 Case, including but not limited to (i) formulating, negotiating or implementing the Plan or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan; (ii) the review by the Debtor's board of directors or other similar management structure of the Debtor's strategic alternatives during the Chapter 11 Case; (iii) any other postpetition act taken or omitted to be taken in connection with or in contemplation of the liquidation of the Debtor; (iv) the solicitation of acceptances of the Plan, the pursuit of confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan; or (v) the administration of the Plan or the property to be distributed under the Plan prior to the Effective Date, except for their fraud, gross negligence, or willful misconduct as determined by a Final Order, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting the Exculpated Parties from liability. Notwithstanding the foregoing, nothing in this Section 6.10 shall exculpate any other party, or release, bar, limit, or otherwise impair (x) any Causes of Action, or (y) any claims, rights, causes of action, or defenses that the Debtor, the Estate, the Litigation Trust, or any Person that is not a Released Party or an Exculpated Party under the Plan or applicable law.**

**Section 6.11. Injunction Related to Third Parties**

To the extent of the releases and exculpation granted in this Plan, all Persons who have held, hold or may hold Claims against or Interests in the Debtor are permanently enjoined from commencing or continuing in any manner against the Released Parties or the Exculpated Parties, or their assets and properties, any suit, action or other proceeding, on account of or respecting any claim, demand, liability, obligation, debt, right, Cause of Action, interest or remedy released or to be exculpated pursuant to this Plan or Confirmation Order. Except as otherwise expressly provided in this Plan, the Plan Supplement or the Confirmation Order, or for obligations issued pursuant to this Plan, all Persons who have held, hold or may hold Claims or Interests that have been released, or are

subject to exculpation, are permanently enjoined, from and after the Effective Date, from: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with any such Claims or Interests; (b) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order on account of or in connection with or with respect to any such Claims or Interests; and (c) creating, perfecting or enforcing any encumbrance of any kind against such Persons or their property on account of or in connection with any such Claims or Interests. This Section 6.11 enjoins only the assertion of claims and Causes of Action of the Debtor and the Estate released under Section 6.9 and claims exculpated under Section 6.10, and does not release, or enjoin the assertion of, any direct claim held by any Person other than the Debtor or the Estate against any Person other than the Debtor. Nothing in this Section 6.11 shall enjoin, limit or impair the rights and remedies of the DIP Lender or the Exit Facility Lender under the DIP Loan Documents, the Final DIP Order, Section 2.1 of the Plan, the Exit Facility Agreement or the Confirmation Order.

**Section 6.12. Term of Injunctions or Stays.**

Unless otherwise provided in this Plan or Confirmation Order, all injunctions or stays provided for under section 362 of the Bankruptcy Code or arising under or entered during the Chapter 11 Case, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay and to the extent consistent with the terms and provisions of this Plan or the Confirmation Order, as applicable.

**Section 6.13. Conditions Precedent to the Effective Date**

It shall be a condition to the Effective Date that each of the following shall have been satisfied or waived in accordance with this Section:

(a) the Confirmation Order shall have become a Final Order and shall be in full force and effect;

(b) the DIP Lender shall have made the Final DIP Loan in accordance with the DIP Credit Agreement;

(c) the Litigation Trust Agreement, in form and substance consented to by the DIP Lender (such consent not to be unreasonably withheld), shall have been executed and delivered, and a Litigation Trustee acceptable to the DIP Lender in its sole discretion shall have been appointed;

(d) the Exit Facility Agreement, in form and substance acceptable to the DIP Lender, shall have been executed and delivered;

(e) the Fenix Agreement shall remain assumed and in full force and effect;

(f) the schedule of Contributed Claims shall have been agreed by the DIP Lender and the Debtor, and the Contributed Claims shall have been contributed to the Litigation Trust;

(g) all DIP Lender Expenses invoiced as of the Effective Date shall have been paid in full in Cash;

(h) the Debtor shall have paid all Allowed Administrative Expense Claims (other than DIP Facility Claims and Professional Fee Claims), Allowed Priority Tax Claims and Allowed Priority Non-Tax Claims then due, and shall have funded the Administrative and Priority Claims Reserve and the Professional Fee Account, in each case in accordance with Sections 2.5.A and 2.9 of the Plan and in amounts acceptable to the DIP Lender;

(i) the Plan Supplement and all other documents necessary to implement the Plan shall be in form and substance acceptable to the DIP Lender;

(j) no Default or Event of Default under the DIP Credit Agreement shall have occurred and be continuing; and

(k) the Effective Date shall occur no later than December 31, 2026 (or such later date as the DIP Lender may agree in writing).

The conditions set forth in this Section may be waived only with the prior written consent of the DIP Lender, in its sole discretion. If the Effective Date does not occur, the Plan shall be null and void, and nothing in the Plan shall constitute a waiver or release of any rights of the DIP Lender under the DIP Loan Documents or the Final DIP Order.

## ARTICLE 7

## ATTACHMENTS

The following documents are deemed to be part of the Plan:

- The Assumed Contract List, to be included in the Plan Supplement.
- A liquidation analysis, to be included in the Plan Supplement.
- The list of Contributed Claims, to be included in the Plan Supplement.
- The Exit Facility Agreement, to be included in the Plan Supplement.
- The Litigation Trust Agreement, to be included in the Plan Supplement.

## ARTICLE 8

## FREQUENTLY ASKED QUESTIONS

**What is the Debtor Attempting to Do in Chapter 11?** Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor attempts to restructure the claims held against it. Formulation and confirmation of a plan of reorganization is the primary goal of Chapter 11. When reorganization is not feasible, however, a debtor may propose a

liquidating plan under Chapter 11. The plan is the legal document that sets forth the manner and the means by which holders of claims against a debtor will be treated.

**Why Am I Receiving This Plan?** In order to confirm a plan of reorganization or liquidation, the Bankruptcy Code requires that a debtor solicit acceptances of a proposed plan, which it is doing with this Plan. If Holders of Claims and Interests in the voting Classes are satisfied with the terms of the Plan as proposed, they may vote in favor of the Plan.

**How Do I Determine Which Class I Am In?** Section 2.2 lists each Class of Claims and Interests and describes who is in that Class, the estimated size of the Class, and the treatment the Class will receive if the Plan is confirmed. Holders of Priority Non-Tax Claims are in Class 1, Holders of General Unsecured Claims are in Class 2, Holders of SAFE Interests are in Class 3, and Holders of the Debtor's common stock are in Class 4. Section 2.1 describes the treatment of DIP Facility Claims, Administrative Expense Claims and Priority Tax Claims, which are not classified.

**Why Is Confirmation of a Plan of Liquidation Important?** Confirmation of the Plan is necessary because if the Plan is confirmed, the Debtor and all of its creditors are bound by the terms of the Plan. If the Plan is not confirmed, the Debtor may not pay creditors as proposed in the Plan while the Debtor remains in bankruptcy.

**What Is Necessary to Confirm the Plan?** For a Class of Claims to approve the Plan, there must be, among other things, the vote in favor of the Plan of two-thirds in total dollar amount and a majority in number of Claims actually voting in each voting Class. For a Class of Interests to approve, there must be, among other things, the vote in favor of the Plan by at least two-thirds in amount of the Allowed Interests that actually vote. If every Impaired Class accepts the Plan in accordance with those majorities, then the Plan may be confirmed under Section 1191(a). If a Class entitled to vote votes to reject the Plan, the Bankruptcy Court can still confirm the Plan under Section 1191(b), but only if certain additional elements are shown, including that the Plan does not discriminate unfairly, and is fair and equitable with respect to each Class of Claims or Interests that is Impaired under, and has not accepted, the Plan. If no Impaired Class of Claims votes to approve the Plan, the Plan nevertheless may be confirmed under Section 1191(b) of the Bankruptcy Code if the Plan does not discriminate unfairly, and is fair and equitable with respect to each class of claims or interests that is impaired under, and has not accepted, the Plan.

**Am I Entitled to Vote on the Plan?** Holders of Claims in Class 2 and Holders of Interests in Classes 3 and 4 are Impaired and entitled to vote. A Holder of a Claim in Class 2 may vote if, as of the Record Date, either (i) the Claim has been listed in the Schedules and is not listed as disputed, contingent, or unliquidated, or (ii) the Holder has timely filed a Proof of Claim. A Holder of an Interest in Class 3 or Class 4 may vote if it is the holder of record of such Interest as of the Record Date, as reflected in the Debtor's books and records. Any Claim or Interest to which an objection has been filed (and such objection is still pending) is not entitled to vote, unless the Bankruptcy Court temporarily allows the Holder to vote upon the Holder's motion. Such motion must be heard and determined by the Bankruptcy Court prior to the date established by the Bankruptcy Court to confirm the Plan.

**How Do I Determine Whether I Am in an Impaired Class?** The chart in Section 2.2 identifies the Classes of Claims and Interests and indicates which Classes are Impaired and

entitled to vote. If your Claim or Interest is Impaired, your vote will be considered by the Bankruptcy Court.

**When Is the Deadline by Which I Need to Return My Ballot?** The Plan is being distributed to Holders of Claims and Interests for their review, consideration, and approval. The deadline by which ballots must be returned is **December 9, 2026 at 4:00 p.m. (prevailing Eastern Time)**. Ballots must be properly executed, completed and delivered, (a) through the Claims Agent's electronic ballot portal at https://securemail.reliable-co.com/filedrop/MVMT, **or** (b) by mail, overnight courier, or personal delivery at the following address:

MVMT Labs, Inc.
c/o Reliable Companies,
Attn: Gene Matthews
1007 North Orange Street, Suite 110
Wilmington, DE 19801

**How Do I Determine When and How Much I Will Be Paid?** In Article 2 of the Plan, the Debtor has provided both written and financial summaries of what it anticipates each Class of creditors will receive under the Plan.

## ARTICLE 9

## DEFINITIONS

### A. Scope of Definitions

For purposes of this Plan, unless the context otherwise requires, all capitalized terms not otherwise defined shall have the meanings ascribed to them in Article 9 of this Plan. The definitions and rules of construction set forth in §§ 101 and 102 of the Bankruptcy Code shall apply when terms defined or construed in the Code are used in this Plan. The definitions that follow that are found in the Bankruptcy Code are for convenience of reference only, and are superseded by the definition found in the Bankruptcy Code.

### B. Definitions

**Section 9.1.** **"9019 Motion"** shall have the meaning set forth in section 1.9 of the Plan.

**Section 9.2.** **"Administrative and Priority Claims Reserve"** means the reserve funded by the Debtor on the Effective Date in the Administrative and Priority Claims Reserve Amount and held by the Litigation Trustee for the payment of Administrative Expense Claims (other than DIP Facility Claims and Professional Fee Claims), Priority Tax Claims and Priority Non-Tax Claims in accordance with Section 2.9 of the Plan.

**Section 9.3.** **"Administrative and Priority Claims Reserve Amount"** means the Debtor's good-faith estimate, acceptable to the DIP Lender, of the aggregate amount necessary to pay in full all Administrative Expense Claims (other than DIP Facility Claims and Professional Fee Claims), Priority Tax Claims and Priority Non-Tax Claims, including all such Claims that are

Allowed, Disputed, contingent, unliquidated, or otherwise estimated as of the Effective Date, to the extent not paid in full on or prior to the Effective Date, funded from DIP Cash Collateral (including the proceeds of the Final DIP Loan).

**Section 9.4. "Administrative Expense Bar Date"** shall apply to Administrative Expense Claims (other than Professional Fee Claims) and means the first Business Day that is thirty (30) days after service of notice of the Effective Date.

**Section 9.5. "Administrative Expense Claim"** or "**Administrative Claim"** means any right to payment constituting a cost or expense of administration of the Chapter 11 Case under Sections 503(b) and 507(a)(2) of the Bankruptcy Code, including without limitation: (a) any actual and necessary costs and expenses incurred on or after the Commencement Date and prior to the Effective Date of preserving the Estate; (b) Claims that have been determined by a Final Order to constitute an administrative expense of the Estate; (c) Professional Fee Claims; and (d) any fees or charges assessed against and payable by the Debtor under Section 1930 of title 28 of the United States Code; *provided* that DIP Facility Claims shall be treated exclusively as set forth in Section 2.1.A of the Plan.

**Section 9.6. "Allowed"** means, with reference to any Claim or Interest, a Claim or Interest (a) arising on or before the Effective Date as to which (i) no objection to allowance or priority, and no request for estimation or other challenge, including, pursuant to section 502 of the Bankruptcy Code or otherwise, has been interposed and not withdrawn within the applicable period fixed by the Plan or applicable law, or (ii) any objection or dispute has been determined in favor of the holder of the Claim or Interest by a Final Order, (b) that is compromised, settled, or otherwise resolved pursuant to the authority of the Debtor or the Litigation Trustee, (c) as to which the liability of the Debtor or the Litigation Trustee, as applicable, and the amount thereof is determined by a Final Order of a court of competent jurisdiction, or (d) expressly allowed hereunder; provided, that notwithstanding the foregoing, (x) unless expressly waived by the Plan, the Allowed amount of Claims or Interests shall be subject to (and shall not exceed) all limitations or maximum amounts permitted set forth in the Bankruptcy Code, including sections 502, 503 or 510 of the Bankruptcy Code, to the extent applicable, and (y) the Litigation Trustee shall retain all claims and defenses with respect to Allowed Claims that are Unimpaired pursuant to the Plan.

**Section 9.7. "Allowed Claim"** means a Claim that is Allowed.

**Section 9.8. "Allowed General Unsecured Claim"** means a General Unsecured Claim to the extent it is, or has become, an Allowed Claim, which in any event shall be reduced by the amount of any offsets, credits, or refunds to which the Debtor shall be entitled on the Confirmation Date.

**Section 9.9. "Allowed Priority Tax Claim"** means a Priority Tax Claim to the extent that it is or has become an Allowed Claim, which in any event shall be reduced by the amount of any offsets, credits, or refunds to which the Debtor shall be entitled on the Confirmation Date.

**Section 9.10. "Approved Budget"** means the budget most recently certified by the Debtor (or, after the Effective Date, the Litigation Trustee) and approved by the Exit Facility Lender in accordance with the terms and maturity of the Exit Facility Agreement.

**Section 9.11. "Assets"** means all assets and property of the Estate, regardless of whether reflected in the financial records of the Debtor, including but not limited to: Cash, deposits, refunds, rebates, abatements, fixtures, equipment, inventory, contractual interests, intangibles, intellectual property, data, books and records, claims, Causes of Action, suits, setoffs, recoupments, equitable or legal rights, interests and remedies.

**Section 9.12.** "**Assumed Contracts"** means an Executory Contract deemed assumed effective as of the Effective Date or such other date as may be agreed to by the parties to the Executory Contract or as ordered by the Bankruptcy Court.

**Section 9.13. "Assumed Contract List"** means the list of Assumed Contracts the Debtor intends to assume pursuant to section 365 of the Bankruptcy Code as of the Effective Date. The Assumed Contract List shall be included with the Plan Supplement.

**Section 9.14. "Avoidance Actions"** means the Causes of Action under sections 502(d), 542, 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code and any other avoidance actions under the Bankruptcy Code.

**Section 9.15. "Ballot" or "Ballots"** means the ballots accompanying the Plan upon which Holders of Impaired Claims and Interests entitled to vote shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process, and which must be actually received on or before the Voting Deadline.

**Section 9.16. "Bankruptcy Code" or "Code"** means title 11 of the United States Code, as amended and in effect on the Commencement Date.

**Section 9.17. "Bankruptcy Court"** means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Case.

**Section 9.18. "Bankruptcy Rules"** means (a) the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under Section 2075 of title 28 of the United States Code, and (b) the Local Rules, in each case, as in effect on the Commencement Date.

**Section 9.19.** "**Bar Date**" means the deadline set by the Bankruptcy Court, pursuant to a Final Order or otherwise, for filing Proofs of Claim in the Case, as the context may require, which includes the Administrative Expense Bar Date, the General Claims Bar Date, and the Governmental Claims Bar Date.

**Section 9.20. "Beneficiaries"** means the Holders of Allowed Class 2 Claims (General Unsecured Claims), Allowed Class 3 Interests (SAFE Interests), and Allowed Class 4 Interests (Common Stock Interests), as beneficiaries of the Litigation Trust, as set forth in this Plan and the Litigation Trust Agreement.

**Section 9.21.** "**Beneficiary Tax Information**" has the meaning ascribed to it in Section 2.5.D of the Plan.

**Section 9.22.** "**Beneficiary Tax Reserve**" has the meaning ascribed to it in Section 2.5.D of the Plan.

**Section 9.23.** **"Business Day"** means any day other than: (a) a Saturday, (b) a Sunday, and (c) a "legal holiday" as defined in Bankruptcy Rule 9006(a).

**Section 9.24.** **"Carve-Out"** has the meaning set forth in the Final DIP Order.

**Section 9.25.** **"Case"** has the same meaning as the term "Chapter 11 Case".

**Section 9.26.** **"Cash"** means legal tender of the United States of America and equivalents thereof.

**Section 9.27.** **"Causes of Action"** means any and all actions, causes of action, rights, suits, debts, sums of money, damages, judgments, claims, and demands whatsoever, whether known or unknown, existing or hereafter arising, in law, equity, or otherwise, including but not limited to the market making irregularities, based in whole or in part upon any act or omission or other event occurring prior to the Commencement Date or during the course of the Case, including through the Effective Date, that belong to the Debtor, Debtor in Possession or the Estate, including, without limitation, the Estate Causes of Action.

**Section 9.28.** **"Chapter 11 Case"** means the case under subchapter V of chapter 11 of the Bankruptcy Code commenced by the Debtor and pending in the Bankruptcy Court as Case No. 26-11113 (TMH).

**Section 9.29.** **"Claim"** has the meaning set forth in section 101(5) of the Bankruptcy Code, as against the Debtor.

**Section 9.30.** **"Claims Objection Deadline"** means the date that is one hundred and eighty (180) days after the Effective Date, as such date may be extended by order of the Bankruptcy Court upon motion of the Litigation Trustee filed before such date expires.

**Section 9.31.** **"Class"** means any group of substantially similar Claims or Interests classified by the Plan pursuant to Section 1122 of the Bankruptcy Code.

**Section 9.32.** **"Commencement Date"** means July 15, 2026, the date the chapter 11 petition for relief was filed.

**Section 9.33.** **"Common Stock Interests"** means all Interests in the Debtor arising from or relating to the Debtor's common stock, whether issued and outstanding, authorized but unissued, or held in treasury.

**Section 9.34.** **"Confirmation**" means the entry by the Bankruptcy Court of the Confirmation Order confirming this Plan.

**Section 9.35. "Confirmation Date"** means the date upon which the Bankruptcy Court shall enter the Confirmation Order; *provided*, *however*, that if on motion the Confirmation Order or consummation of the Plan is stayed pending appeal, then the Confirmation Date shall be the entry of the Final Order vacating such stay or the date on which such stay expires and is no longer in effect.

**Section 9.36. "Confirmation Hearing"** means the hearing held by the Court to consider the confirmation of the Plan, as it may be adjourned or continued from time to time, which is presently scheduled for December 16, 2026 at 2:00 p.m. (Prevailing Eastern Time).

**Section 9.37. "Confirmation Order"** means an order of the Court or any amendment thereto confirming the Plan in accordance with the provisions of chapter 11 of the Bankruptcy Code.

**Section 9.38. "Contributed Claims"** means the claims and causes of action that the Foundation Parties have or may have against any third parties that arise from or are related to the launch of the $MOVE token, the Tripartite Agreement, the Transfer Agreement and the Fenix Agreement, as specified on the schedule mutually agreed by the DIP Lender and the Debtor and included in the Plan Supplement.

**Section 9.39.** "**Creditor**" has the meaning ascribed to such term in § 101(10) of the Bankruptcy Code.

**Section 9.40.** "**CRO**" means Chief Restructuring Officer.

**Section 9.41. "Debtor"** means MVMT Labs, Inc., the debtor and debtor in possession in the Chapter 11 Case.

**Section 9.42.** "**Debtor in Possession**" means the Debtor, in its capacity as a debtor in possession pursuant to sections 1182(2) and 1184 of the Bankruptcy Code.

**Section 9.43. "Default"** has the meaning set forth in the DIP Credit Agreement.

**Section 9.44. "Default Rate"** has the meaning set forth in section 2.5(b) of the DIP Credit Agreement.

**Section 9.45. "DIP Cash Collateral"** means all of the Debtor's cash, including any cash in deposit accounts, wherever located, whether as original collateral or proceeds of other collateral, constituting cash collateral of the DIP Lender within the meaning of section 363(a) of the Bankruptcy Code.

**Section 9.46.** "**DIP Claims**" or "**DIP Facility Claims**" mean any and all Claims held by the DIP Lender arising under or relating to the DIP Credit Agreement or the DIP Orders, and that constitute DIP Obligations.

**Section 9.47.** "**DIP Credit Agreement**" means that certain Second Amended and Restated Senior Secured, Superpriority Debtor-in-Possession Loan and Security Agreement, dated as of October 23, 2026, by and between MVMT Labs, Inc., as borrower, and MNF DIP

SPV Ltd, as DIP lender, as amended, restated, supplemented or otherwise modified from time to time in accordance with its terms.

**Section 9.48.** "**DIP Facility**" or "**DIP Financing Facility**" means the loan facility provided to the Debtor pursuant to the terms of the DIP Credit Agreement authorized by the Final DIP Order.

**Section 9.49.** "**DIP Lender**" means MNF DIP SPV Ltd, together with its successors and permitted assigns.

**Section 9.50.** **"DIP Lender Expenses"** has the meaning set forth in the DIP Credit Agreement.

**Section 9.51.** **"DIP Liens"** has the meaning set forth in the Final DIP Order.

**Section 9.52.** "**DIP Loan**" has the meaning set forth in the DIP Credit Agreement.

**Section 9.53.** "**DIP Loan Documents**" means the "DIP Loan Documents" as defined in the DIP Credit Agreement.

**Section 9.54.** "**DIP Motion**" has the meaning ascribed to it in Section 1.9 of the Plan.

**Section 9.55.** "**DIP Obligations**" means the "Obligations" as defined in the DIP Credit Agreement and all other obligations of the Debtor under the DIP Loan Documents and the DIP Orders.

**Section 9.56.** "**DIP Orders**" means the Interim DIP Order, the Second Interim DIP Order and the Final DIP Order.

**Section 9.57.** **"DIP Releases"** has the meaning set forth in the Final DIP Order.

**Section 9.58.** **"DIP Superpriority Claims"** has the meaning set forth in the Final DIP Order.

**Section 9.59.** "**Disallowed"** means a (a) Claim, or any portion thereof, that has been disallowed by a Final Order or a settlement, or as provided in this Plan, (b) Claim or any portion thereof that is listed in the Schedules at zero or as an unknown amount, or as contingent, disputed, and/or unliquidated, and as to which a Bar Date has been established but no Proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law, or (c) Claim or any portion thereof that is not listed in the Schedules and as to which a Bar Date has been established but no Proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law.

**Section 9.60.** **"Disputed"** means, with respect to any Claim or Interest, a Claim or Interest that is not yet Allowed or Disallowed, including (a) any Proof of Claim that, on its face,

is contingent or unliquidated; (b) any Proof of Claim or request for payment of an Administrative Claim filed after the Effective Date or deadline for filing Proofs of Claim based on the Debtor's rejection of Executory Contracts, as applicable, and (c) any Claim that is subject to an objection or a motion to estimate, in each case that has not been withdrawn, resolved, or ruled on by a Final Order of the Bankruptcy Court.

**Section 9.61. "Disputed Claim"** means a Claim that is Disputed.

**Section 9.62. "Disputed Interest"** means an Interest that is Disputed.

**Section 9.63. "Distribution"** means a distribution of Cash or other Assets of the Estate made in accordance with the Plan to Holders of Allowed Claims or Allowed Interests.

**Section 9.64. "Distribution Date"** means the date on which the Litigation Trustee shall make a Distribution, which shall be a date or dates selected by the Litigation Trustee in accordance with the terms of this Plan.

**Section 9.65.** "**DOJ Investigation**" has the meaning ascribed to it in section 1.7 of the Plan.

**Section 9.66. "Effective Date"** means the first Business Day on which all conditions to the Effective Date set forth in Section 6.13 of the Plan have been satisfied or waived in accordance therewith.

**Section 9.67. "Entity"** means an entity as defined in Section 101(15) of the Bankruptcy Code.

**Section 9.68. "Estate"** means the estate created in the Debtor's Chapter 11 Case containing all assets of the Debtor pursuant to Bankruptcy Code section 541.

**Section 9.69. "Estate Causes of Action"** has the meaning ascribed to it in Section 2.5.F of the Plan.

**Section 9.70. "Event of Default"** means an event of default under the DIP Credit Agreement or, after the Effective Date, an event of default under the Exit Facility Agreement, or the failure to comply with Section 2.1.B of the Plan, as applicable.

**Section 9.71. "Exculpated Claim"** means any Claim or Causes of Action whatsoever related to any act taken or omitted after the Commencement Date and on or before the Effective Date arising out of the Chapter 11 Case related to the Debtor and the Estate, including, without limitation, (i) the negotiation of any settlements entered into, with, or by the Debtor or any Estate representative, (ii) the formulation, preparation, dissemination, negotiation, filing, prosecution, approval or administration of the Plan and/or any financing, investment, or sale agreement with respect to the Debtor, and/or (iii) any contract, instrument, release, assignment, or other agreement or document created or entered into in connection with any such negotiations or settlements of the Chapter 11 Case, or any financing agreement or settlement agreement in connection therewith,

the filing of the Chapter 11 Case, the pursuit of Confirmation, and the administration and implementation of the Plan.

**Section 9.72. "Exculpated Party" or "Exculpated Parties"** has the meaning ascribed to it in Section 6.10 of the Plan.

**Section 9.73. "Executory Contract"** means all unexpired leases and executory contracts as described in section 365 of the Bankruptcy Code.

**Section 9.74. "Exit Conversion"** means the conversion of the DIP Obligations into the Exit Facility Obligations on the Effective Date through the entry into the Exit Facility Agreement, without the payment of any fees not otherwise specified in the DIP Loan Documents.

**Section 9.75. "Exit Facility"** means the exit loan facility resulting from the Exit Conversion.

**Section 9.76. "Exit Facility Agreement"** means the Exit Facility Agreement, a copy of which shall be filed as part of the Plan Supplement.

**Section 9.77. "Exit Facility Lender"** means the DIP Lender upon the Exit Conversion, and any assignee thereof in accordance with the terms of the Exit Facility Agreement.

**Section 9.78. "Exit Facility Liens"** means Liens securing the Exit Facility Obligations, which shall include all Assets that are subject to DIP Liens and upon the formation of the Litigation Trust, first priority Liens on all Litigation Trust Assets and the proceeds thereof, subject only to the Carve-Out (solely to the extent provided in the Final DIP Order), which Liens shall be deemed automatically perfected on the Effective Date by the Confirmation Order without the need for any further filing or action.

**Section 9.79. "Exit Facility Obligations"** means all obligations due under the Exit Facility Agreement, which as of the Exit Conversion shall include all DIP Obligations.

**Section 9.80. "Exit Fee"** has the meaning set forth in the DIP Credit Agreement.

**Section 9.81. "Fee Application"** means an application for allowance and payment of a Professional Fee Claim.

**Section 9.82.** "**Fenix Agreement**" has the meaning ascribed to it in section 1.7 of the Plan.

**Section 9.83. "Final DIP Loan"** has the meaning set forth in section 2.1(c) of the DIP Credit Agreement.

**Section 9.84. "Final DIP Order"** means the order entered by the Bankruptcy Court on October 19, 2026 [Docket No. 218], approving the Debtor's entry into the DIP Facility on a final basis.

**Section 9.85. "Final Order"** means an order or judgment of the Bankruptcy Court that has not been reversed, stayed, modified or amended and as to which (a) any appeal that has been taken has been finally determined or dismissed, or (b) the time for appeal has expired and no notice of appeal has been filed.

**Section 9.86. "Foundation"** has the meaning set forth in section 1.1 of the Plan.

**Section 9.87. "Foundation Litigation Share"** means the amount payable to Foundation pursuant to Section 2.5.E.6 of the Plan, which shall be equal to thirty-three percent (33%) of any recovery realized by the Litigation Trust in an amount greater than $12.5 million and less than or equal to $33.5 million, which shall not constitute Litigation Trust Distributable Cash.

**Section 9.88. "Foundation Parties"** has the meaning ascribed to the term "Foundation Party" in the DIP Credit Agreement, and includes MNF DIP SPV Ltd, Movement Limited, and Movement Network Foundation, together with their affiliates and their respective current or future officers, employees, directors (and the employers of any independent directors), agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys and predecessors in interest, each in their capacity as such.

**Section 9.89. "General Claims Bar Date"** means September 14, 2026.

**Section 9.90. "General Unsecured Claim"** means any Claim against the Debtor that is not (i) a Secured Claim; (ii) an Administrative Expense Claim (including a DIP Facility Claim); (iii) a Priority Tax Claim; or (iv) a Priority Non-Tax Claim.

**Section 9.91.** "**Global Resolution**" has the meaning ascribed to it in Section 1.8 of the Plan, as approved by the Final DIP Order and implemented by the Plan and the Confirmation Order.

**Section 9.92. "Golding"** has the meaning ascribed to it in Section 1.7 of the Plan.

**Section 9.93. "Governmental Claims Bar Date"** means January 11, 2027.

**Section 9.94. "Holder"** means the beneficial holder of any Claim or Interest, in its capacity as such.

**Section 9.95. "Impaired"** has the meaning ascribed to it in Section 1124 of the Bankruptcy Code.

**Section 9.96. "Indebtedness"** has the meaning set forth in the DIP Credit Agreement.

**Section 9.97. "Interest"** means (i) an ownership interest in the Debtor, including interests evidenced by common or preferred stock, membership interests, options, stock appreciation rights, restricted stock, restricted stock units or their equivalents, or other rights to purchase or otherwise receive any ownership interest in the Debtor and any right to payment or

compensation based upon any such interest, whether or not such interest is owned by the holder of such right to payment or compensation; (ii) a SAFE Interest; or (iii) any Claim against the Debtor that is subordinated and has the same priority as common or preferred stock by operation of the Bankruptcy Code or any order entered by the Bankruptcy Court.

**Section 9.98. "Interim Compensation Order"** means the *Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals and (II) Granting Related Relief* [Docket No. 94].

**Section 9.99. "Interim DIP Order"** has the meaning ascribed to it in Section 1.9 of the Plan.

**Section 9.100. "Kahn"** has the meaning set forth in Section 1.3 of the Plan.

**Section 9.101. "Liabilities"** means the liabilities of the Estate, whether or not reflected in the financial records of the Debtor.

**Section 9.102. "Lien"** has the meaning ascribed to it in § 101(37) of the Bankruptcy Code, except that a lien that has been or may be avoided or void shall not constitute a Lien for the purposes of the Plan.

**Section 9.103.** "**Litigation Trust"** means the grantor trust to be created upon the Effective Date for the benefit of the Beneficiaries.

**Section 9.104. "Litigation Trust Agreement"** means the agreement, substantially in the form included in the Plan Supplement, governing the operations of the Litigation Trust, as such agreement may be subsequently amended, supplemented or otherwise modified from time to time in accordance with the terms thereof.

**Section 9.105. "Litigation Trust Assets**" means all assets held by the Litigation Trust, including the Debtor's Assets transferred on the Effective Date, the Vested Causes of Action, and all proceeds of the foregoing, but excluding the Foundation Litigation Share.

**Section 9.106. "Litigation Trust Distributable Cash"** means the Cash in the Litigation Trust and any other Litigation Trust Assets reduced to Cash, net of the Litigation Trust Reserve, to be distributed in accordance with the Waterfall. Litigation Trust Distributable Cash does not include (i) the Foundation Litigation Share or (ii) amounts held in the Administrative and Priority Claims Reserve or the Professional Fee Account until released to the Litigation Trust in accordance with Section 2.9 of the Plan.

**Section 9.107. "Litigation Trust Professionals"** means the agents, financial advisors, attorneys, consultants, independent contractors, representatives, and other professionals retained by the Litigation Trust (in its capacities as such).

**Section 9.108. "Litigation Trust Reserve"** means an amount sufficient to fund the accrued and estimated expenses and costs of operating or effectuating the duties of the Litigation Trust, as may be incurred from time to time by the Litigation Trustee pursuant to the Litigation Trust

Agreement for a period of time not less than the maturity of the Exit Facility Obligations and in accordance with the Approved Budget.

**Section 9.109. "Litigation Trustee"** shall mean the individual or entity designated and retained as the trustee to the Litigation Trust, as of the Effective Date or as soon as reasonably practicable thereafter, as the fiduciary responsible for administering the Litigation Trust.

**Section 9.110. "Local Rules"** means the Local Rules of Bankruptcy Practice and Procedures of the United States Bankruptcy Court for the District of Delaware.

**Section 9.111. "Manche"** has the meaning ascribed to it in Section 1.1 of the Plan.

**Section 9.112. "Metaverse Litigation"** has the meaning set forth in Section 1.7 of the Plan.

**Section 9.113. "ML"** has the meaning ascribed to it in Section 1.1 of the Plan.

**Section 9.114. "Move Industries"** has the meaning ascribed to it in section 1.7 of the Plan.

**Section 9.115. "Movement Network"** has the meaning set forth in section 1.1 of the Plan.

**Section 9.116. "Permitted Variance"** shall have the meaning set forth in the Exit Facility Agreement but, in any event, shall be twenty-five percent (25%) or less of cumulative disbursements from the Approved Budget.

**Section 9.117. "Person"** means a person as defined in § 101(41) of the Bankruptcy Code.

**Section 9.118. "Petition Date"** means the Commencement Date, or July 15, 2026.

**Section 9.119. "Plan"** means this plan of liquidation for the resolution of outstanding Claims and Interests in the Case, as may be modified, amended, or supplemented at any time in accordance with the Bankruptcy Code, Bankruptcy Rules, and the terms hereof, including all exhibits, supplements, appendices, and schedules hereto.

**Section 9.120. "Plan Documents"** means the compilation of documents and forms of documents, schedules and exhibits to the Plan that aid in effectuating the Plan as specifically identified as such herein and filed with the Bankruptcy Court, including the Plan, the Plan Supplement, and the Confirmation Order.

**Section 9.121. "Plan Releases"** has the meaning set forth in Section 1.8(d) of the Plan.

**Section 9.122. "Plan Supplement"** means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be filed on or before the Plan Supplement Deadline, and any additional documents or schedules filed before the Effective Date as supplements or amendments to the Plan Supplement, each of which shall be in form and substance acceptable to

the DIP Lender in accordance with Section 6.6 of the Plan. Subject to Section 6.6 of the Plan, the Debtor shall have the right to add to or amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date.

**Section 9.123. "Plan Supplement Deadline"** means the date that is seven (7) days before the Voting Deadline, or such later date as may be approved by the Bankruptcy Court, by which the Debtor shall file the Plan Supplement with the Bankruptcy Court.

**Section 9.124. "Potter Anderson"** has the meaning ascribed to it in Section 1.9 of the Plan.

**Section 9.125. "Priority Non-Tax Claim"** means any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, that is entitled to priority in payment under section 507(a) of the Bankruptcy Code.

**Section 9.126. "Priority Tax Claim"** means any Claim of a governmental unit (as that term is defined in the Bankruptcy Code) of the kind entitled to priority in payment as specified in Sections 502(i) and 507(a)(8) of the Bankruptcy Code.

**Section 9.127. "Pro Rata" or "Pro Rata Share"** means, for an Allowed Claim or Allowed Interest in a particular Class, a share proportional to the ratio of the amount of such Allowed Claim or Allowed Interest to the amount of all Allowed Claims or Allowed Interests in the same Class.

**Section 9.128. "Professional"** means any person or Entity employed by the Debtor in accordance with Sections 105, 327, 328, 363, or 1103 of the Bankruptcy Code, and who shall be compensated for services rendered prior to and including the Effective Date pursuant to Sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code.

**Section 9.129. "Professional Fee Account"** means the professional fee escrow account funded by the Debtor on the Effective Date from DIP Cash Collateral (including the proceeds of the Final DIP Loan) in accordance with Section 2.9 of the Plan, for the purpose of paying Allowed Professional Fee Claims. The Professional Fee Account, and all funds held therein, shall be held in trust for the Professionals and shall be available only to satisfy Allowed Professional Fee Claims (to the extent unpaid), and any excess shall be released to the Litigation Trust in accordance with Section 2.9 of the Plan.

**Section 9.130. "Professional Fee Bar Date"** shall apply to Professional Fee Claims and means the first Business Day that is sixty (60) days after the Effective Date or such other date established by Final Order of the Bankruptcy Court.

**Section 9.131. "Professional Fee Claims"** means an Administrative Claim for reasonable compensation of a Professional for services rendered or expenses incurred in the Chapter 11 Case on or prior to the Effective Date. Province may seek the restructuring fee on or after the Effective Date with the request due by no later than the Professional Fee Bar Date.

**Section 9.132. “Proof of Claim”** means a Claim filed against the Debtor in this Chapter 11 Case.

**Section 9.133. “Province”** has the meaning ascribed to it in Section 1.9 of the Plan.

**Section 9.134. “Record Date”** means the record date for determining the entitlement to vote on the Plan, which date is October 31, 2026.

**Section 9.135. “Rejected Contract”** means an Executory Contract deemed rejected effective as of the Effective Date or such other date as may be agreed to by the parties to the Executory Contract or as ordered by the Bankruptcy Court.

**Section 9.136. “Rejection Claim”** means any Claim arising from a Rejected Contract, which is a General Unsecured Claim.

**Section 9.137. “Rejection Claims Bar Date”** means the deadline to file a Proof of Claim for damages under a Rejected Contract and such deadline is thirty (30) days after service of notice of the Effective Date in the event the Rejected Contract was rejected pursuant to the Plan.

**Section 9.138. “Released Parties”** has the meaning set forth in Section 6.9 of the Plan.

**Section 9.139. “Restricted Purpose”** has the meaning set forth in the DIP Credit Agreement.

**Section 9.140. “SAFE Interests”** means all Interests in the Debtor arising from or relating to a fully executed, duly funded Simple Agreement for Future Equity.

**Section 9.141. “Scanlon”** has the meaning ascribed to it in Section 1.1 of the Plan.

**Section 9.142. “Schedules**” means the schedules of assets and liabilities and the statement of financial affairs filed by the Debtor pursuant to § 521 of the Bankruptcy Code, as such schedules and statement have been or may be supplemented or amended from time to time.

**Section 9.143. “Second Interim DIP Order”** means the second order entered by the Bankruptcy Court, on September 18, 2026 [Docket No. 171], approving the Debtor’s entry into and performance under the DIP Facility on an interim basis.

**Section 9.144.** “**Secured Claim**” means a Claim that is secured by a Lien (which is valid, perfected, and enforceable under applicable law or by reason of a Final Order) on the property in which the Estate has an interest or that is subject to a set off under § 553 of the Bankruptcy Code, to the extent of the value of the collateral, as determined in accordance with § 506(a) of the Bankruptcy Code, or to the extent of the amount subject to setoff.

**Section 9.145.** “**Subchapter V Trustee”** means Jeffrey Schwendeman of RPA Advisors, LLC, the trustee appointed pursuant to 11 U.S.C. § 1183(a).

**Section 9.146. "Tripartite Agreement"** has the meaning set forth in section 1.1 of the Plan.

**Section 9.147. "Unclaimed Property"** means any Distributions that are returned to the Litigation Trustee as (i) undeliverable to a Creditor or (ii) unclaimed by a Creditor or Holder of an Interest.

**Section 9.148. "Unimpaired"** means a claim that is not "impaired" pursuant to section 1124 of the Bankruptcy Code.

**Section 9.149. "United States Trustee" or "U.S. Trustee"** means the United States Trustee appointed under Section 591 of title 28 of the United States Code to serve in the District of Delaware.

**Section 9.150. "Vested Causes of Action"** means the Causes of Action that will vest in the Litigation Trust on the Effective Date, including, but not limited to, Estate Causes of Action and Contributed Claims.

**Section 9.151. "Voting Deadline"** means December 9, 2026, at 4:00 p.m. (prevailing Eastern Time), or such other date and time as may be set by order of the Bankruptcy Court.

**Section 9.152. "Waterfall"** has the meaning set forth in Section 2.5.A of the Plan.

**Section 9.153. "$MOVE Token Launch"** means the initial creation, issuance, and distribution of the $MOVE Tokens by MVMT Labs, Inc. on December 9, 2024.

Dated: November 9, 2026

Respectfully submitted,

DEBTOR
MVMT Labs, Inc.

By: *<u>/s/ Michael Robinson</u>*
Name: Michael Robinson
Chief Restructuring Officer